Justina K. Sessions, SBN 270914
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2197
Facsimile: (415) 947-2099
Email: jsessions@wsgr.com

Jonathan M. Jacobson, New York SBN 1350495
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7758
Facsimile: (212) 999-5899
Email: jjacobson@wsgr.com

*Attorneys for Defendants Google LLC,*
*Alphabet Inc., and YouTube, LLC*

# United States District Court
# Northern District of California
## San Jose Division

-------------------------------------------------------------x
                   :

IN RE GOOGLE DIGITAL ADVERTISING  :
ANTITRUST LITIGATION,            :     Case No.: 5:20-CV-08984-BLF
                   :
                   :     **NOTICE OF MOTION AND**
                   :     **MOTION TO DISMISS**
                   :     **CONSOLIDATED CLASS**
                   :     **ACTION COMPLAINT, AND**
                   :     **SUPPORTING MEMORANDUM**
                   :     **OF POINTS AND**
                   :     **AUTHORITIES**
                   :
                   :     Hearing Date:  October 14, 2021
                   :     Time:  9:00 a.m.
                   :     Place:  Courtroom 3
                   :     Judge:  Hon. Beth Labson Freeman
-------------------------------------------------------------x

## NOTICE OF MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

      PLEASE TAKE NOTICE that on October 14, 2021, at 9:00 a.m., or as soon thereafter as this matter may be heard, either in Courtroom 3 of this Court, located at 280 South 1st Street, San Jose, California, or by videoconference or teleconference (if the Court prefers), Defendants Google LLC, Alphabet Inc., and YouTube, LLC will and hereby do move the Court for an order dismissing Plaintiffs' Consolidated Class Action Complaint.

      This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiffs fail to plausibly plead a facially sustainable relevant market, monopoly power, or any anticompetitive conduct by Defendants, each of which is fatal to Plaintiffs' Sherman Act and Unfair Competition Law claims.

      The Motion is based upon this Notice; the accompanying Memorandum of Points and Authorities; any reply memorandum; the pleadings and files in this action; and such other matters as may be presented at or before the hearing.

Dated: June 4, 2021                    Respectfully submitted,

                            WILSON SONSINI GOODRICH & ROSATI
                            Professional Corporation

                            */s/ Justina K. Sessions*
                            Justina K. Sessions, SBN 270914
                            WILSON SONSINI GOODRICH & ROSATI
                            Professional Corporation
                            One Market Plaza
                            Spear Tower, Suite 3300
                            San Francisco, California 94105
                            Telephone: (415) 947-2197
                            Facsimile: (415) 947-2099
                            Email: jsessions@wsgr.com

                            *Attorneys for Defendants Google LLC,*
                            *Alphabet Inc., and YouTube, LLC*

1

## <u>TABLE OF CONTENTS</u>

2

TABLE OF AUTHORITIES ....................................................................................... ii

ABBREVIATIONS AND CONVENTIONS ................................................................ v

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 3

I.      PLAINTIFFS HAVE NOT ALLEGED A PLAUSIBLE RELEVANT MARKET ........... 3

        A.    Plaintiffs implausibly exclude services for Facebook, Amazon, and other display ad sites ............................................................................................ 3

        B.    Plaintiffs' allegations suggest that the "market" here is two-sided ........................ 6

II.    NO MONOPOLY POWER IN AD EXCHANGES OR NETWORKS ............................ 8

III.   NO EXCLUSIONARY CONDUCT ................................................................... 8

IV.   NO ACTIONABLE UCL CLAIM .................................................................... 17

CONCLUSION ......................................................................................................... 18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                    **Page(s)**

3

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
4    592 F.3d 991 (9th Cir. 2010)..................................................................................10

5

*Apple iPod iTunes Antitrust Litig.*,
     No. C 05-00037 JW, 2009 WL 10678940 (N.D. Cal. Oct. 30, 2009).......................................14

6

*Ashcroft v. Iqbal*,
7    556 U.S. 662 (2009) ......................................................................................5, 9

8

*Bayou Bottling, Inc. v. Dr Pepper Co.*,
9    725 F.2d 300 (5th Cir. 1984)................................................................................11

10

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
     65 F.3d 1406 (7th Cir. 1995) ................................................................................8

11

*California v. Sutter Health Sys.*,
12   84 F. Supp. 2d 1057 (N.D. Cal. 2000), *aff'd mem.*, 217 F.3d 846 (9th Cir. 2000) ....................4

13

*Cascade Health Solutions v. PeaceHealth*,
14   515 F.3d 883 (9th Cir. 2008)................................................................................14

15

*Chavez v. Whirlpool Corp.*,
     93 Cal. App. 4th 363 (2001) ................................................................................17

16

*Christy Sports, LLC v. Deer Valley Resort Co.*,
17   555 F.3d 1188 (10th Cir. 2009)............................................................................ 10-11

18

*City of Groton v. Connecticut Light & Power Co.*,
19   662 F.2d 921 (2d Cir. 1981) ................................................................................16

*City of San Jose v. Comm'r of Baseball*,
20   776 F.3d 686 (9th Cir. 2015).................................................................................3

21

*Continental Airlines, Inc. v. United Airlines*,
22   277 F.3d 499 (4th Cir. 2002)................................................................................15

23

*Dreamstime.com LLC v. Google LLC*,
     No. C 18-01910 WHA, 2019 WL 341579 (N.D. Cal. Jan. 28, 2019)..................................15, 16

24

*Feitelson v. Google Inc.*,
25   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................................2, 17

26

*FTC v. Qualcomm Inc.*,
27   969 F.3d 974 (9th Cir. 2020)........................................................................7, 8, 13, 16

28

ii

*HDC Med. v. Minntech Corp.*,
    474 F.3d 543 (8th Cir. 2007)........................................................................................15

