## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re Google Digital Advertising Antitrust Litigation** | Case No. 1:21-md-3010 (PKC) |
| *This document relates to:*<br><br>**In re Google Digital Publisher Antitrust Litigation** | Case No. 1:21-cv-7034 (PKC) |

## MEMORANDUM OF LAW
## IN SUPPORT PUBLISHER CLASS PLAINTIFFS' MOTION FOR
## <u>COLLATERAL ESTOPPEL AND PARTIAL SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   ISSUES TO BE GIVEN PRECLUSIVE EFFECT .............................................. 3

III.  ARGUMENT ........................................................................................................ 6

    A.    The Requirements for Issue Preclusion are Satisfied. ............................. 6

        1.    The issues are the same. ............................................................... 6

            i.    Monopolization in violation of Section 2. ....................... 7

            ii.   Tying in violation of Sections 1 and 2. ......................... 12

            iii.  Publishers' slightly different framing of the same facts does not foreclose collateral estoppel. ..................................... 15

        2.    The issues were actually decided. ............................................. 17

        3.    Google had a full and fair opportunity to litigate the issues. ................... 18

        4.    Resolving the issues was necessary to support the EDVA Opinion. ........ 18

    B.    Applying Issue Preclusion Would Resolve Large Portions of Publishers' Claims and Significantly Streamline Trial. .......................................... 18

IV.   CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*GAF Corp. v. Eastman Kodak Co.*,
    519 F. Supp. 1203 (S.D.N.Y. 1981)........................................................17

*In re Google Digital Advert. Antitrust Litig. ("Google I")*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)................................................7, 12

*Hickerson v. City of New York*,
    146 F.3d 99 (2d Cir. 1998)..................................................................17

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    280 F. Supp. 3d 691 (D. Md. 2017), *aff'd*, 937 F.3d 1359 (Fed. Cir. 2019) ......................8, 17

*Montana v. U. S.*,
    440 U.S. 147 (1979)............................................................................16

*Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*,
    553 F. Supp. 962 (N.D. Ill. 1982)..........................................................9

*S.E.C. v. Mattera*,
    2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ...........................................2

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)..................................................................7

*Selectron, Inc. v. Am. Tel. & Tel. Co.*,
    587 F. Supp. 856 (D. Or. 1984) ...........................................................9

*In re: Tether and Bitfinex Crypto Asset Litigation*,
    2024 WL 3520363 (S.D.N.Y. 2024) .....................................................9

*Torry v. Northrop Grumman Corp.*,
    399 F.3d 876 (7th Cir. 2005) ...............................................................9

*United States v. Google LLC*,
    1:23-CV-108, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ..................... *passim*

*United States v. Int'l Bus. Machines Corp.*,
    163 F.3d 737 (2d Cir. 1998)................................................................12

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)........................................................................5, 12

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ............................................................12

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)........................................................12, 13

*Walker v. City of N.Y.*,
    1999 WL 328356 (S.D.N.Y. May 24, 1999) ..................................7, 10

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 15 ...........................................................................9

Fed. R. Civ. P. 56 ........................................................................1, 2

## I.    INTRODUCTION

In an April 17, 2025 liability decision following a three-week bench trial, Judge Leonie Brinkema found that Google: (1) violated Section 2 of the Sherman Act by "willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market"; and (2) violated Sections 1 and 2 of the Sherman Act by "unlawfully [tying] its publisher ad server (DFP) and ad exchange (AdX)." *United States v. Google LLC*, 1:23-CV-108 (LMB/JFA), 2025 WL 1132012, at *1 (E.D. Va. Apr. 17, 2025) ("EDVA Opinion" or "EDVA Op."). In her 115-page opinion, Judge Brinkema made extensive findings of fact that conclusively resolved numerous disputed issues against Google. Most of those issues are identical to those implicated by the claims of the Publisher Class Plaintiffs ("Publishers").

This Court should apply the doctrine of non-mutual offensive collateral estoppel to give preclusive effect to Judge Brinkema's liability determinations and their predicates because Publishers allege violations of the same laws—Sections 1 and 2 of the Sherman Act—and they base those claims on the same Google conduct during the same time period.[1] *See* Joint Br. § I.A.

With respect to Publishers' monopolization claims under Section 2 (Count II), the Court should enter partial summary judgment under Rule 56(a) holding that Google unlawfully monopolized the markets for publisher ad servers and ad exchanges.[2] To reach that result, the Court should give preclusive effect to Judge Brinkema's findings that establish each element of Google's Section 2 violation: that publisher ad servers and ad exchanges are relevant product markets with worldwide geographic scope; that Google had and continues to have monopoly

---

[1] In accordance with this Court's May 15, 2025 order (ECF 993), this brief applies the legal standards from the MDL Plaintiffs' joint brief ("Joint Br.") to the particular issues in Publishers' case.