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018)....................................................................................5, 7

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997)........................................................................................8

*In re Google Digital Advertising Litig.*,
    No. 20-cv-03556-BLF, ECF No. 143 (N.D. Cal. May 13, 2021) ....................... *passim*

*It's My Party, Inc. v. Live Nation*,
    811 F.3d 676 (4th Cir. 2016)........................................................................................14

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008)............................................................................11, 17

*Northern Pacific R. Co. v. United States*,
    356 U.S. 1 (1958) ........................................................................................................13

*Novation Ventures, LLC v. J.G. Wentworth Co.*,
    711 F. App'x 402 (9th Cir. 2017)................................................................................17

*Ohio v. American Express*,
    138 S. Ct. 2274 (2018) ...........................................................................................2, 6-8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ...........................................................................................11-12, 16

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)...........................................................................................8

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)......................................................................................8-9

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020), *dismissed with prejudice*, No. 20-cv-
    00363-BLF (N.D. Cal. Apr. 26, 2021), ECF No. 71 ....................................................9

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013)..........................................................................................7

*United States v. Archer-Daniels-Midland Co.*,
    781 F. Supp. 1400 (S.D. Iowa 1991)..............................................................................5

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974) .......................................................................................................9

iii

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ...........................................................................................7

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................................................ *passim*

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ......................................................................................9

**Statutes**

California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798.198(a) (2018) .........................16

Clayton Act § 4B, 15 U.S.C. § 15b ........................................................................................10

EU General Data Protection Regulation: Regulation (EU) 2016/679 ..........................................16

Sherman Act § 1, 15 U.S.C. § 1 ...............................................................................................2

Sherman Act § 2, 15 U.S.C. § 2 .................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ................................................................................................ *passim*

ABA Section of Antitrust Law, Antitrust Law Developments (8th ed. 2017) ....................4

U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010) ...................................9

**ABBREVIATIONS AND CONVENTIONS**

- All emphases are added.

- Citations to internal quotations are omitted except where provided otherwise.

- Order Granting Motion to Dismiss with Leave to Amend, *In re Google Digital Advertising Litig.*, No. 20-cv-03556-BLF, ECF No. 143 (N.D. Cal. May 13, 2021) is referred to as "*Advertiser Op.*"

1

## MEMORANDUM OF POINTS & AUTHORITIES

2

### INTRODUCTION

3       The vast and growing amount of original content on the Internet is generally free to users,

4   largely because of the financial support of digital advertising.  Over the past dozen years, digital

5   display advertisers have seen their returns on investment increase substantially; publisher websites

6   have flourished through their increasing ability to monetize their pages' real estate; and users have

7   seen increasing and valued content for free.  Google's display advertising technology has helped

8   advertisers reach consumers interested in their products, and helped publishers sell more and more

9   advertising space in increasingly sophisticated ways.  And the innovation continues, increasing the

10  returns for publishers and advertisers, while enabling users to continue to access the content they

11  want for free.

12      This history of strong and increasing benefits to all is now the backdrop for antitrust suits

13  brought by advertisers, publishers, and various others.  The first of the ad tech cases was filed in

14  May 2020, and more (19 to be precise) quickly followed.  On April 30, 2021, Google petitioned

15  the Judicial Panel on Multidistrict Litigation for centralization of all the "ad tech" cases in this

16  Court, *In re Digital Advertising Antitrust Litig.*, MDL No. 3010, and that petition remains pending.

17  The case at hand is a consolidation of six cases brought by publishers: *Sweepstakes Today* (5:20-

18  cv-08984-BLF), *Genius Media et al.* (5:20-cv-09092-BLF), *Sterling International* (5:20-cv-

19  09321-BLF), *Astarita* (5:21-cv-00022-BLF), *Mikula Web Solutions* (5:21-cv-00810-BLF),

20  and *JLaSalle Enterprises* (5:21-cv-00748-BLF).

21      The allegations in the now consolidated Publisher Complaint attack almost every aspect of

22  Google's advertising technology developments, from long-ago acquisitions, to charging a fee for

23  conducting an auction, to offering related products under a single user interface to simplify the

24  process of placing or receiving a digital ad.  The Complaint has three counts.  Count 1 is for

25  monopolization of three putative ad tech markets under Sherman Act § 2.  Count 2 is for attempted

26  monopolization of the same markets, also under § 2.  Count 3 is for the same antitrust claims under

27  California's unfair competition law.  There is no claim under Sherman Act § 1.  Taking all of the

28

Complaint's non-conclusory allegations as true, and allowing for all reasonable inferences to be drawn in Plaintiffs' favor, the Complaint fails to allege any kind of antitrust violation.

First, each of Plaintiffs' three purported relevant markets, "publisher Ad Servers, Ad Exchanges, and Ad Networks" (Compl. ¶ 158), fails for the reasons this Court explained just last month in the *Advertiser* case, specifically the refusal to acknowledge the competitive constraints on ad tech pricing imposed by social media and other directly-served websites. *Advertiser Op.*, at 5-6. Plaintiffs also consistently ignore the implications of one of the most critical aspects of advertising technology: the need to ensure that advertisers do not pay too much while publishers do not receive too little. Plaintiffs allege each putative market as a distinct *one-sided* market. Yet digital display advertising requires advertisers and publishers to engage at the identical moment in time, and no transaction can be completed unless both do so. Plaintiffs' allegations thus suggest that digital ad tech is a *two-sided transaction market* as a matter of law under *Ohio v. American Express*, 138 S. Ct. 2274 (2018) ("*Amex*"). Plaintiffs plead no facts to suggest the contrary. In fact, their Complaint does not address two-sidedness at all.