[2] This Court may enter summary judgment on "part" of a claim. *See* Fed. R. Civ. P. 56(a).

power in those markets; that Google has willfully acquired and maintained its monopoly power through a combination of anticompetitive acts with synergistic anticompetitive effects; and that Google's procompetitive justifications and defenses fail on the merits. The Court should also treat the factual bases for these findings as conclusively established here—e.g., that Google's use of First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules unfairly preferenced its AdX exchange to the detriment of its publisher customers and rival platforms, and that Google charged a durable, supracompetitive 20% take rate on AdX.[3]

With respect to Publishers' tying claims under Sections 1 and 2 (Count I), the Court should enter partial summary judgment under Rule 56(a) holding that Google unlawfully tied its DFP ad server (the tied product) and its AdX exchange (the tying product). To reach that result, the Court should give preclusive effect to Judge Brinkema's findings that establish each element of Google's Section 1 and 2 violations for unlawful tying: that publisher ad servers and ad exchanges are distinct products; that Google possessed sufficient market power in the ad exchange market to restrain competition in the publisher ad server market; that Google conditioned the purchase of AdX on the purchase of DFP; and that the AdX-DFP tie had a substantial impact on interstate commerce. The Court should again treat the factual bases for these findings as conclusively established here—e.g., that by restricting AdX's submission of real-time bids to DFP, Google effectively coerced publishers to use DFP to gain access to AdX's core features and essential advertiser demand.

---

[3] If this Court gives preclusive effect to any of the EDVA court's findings establishing the elements of Google's liability under Sections 1 and 2, Google should also be precluded from re-litigating the underlying factual findings. *S.E.C. v. Mattera*, 2013 WL 6485949, at *9 (S.D.N.Y. Dec. 9, 2013) (Castel, J.) (holding preclusive effect of defendant's conviction estopped him from "relitigating the *same facts*" in civil claim brought by SEC) (emphasis added). To the extent this Court does not grant Publishers' motion in its entirety, however, it may still grant Publishers' motion on "any material fact" that has been conclusively-established in the EDVA Opinion. Fed. R. Civ. P. 56(g) (court may treat "any material fact" as "established in the case").

As detailed in Part II below, Publishers seek preclusion on twenty-five findings by Judge Brinkema, along with the underlying factual determinations supporting those findings. Appendix A to Publishers' Notice of Motion—discussed in Part II—sets forth the exact language from the EDVA Opinion for each of these twenty-five findings and their factual predicates. As shown in Part III.A, all elements of collateral estoppel are satisfied for each. Applying collateral estoppel here would not only be fair, Joint Br. § II, but would also significantly streamline the trial, *see* Part III.B *infra*. Accordingly, the Court should grant Publishers' motion for partial summary judgment as to each issue identified in Appendix A.

## II.    ISSUES TO BE GIVEN PRECLUSIVE EFFECT

The issues on which Publishers seek preclusion are addressed in detail in Judge Brinkema's opinion and are supported by myriad citations to the extensive evidentiary record developed at trial. Among the numerous findings made in the 115-page EDVA Opinion, Publishers seek preclusion on twenty-five issues, along with the predicate factual findings on those issues, that are central to establishing Google's liability under Section 2 for unlawful monopolization and Sections 1 and 2 for unlawful tying. They are summarized below.

The below issue numbering corresponds to Appendix A, attached to Publishers' Notice of Motion. Appendix A organizes the twenty-five issues in chart form by legal claim; lists each issue under the relevant element of the claim; identifies the factual findings that Judge Brinkema relied on to conclude that the element was satisfied; and cross-references where that same issue has been raised in Publishers' case.[4] As explained below, Issues 1-20 relate to Publishers' monopolization claims; Issues 21-25 relate to Publishers' claims for unlawful tying.

---

[4] Publishers' Appendix A adopts a numbering scheme where issues at the level of a legal element or a defense are assigned a number (e.g., Issue 1), while the predicate findings Judge Brinkema cited as establishing that element or refuting that defense are assigned a sub-part of that same number (e.g., Issues 1.1, 1.2, and so on).

With respect to their monopolization claims under Section 2, Publishers respectfully request that the Court give preclusive effect to the following findings in the EDVA Opinion:

**Issue 1**:     Publisher ad servers for open-web display advertising are a distinct relevant product market.

<u>Factual predicates</u>: Ad servers are functionally unique, priced differently, exhibit inelastic demand, and are not interchangeable with ad tech tools for selling other types of digital advertising (Issues 1.1-1.6).

**Issue 2**:     Ad exchanges for open-web display advertising are a distinct relevant product market.

<u>Factual predicates</u>: Ad exchanges are functionally unique, priced differently, exhibit inelastic demand, and are not interchangeable with other ad tech tools for selling other types of digital advertising (Issues 2.1-2.5).

**Issue 3**:     The entire ad-tech stack is not a single two-sided product market or two-sided transaction platform.

<u>Factual predicates</u>: The ad-tech stack consists of unique buy-side and sell-side products for different users and different purposes, and competitors offer distinct products aimed at specific levels of the stack (Issues 3.1-3.4).

**Issue 4**:     The publisher ad server and ad exchange markets have worldwide geographic scope.

**Issue 5**:     Google has monopoly power in the market for publisher ad servers.

<u>Factual predicates</u>: Google maintained high and durable market shares exceeding 90% in a market with high barriers to entry and switching costs, and it repeatedly degraded product quality despite customer complaints (Issues 5.1-5.8).