Second, Plaintiffs' monopoly power allegations are insufficient. The failure to allege a valid relevant market defeats all the claims that Google has monopoly power or a dangerous probability of achieving it. Moreover, even if the market allegations were accepted, the allegations that Google has monopoly power in ad networks or ad exchanges are legally insufficient; the "approximately 50%" share Plaintiffs allege Google has in these two "markets," Compl. ¶ 172, is well below the level necessary to infer monopoly power.

Third, Plaintiffs have not alleged exclusionary conduct. Any challenge to the acquisitions they mention is time-barred; offering a combination of two products available separately is not tying; enacting rules to ensure fair treatment of both sides of the transaction is not exclusionary; and favoring one's own products on one's own platform – were that even true – is competition, not an antitrust violation. *See Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, *LLP*, 540 U.S. 398, 407-08 (2004); *Advertiser Op.*, at 7-9.

Fourth, as in *Feitelson v. Google*, "Plaintiffs' UCL claim based on 'unfair' competition rises and falls with their Sherman Act claims." 80 F. Supp. 3d 1019, 1034 (N.D. Cal. 2015). The

failure of the Sherman Act claims therefore dooms Plaintiffs' UCL claim as well.  *Accord Advertiser Op.*, at 10; *City of San Jose v. Comm'r of Baseball*, 776 F.3d 686, 691-92 (9th Cir. 2015).

Pleading a valid relevant market, monopoly power (or a dangerous probability of success) in that market, and facts sufficient to show exclusionary conduct are all essential elements of Plaintiffs' claims.  *Trinko*, 540 U.S at 407-08.  Plaintiffs' failure adequately to plead these elements warrants dismissal of the case in its entirety.

## ARGUMENT

## I.   PLAINTIFFS HAVE NOT ALLEGED A PLAUSIBLE RELEVANT MARKET

The Complaint asserts three relevant markets for services provided to publishers – Ad Servers, Ad Exchanges, and Ad Networks.  Compl. ¶ 158.  It alleges each as a one-sided market, *id.* ¶¶ 160-68, and it excludes substitution from direct placement and what it calls "owned-and-operated" sites such as Facebook and Amazon, *id.* ¶ 169.  These are both fatal flaws, and each independently warrants dismissal under Rule 12(b)(6).

### A.   Plaintiffs implausibly exclude services for Facebook, Amazon, and other display ad sites

To anyone with a computer, tablet, or phone, it is readily apparent that there is extensive display advertising on Facebook and other owned-and-operated "social" sites, on Amazon and other owned-and-operated "shopping" sites, and on other sites that contract with advertisers directly.  Compl. ¶¶ 165, 169.  Plaintiffs exclude services for advertising on all these sites from their proposed relevant markets because, if they do not, any claim of actual or attempted monopoly falls apart immediately.  As in the *Advertiser* case, the Publishers' Complaint provides no basis for ignoring these substitutes and should be dismissed accordingly.  *Advertiser Op.*, at 5-6.

***Social & Shopping Sites.***  Plaintiffs' entire argument about social and shopping sites is that advertisements placed on Facebook and Amazon reach only visitors to those websites.  Compl. ¶ 169.  Plaintiffs' argument is equally true of advertisements placed on Google's YouTube; yet Plaintiffs include YouTube (which is a part of the Google Display Network) in their alleged

1   market.  *See, e.g.*, *id*. ¶¶ 72, 165.  This inconsistent treatment of "walled" websites aside, Plaintiffs'

2   argument fails.

3        First, just like the Plaintiffs in the *Advertiser* case, the Publisher Plaintiffs ignore entirely

4   the importance of downstream competition.  As in the *Advertiser* case, an advertiser's decision to

5   place an ad, *e.g.*, on Facebook, necessarily reduces the need to place the ad on a Google-served

6   site, constraining any power Google might exercise (and thus warranting inclusion in the relevant

7   market).  Similarly here, with publishers, an advertiser's ability to go elsewhere forces ad tech

8   providers to keep their prices down to avoid publisher loss of business to the "walled gardens" and

9   others.  Facebook, Amazon, and the others constrain Google's ad tech prices to publishers because

10  higher ad tech fees to publishers will raise their costs and make ads on their sites more costly,

11  leading advertisers to go to these other sites (or apps) and elsewhere.  This is why one must look

12  at downstream conditions when defining the boundaries of the relevant market for the intermediate

13  services in issue.  *See California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1067 (N.D. Cal. 2000),

14  *aff'd mem.*, 217 F.3d 846 (9th Cir. 2000) (holding Kaiser in the acute inpatient care services market

15  even though its services are provided only to Kaiser members).  As a leading treatise explains: "In

16  the case of intermediate goods, examining only the demand substitutability of potentially

17  competing inputs to the exclusion of downstream market conditions can lead to an inaccurate

18  relevant product and geographic market definition."  ABA SECTION OF ANTITRUST LAW,

19  ANTITRUST LAW DEVELOPMENTS 620 (8th ed. 2017).  To the same effect, the federal agencies'

20  *Merger Guidelines* "explicitly call for taking into account downstream competition when defining

21  relevant markets."  *Id.* (citing U.S. DEP'T OF JUSTICE & FTC, HORIZONTAL MERGER GUIDELINES

22  § 4.1.3 (2010)).  Plaintiffs provide no basis for ignoring the constraints on ad tech services that

23  sites such as Facebook and Amazon provide, and their failure *even to address* downstream

24  conditions means their market allegations fail as a matter of law.