**Issue 6**:     Google has monopoly power in the market for ad exchanges.

<u>Factual predicates</u>: Google charged a durable and supracompetitive 20% take rate on AdX for more than a decade, restricted access to AdX's desirable features, prevented customers from switching, and maintained high market shares nine times larger than its next-largest competitor (Issues 6.1-6.10).

**Issue 7**:     Google monopolized the markets for publisher ad servers and ad exchanges by tying together its DFP ad server and its AdX ad exchange.

<u>Factual predicates</u>: Google forced combined use of DFP and AdX to the detriment of customers by restricting essential AdWords demand to AdX and by restricting the essential features of AdX to DFP users (Issues 7.1-7.2).

**Issue 8**:     Google monopolized the markets for publisher ad servers and ad exchanges by imposing a series of anticompetitive auction practices on AdX and DFP.

**Issue 9**:    First Look was anticompetitive.

        Factual predicates: First Look favored AdX over other ad exchanges in DFP, harming publishers and rival ad exchanges (Issues 9.1-9.3).

**Issue 10**:    Last Look was anticompetitive.

        Factual predicates: Last Look reduced publisher revenue, decreased rivals' scale, suppressed price competition, and further entrenched Google's market power (Issue 10.1).

**Issue 11**:    Dynamic Revenue Share was anticompetitive.

**Issue 12**:    Unified Pricing Rules are anticompetitive.

**Issue 13**:    The refusal to deal doctrine in *Trinko* does not apply to Google's conduct.

        Factual predicates: Google sacrificed short-run benefits to harm rivals and its anticompetitive acts were directed at and harmed its customers (Issues 13.1-13.2).

**Issues 14-19**:    Each of Google's alleged procompetitive justifications is invalid or insufficient (Issue 14), including its purported procompetitive justifications for the AdX-DFP tie (Issue 15), First Look (Issue 16), Last Look (Issue 17), Dynamic Revenue Share (Issue 18), and Unified Pricing Rules (Issue 19).

        Factual predicates: The AdX-DFP tie did not improve product quality or security (Issues 15.1-15.2); First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules were intended to harm competition and reduced publisher revenue and freedom of choice (Issues 16.1, 17.1, 18.1, 19.1).

**Issue 20**:    Google's anticompetitive acts were not a series of product design choices.

        Factual predicates: Google's tying of AdX and DFP and auction manipulations were not simply product design choices; the AdX-DFP tie significantly reduced usage of rivals' products (Issues 20.1-20.2).

        With respect to their tying claims under Sections 1 and 2, Publishers respectfully request that the Court give preclusive effect to the following findings in the EDVA Opinion:

**Issue 21**:    Publisher ad servers and ad exchanges are distinct products.

**Issue 22**:    Google conditioned the purchase of the tying product, AdX, on the purchase of the tied product, DFP.

**Issue 23**:    Google effectively coerced publishers wanting access to AdX to use DFP.

        Factual predicates: Google restricted essential AdWords advertiser demand to AdX

and restricted the core feature of real-time bids on AdX to DFP users, thus making the combined use of DFP and AdX the only viable economic option for publishers (Issues 23.1-23.4).

**Issue 24**:    Google's monopoly power in the tying product market (ad exchanges) was sufficient market power to restrain competition in the tied product market (publisher ad servers).

Factual predicates: Google restrained competition in the market for publisher ad servers in part by restricting the unique advertising demand offered by AdWords advertisers to AdX (Issue 24.1).

**Issue 25**:    Tying DFP and AdX had a substantial impact on interstate commerce.[5]

## III.    ARGUMENT

### A.    The Requirements for Issue Preclusion are Satisfied.

As detailed in the MDL Plaintiffs' Joint Brief, applying non-mutual offensive collateral estoppel to preclude re-litigation of previously resolved issues is appropriate when: (1) the issues in the two proceedings are in substance the same; (2) those issues were actually decided in the earlier proceeding; (3) the defendant had a full and fair opportunity to litigate those issues; and (4) resolving those issues in the earlier proceeding was necessary to reach a final decision on the merits. *See* Joint Br. at 2-4. All four requirements are met here.

#### 1.    The issues are the same.

As Google previously (and repeatedly) admitted, the cases in this MDL—including Publishers' case—are "based on the same legal theories and the same alleged conduct involving the same Google products and services, relying on many of the same documents collected in parallel investigations." Joint Br. at 5-6. These prior admissions are binding here. *See id.*

Google's prior admissions are equally true today and apply with even greater force to the

---

[5] The issues on which Publishers seek preclusion will not establish any elements of the monopolization or tying claims for the AdSense Publishers Class, which relies on different product markets. However, Google should be barred from re-litigating all factual findings detailed in Appendix A, some of which relate to Publishers' AdSense claims (e.g., that social media and in-app ads are not reasonably interchangeable with open-web display ads).

specific issues on which Publishers seek preclusion.  Judge Brinkema has now conclusively

resolved those issues following careful consideration of a common factual record developed

through coordinated discovery, the same opinions proffered by the same Google experts, and the

same arguments and defenses that Google has asserted here to avoid liability under the same

laws.  *See* Joint Br. § I.A.