25        Second, the allegation that open and "walled" sites "are not reasonable substitutes for each

26  other and are not viewed as such by advertisers or publishers," Compl. ¶ 169, is entirely

27  conclusory.  Plaintiffs plead no *facts* to suggest that advertisers and publishers do not view the two

28

as substitutes.  This pleading of a conclusion supported by no facts will not do.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Direct sales.*  The exclusion of publishers' ability to sell ads directly fails for similar reasons.  Plaintiffs effectively concede substitution between direct and programmatic sales in Paragraph 109, where they argue that Google's Enhanced Dynamic Allocation (a feature in Google's ad server) has taken sales away from "publishers' direct sales channels and drive[n] more advertisers to programmatic channels."  But Plaintiffs seek to exclude this sales channel because an investment in personnel and some advertising technology is required to sell programmatic ads directly.  Compl. ¶ 165.  "As a result," they say, "the direct sales channel features only the highest-value publisher-advertiser transactions."  *Id.*  That is precisely why direct sales should be *included* in the market.  "The existence of large, powerful buyers of a product mitigates *against* the ability of sellers to raise prices."  *United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1415 (S.D. Iowa 1991).  Thus, the threatened loss of these "highest-value" transactions is just what would threaten ad tech providers the most, and thereby inhibit the exercise of any market power.  These transactions therefore must be included in any properly defined market.  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018).

*Advertiser Case Ruling.*  The Court addressed and found deficient the very similar allegations in the *Advertiser* case in its May 13 opinion:

> [T]he Court agrees with Defendants that "the alleged market for 'online display advertising services' on the 'open web' improperly excludes other ways for advertisers to reach publishers without using Google's services." The Court is particularly concerned that Plaintiffs' market excludes social-media display advertising and direct negotiations. Plaintiffs must allege additional facts that indicate that the categories excepted from the identified market are not economic substitutes to "[d]isplay advertising brokering services."

*Advertiser Op.*, at 6.  The Court's conclusion is equally applicable here.  The Publisher Plaintiffs have failed to allege facts that would warrant limiting the relevant market to indirect sales on the "open web."

### B.    Plaintiffs' allegations suggest that the "market" here is two-sided

Each of the three "markets" the Complaint alleges is defined as one-sided, focused on a hypothetical entity's ability to raise prices on just the publisher side.  Compl. ¶¶ 162, 164, 167.  But Plaintiffs also allege that "Google represents the interests of two sides of the Ad Tech Stack that conflict; advertisers want to pay as little as possible, whereas publishers want to maximize their revenues."  *Id.* ¶ 204.  Despite this and similar acknowledgements of the two sides, however, there is *nothing at all* in the Complaint to address the implications of this admitted two-sidedness for market definition.  This failure even to address the two-sided nature of digital display ads warrants dismissal.

The allegations in Plaintiffs' Complaint describe a two-sided *transaction* market under *Amex*.  "Two-sided transaction platforms facilitate a single, simultaneous transaction between participants."  *Amex*, 138 S. Ct. at 2286.  Every digital display ad transaction requires the simultaneous participation of an advertiser (wanting its ad to be displayed) and a website or "publisher" (wanting payment for the use of its digital real estate).  *See* Compl. ¶ 46 ("Today, the Ad Tech Stack facilitates the automated selling and buying of digital ad inventory on a large scale in real time"); *see also id.* ¶¶ 5, 54.

According to Plaintiffs, moreover, the value to each side increases with the number of participants on the other.  Indeed, Paragraph 75 of the Complaint says that, "as the number of publishers offering impressions on Google's Ad Exchange has grown, increasing the inventory of impressions available on that Exchange, more advertisers are encouraged to use Google's Ad Exchange. Each additional advertiser increases the importance of Google's Ad Exchange to all publishers using it. Likewise, each additional publisher increases the importance of Google's Ad Exchange to all advertisers using it."  *See also id.* ¶ 74 ("as the number of users on one side of the platform increases, . . . access to the platform becomes necessary to users on the other side of the platform").  Paragraph 76 adds: "These same indirect network effects are present in the Ad Network market as well. As greater numbers of advertisers purchase through an Ad Network, the more publishers are pushed to use that Ad Network. Similarly, as the number of publishers selling inventory through an Ad Network increases (which increases the inventory of impressions), the

1   more advertisers need to purchase inventory through that Ad Network (because it enhances their

2   ability to reach audiences)."

3      As mentioned, Plaintiffs also have made clear that, in any given digital display ad

4   transaction, publishers and advertisers have conflicting interests.  Publishers want to get as much

5   as possible and advertisers want to pay as little as possible.  *See* Compl. ¶ 204; *see* Lead Counsel

6   Mot. of Boies Schiller et al. at 2, *In re Google Digital Advertising Antitrust Litig.*, No. 20-cv-

7   03556-BLF (N.D. Cal. Feb. 25, 2021), ECF No. 101 ("publishers and advertisers square off at

8   opposite ends of a buy-sell transaction, a transaction in which publishers push for higher prices

9   and advertisers seek to pay less").

10      Plaintiffs thus allege the precise indirect network effects that *Amex* holds preclude claims

11   based on harm to just one side.  *Amex*, 138 S. Ct. at 2280-82 ("Indirect network effects exist where

12   the value of the two-sided platform to one group of participants depends on how many members

13   of a different group participate. . . . In other words, the value of the services that a two-sided

14   platform provides increases as the number of participants on both sides of the platform

15   increases.").  Under *Amex*, if a market is in fact a two-sided transaction market, allegations of one-

16   sided markets instead are insufficient as a matter of law.  *Id*. at 2287-88; *US Airways, Inc. v. Sabre

17   Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("In cases involving two-sided transaction

18   platforms, the relevant market must, as a matter of law, include both sides of the platform.").