### i.  Monopolization in violation of Section 2.

A Section 2 claim requires proof of "(1) the possession of monopoly power in the

relevant market and (2) the willful acquisition or maintenance of that power as distinguished

from growth or development as a consequence of a superior product, business acumen, or

historic accident."  *In re Google Digital Advert. Antitrust Litig.* ("*Google I*"), 627 F. Supp. 3d

346, 378 (S.D.N.Y. 2022).  A successful plaintiff must establish a relevant product and

geographic market, defendant's monopoly power in that market, and defendant's acquisition or

maintenance of that power through anticompetitive conduct with anticompetitive effects.  *See id.*

at 378-79; *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651–52 (2d Cir. 2015).

*Relevant product markets*.  Both Publishers and the government alleged the same

product markets specific to programmatic open-web display advertising: the market for publisher

ad servers, which is dominated by Google's DFP server; and the market for ad exchanges, which

is dominated by Google's AdX exchange.  Publishers' First Amended Complaint ("FAC"), ECF

408 ¶¶ 7, 113-18; Ex. 1,[6] First Amended Complaint ("DOJ Compl.") ¶¶ 282-96, United States v.

Google LLC, No. 23-cv-108 (LMB/JFA) (E.D. Va. Apr. 17, 2023), ECF 120. Although

Publishers and their experts use the labels "advanced ad servers" to describe publisher ad servers

---

[6] Documents identified with exhibit numbers—Ex. __—are attached the Declaration of Izaak Earnhardt in support
of this Motion, filed contemporaneously with the Notice of Motion and this Memorandum of Law.

such as DFP, and "advanced auction platforms" to describe ad exchanges such as AdX, those labels do not affect the substantive consistency of the alleged product markets. *See Walker v. City of N.Y.*, 1999 WL 328356, at *3 (S.D.N.Y. May 24, 1999) (collateral estoppel applied where there was "no material difference between the issues" and explaining "[n]omenclature does not govern the application of collateral estoppel"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 717–19 (D. Md. 2017), *aff'd*, 937 F.3d 1359 (Fed. Cir. 2019) (finding the same alleged relevant market despite different wording).

The Court should give preclusive effect to Judge Brinkema's findings that publisher ad servers and ad exchanges each constitute a distinct relevant product market. *See* App'x A (Issues 1-2). That necessarily includes rejecting Google's arguments that the relevant product markets should include all types of digital advertising and that the entire ad tech stack is a two-sided transaction platform. *See* App'x A (Issue 3). The Court should also treat the factual bases for Judge Brinkema's findings as conclusively established here—e.g., that the products in those markets have distinct demand, are used for distinct purposes, are priced differently, and have no reasonable substitutes. *See* App'x A (Issues 1.1-1.6, 2.1-2.5).

***Relevant geographic markets***. The government alleged and Judge Brinkema found that the publisher ad server and ad exchange product markets have worldwide geographic scope. *See* Ex. 1, DOJ Compl. ¶ 281; App'x A (Issue 4). Although Publishers' complaint alleged a narrower geographic market, limited to the United States (FAC ¶ 121), their economics expert has since determined that the evidence supports the market as alleged and also supports a worldwide market—though the distinction is ultimately immaterial to his opinions. ECF 959-4, Elhauge Dep. at 50:13-18 ("the evidence supports defining a geographic market that is at least as large as the United States, but there is other evidence that supports defining a worldwide market

and that we ultimately don't have to choose between the two of them"); ECF 959-1, Elhauge

Rpt. ¶¶ 186-87 (describing evidence supporting worldwide market); *see also* ECF 983-19,

Kroger Rpt. ¶ 80 (Publishers' forensic accounting expert opining that Google "operates its

business on a global basis" and analyzing "the financial performance of Google's ads business

on a global basis, as Google does.").

Thus, the evidence adduced through fact and expert discovery here clearly supports a

worldwide geographic market, consistent with Judge Brinkema's findings in the EDVA Opinion.

If necessary, the complaint in this action can be amended under Rule 15(a) or 15(b) to align with

the evidence and to give preclusive effect to the EDVA court's determination of the relevant

geographic market.  *See In re: Tether and Bitfinex Crypto Asset Litigation*, 2024 WL 3520363, at

*11 (S.D.N.Y. 2024) (Failla, J.) (permitting amendment after the close of discovery to "realign

the allegations of the complaint to facts adduced during discovery"); *Torry v. Northrop

Grumman Corp.*, 399 F.3d 876, 878–79 (7th Cir. 2005) (a party may amend complaint under

Rule 15(b) "in order to simplify proof of res judicata or collateral estoppel").[7]  Accordingly, the

Court should give preclusive effect to Judge Brinkema's findings that the publisher ad server and

ad exchange product markets have worldwide geographic scope.  *See* App'x A (Issue 4).

*Monopoly power*.  Both Publishers and the government alleged that Google has

monopoly power in the two relevant markets.  FAC ¶¶ 8, 158-74; Ex. 1, DOJ Compl. ¶¶ 282-96.