19      Stating a claim under Sherman Act § 2 requires a plaintiff to allege a plausible relevant

20   market.  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *Hicks*, 897 F.3d at 1120-21;

21   *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).  Here, as just discussed, Plaintiffs'

22   allegations describe a market that appears to be a two-sided transaction market as a matter of law

23   under *Amex*.  138 S. Ct. at 2276-78.  But the Complaint conspicuously ignores even addressing the

24   point.  And this suggests that Plaintiffs have committed the exact same error as the plaintiffs in

25   *Amex*: defining the relevant markets to include only one side, where the facts require them to

26   "include both sides of the platform when defining the market."  138 S. Ct. at 2286.  Plaintiffs'

27   attempt to define what their allegations suggest is a two-sided transaction market as a series of

28   distinct one-sided markets means that the markets alleged are, for that reason alone, implausible

7

1   and insufficient.  *Amex*, 138 S. Ct. at 2287 ("[i]n two-sided transaction markets, only one market

2   should be defined.").

3                                          *    *    *

4        Plaintiffs have failed to meet their burden of pleading a plausible relevant market.  As that

5   is an essential element of each of Plaintiffs' claims, the Complaint should be dismissed in its

6   entirety.

7   **II.      NO MONOPOLY POWER IN AD EXCHANGES OR NETWORKS**

8        Plaintiffs assert claims both for maintaining a monopoly (Count 1) and for attempted

9   monopolization (Count 2) under Sherman Act § 2.  Monopolization claims require allegations of

10  monopoly power in the relevant market.  *Trinko*, 540 U.S. at 407-08.  The monopoly power

11  allegations here fail to launch because Plaintiffs do not allege a viable relevant market as just

12  discussed.  But even if the markets were sufficiently alleged, the Ad Exchange and Ad Network

13  monopoly power allegations both fail as a matter of law.

14       Plaintiffs claim that Google has a share of the claimed "publisher Ad Server" market in

15  excess of 70%, Compl. ¶ 170, but for both Ad Exchanges and Ad Networks, it asserts just

16  "approximately 50%," *id.* ¶ 172.  While pleading 70% arguably reaches past the minimum for a

17  monopoly share, *see Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir.

18  1997) (65%); *but cf. PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) (64% not

19  enough), the 50% claimed here clearly does not.  *Blue Cross & Blue Shield United v. Marshfield*

20  *Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) ("Fifty percent is below any accepted benchmark for

21  inferring monopoly power from market share.") (Posner, J.); *see Rebel Oil Co., Inc. v. Atlantic*

22  *Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995).  The Count 1 claims for actual monopolization

23  of Ad Servers and Ad Exchanges should be dismissed accordingly.

24  **III.     NO EXCLUSIONARY CONDUCT**

25       In addition to alleging facts to establish a relevant market and the defendant's monopoly

26  power, a monopolization plaintiff must also allege facts plausibly demonstrating conduct

27  qualifying as anticompetitive or exclusionary under the case law.  *Trinko*, 540 U.S. at 407-08;

28  *Qualcomm*, 969 F.3d at 990.  Plaintiffs fail on this essential element as well.

Plaintiffs describe their conduct allegations in Paragraph 78 of the Complaint and identify six types of conduct: (1) acquisitions, (2) imposing rules designed to ensure Google's Ad Exchange wins more, (3) "taxing" rival Ad Exchanges through Google's Open Bidding process, (4) tying of Google's Ad Servers to its Ad Network, (5) excluding and impairing rival Ad Networks from competing for impressions, and (6) using rate structures that raise rivals' costs.  Google addresses these claims in order below, and then explains why considering them as a whole does not affect the outcome.

*Acquisitions.*   Plaintiffs claim to be challenging numerous Google acquisitions, but specifically refer only to DoubleClick, AdMob, and AdMeld.   Compl. ¶¶ 80-87.   Those acquisitions all took place well before the four-year period preceding the Complaint.  *See* 15 U.S.C. § 15b (four-year limitations period).  Any claim based on them is therefore time-barred, and cannot be saved by the continuing violation theory because that theory does not apply to consummated acquisitions such as these.  *See Advertiser Op.*, at 8; *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 994 (N.D. Cal. 2020), *dismissed with prejudice*, No. 20-cv-00363-BLF (N.D. Cal. Apr. 26, 2021), ECF No. 71; *see also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014).

Plaintiffs allege no facts to suggest (and do not appear to contend) fraudulent concealment of these publicly-disclosed acquisitions.  Nor is there anything in the Complaint to suggest any kind of other exception to the limitations bar.

Even if limitations did not preclude the claim, the acquisition allegations are entirely conclusory.  Plaintiffs do not address many of the most basic inquiries universally made in anti-merger litigation, such as the relevant markets affected by the acquisitions, the parties' market shares, the other competitors supplying these products, the effect if any of the transaction on market concentration, or the efficiencies the acquisitions created.  *E.g.*, *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974); U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010).  Plaintiffs' acquisition allegations fail to help their monopolization claims.  *Iqbal*, 556 U.S. at 578.

***Ensuring Ad Exchange wins more bids.***  Plaintiffs complain that Google's auction formats give Google's Ad Exchange an advantage over other exchanges.  There is no allegation here of fraud and no allegation that advertisers or publishers are prevented from bypassing Google entirely and simply using non-Google exchanges.  Even accepting all of the allegations as true (though they are not), Plaintiffs' self-preferencing claim fails as a matter of law.

The Supreme Court's decision in *Trinko* makes clear that preferring one's own offerings on one's own system does not violate the law.  540 U.S. at 407-08 ("Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.").  Thus, in *Trinko*, the Court held that it did not violate § 2 for Verizon to favor itself by denying access to its local telephone lines to would-be rivals.  In *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc*., 555 U.S. 438 (2009), the Court held similarly that a price squeeze – an especially strong form of self-favoring – did not violate § 2 absent allegations of below-cost pricing.  And in the *Advertiser* case, this Court rejected similar claims as effectively raising a "duty to deal" argument inconsistent with *Trinko*, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010), and other cases.  *Advertiser Op.*, at 8.