Further, Publishers and their experts rely on largely the same evidence and indicia of market

power that the government and its experts relied on, which Judge Brinkema ultimately found

---

[7] Courts have also found that, where the geographic scope of the relevant market in the subsequent suit was entirely encompassed by the geographic scope of the relevant market in the prior suit, it was reasonable to give preclusive effect to a finding of monopoly power.  *See Selectron, Inc. v. Am. Tel. & Tel. Co.*, 587 F. Supp. 856, 862 (D. Or. 1984) (Oregon and Washington markets encompassed by national market); *see also Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 553 F. Supp. 962, 969-70 (N.D. Ill. 1982) (a finding of antitrust conspiracy covering Midwest preclusive as to conspiracy in the Chicago area).

sufficient to establish Google's monopoly power in both markets.  EDVA Op. at \*30-35 (citing high market share, high barriers to entry, and direct evidence of monopoly power in ad exchange and ad server markets); ECF 959-1, Elhauge Rpt. § VI (identifying same factors).

The Court should therefore give preclusive effect to Judge Brinkema's findings that Google possessed monopoly power in the relevant markets.  *See* App'x A (Issues 5-6).  That necessarily includes rejecting Google's counter-arguments that the durable take rates it charged on AdX were insufficient direct evidence of its monopoly power, and that its market shares were too low to establish monopoly power indirectly.  *See* App'x A (Issues 6.5, 6.10).  The Court should also treat the factual bases for the findings as conclusively established here—e.g., that both markets had high barriers to entry, that Google degraded the quality of its products despite negative customer feedback, and that Google charged a durable 20% take rate on AdX for more than a decade, which was double the rate charged by rival ad exchanges.  *See* App'x A (Issues 5.1-5.8, 6.1-6.10).

***Anticompetitive conduct and effects***.  The government alleged and Judge Brinkema found that Google engaged in anticompetitive conduct by tying DFP to AdX, and also by employing the following exclusionary practices on AdX: First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules.  *See* Ex. 1, DOJ Compl. ¶¶ 114, 124, 138, 164, 198-207, 239-47; App'x A (Issues 7-12).  Judge Brinkema further found that this anticompetitive conduct had synergistic anticompetitive effects in both the ad server and ad exchange markets. *See* App'x A (Issues 7-12).

Publishers likewise allege that Google engaged in each category of conduct that Judge Brinkema found anticompetitive, and they assert the same anticompetitive effects via the same mechanisms.  *See* App'x A (Issues 7-12).

Publishers and their experts address First Look and Last Look under the umbrella term "Dynamic Allocation," but labels do not "govern the application of collateral estoppel." *See Walker*, 1999 WL 328356, at *3. Indeed, the conduct at issue is identical and Publishers and the DOJ both allege First Look and Last Look were features of Dynamic Allocation. *See* FAC ¶ 264 (alleging that Dynamic Allocation gave AdX an exclusive "first-in-line advantage and a last look" over all other ad exchanges); DOJ Compl. ¶¶ 124, 256 (explaining that First Look and Last Look were features of Dynamic Allocation). Publishers and their experts also explicitly address Dynamic Revenue Share and Unified Pricing Rules.[8] *See* FAC §§ IV.B.4, IV.B.9; ECF 959-1, Elhauge Rpt. §§ VII.B.3-4.

Although Publishers allege several additional ties, the AdX-DFP two-way tie at the center of their case includes the tie addressed at length in the EDVA Opinion—where AdX was characterized as the tying product and DFP as the tied product. Publishers do not seek partial summary judgment on the other direction of their alleged two-way tie between DFP and AdX— where DFP is the tying product and AdX is the tied product. But numerous of Judge Brinkema's findings support the elements of such a tie. *See* App'x A (Issues 5, 6.6-6.8, 7.1-7.2, 9.1-9.3, 13.1-13.2, 15.1, 21-25). The Court should grant issue preclusion on those findings, which Publishers will use at trial along with additional evidence to establish this direction of the AdX-DFP tie.

The Court should give preclusive effect to Judge Brinkema's findings of Google's anticompetitive acts and their anticompetitive effects. *See* App'x A (Issues 7-12). That

---

[8] Publishers' complaint included allegations of numerous anticompetitive acts in addition to those found anticompetitive by Judge Brinkema. Following discovery, Publishers have chosen not to pursue those additional acts other than Google's use of a discriminatory risk aversion coefficient. ECF 982 at 4 n.3. The possibility that Publishers may attempt to prove that using discriminatory risk aversion coefficients was an *additional* anticompetitive act has no bearing on the propriety of issue preclusion as to First Look, Last Look, Dynamic Revenue Share, or Unified Pricing Rules—all of which are common between the two cases.

necessarily includes rejecting Google's procompetitive justifications, which she found either invalid, insufficient, or outweighed by anticompetitive effects. *See* App'x A (Issues 14-19). The Court should also treat the factual bases for Judge Brinkema's findings as conclusively established here—e.g., that Google engaged in the alleged acts; that the acts foreclosed rivals, reduced competition, and degraded product quality; and that the acts harmed publishers and enabled Google to charge supracompetitive 20% take rates on AdX. *See* App'x A (Issues 7-12).

      ***Google's defenses***. In the government's case, Google asserted that it was immunized from antitrust scrutiny by the refusal-to-deal doctrine articulated in *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). *See* EDVA Op. at \*42-44. Google also asserted that it was shielded from liability for implementing First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules because they were merely "product design choices." *Id.* at \*46. Because Google asserts the same two defenses here, the Court should give preclusive effect to Judge Brinkema's findings rejecting both. *See* App'x A (Issues 13, 20).