Plaintiffs are saying, in essence, that Google should not be allowed to do what it takes to win a given auction.  *See, e.g.*, Compl. ¶ 104 (complaining that "last look" "allowed Google the opportunity to outbid other ad sources on every impression"); *see generally id.* ¶¶ 100-09, 113.  But this notion that a firm should take steps to pull its punches so as not to favor itself is no different from telling a firm to stop competing.  That is why the courts have consistently rejected similar claims.  In *Christy Sports, LLC v. Deer Valley Resort Co*., 555 F.3d 1188 (10th Cir. 2009), for example, the plaintiff had long operated the ski shop at Deer Valley, but the defendant (DVRC) elected to evict the plaintiff and operate the ski shop itself.  The court assumed monopoly power but rejected the claim, saying: "The Sherman Act does not force DVRC to assist a competitor in

1   eating away its own customer base, especially when that competitor is offering DVRC nothing in

2   return." *Id.* at 1197.

3       Similarly, in *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008),

4   MySpace previously had links to other social media websites on its site, including the plaintiff's,

5   but stopped linking to them.  The court found that MySpace had no obligation to continue to link

6   to other sites and that there was no antitrust harm shown.  And in *Bayou Bottling, Inc. v. Dr Pepper*

7   *Co.*, 725 F.2d 300 (5th Cir. 1984), the local Pepsi bottler complained because the local Coke bottler

8   (an alleged 80% share monopolist) would not allow Pepsi in vending machines or coolers that the

9   Coke bottler supplied or serviced.  The court said: "Without anything more, these practices are not

10  barred by the antitrust laws. They are competitive acts. It ought to be apparent that 'a monopolist's

11  right to compete is not limited to actions undertaken with an altruistic purpose. Even monopolists

12  must be allowed to do as well as they can with their business.'" *Id.* at 304 (citation omitted).  The

13  same is true here.  If the antitrust laws would permit Google to exclude other exchanges entirely

14  from bidding in its auctions, which they do, surely they cannot prohibit Google from allowing

15  them in and competing with them.  *See linkLine*, 555 U.S. at 449-51.

16      Plaintiffs' allegations, moreover, do not suggest that Google's alleged "favoring" had any

17  adverse effect on publishers; in fact, the allegations indicate that publishers benefited.   For

18  example, in discussing "header bidding" and Google's "last look," Paragraph 113 of the Complaint

19  says: "By retaining a last look, Google's Ad Exchange must only beat the header bidding

20  [auction's] clearing price. Even though a header bidding advertiser would be willing to pay more

21  than its winning bid, Google's last look results in a lower sale price because Google's winning

22  bidder and the header bidding winner did not have to determine which would bid the highest in an

23  auction between them."

24      But as this allegation makes clear, Google's winning bidder is paying *more* than the header

25  bidding auction winner's bid.  That means the publisher gets more money with Google bidding

26  against the header bidding winner, not less.  Perhaps, as Plaintiffs allege, the header bidding winner

27  "would be willing to pay more," but even so the publisher would not receive what the header

28  bidder is "willing to pay" – only what it actually bid.  And the allegations make clear that Google

1   advertisers won only when they bid more than header bidders, causing publishers to receive *more*

2   from Google's advertiser-bidders than they would have received from header bidders.  If Google's

3   Ad Exchange did not participate in the auction, then the publisher would have received the lower

4   bid submitted through header bidding.  Thus, adding a later auction can only benefit publishers.  If

5   the later auction winner bids more, the publisher gains; if the bids are lower, the publisher still gets

6   the benefit of the header bidding auction.

7         Plaintiffs' true complaint appears to be that Google does not participate in header bidding.

8   *See* Compl. ¶ 113 (complaining that Google "bid the lowest amount needed to beat the header

9   bidding auction clearing price, rather than competing directly with the header bidding auction

10   participants.").  Plaintiffs speculate that bid prices within a header-bidding auction would be higher

11   if Google participated in those auctions rather than having to beat the winning header-bidding

12   price.  But the antitrust laws do not require Google to deal with its rivals by participating in header

13   bidding.   "The Sherman Act does not restrict the long-recognized right of [a] trader or

14   manufacturer engaged in an entirely private business, freely to exercise his own independent

15   discretion as to parties with whom he will deal."  *Trinko*, 540 U.S. at 408; *see also Advertiser Op.*,

16   at 8; *linkLine*, 555 U.S. at 448 ("As a general rule, businesses are free to choose the parties with

17   whom they will deal, as well as the prices, terms, and conditions of that dealing.").   Thus,

18   Plaintiffs' allegation about Google's lack of participation in header bidding or other types of

19   auctions does not state an antitrust claim.  *See also Trinko*, 540 U.S. at 415-16 (Sherman Act "does

20   not give judges carte blanche to insist that a monopolist alter its way of doing business whenever

21   some other approach might yield greater competition.").

22         ***"Taxing" rival ad exchanges.***  According to the Complaint, Google introduced "Exchange

23   Bidding" to compete with header bidding.  Compl. ¶ 117.  Under that system, as described in the

24   Complaint, Google allegedly conducts a series of auctions within its system and then pits the

25   winning bid against bids from other exchanges.  *Id.* ¶¶ 118-19.  The complaint is that "[i]n that

26   final auction, however, if the winning bidder of the Exchange Bidding auction uses a non-Google

27   Ad Exchange, Google imposes an explicit 5–15% surcharge or tax on the winning bid."  *Id.* ¶ 119.

28   Plaintiffs also complain, on the same basis, that Google charges an "audience fee" for use of its

12

1   services when the winning bid is from a non-Google network or exchange.  *Id.* ¶ 141.  In other

2   words, if another network or exchange participates in a Google auction and wins, Google charges

3   a fee.  This is not remotely anticompetitive; the law does not require firms to give away their

4   products for free.  *E.g.*, *Qualcomm*, 969 F.3d at 998-1001.