### ii. Tying in violation of Sections 1 and 2.

      A tying claim under Section 1 requires proof of four elements: (1) "the two products are distinct"; (2) "the seller has appreciable market power in the tying market"; (3) "the defendant actually tied the sale of the two products"; and (4) "the tying arrangement affects a substantial amount of interstate commerce." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 n.5 (2d Cir. 2001); *see also United States v. Int'l Bus. Machines Corp.*, 163 F.3d 737, 741 (2d Cir. 1998). "If monopoly power (or sufficient market power) is alleged and proven, the tying arrangement may be unlawful per se without the need to prove anticompetitive effects or other market conditions." *Google I,* 627 F. Supp. 3d at 368 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15 (1984)). Under Section 2, tying is simply treated as an act of willful maintenance within the monopolization framework, with anticompetitive effects in the

monopolized market assessed under the rule of reason. *See* EDVA Op. at *38; *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020) ("'When the defendant is a dominant firm' and meets 'a much stricter power requirement,' however, the 'special screening function' of the tying factors is 'largely unnecessary, and the more general standards of § 2 become relevant' because 'the technical requirements ... attach only to per se ties.'") (citing Areeda & Hovenkamp ¶ 777, at 324); *see also In re Visa Check*, 280 F.3d at 133 n.5 ("Plaintiffs could also prove their tying claims under a rule of reason theory, requiring plaintiffs to prove that the challenged action had an adverse effect on competition as a whole in the relevant market[.]").

*Distinct products*. As noted above, both Publishers and the government alleged that Google tied its DFP ad server to its AdX exchange in violation of Sections 1 and 2. Although the government alleged a one-way tie and Publishers allege a two-way tie that includes the one-way tie, all such ties require proof of product distinctness. The Court should therefore give preclusive effect to Judge Brinkema's findings that DFP and AdX are distinct products. *See* App'x A (Issue 21). This element is also established by her related findings that publisher ad servers and ad exchanges are distinct relevant product markets. *See* App'x A (Issues 1-2).

*Market power*. The government alleged a tie where AdX was the tying product and DFP was the tied product. Ex. 1, DOJ Compl. ¶¶ 336-39; EDVA Op. at *38. Judge Brinkema found that Google had market power in ad exchanges—indeed, that it had monopoly power—which was sufficient to sustain the government's tying claims under both Sections 1 and 2. EDVA Op. at *40. The Court should give preclusive effect to these findings as establishing one direction of Publishers' alleged two-way tie under both Sections. *See* App'x A (Issue 24).

Although the government did not explicitly ask the court to find a tie where DFP was the tying product, Judge Brinkema elsewhere found that Google had monopoly power in the

publisher ad server market.  EDVA Op. at *30-31.  Monopoly power is obviously sufficient market power, so Judge Brinkema's findings establish the market power element for Publishers' claim that there was an additional tie in the other direction—with DFP the tying product and AdX the tied product.  The Court should preclude Google from asserting otherwise.

*Conditioning*.  The government alleged and Judge Brinkema found that Google conditioned the purchase of its AdX exchange—with its exclusive access to essential advertiser demand on AdWords—on the purchase of its DFP ad server.  Ex. 1, DOJ Compl. ¶ 338; EDVA Op. at *39-40.  Publishers make the same assertions for one direction of their alleged two-way tie between DFP and AdX.  *See* App'x A (Issues 22-23).  The Court should give preclusive effect to Judge Brinkema's findings, as well as their factual bases, that the conditioning (or tying) element is met for the tie with AdX as the tying product.

The Court should also give preclusive effect to Judge Brinkema's factual findings supporting the conditioning (or tying) element for the tie with DFP as the tying product—e.g., that the products were bundled, and that Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules forced publishers using DFP to sell their ad impressions through AdX.  *See* App'x A (Issues 5.4, 6.6-6.8, 7.1-7.2, 9.1-9.3, 10-12, 13.1-13.2, 15.1).  These findings go a long way towards establishing the other direction of Publishers' alleged two-way AdX-DFP tie.

*Substantial commerce*.  The Court should give preclusive effect to Judge Brinkema's findings that the tie between DFP and AdX affected a substantial amount of interstate commerce.  *See* App'x A (Issue 25).  Given that each of DFP and AdX involve billions of dollars in ad transactions annually, Google cannot seriously dispute—and did not dispute in the government's case—that this element is satisfied.

14

*Anticompetitive effects*.  Judge Brinkema found anticompetitive effects in both the ad server market and the ad exchange market resulting from Google's challenged acts of monopolization, including its tying of AdX and DFP.  EDVA Op. at *41-42.  Although proving anticompetitive effects in the tied market is not necessary under the *per se* rule of Section 1, Judge Brinkema nevertheless found anticompetitive effects in the ad server market from Google's tying conduct for purposes of Section 2.  EDVA Op. at *31.  Judge Brinkema likewise made numerous findings of fact supporting anticompetitive effects in the ad exchange market from Google's same tying activities.  *See* App'x A (Issues 7-9).  Because Publishers allege the same markets, conduct, and anticompetitive effects, the Court should give preclusive effect to these findings for both Publishers' Section 1 and 2 claims.