5          Plaintiffs' theory is that, if a rival exchange chooses to participate in an Exchange Bidding

6   auction, it is at a cost disadvantage versus Google because it must incur the 5-15% fee.  The

7   audience fee argument is essentially the same.  Compl. ¶¶ 120, 141.  The Ninth Circuit rejected an

8   equivalent argument in *Qualcomm*.  There, the argument was that rival modem chip suppliers were

9   harmed because customers had to pay Qualcomm a royalty for its intellectual property when

10  buying rival chips but, when buying from Qualcomm, the royalty payment allowed Qualcomm to

11  offer low prices for the chips.  969 F.3d at 998.  Rivals claimed to be disadvantaged because

12  Qualcomm's patent royalties gave it a cost advantage over other modem chip sellers, *id.*, an

13  argument no different from Plaintiffs' argument here that the fee for Ad Exchange participation

14  impairs rivals' ability to win auctions by raising their costs.  The Ninth Circuit concluded that the

15  argument is inconsistent with the Supreme Court's holding in *linkLine*:  "the FTC suggests that

16  Qualcomm's royalty rates impose an anticompetitive surcharge on its rivals' sales . . . because

17  Qualcomm uses its licensing royalties to charge anticompetitive, ultralow prices on its own modem

18  chips—pushing out rivals by squeezing their profit margins and preventing them from making

19  necessary investments in research and development.  But this type of 'margin squeeze' was

20  rejected as a basis for antitrust liability in *Linkline*."  969 F.3d at 1000-01.  Qualcomm was entitled

21  to charge for its intellectual property, and Google is equally entitled to charge for the use of its

22  technology.

23          ***"Tying" ad servers to ad network.***  Plaintiffs' next argument is that Google tied the use of

24  its ad servers to its ad network.  Compl. ¶¶ 123-36.  They say:  "Google further responded to

25  competition from header bidding by locking critical Ad Exchange functionality into its publisher

26  Ad Server and ultimately marketing and selling both products under a single product name, Google

27  Ad Manager."  *Id.* ¶ 123.  The argument fails from the outset because Plaintiffs do not allege that

28  the products are unavailable separately within Ad Manager, which is an essential element of any

13

tying claim.  *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 n.4 (1958) ("Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."); *Apple iPod iTunes Antitrust Litig*., No. C 05-00037 JW, 2009 WL 10678940, at *5 (N.D. Cal. Oct. 30, 2009) ("if the buyer is free to take either product by itself, there is no tying").  Any suggestion of tying is at best conclusory.

Although Plaintiffs fail to allege any kind of express tie (*i.e.*, "you must use my ad server if you also use my ad network"), they appear to contend that the coercion necessary to plead a tying claim can be the product of economic imperative as well as express contractual language.  *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 914-15 (9th Cir. 2008).  But Plaintiffs here have alleged no facts to support such a theory.  They have alleged only that Google combined the products in a single package.  That does not save the claim.  *See It's My Party, Inc. v. Live Nation*, 811 F.3d 676, 684-85 (4th Cir. 2016) ("[Plaintiff] argues that tying occurs any time a seller who has market power over product A offers it for sale together with product B. But merely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive.").

Plaintiffs also assert that "[i]n order to reach a significant portion of Google's large stable of advertisers, publishers have no realistic alternative but to place their impressions on the Google Ad Exchange."  Compl. ¶ 124.  That is not a tie.  To reach the advertisers that have chosen to bid through Google, publishers must of course use Google's services.  Nothing inhibits Plaintiffs from using other services to reach advertisers that have chosen to bid elsewhere.  That Google has accumulated a "large stable of advertisers" is competition, not exclusion.  *Dreamstime.com, LLC v. Google LLC*, No. C 18-01910 WHA, 2019 WL 341579, at *8 (N.D. Cal. Jan. 28, 2019) (not exclusionary for "a monopolist [to] utiliz[e] its competitive advantage").

**_Excluding ad networks from competing._**  Plaintiffs claim that Google inhibits rival ad networks by "policing malicious code."  Compl. ¶ 138.

The argument has no basis.  Plaintiffs assert that Google's publisher ad server excluded other networks from competing where Google found that the ad network's submission contained malware or other undesirable code.  *Id.*  Of course, Google did – and continues to do so.  Plaintiffs

cannot argue that protecting user safety is anticompetitive.  *See HDC Med. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007) (design change designed to protect patient safety upheld); *Continental Airlines, Inc. v. United Airlines*, 277 F.3d 499, 514 (4th Cir. 2002) (safety concerns recognized as a justification for carry-on baggage restrictions).  Plaintiffs call this a "false pretext," Compl. ¶ 138, but allege no facts to suggest even the slightest falsity and provide not a single example of Google flagging code that was not in fact malicious.  Ensuring the stability of its ad network cannot reasonably be attacked as an antitrust violation.

Although Google need not and is not relying on the point, Plaintiffs cannot dispute that bad code can impair the workings of an auction and, if bad enough, can cause the entire system to experience serious delays.  It is equally undeniable that malware can infect users' computers, driving them away from publishers' websites and the advertising that helps support them. This has been and continues to be a major concern as numerous commentators (albeit outside the four corners of this Complaint) have pointed out.  *See* Trend Micro, *Malvertising: When Online Ads Attack* (March 19, 2015), at https://bit.ly/2QIdwNl; Jennifer Schlesinger, *Beware of malicious ads that can harm computers without a click* (May 20, 2014), at https://cnb.cx/3gUG2WB; Imperva, *What is maladvertising?*, at https://bit.ly/3gSUiPE.