### iii.  Publishers' slightly different framing of the same facts does not foreclose collateral estoppel.

In its response to Publishers' pre-motion letter, Google erroneously asserted that certain differences between how the government and Publishers defined the relevant markets for their Section 2 monopolization claims—namely, the scope of geographic and product markets— preclude application of collateral estoppel.  ECF 977 at 4.  Publishers have already addressed the issue of geographic scope above.  *Supra* Part III.A.1.i.  Further, Publishers' slightly different framing of product markets does not change the reality that the underlying products (DFP and AdX) and their features are identical across the two cases.  *See* Joint Br. § I.A.

Google suggests that Publishers' product-market definitions foreclose collateral estoppel because they include instream video ads, which Google claims Judge Brinkema held to be outside the relevant product markets.  ECF 977 at 4.  Google is wrong.  The government did not contend that the relevant product markets included instream video ads on publisher websites.  *Cf.* Ex. 1, DOJ Compl. at 16-17 & n. 4.  Nor did Google contend that the government's proposed

product markets were correctly defined other than the failure to include instream video ads on publisher websites. Rather, Google argued that the relevant product markets were much broader and covered platforms for selling all types of digital advertising, such as instream video, mobile apps, and social media. EDVA Op. at *20, *23.

In noting that DFP and AdX were in product markets distinct from ad servers and ad exchanges focusing on instream video and other types of advertising *beyond* open-web display ads, Judge Brinkema was simply rejecting Google's arguments for *much broader* product market definitions. For example, Judge Brinkema noted that publishers of "primarily text-based news content online … cannot monetize the primary content on their websites with instream video ads[,]" and that platforms "that facilitate the sale of *only* instream video, mobile app, or social media ads" are not a substitute for those such as DFP and AdX that specifically facilitate the sale of open-web display ads. EDVA Op. at *20, *23 (emphasis added). Her statements about instream video in these contexts did not explicitly or implicitly reject Publishers' product market definitions here, which like the government's focus solely on open-web display ads. Nor do those statements alter the reality that publishers in fact sell open-web, video ads using DFP and AdX that are displayed alongside non-video ads on their websites. *Cf.* ECF 959-5, Das Rpt. ¶ 21; ECF 959-3, Elhauge Reb. Rpt. ¶¶ 79, 108 & n.306.

But even if Judge Brinkema's opinion can be read as categorically adopting narrower product-market definitions that exclude open-web display ads in video form, her findings supporting Google's liability under Section 2 are nevertheless "in substance the same" as those implicated by Publishers' slightly broader definitions. *See Montana v. U. S.*, 440 U.S. 147, 155 (1979); Joint Br. § I.A. Google cannot show that the marginal addition of instream video ads has any material effect on the assessment of Google's market power.

For example, Judge Brinkema found that Google had monopoly power in the market for publisher ad servers based on its durable market shares over 90% and qualitative factors such as high barriers to entry.  EDVA Op. *30.  Those findings are not altered materially by including the additional transaction type of instream video.  With respect to the market for ad exchanges, Judge Brinkema found that Google had monopoly power based on its durable 20% take rate (direct evidence of pricing power) and durable market shares in excess of 60% (indirect evidence).  EDVA Op. *31-35.  Those findings are likewise not altered materially by including a small subset of instream video transactions on which Google consistently charged a 20% take rate.  *Cf. Hickerson v. City of New York*, 146 F.3d 99, 112 (2d Cir. 1998) ("'[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues' . . .  only when these changes 'significantly' affect the overall complexion of the record.") (quoting *Montana v. U. S.*, 440 U.S. 147, 157, 159 (1979)); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 717–19 (D. Md. 2017), *aff'd*, 937 F.3d 1359 (Fed. Cir. 2019) (collateral estoppel applied where "alleged relevant market [had] not changed in a material way").

In short, re-litigating the already-resolved issues of relevant markets and market power based on slightly different framing of the same underlying facts would needlessly waste both party and judicial resources.  *See GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1214 (S.D.N.Y. 1981) ("slightly different time period covered by the evidence in this case would not likely cause a jury to find different market definitions or reach different conclusions as to Kodak's market power").

### 2.  The issues were actually decided.

There should be no dispute that the issues on which Publishers seek preclusion, as reflected in Appendix A, were "actually decided" by Judge Brinkema.  *See* Joint Br. § I.B.

Appendix A consists entirely of direct quotes from the EDVA Opinion, which is the best evidence that Publishers are not seeking preclusion on any issues based on inferences or implicit extensions of Judge Brinkema's findings.

### 3. Google had a full and fair opportunity to litigate the issues.

There should likewise be no dispute that Google had "a full and fair opportunity" to litigate the issues on which Publishers seek preclusion. *See* Joint Br. § I.C.