**Increasing rivals' costs.**  Plaintiffs assert that Google no longer provides the same data about users that it did previously, and that it now insists on providing separate user identifiers for advertisers and publishers.  They argue that "transactional data involving users is key to the online marketplace. Knowing what ads users have been shown, what ads they have ignored, what ads they have read, and what ads have actually led to a purchase provides significant information that makes a given impression more valuable to a wider range of advertisers."  Compl. ¶ 152.  They say that Google has "limited the post-transactional information available to publishers," *id.* ¶ 157, and claim this is problematic: "Limiting the transactional information available to rival intermediaries raises their costs because user information is one of the most valuable inputs the intermediary can offer a publisher. If rival Ad Networks and Ad Exchanges are limited in the user information they can obtain from transactions, they will have to purchase user information elsewhere."  *Id.* ¶ 153.

These allegations do not state a claim.  Plaintiffs cite no duty to provide competitors with any data Google is alleged to collect and *Trinko* and *Qualcomm* make clear there is no such duty.  *See Advertiser Op.*, at 8; *Dreamstime.com*, 2019 WL 341579, at 8 ("Although the data collection likely gives Google an advantage in the online search advertising market over its rivals, a monopolist utilizing its competitive advantage does not equate to anticompetitive conduct.").  Importantly, moreover, Plaintiffs fail to consider the impact of the General Data Protection Regulation and the California Consumer Privacy Act.  California Consumer Privacy Act of 2018 ("CCPA"), Cal. Civ. Code § 1798.198(a) (2018);   EU General Data Protection Regulation ("GDPR"): Regulation (EU) 2016/679.  Plaintiffs offer no facts to suggest that Google's actions were not good faith efforts to comply with these and other consumer protection and privacy laws.  *Cf.* Google Privacy Blogs, at https://bit.ly/3bwR6Wy and https://bit.ly/3eTllc7.

Given the absence of any antitrust duty to provide additional user data, and the serious privacy implications if it did so, Plaintiffs' data sharing and raising-rivals-costs arguments should be rejected entirely.

**Combined effect.**  Plaintiffs can be expected to argue in opposition that, even if their various claims fail individually, they can succeed by arguing that the combined effect of the challenged conduct is to enhance or protect monopoly power.  That argument is meritless too, as the courts have consistently "reject[ed] the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act."  *City of Groton v. Connecticut Light & Power Co*., 662 F.2d 921, 928-29 (2d Cir. 1981).  In *linkLine*, for example, the Supreme Court said that the plaintiffs there could not "join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability . . . . Two wrong claims do not make one that is right."  555 U.S. at 457; *accord, e.g.*, *Advertiser Op.*, at 7; *Dreamstime.com*, 2019 WL 341579, at *7-8 ("Taking the synergistic effect of the alleged predatory acts together as an overall scheme, this maintenance theory still does not succeed as a Section 2 monopolization claim as 'there can be no synergistic result' if none of the acts alleged is an antitrust violation.") (quoting *Cal. Computer Prods., Inc. v. IBM*, 613 F.2d 727, 736 (9th Cir. 1979)).

1

* * *

2     Plaintiffs must allege facts that plausibly show exclusionary conduct and have failed to do

3 so.  Even if their faulty market definitions were sustained, therefore, the Complaint should be

4 dismissed in its entirety.

5 **IV.     NO ACTIONABLE UCL CLAIM**

6     The failure of the Sherman Act claims requires dismissal of the UCL claim as well.  *E.g.*,

7 *Advertiser Op.*, at 10; *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1034 (N.D. Cal. 2015)

8 (holding that the UCL claim based on unfair competition "rises and falls" with the Sherman Act

9 claims); *see Novation Ventures, LLC v. J.G. Wentworth Co.*, 711 F. App'x 402, 405 (9th Cir. 2017)

10 ("[A]ny claimed unlawfulness [or] unfairness . . . was based entirely on the alleged federal antitrust

11 . . . wrongdoing."); *LiveUniverse, Inc.*, 304 F. App'x at 557 ("Where . . . the same conduct is

12 alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim,

13 a finding that the conduct is not an antitrust violation precludes a finding of unfair competition.").

14     That Plaintiffs allege that Google acted not only unlawfully but also unfairly does not

15 change the result.  "If the same conduct is alleged to be both an antitrust violation and an 'unfair'

16 business act or practice for the same reason . . . the determination that the conduct is not an

17 unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' towards

18 consumers."  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).  Therefore, a

19 determination that the Complaint here fails to allege a Sherman Act claim disposes equally of the

20 claim under the UCL.

21

22

23

24

25

26

27

28

1

## **CONCLUSION**

2      The Complaint should be dismissed for failure to state a claim under Rule 12(b)(6).

3    Dated: June 4, 2021                    Respectfully submitted,

4                                           WILSON SONSINI GOODRICH & ROSATI
5                                           Professional Corporation

6                                           */s/ Justina K. Sessions*
                                            Justina K. Sessions, SBN 270914
7                                           WILSON SONSINI GOODRICH & ROSATI
                                            Professional Corporation
8                                           One Market Plaza
                                            Spear Tower, Suite 3300
9                                           San Francisco, California 94105
                                            Telephone: (415) 947-2197
10                                          Facsimile: (415) 947-2099
11                                          Email: jsessions@wsgr.com

12                                          Jonathan M. Jacobson, New York SBN 1350495
                                            WILSON SONSINI GOODRICH & ROSATI
13                                          Professional Corporation
                                            1301 Avenue of the Americas, 40th Floor
14                                          New York, New York 10019
                                            Telephone: (212) 497-7758
15                                          Facsimile: (212) 999-5899
16                                          Email: jjacobson@wsgr.com

17                                          *Attorneys for Defendants Google LLC,*
                                            *Alphabet Inc., and YouTube, LLC*
18

19

20

21

22

23

24

25

26

27

28