### 4. Resolving the issues was necessary to support the EDVA Opinion.

As with the two preceding requirements for collateral estoppel, Google has no plausible basis to argue that the issues on which Publishers seek preclusion were not "necessary" to Judge Brinkema's liability decision, *see* Joint Br. § I.D—which is a "final" decision under the Second Circuit's collateral-estoppel precedent, *see* Joint Br. § I.E. Each of the issues listed in Appendix A directly pertains to the elements of the government's monopolization claim under Section 2 and tying claims under Sections 1 and 2. *See generally* App'x A. None of those findings can fairly be characterized as dictum.

But even if some subset of the findings would support Google's liability under Sections 1 and 2 without the others, that is immaterial because any alternative, independently sufficient basis for a decision should still be given preclusive effect. *See* Joint Br. at 12.

### B. Applying Issue Preclusion Would Resolve Large Portions of Publishers' Claims and Significantly Streamline Trial.

Granting partial summary judgment in favor of Publishers on all issues in Appendix A would go a long way towards establishing Google's liability for the proposed AdX Publisher Class. *See* ECF 956. As the Court contemplated when setting the current briefing schedule, applying issue preclusion would dramatically narrow any subsequent briefing on Google's motion for summary judgment, sparing substantial party and judicial resources. It would also

dramatically streamline trial by eliminating the need to prove most elements of Publishers'

monopolization and tying claims. Not only would that potentially save weeks of testimony and

the need to introduce hundreds of exhibits, but it would also make the jury's job much easier.

Trial would then largely focus on issues of injury, causation, and damages.

**Monopolization in violation of Section 2 (Count II)**. If the Court grants partial

summary judgment on the requested issues, Publishers will have established the following

elements of Section 2 claims for the AdX Publisher Class: (1) advanced ad servers (DFP) and

advanced auction platforms (AdX) are relevant product markets with worldwide geographic

scope; (2) Google possessed monopoly power in both of those relevant markets; (3) Google

willfully maintained its monopoly power through the anticompetitive acts of tying DFP to AdX,

and employing Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules; and

(4) Google's anticompetitive acts had anticompetitive effects in both relevant markets.

Publishers would still need to establish that these acts caused them to pay overcharges on AdX

and the aggregate amount of damages they sustained.

**Tying in violation of Section 1 (Count I)**. If the Court grants partial summary judgment

on the requested issues, Publishers will have established the following elements of Section 1

tying claims for the AdX Publisher Class: (1) DFP and AdX are distinct products; (2) Google

had market power in the market for advanced ad servers and advanced ad exchanges; (3) Google

conditioned the purchase of AdX on the purchase of DFP; and (4) Google's tie affected a

substantial amount of interstate commerce. With respect to that direction of the two-way tie

where AdX is the tying product and DFP the tied product, Publishers will have established all

four elements. With respect to the reverse direction of the two-way tie where DFP is the tying

product and AdX the tied product, Publishers will have established elements (1), (2), and (4).[9] To the extent it is necessary to do so, Publishers also will have established that Google's tying of DFP to AdX had anticompetitive effects in the market for advanced ad servers.[10]  Publishers would still need to establish that Google's ties caused them to pay overcharges on AdX and the aggregate amount of damages they sustained.

**Tying in violation of Section 2 (Counts I and II)**.  Under Section 2, Google's tying of DFP and AdX is treated as an act of willful monopolization, which Plaintiffs allege was one part of Google's broader anticompetitive scheme.  Although proving the strict elements of tying is not necessary for scheme claims under Section 2 where tying (or tying-like conduct) is one part of the scheme, granting partial summary judgment on the requested issues will nevertheless establish the same elements of tying identified above in the Section 1 context—including anticompetitive effects in the tied product market.

## IV.    CONCLUSION

As explained above, all elements of issues preclusion are met for each issue identified in Appendix A.  Further, fairness considerations strongly support application of issue preclusion here.  *See* Joint Br. § II.  Accordingly, this Court should grant Publishers' motion for partial summary judgment on all issues identified in Appendix A.  *See id.* § III.  A proposed order is attached.

---

[9] Publishers also will have established numerous facts supporting the element that Google conditioned the purchase of DFP on the purchase of AdX.  *See* Appendix A (Issues 5.4, 6.6-6.8, 7.1-7.2, 9.1-9.3, 10-12, 13.1-13.2, 15.1).

[10] Publishers also will have established numerous facts supporting the element that Google's tie had anticompetitive effects in the market for advanced ad exchanges.  *See* Appendix A (Issues 7-9).

Dated: June 20, 2025

Respectfully submitted,

David Boies
dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

*Lead Counsel for the Publisher Class*

/s/ Philip C. Korologos
Philip C. Korologos
pkorologos@bsfllp.com
Robert J. Dwyer
rdwyer@bsfllp.com
James Keyte
jkeyte@bsfllp.com
Luke Williams
lwilliams@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300

Mark C. Mao
mmao@bsfllp.com
Sean P. Rodriguez
srodriguez@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6820

Sabria A. McElroy
smcelroy@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 377-4216

Izaak Earnhardt
iearnhardt@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave NW, 11th Floor
Washington, DC 2005
Telephone: (202) 237-2727

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
Andrew Ellis
aellis@koreintillery.com
Ian Moody
imoody@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Fax: (314) 241-3525

Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Jeremy Gradwohl
jgradwohl@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Robert E. Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

*Interim Co-Lead Counsel for the Publisher Classes*