**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re Google Digital Advertising Antitrust Litigation** | Case No. 1:21-md-3010 (PKC) |
| *This document relates to:*<br><br>**In re Google Digital Publisher Antitrust Litigation** | Case No. 1:21-cv-7034 (PKC) |

**PUBLIC REDACTED VERSION**

**PUBLISHER PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO GOOGLE'S MOTION TO EXCLUDE THE
<u>EXPERT TESTIMONY OF PROF. EINER ELHAUGE</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

I.      INTRODUCTION AND SUMMARY ................................................................ 1

II.     LEGAL STANDARDS ....................................................................................... 5

III.    PROFESSOR ELHAUGE IS INDISPUTABLY QUALIFIED IN ECONOMICS .......... 7

IV.     ARGUMENT ...................................................................................................... 7

        A.      Prof. Elhauge's Yardstick Analysis is Standard and Reliable ............................... 7

        B.      Prof. Elhauge Accounted for Each of the Alternative Factors that Google Claims Explains the Higher Prices on Web Ad Sales Transactions ................................. 12

                1.      Google's "aggregated demand" argument has no merit. .......................... 12

                2.      Google's "better reporting and safety" arguments have no merit............. 17

                3.      Google's "different competitive conditions" argument has no merit. ...... 19

V.      CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Adesina v. Aladan Corp.*,
    438 F. Supp. 2d 329 (S.D.N.Y. 2006) .................................................................. 6

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) ........................................................................... 16

*Allen v. Dairy Mktg. Services*, LLC,
    2013 WL 6909953 (D. Vt. Dec. 31, 2013) .................................................. 8, 16

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ............................................................................ 7

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) .......................................................................... 20

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ......................................................................... 17

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
    554 F. Supp. 3d 606 (S.D.N.Y. 2020) ............................................................. 7

*Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011) ............................................................. 6

*City of Almaty, Kazakhstan v. Ablyazov*,
    2021 WL 5154110 (S.D.N.Y. Nov. 5, 2021) ................................................... 6

*City of Rockford v. Mallinckrodt ARD, Inc.*,
    2024 WL 1363544 (N.D. Ill. Mar. 29, 2024) ................................................ 17

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) ..................................................................... 8

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ....................................................................... 16

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ............................................. 6, 8

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2015 WL 5093503 (E.D.N.Y. July 10, 2015) .................................................. 6

*In re Da Vinci Surgical Robot Antitrust Litig.*,
    2024 WL 5697897 (N.D. Cal. Mar. 31, 2024) .......................................... 1, 2, 7

*In re Elec. Books Antitrust Litig.*,
    2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ................................................ 8, 9

*In re Google Digital Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022) ........................................................ 10

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ................................................ 2, 8

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    982 F.3d 113 (2d Cir. 2020) .................................................................. 7

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    2015 WL 5767415 (E.D. Pa. July 29, 2015) ................................................ 8

*In re Namenda Direct Purchaser Antitrust Litig.*,
    331 F. Supp. 3d 152 (S.D.N.Y. 2018) ................................................. 5, 7, 8

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    638 F. Supp. 3d 227 (E.D.N.Y. 2022) ........................................................ 6

*In re Pharmacy Benefit Managers Antitrust Litig.*,
    2017 WL 275398 ............................................................................. 17

*In re Restasis (Cyclosproine Ophthalmic Emulsion) Antitrust Litig.*,
    335 F.R.D. 1 (E.D.N.Y. 2020) ......................................................... 5, 8, 16

*In re Vitamin C Antitrust Litig.*,
    2012 WL 6675117 (E.D.N.Y. Dec. 21, 2012) ................................................ 6

*In re Wholesale Grocery Products Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) ............................................................... 17

*Iowa Pub. Emps. Ret. Sys. v. Bank of Am. Corp.*,
    2022 WL 2829880 (S.D.N.Y. June 30, 2022) ................................................ 8

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ......................................................................... 9

*Kumho Tire Co., Ltd v. Carmichael*,
    526 U.S. 137 (1999) ......................................................................... 6

*Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*,
    2019 WL 1055527 (S.D.N.Y. Mar. 6, 2019) ................................................. 6

*Moehrl v. Nat'l Ass'n of Realtors*,
    2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ................................................ 7

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) ........................................................................ 6

*Sitts v. Dairy Farmers of Am., Inc.*,
    417 F. Supp. 3d 433 (D. Vt. 2019) ............................................................ 8

*SourceOne Dental Inc. v. Patterson Cos., Inc.*,
    2018 WL 2172667 (E.D.N.Y. May 10, 2018) ................................... 1, 5, 8

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 551 (1931) ................................................................................... 9

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) ................................................................. 20

*United States v. Google LLC*,
    2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ...................................... 9, 10

*ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*,
    2023 WL 3558214 (W.D.N.Y. May 19, 2023) ...................................... 16

*Weiner v. Snapple Beverage Corp.*,
    2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ........................................ 17

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009) ..................................................................... 5

**Rules**

Federal Rule of Evidence 702 ............................................................................ 5

**Other Authority**

ABA Section of Antitrust Law, Antitrust Law Developments (9th ed. 2022) ......................................... 16

## I.    INTRODUCTION AND SUMMARY

Google's *Daubert* Motion[1] does not contest Prof. Elhauge's impeccable credentials—and for good reason.  Prof. Elhauge has been qualified as an expert in antitrust economics by all twenty-five courts to rule on that question, Elhauge Rpt. ¶2 & Ex. A (ECF 959-1),[2] with multiple courts recognizing him as "an antitrust titan."  *E.g., In re Da Vinci Surgical Robot Antitrust Litig.*, 2024 WL 5697897, at *9 (N.D. Cal. Mar. 31, 2024).  Despite the breadth of Prof. Elhauge's analyses in this case,[3] the Motion seeks to exclude only one aspect: the standard economic yardstick model that Prof. Elhauge used—in conjunction with other class-wide evidence and analyses—to compute aggregate damages suffered by both proposed Classes.[4]

Prof. Elhauge has more than satisfied Plaintiffs' burden of showing that his Yardstick is "sufficiently comparable to permit a degree of reliable comparison" with the auction platform transactions at issue.  *SourceOne Dental Inc. v. Patterson Cos., Inc*., 2018 WL 2172667, at *5 (E.D.N.Y. May 10, 2018); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust*

---

[1] Defendants Google LLC, Alphabet Inc., and YouTube, LLC's Mem. of Law in Support of Their Mot. to Exclude the Expert Test. of Prof. Einer Elhauge, June 16, 2025, ECF 1030 ("Motion" or "Mot.").

[2] Unless otherwise noted, all emphases are added, and internal quotation marks and citations are omitted.  Previously filed exhibits are identified by their docket number.  Any additional supporting documents are identified as exhibits—Ex. __—to the Declaration of Izaak Earnhardt, filed contemporaneously herewith.

[3] Prof. Elhauge analyzes multiple economic topics in the 600+ pages of his two scholarly reports, including: definition of the relevant markets; Google's monopoly power in each of these markets; that the multiple acts making up the alleged scheme of anticompetitive conduct (the "Challenged Conduct" or the "Scheme") were anticompetitive both standing alone and collectively; that the Scheme artificially inflated the prices (take rates) that Google charged for its advanced auction platform (AdX) and basic auction platform (AdSense), and for the "package" of Google's ad servers plus its auction platforms; and that all or virtually all members of both Publisher Classes (AdX and AdSense) paid higher prices due to the Scheme.  *See* Expert Report of Professor Einer Elhauge, October 4, 2024 (ECF 959-1) ("Elhauge Rpt."); Corrected Expert Rebuttal Report of Professor Einer Elhauge, March 9, 2025 (ECF 959-3) ("Elhauge Reb. Rpt.").

[4] Google's Motion only seeks to exclude the damages analysis.  *See* Mot. 2 ("damages opinions should be excluded"); *id.* 6-7 (limiting critique to the damages analysis); *id.* 9 ("Prof. Elhauge's damages opinions should be excluded"); *id.* 20 ("his damages opinions should be excluded").  Google's *Daubert* Motion thus does not challenge Prof. Elhauge's use of his Yardstick model to assess anticompetitive effects, Elhauge Rpt. ¶¶396-413, or to evaluate class-wide impact, *id.* ¶¶440-453.

*Litig.* ("*Keurig II*"), 2025 WL 354671, at *34 (S.D.N.Y. Jan. 30, 2025) (yardstick need not be a "perfect clone"); *In re Da Vinci*, 2024 WL 5697897, at *12 (yardstick need only have "meaningful economic similarit[ies]"). Because Google has engaged in the Challenged Conduct for nearly two decades,[5] Prof. Elhauge had no data reflecting a "clean period" to use as a competitive benchmark. Elhauge Reb. Rpt. ¶34. As a result, consistent with applicable law and economics, Prof. Elhauge searched for a set of transactions involving software tools that would be analogous to the web ad technology at issue, but which were not subject to the Challenged Conduct. Prof. Elhauge found such transactions, involving a *similar* set of technologies, sold by a *similar* set of companies (including Google), used by a *similar* set of businesses, for *similar* purposes, in order to advertise to a *similar* set of consumers. Elhauge Rpt. ¶401. Those transactions take place in an adjacent series of markets for visual advertising impressions sold on platforms that Google owns and operates.[6]

Prof. Elhauge's Yardstick involves certain app ad impression transactions completed though Google's AdX and AdMob mobile app auction platforms. *See* Elhauge Rpt. ¶¶404-13; Elhauge Reb. Rpt. ¶¶45, 593-96, 609-10. Google created the Yardstick when, in November 2021, it eliminated its ties on certain mobile app transactions. Elhauge Rpt. ¶404. This change allowed app developers to use a buyer's SDK—the ad server analog—instead of only Google's SDK on Google's auction platforms. *Id.* Without the ties, competitive pressure forced Google to lower its auction platform take rate *just on the mobile app transactions no longer subject to ties*

---

[5] Elhauge Rpt. ¶¶269, 288, 304, 316, 324, 334, 356, 368.

[6] Google's expert, Dr. Mark Israel, endorsed the same methodology during his trial testimony in *United States v. Google LLC* (E.D. Va. Sept. 26, 2024), Tr. 116:21-117:13 (ECF 957-12) (describing in the context of assessing monopoly power in a conduct case, that one "compare[s] the alleged market in a situation where it is not alleged to be a monopoly … [and] if you actually see prices with and without monopolization [*i.e.*, the alleged misconduct], then you can directly compare and ask if the price is higher").

from ███████████████████ thereby establishing a competitive rate for auction

platform services.  Elhauge Rpt. ¶¶404-09; Elhauge Reb. Rpt. ¶¶598, 610, 615.  Google

maintained its ████ take rate on those mobile app transactions that continued to be subject to ties.

Prof. Elhauge conservatively measured damages by taking the difference between the highest

Yardstick take rate (████) and the take rate charged on its web auction platforms (generally,

████) (the "take rate differential"), and multiplying that result by Class ad impression sales on

Google's auction platforms.  Elhauge Rpt. ¶¶442, 444, 447, 455, 457 & Errata (ECF 957-2).

    Google claims that Prof. Elhauge simply "ignores" (Mot. 9) and "did not address" (*id.* 7)

whether certain features Google purportedly offers to publishers using its web auction platforms

are available to developers using Google's analogous mobile app auction platforms.  *Id.* 12-18.

Google also asserts that Prof. Elhauge admits that the Yardstick app transactions are subject to

different competitive conditions.  *Id.* 18-20.  According to Google, because these "differences"

could, at least in theory, account for some of the take rate differential, the Yardstick must be

excluded.  Google is wrong on the facts, the economics, and the law.

    ***First***, before November 2021, despite the supposed additional value Google brought to its

web auction platforms, Google charged the exact same take rate for its web and mobile ad

platforms: ████  Elhauge Rpt. ¶410; Elhauge Reb. Rpt. ¶601.  Google only dropped its take rate

in the Yardstick ██████████████████ when it eliminated the sell-side ties for the

Yardstick transactions.  Elhauge Rpt. ¶¶404-13; Elhauge Reb. Rpt. ¶¶45, 609-10.  This Yardstick

rate was not only lower than the ████ charged for web transactions, but also lower than the ████

rate that Google continued to charge after November 2021 for mobile ad platform transactions

that were still subject to the ties.  Elhauge Rpt. ¶¶403, 410.  Google's auction platforms for

mobile apps (AdMob and AdX) are *the same* for the Yardstick and non-Yardstick mobile app

transactions. Elhauge Rpt. ¶404; Elhauge Reb. Rpt. ¶606. Thus, Google's alleged differences in "value" between the web and mobile apps cannot explain the take rate differential.

**Second**, Google's contemporaneous internal documents making the business case for reducing the take rate on the third-party SDK mobile app Yardstick transactions (with ties removed) do not reference any of the feature differences Google now touts, in litigation, as the basis for the price reduction. *See* Elhauge Rpt. ¶¶406-09; Elhauge Reb. Rpt. ¶¶598, 610, 615. Google contemporaneously understood that the take rate reduction was driven by the

█████████████████████████████████████████████████████████████████.[7]

**Third**, Google's assertion that "Prof. Elhauge calculates damages as the 'entire excess' of the roughly 20% rate for transactions on AdX and AdSense over" the price he believes would prevail absent the Challenged Conduct (Mot. 20) is false. Prof. Elhauge's damages analysis uses ████ as the but-for rate, but the rate for Yardstick transactions ██████████████████████. *See* Mot. 6, n.29 (███████████████████████████); Elhauge Rpt. ¶442. Thus, even if Google were correct—and it is not—that some of the "value" differences accounted for a portion of this ████ price difference, that would not invalidate the conservative ████ Yardstick differential.

**Fourth**, Google's assertions that Prof. Elhauge "ignores" and "did not address any" of Google's claimed differences in quality and competitive conditions (Mot. 7, 9) are false. Prof. Elhauge provided detailed, point-by-point critiques of these arguments. *See* Elhauge Reb. Rpt. ¶¶604-613; *id.* ¶604 (addressing claim that Google charges much more for web than mobile because of supposed "benefit" of access to Google Ads); *id.* ¶¶607-09, 611-12 (responding to Google's multiple specific "additional benefits" arguments); *id.* ¶613 (refuting claim that

---

[7] *E.g.*, GOOG-AT MDL-009468493 at -493 (Ex. 9); Elhauge Rpt. ¶¶406-09; Elhauge Reb. Rpt. ¶¶598, 610, 615.

"integration benefits" account for take rate differential). Google simply ignores his responses.

*Fifth*, none of the asserted "differences"—even if accurate and relevant—would come close to rising to the level required for exclusion of a yardstick damages model. *See, e.g.*, *SourceOne*, 2018 WL 2172667, at *4 ("The weaknesses [in the form of important differences] defendants identify [with the benchmark] are not the kind of deep-seated methodological flaws that can preclude an expert's testimony. If defendants believe that [plaintiff's expert] has insufficiently discounted his conclusion because of dissimilarities between his benchmarks and plaintiff, they or their experts can make that point at trial."); *In re Restasis (Cyclosproine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 21-23 (E.D.N.Y. 2020) (that expert allegedly ignored differences between the yardstick and market in question deemed a jury issue).

In short, Prof. Elhauge's reasoned responses to Google's critiques are all grounded in record evidence and standard economics. They are neither "speculative" nor "conjectural"; nor are they based on assumptions that are "'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009). Google's Motion is akin to that which Chief Judge McMahon observed in *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018): "[L]ike so many such motions, [the motion] is nothing more than a 'we do not agree with his opinion so it is junk science' motion, of the sort that causes this and many judges . . . to view all *Daubert* motions with a certain degree of skepticism." Google's Motion should be denied.

## II.    LEGAL STANDARDS

Google fails to meet the high burden for exclusion. *Daubert* and Federal Rule of Evidence 702 require that a court must determine whether: (1) the witness is "qualified," (2) the opinion is "reliable," and (3) the expert testimony will "assist the trier of fact." *In re Payment*

*Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 242 (E.D.N.Y. 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).  Google contests only one prong: reliability.  An expert must "articulate a rationale for his methodology" that is not "patently flawed or unreasonable." *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *8 (E.D.N.Y. Dec. 21, 2012).[8]  Disputes over the factual basis for an expert's testimony go "to the weight of [the] testimony, not its admissibility." *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, 2019 WL 1055527, at *4-5 (S.D.N.Y. Mar. 6, 2019).[9]

The high bar for exclusion is particularly apt in the antitrust context, which involves economic expertise requiring a substantial degree of professional judgment. *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014), , 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("Deference to experts is particularly appropriate when expert testimony concerns 'soft sciences' like economics.").  Economics and statistics "require the use of professional judgment," such that expert testimony in those fields is less likely to be excluded "because challenges may ultimately be viewed as matters in which reasonable experts may differ." *In re Vitamin C Antitrust Litig.,* 2012 WL 6675117, at *5 (E.D.N.Y. Dec. 21, 2012).[10]

---

[8] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d. at 263 ("If an expert's testimony lies within 'the range where experts might reasonably differ,' the jury, and not the trial court, should 'decide among the conflicting views of different experts.'" (quoting *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 153 (1999)).

[9] *See City of Almaty, Kazakhstan v. Ablyazov*, 2021 WL 5154110, at *11 (S.D.N.Y. Nov. 5, 2021) ("To the extent [opponent] argues that [one expert's] report better accounts for the factual record than [another's], that also does not justify exclusion of [an expert's] testimony."); *Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony may go to weight, not admissibility.") (quoting *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 343 (S.D.N.Y. 2006)); Fed. R. Evid. 702 advisory committee notes (2000) ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

[10] Google's cited cases (Mot. 7-8) are inapposite. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020), involved an expert who, unlike here, failed to reliably

## III.    PROFESSOR ELHAUGE IS INDISPUTABLY QUALIFIED IN ECONOMICS

Prof. Elhauge is the Petrie Professor at Harvard Law School, where he teaches the economic analysis of antitrust law, health policy, and other subjects.  Elhauge Rpt. ¶1.  Prof. Elhauge is the editor of the *Research Handbook on the Economics of Antitrust Law*; is the author of *U.S. Antitrust Law & Economics*; is the co-author of Philip E. Areeda, Einer Elhauge, & Herbert Hovenkamp, *Antitrust Law* (Vol. X, 1996); has published extensively about anticompetitive practices; and has been named one of the world's leading competition economists in the *International Who's Who of Competition Lawyers and Economists*.  *Id.* ¶¶2-3. He has testified as an expert in economics in dozens of cases and has been qualified as an expert in antitrust economics by all twenty-five courts assessing his expertise, Elhauge Rpt. ¶2 & Ex. A, including other courts in this district, *see In re Namenda*, 331 F. Supp. at 172-174; *Garber v. Off. of the Comm'r of Baseball*, No. 12-cv-3704 (SAS), Nov. 24, 2015, Hearing, Tr. at 11 (S.D.N.Y), ECF 472 (Ex. 10).  "Multiple district courts before which he has testified have gone so far as to describe Elhauge as 'an antitrust titan.'"  *In re Da Vinci*, 2024 WL 5697897, at *9 (quoting *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *5 (N.D. Ill. Mar. 29, 2023)).

## IV.    ARGUMENT

### A.    Prof. Elhauge's Yardstick Analysis is Standard and Reliable

Prof. Elhauge uses a standard economic yardstick model to compute aggregate damages to both Classes.[11]  The yardstick approach, which the Motion does not contest, "examines the

---

apply his own methodology.  Likewise, in *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268-69 (2d Cir. 2002), the expert failed to "apply his stated methodology 'reliably to the facts of the case,'" and "inexplicably" failed to include variables in his analysis that he, himself, had identified.  Similarly inapposite is *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 614-15 (S.D.N.Y. 2020), which excluded an expert's report "because every section of [the] expert report is pervaded with impermissible legal conclusions and his opinions are not based on any evident reliable methodology."

[11] Prof. Elhauge combined his Yardstick analysis with economic theory and Google's contemporaneous internal documents.  Elhauge Rpt. ¶¶239, 242, 404-11; Elhauge Reb. Rpt. ¶¶594-95, 609-19.

actual prices and quantities that occurred in a similar market that was not affected by defendant's behavior." *Restasis*, 335 F.R.D. at 15; *see also* Elhauge Rpt. ¶400 & n.1009. Courts in antitrust cases frequently approve yardsticks as appropriate means of assessing harm and measuring damages in antitrust litigation. *See, e.g., Iowa Pub. Emps. Ret. Sys. v. Bank of Am. Corp.*, 2022 WL 2829880, at *25 (S.D.N.Y. June 30, 2022), *R. & R. adopted*, 2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024).[12] Yardsticks must simply be "sufficiently comparable to permit a degree of reliable comparison" with the transactions at issue. *SourceOne*, 2018 WL 2172667 at *5; *see also Keurig II*, 2025 WL 354671, at *34 (yardstick need not be a "perfect clone"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *10 (E.D. Pa. July 29, 2015) ("Prof. Elhauge's benchmark determinations need not be perfect, indeed they could even be 'shaky' but 'admissible' under *Daubert*").

One reason for the "liberal" standard for admission of yardsticks is that they are used to compute damages. In antitrust, courts recognize that because of "the inherent difficulty of identifying a 'but-for world,' antitrust damages need not be measured with certainty." *Restasis*, 335 F.R.D. at 32 (cleaned up); *Air Cargo*, 2014 WL 7882100, at *60 ("The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.")

---

[12] *See also In re Namenda*, 331 F. Supp. 3d at 220 (endorsing yardstick (or "benchmark") analysis as reliable method of calculating class-wide damages); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118 (S.D.N.Y. 2015) (monopolization case endorsing yardstick of profit margins of firms "likely to be as profitable as News Corp. in a market unaffected by monopolization" to calculate "overcharges and damages" for class certification purposes); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014) ("yardstick" is one of "the two most common methods of quantifying antitrust damages"); *SourceOne*, 2018 WL 2172667, at *4 ("Defendants do not dispute the validity of a … 'yardstick' methodology—unsurprisingly, because it is a generally accepted method for measuring antitrust damages."); *Allen v. Dairy Mktg. Services, LLC*, 2013 WL 6909953, at *16 (D. Vt. Dec. 31, 2013) (plaintiff's expert "properly use[d] a yardstick approach … compar[ing] the prices in the proposed geographic market . . . to [those] in a market … unaffected by the antitrust violations"). One court in this Circuit upheld a yardstick analysis performed by Prof. Elhauge in denying a summary judgment motion. *Sitts v. Dairy Farmers of Am., Inc.,* 417 F. Supp. 3d 433, 474-75 (D. Vt. 2019).

(quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).[13]

Prof. Elhauge calculated damages arising from the allegedly inflated take rates that members of both Classes paid for Google's auction platforms (AdX and AdSense). Elhauge Rpt. ¶¶454-59 & Errata; Elhauge Reb. Rpt. ¶¶759-65. To make these calculations, consistent with applicable law and economics, Prof. Elhauge chose a yardstick in which similar ad tech technologies offered by Google and others were used by a similar set of businesses to place ads that reach a similar set of consumers, but without the same tying restraints. Elhauge Rpt. ¶¶401, 403-05. Whereas the ads at issue in this case are placed on the open web,[14] the ads in the Yardstick are placed on mobile apps. On the web, publishers sell ad impressions; in apps, the sellers of ad impressions are called developers; but in both, they are producers of digital content who sell space for ads. Elhauge Rpt. ¶¶155, 401. On the web, publishers use ad servers to process and configure ad sales; in apps, developers use "SDKs" for similar purposes.[15] In both environments, advertisers and ad agencies use ad buying tools (including those offered by Google) to manage their ad buys. *Id.* ¶¶401-02, 405. And in both environments, auction

---

[13] *In re Elec. Books*, 2014 WL 1282293, at *16 ("[T]he Supreme Court has long taught that 'damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'" (quoting *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981))).

[14] Open web display ads are distinct from other display ads, such as those in print media, search, closed "walled garden" platforms (Facebook, Twitter, etc.), and from mobile apps. Elhauge Rpt. ¶¶109-67.

[15] SDKs provide the same functions for mobile app ads as ad servers provide for open-web display ads. SDKs and ad servers also interact with auction platforms in similar ways. Elhauge Rpt. ¶402. The one distinction does not affect the Yardstick analysis, however. For the web, publishers rely on centralized ad servers (provided almost exclusively by Google) to request advertiser bids, serve ads, facilitate billing and provide other ad server functions. *Id.* ¶¶203-05, 220; *United States v. Google LLC* ("EDVA Op."), 2025 WL 1132012, at *30 (E.D. Va. Apr. 17, 2025). For mobile apps, one the other hand, some buyers (advertisers) require developers to install specific SDKs in their apps for the developers to communicate specific information about the ad impression to buyers. Elhauge Rpt. ¶402. As a result, while publishers rarely use more than one ad server, developers often install multiple SDKs within their apps. *Id.* ¶¶220, 402. However, this difference between SDKs and ad servers has no effect on the take rates Google would charge for its open web auction platforms in a competitive market or on the competitive rates Google's mobile app auction platform did charge for the Yardstick segment. *Id.* ¶402 & n.1019.

platforms offered by Google and others conduct auctions connecting ad "supply" with ad "demand," and charge take rates as a percentage of the auction clearing price. *Id.* ¶401. In short, the Yardstick consisted of the subset of mobile app ad transactions completed though Google's mobile app ad auction platforms that were not subject to similar ties to those Google imposes on its open web ad auction platforms (AdX and AdSense) or as those Google imposes on its app ad auction platforms (AdX and AdMob) outside the Yardstick. *Id.* ¶¶401-13; Elhauge Reb. Rpt. ¶¶45, 593-96, 609-10.

For years, Google had sell-side and buy-side ties/restraints in mobile apps that were materially similar to its ties/restraints in web transactions.[16] In November 2021, Google created a new program that permitted developers to use non-Google SDKs to access certain non-Google demand (called "Authorized Buyers") through Google's AdX and AdMob mobile app auction platforms. Elhauge Rpt. ¶404.[17] Through this change, Google removed the sell-side tie that had

---

[16] In open-web display, Google tied its ad servers with its auction platforms such that web publishers were unable to effectively access Google's auction platforms (AdX and AdSense Auction Platform) without also using Google's ad servers (DFP or AdSense) and *vice versa* (the "sell-side ties"). Elhauge Rpt. ¶¶287-308; Elhauge Reb. Rpt. ¶¶345-47, 355-59; Elhauge Dep. 117:23-119:7 (ECF 959-4); *In re Google Digital Advert. Antitrust Litig.* ("*Google I*"), 627 F. Supp. 3d 346, 368-69 (S.D.N.Y. 2022); *EDVA Op.* *38-41. In apps, prior to November 2021, Google maintained similar sell-side ties, requiring developers seeking to use Google's app auction platforms (AdMob and AdX) to sell app ads to use Google's SDK (the app analog to an ad server), and *vice versa*. Elhauge Rpt. ¶¶403-04. And in both the web and app markets, the only way publishers and developers could receive bids from Google Ads (Google's dominant ad buying tool), was to use Google's auction platforms (the "buy-side ties/restraints"). *Id.* ¶403. Google used these buy-side ties/restraints to reinforce its sell-side ties and thereby bolster its market power in its auction platforms. *See* Elhauge Dep. 178:19-179:13; 180:1-14; Elhauge Rpt. ¶¶276, 283, 302; Elhauge Reb. Rpt. ¶¶253, 366; *Google I*, 627 F. Supp. 3d at 368; *EDVA Op.* *12-13, 40.

[17] Prior to November 2021, with limited exceptions, the only way a developer could sell app impressions via Google's mobile app auction platforms, and thereby offer impressions to Google Ads advertisers, was to use Google's SDK (ad server analog). Elhauge Rpt. ¶403. During this period, Google charged at least 20% for all AdX and AdMob auction platform transactions. After November 2021, Google launched a program that allowed mobile app developers to use AdX and AdMob to solicit bids and use third-party SDKs to serve the ads and report on the transaction. *Id.* ¶404. If the winner of the AdX or AdMob auction is a buyer using the Google SDK, Google charged 20% for its AdX or AdMob auction platform functions. *Id.* ¶¶403-04. But if the winner is a buyer that uses the app developer's corresponding third-party SDK, Google charged 10% for those same auction platform functions until mid-2022, when it reduced the take rate on those transactions to 5%. *Id.* ¶404.

previously required developers using Google's auction platforms for mobile ads (AdX and AdMob) to also use Google's SDK (the analog to the ad server). *Id.* ¶¶403-04. As a result, developers using *non-Google* SDKs could now transact through Google's mobile app auction platforms. *Id.* And when those developers using non-Google SDKs transacted through Google's mobile app auction platforms to sell ad space to advertisers using non-Google ad buying tools (Authorized Buyers), Google slashed its mobile auction platform take rate from ███████

███████████████ (in Q2 2022). *Id.* ¶404; *see also* Mot. 6 & n.29 (conceding that Google reduced its fee only for Yardstick transactions to ███████████

███████████ ). Thus, on transactions that were no longer subject to the sell-side ties (because Google now allowed non-Google SDKs to transact through its mobile app auction platforms), and not subject to Google's buy-side ties/restraints (because these transactions involved buyers using non-Google buying tools), competition forced Google to cut its take rate ████████████████ . Google's Motion does not contest *any of these facts*.

Google's internal documents make clear that, with the ties removed, Google was forced to lower take rates to meet the competition from rival auction platforms. Elhauge Rpt. ¶¶406-08; Elhauge Reb. Rpt. ¶¶45, 610 & n.1567. A September 2021 document ████████████

████████████████████████████████████

█████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

███████████████████████████ GOOG-AT-MDL-007334263 at 264 (Ex. 11); *see also* Elhauge Rpt. ¶406. Thus, Google recognized that competition for auction platform transactions would increase significantly when Google removed the tie that required developers

using AdX and/or AdMob to use Google's SDK exclusively.  As a result, Google responded by slashing its take rate to match competition from rival auction platforms.

To be conservative, Prof. Elhauge used only the initial ██ take rate charged in the Yardstick (not the ultimate ██ take rate) to compare to the average take rates Google charged for its two web auction platforms during the Class Period: 19.67% for AdX and 20.57% for AdSense.  Elhauge Rpt. ¶¶442, 444, 447; Elhauge Reb. Rpt. ¶ 764.[18]  The difference between the Yardstick and AdX/AdSense take rates, respectively, measures damages on all impressions for each Class member.  Elhauge Rpt. ¶455; Elhauge Reb. Rpt. ¶¶761, 765.

## B. Prof. Elhauge Accounted for Each of the Alternative Factors that Google Claims Explains the Higher Prices on Web Ad Sales Transactions

Google argues that Prof. Elhauge's yardstick analysis potentially overstates damages because the take rate differential could have been due to factors other than the challenged ties. Mot. 12-20.  Google contends that the Yardstick did not provide certain supposedly "valuable" services offered in web display (Mot. 12-18), and that the take rate differential could be explained by differences in competitive conditions (Mot. 18-20).  Neither argument withstands scrutiny.

### 1. Google's "aggregated demand" argument has no merit.

Google asserts that for third-party SDKs (the ad server analogs) used for Yardstick transactions, "developers selling app impressions must establish their own separate, direct relationships with each buyer that uses a third-party SDK."  Mot. 13.  It asserts further that for open web transactions, Google "aggregates demand from many buyers on AdX and AdSense." *Id.*  Google suggests that this difference explains the take rate differential.  Mot. 14.  Not so.

---

[18] The Yardstick take rate differential is also conservative because it only measures the anticompetitive effects of the ad server-auction platform tying restraints, and not the effects of the additional exclusionary conduct.  Elhauge Rpt. ¶¶404-06; Elhauge Reb. Rpt. ¶¶505, 510, 593-600; Elhauge Dep. 174:9-175:11.

*First*, before November 2021, despite the supposed additional value Google brought to its web platforms, *Google charged the exact same take rate* for the web and mobile app auction platforms: ███. And Google only dropped its take rate in the yardstick from ███████ ████████ when it eliminated the sell-side ties for the mobile app ads (for the transactions not subject to the buy-side ties/restraints, *i.e.*, the Yardstick transactions). Indeed, Prof. Elhauge showed that this ████ rate was not only lower than the ████ rate it charged for web auction transactions, but also lower than the parallel ████ rate that Google continued to charge ███ ██████████ for mobile app transactions that were still subject to its ties. Elhauge Rpt. ¶¶403, 410. The take rate differential *within the mobile app ads environment* can only be explained by the absence of the ties, negating Google's claim that some or all the difference between the ████ web rate and the ████ app rate reflects "value" differences *between* the web ads environment and the mobile app ads environment. Only the removal of the tying in the mobile app ad transactions—and the competitive pressure that evolved from that removal—*and nothing else*, could possibly account for the take rate differential.

The Yardstick confirms the anticompetitive effects of the Challenged Conduct in two independent ways: (a) the Yardstick compares pricing for Class transactions (on the open web) *with the ties* (████ take rate) with pricing for mobile app ad platform transactions involving similar products, firms, and customers but *without the ties* (████ take rate), and (b) the Yardstick compares pricing for mobile app ad platform transactions *with the ties* (████ take rate) with mobile app ad platform transactions *without the ties* (████ take rate). *Id.* ¶¶403-04, 410.

*Second*, Google recognizes that developers pay ████ on app transactions using Google's mobile app auction platforms when using Google's SDK (ad server analog)—the Yardstick rates only apply where developers use *third-party* SDKs to render and report, meaning Google is

providing only auction platform services. Mot. 14-15. Google attempts to explain this discrepancy by asserting that Google's SDK provides additional value. *Id.* This makes no sense given that Google charged nothing for its SDK services, Elhauge Rpt. ¶411; Elhauge Reb. Rpt. ¶608, and Google charged the higher take rate on its auction platforms, which are used across both Yardstick and non-Yardstick transactions to auction mobile app impressions.

**Third,** Google's argument does not make economic sense. Aggregation of demand in open web auction platforms does not provide material additional value given that, within the Yardstick transactions, developers can and do aggregate demand *on their own* by programming multiple SDKs in their apps. And the evidence shows that developers do so cheaply and efficiently. Elhauge Reb. Rpt. ¶613; *see also* Elhauge Dep. 268:5-24; Das Reb. Rpt. ¶¶185-87, 197-99 (ECF 959-6).[19] In other words, even in Yardstick transactions, developers still have access to the aggregated demand.[20]

**Fourth**, Google's own internal analysis concluded that "whatever costs are imposed by having [multiple] SDKs are commonly seen to be eclipsed by the revenue benefits." Elhauge Reb. Rpt. ¶613 & n.1578 (quoting GOOG-AT-MDL-001967178 at -182). Google attempts to explain this admission by saying it implies that developers incurred some additional costs when they used rival SDKs. Mot. 15. But Prof. Elhauge's point was that the evidence is that the incremental cost of using additional SDKs is low given that the use of multiple SDKs is "ubiquitous in the mobile app ad serving market, and the ease with which SDKs can be

---

[19] In fact, "the use of multiple SDKs is ubiquitous in the mobile app ad serving market," because, as Google recognized internally, the incremental value of each additional SDK exceeds the cost of such integration. Elhauge Reb. Rpt. ¶613 & n.1578 (citing GOOG-AT-MDL-001967178 at -182).

[20] Moreover, the Yardstick Transactions at the lower rates take place only after the same aggregated demand from the AdX/AdMob platforms compete for the impression, and the impression is won by an Authorized Buyer whose own "third-party" SDK is used to report and render the ad on the developer's app.

downloaded renders it [the mobile app ad serving market] a reasonable comparator to display ads. Integration with multiple 3P [third-party] SDKs was not an anomaly, but an important feature that many competitors, and Google itself, adopted." Elhauge Reb. Rpt. ¶613.[21]  In any event, as pointed out above, Google charged *nothing* for its SDK (despite all of its supposed "additional value"), *nothing* for the AdSense tag, and often *nothing* (and at most a nominal amount) for its DFP ad server.  Elhauge Rpt. ¶411; Elhauge Reb. Rpt. ¶608.  In short, there is no evidence for Google's assertion that its ad server/SDK services were sufficiently valuable that they could explain the take rate differential.  Elhauge Reb. Rpt. ¶608.[22]

   *Fifth*, that publishers using AdX or AdSense for open web transactions received access to aggregated demand is neither a product feature of Google's web auction platforms nor a reflection of any difference between product features for web versus app transactions.  Elhauge Rpt. ¶402; Elhauge Reb. Rpt. ¶606.  That use of Google's web ad tools offered "aggregated demand" was simply an effect of the challenged ties, which made the use of Google's ad server and ad platform the only way to access Google Ads demand.  *See* Elhauge Rpt. ¶403; Elhauge Reb. Rpt. ¶¶595, 604.  Similarly, with mobile apps, outside of the Yardstick, Google required that developers use Google's SDK (ad server analog) and auction platforms in order to access Google Ads demand.  *Id.*  Thus, the fact that use of Google's SDK is the only way to access

---

[21] The Motion's reference to the opinion of Plaintiffs' expert, Anand Das, regarding the time required for adding SDKs (Mot. 14 & n.43) mischaracterizes Das's opinions.  Das's analysis confirms the low incremental costs of adding SDKs.  Drawing on Google's own documents, Das states that "Even though adding SDKs can take a few hours to 1-2 days (depending on the complexity of the app and SDK and a developer's experience), the relatively *minimal time investment* is well worth the increased revenue for many developers."  Das Reb. Rpt. ¶187 (emphasis added).  Further, Das states: "Buyers often prefer third-party SDKs.  As explained in an internal Google document, some demand sources prefer third-party SDK integrations for 'better signal collection, custom rendering, and maintaining direct relationships with the publishers.'"  *Id.* ¶188 (citing GOOG-AT-MDL-001973033, at -034).

[22] *About AdMob bidding ad sources*, Google AdMob Help, https://support.google.com/admob/answer/11555701?sjid=13298382631766127304-NC# (Ex. 12).

"aggregated demand" is simply a result of the challenged ties—and not a feature of Google's SDK itself.  Elhauge Reb. Rpt. ¶604; *see also id.* ¶¶605-07.[23]

      **Sixth**, even if Google's SDK offered some additional value independent of the ties (that Google would have charged for absent the ties), the Yardstick would still be valid.  Prof. Elhauge conservatively uses ▮▮▮ as the but-for rate, when in fact, the rate for Yardstick transactions ▮▮▮▮▮▮▮▮▮▮▮.  *See* Elhauge Rpt. ¶442; Elhauge Reb. Rpt. ¶¶33, 707.

      **Seventh**, Google's asserted differences between Prof. Elhauge's Yardstick and Google's web ad markets are matters for the jury, not a basis for exclusion.  *SourceOne*, 2018 WL 2172667, at *5 ("If defendants believe that [plaintiff's expert] has insufficiently discounted his conclusion because of dissimilarities between his benchmarks and plaintiff, they or their experts can make that point at trial."); *id.* (critiques of an expert's selection of a benchmark "[g]enerally . . . are issues of the expert's credibility that ought to be decided by a jury."); *ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, 2023 WL 3558214, at *2 (W.D.N.Y. May 19, 2023) ("the adequacy of . . . comparators goes to 'the weight of the testimony and its credibility, not its admissibility").[24]

---

[23] Google cites no evidence showing that the lack of access to aggregated demand in Yardstick transactions is a cause of the lower take rate.  One document Google cites states only that third-party SDK integration "implies direct relationship and/or contract between the buyer and the publisher, which is usually associated with lower rev share."  Mot. 14 (citing GOOG-AT-MDL-007334263 at -264).  But this quotation refers to *direct deals* between a developer and a buyer, which are not at issue in this case.  This document is not discussing the programmatic auctions or the services of an auction platform at issue here.  Elhauge Reb. Rpt. ¶614; *see also* Elhauge Rpt. ¶¶168-73, 179; Elhauge Reb. Rpt. ¶¶14-16, 150-69.

[24] *Restasis*, 335 F.R.D. at 21, 23 (where defendant attacked yardstick of similar drug market in part because expert allegedly ignored differences, court found expert "offered persuasive reasons for choosing" the yardstick and that defendant "may make its case to a jury"); *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968–69 (9th Cir. 2013) ("challenges [to] the expert's assumptions and comparisons" were "colorable, but none go to admissibility" and instead "amount to impeachment"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997) ("Whether [the yardstick] properly compares to the relevant market presents a question of fact for the jury."); *Dairy Mktg. Services*, 2013 WL 6909953 at *15 (rejecting *Daubert* challenge to an expert's damage computations based on yardstick); ABA Section of Antitrust Law, Antitrust Law Developments 834 (9th ed. 2022) ("Whether the plaintiff has met [its] burden of showing comparability [of a yardstick] ordinarily is a question for the trier of fact.").

Defendants' cited cases (Mot. 10-12) are inapposite.[25]

### 2. Google's "better reporting and safety" arguments have no merit.

Google argues that Prof. Elhauge did not account for the purported superiority of its web auction platforms in performing reporting services and security protections supposedly unavailable on the Yardstick transactions. Mot. 15-18. Google's argument ignores the facts, and in any event, these additional features cannot explain the take rate differential.

**First**, as pointed out above, *supra* at 13, the take rate differential prevailed not only between the web and Yardstick mobile app transactions but also between the Yardstick mobile app transactions and the non-Yardstick mobile app transactions. Given that Google offered the exact same services on its auction platforms for Yardstick and non-Yardstick transactions, better "reporting and safety" cannot explain the take rate differential.

**Second**, for app ad impressions sold via the AdMob and AdX auction platforms, Google suggests that *Google's SDK* provides reporting services and protection from spam and fraud that Google does not provide when advertisers use a third-party SDK. But this is an argument that *Google's SDK* (ad server analog) provides additional product value, *not that its auction*

---

[25] Google cites to cases (Mot. 10-12) where unlike here, the expert neither considered nor controlled for non-conduct factors. In *In re Wholesale Grocery Products Antitrust Litig.*, 946 F.3d 995, 1002-03 (8th Cir. 2019), the court rejected *counsel's* claim that the court should permit the mere "assump[tion]" that non-conspiratorial factors were no different in the comparators. *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *6-8 (S.D.N.Y. Aug. 5, 2010), which excluded a *four page* expert report that did no more than outline in *principle* two methods, one of which was a yardstick, of how damages could be calculated in theory, was based only on a "cursory review of the underlying record," and where the expert conceded he did "nothing to confirm that his proposed approaches would be workable." *City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *8 (N.D. Ill. Mar. 29, 2024), excluded an expert who failed to take account of differences in market structure between an industry-wide price index chosen as yardstick and the market for the drug at issue. The same distinction applies to *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 594 (7th Cir. 1998), where the expert failed to correct for differences in market shares between the actual and yardstick markets. Finally, in *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017), the expert, unlike here, "admitted that he could not rule out other factors as being responsible for the [price] differential because he did not consider any other factors."

*platforms do*.  Elhauge Rpt. ¶411; Elhauge Reb. Rpt. ¶¶606, 608.[26]  Google charged the take rate

price at issue on its *auction platform transactions*, and thus greater SDK quality could not

possibly explain any part of the difference in *auction platform* take rates between web

transactions and Yardstick transactions.  *Id.*[27]

     ***Third***, even if it were not conceptually flawed, Google's argument that extra services

provided by Google's SDK explain the auction platform take rate differential is contrary to

record evidence.[28]  Google falsely asserts that "Prof. Elhauge does not contend that developers

using third-party SDKs for app transactions receive the same level of protection from malware,

invalid traffic, and ad fraud as publishers that use AdX and AdSense for web transactions (or

Google's SDK for app transactions)."  Mot. 17.  To the contrary, Prof. Elhauge pointed out that

Google's expert, Prof. Chevalier, acknowledged that third-party SDKs provided security services

similar to Google's SDK, and yet rival mobile app ad auction platforms accessed by third-party

SDKs charged a rate of ████.  Elhauge Reb. Rpt. ¶609 (citing Chevalier Rpt. ¶78).  Google

---

[26] If Google were able to charge a higher take rate on its auction platforms, but only when accessed by Google's SDK, that would mean that Google was able to leverage its SDK market power to charge higher auction platform rates.  Elhauge Reb. Rpt. ¶¶605-06.  But that would be an effect of the challenged ties, rather than an effect of higher SDK quality.  *Id.*

[27] In addition, Google's brief states that "[w]hen app impressions are sold on AdMob using a third-party SDK," the third-party SDK provides the additional security and reporting services.  Mot. 5.  But Google does not claim that Google outsources these services to third-party SDKs when mobile app impressions are sold on AdX.  Thus, it appears that Google provides the security and reporting services for non-Google SDK sales on AdX through AdX itself, but it provides those services through the Google SDK for sales on AdMob.  In other words, there are no additional services offered by Google for Yardstick and non-Yardstick transactions through AdX, and thus the cost or value of providing these services cannot explain the much higher take rates for the non-Yardstick transactions.

[28] Moreover, Google's current website contradicts its argument.  Specifically, Google claims that it does not offer creative scanning services on the Yardstick transactions that it offers through Google's SDK and on web transactions.  Mot. 17.  But Google's website says otherwise.  *See Buyer SDK ad format*, Google for Developers, https://developers.google.com/authorized-buyers/rtb/buyer-sdk-ads (Ex. 13) ("Creatives are reviewed . . . to ensure they meet our policies and publisher settings.").

simply ignores this evidence.[29]

**Fourth**, Google's documents show that Google provided some protection from spam and malware for Yardstick transactions long after the Yardstick rate was lowered from ███████ ███████████████. Das Reb. Rpt. ¶204; Elhauge Reb. Rpt. ¶612. Thus, even if Google later stopped providing such services, that could not explain the lowered revenue share in November 2021. *Id.*

**Fifth**, as shown above, *supra* at 16, even if Google's auction platforms, and not its SDK, provided the services at issue (and thus could have accounted for some of the take rate differential), the Yardstick would still be valid given that Prof. Elhauge conservatively uses a take rate ████████████████████████████████ *See* Elhauge Rpt. ¶442; Elhauge Reb. Rpt. ¶707.

**Sixth**, as set forth above, *supra* at 16-17, as a matter of law, Google's asserted "services" differences constitute a factual dispute for the jury, not a basis for exclusion of an expert.

### 3. Google's "different competitive conditions" argument has no merit.

Finally, Google offers the erroneous argument that Prof. Elhauge failed to account for differences in "competitive conditions" between web and Yardstick transactions, and thus cannot attribute the take rate differential only to the ties. Mot. 18-20.

**First**, the *only* differences in "competitive conditions" between web and app transactions that Google mentions are those that Prof. Elhauge himself identified (Mot. 18-19) and he only observed that competitive pressure resulting from removing the ties drove Google to lower the

---

[29] Moreover, Google's internal documents did not indicate that the difference in rates reflected any difference in product value. Elhauge Rpt. ¶409. Instead, those documents indicated that the difference in rates reflected the fact that Google did not feel "competitive pressure" on the tied transactions but did on the untied transactions in the Yardstick. *Id.* ¶¶406-410; Elhauge Reb. Rpt. ¶¶598, 610, 615.

rate for Yardstick transactions ████ to match rival auction platform prices. Elhauge Rpt. ¶¶403-410; Elhauge Reb. Rpt. ¶¶45, 598, 610, 615. Where the ties were kept in place, prices did not fall at all. *Id.* Prof. Elhauge thus logically, and consistent with economic theory, attributed the competitive pressure that caused Google to lower prices, but only for the Yardstick transactions, to the removal of the ties. *Id.*

**Second**, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (cited Mot. 19-20), is inapposite. As discussed above, by conservatively choosing a ████ but-for take rate ██████████, Prof. Elhauge did not attribute the entire take rate differential to the challenged restraints. Even if he had, Prof. Elhauge would have complied with the admonition in *Berkey Photo* that "a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct." 603 F.2d at 297-98. By measuring the take rate differential after Google eliminated the ties in a comparable yardstick market, he measured the effect of just that anticompetitive conduct, no more, no less. And he did control for "any differences in competitive conditions that he believes exist for web and app transactions to isolate 'the price increment caused by' the alleged tying restraints." Mot. 20. Competitive conditions changed in the Yardstick segment only when Google eliminated its ties in that segment. Elhauge Rpt. ¶¶403-11; Elhauge Reb. Rpt. ¶¶41, 45, 598, 610, 615.[30] As a result, the Yardstick is appropriate and reliable.

## V. CONCLUSION

For all the foregoing reasons, Google's Motion should be denied.

---

[30] *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335 (2d Cir. 1988) (cited Mot. 20), is inapposite for the same reason. Unlike in *U.S. Football League*, Prof. Elhauge's Yardstick does not measure impact or damages attributable to any "lawful factors." *Id.* at 1378-79.

Dated: July 16, 2025

Respectfully submitted,

David Boies
dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

*Interim Co-Lead Counsel*
*for the Publisher Class*

/s/ Philip C. Korologos
Philip C. Korologos
pkorologos@bsfllp.com
Robert J. Dwyer
rdwyer@bsfllp.com
James Keyte
jkeyte@bsfllp.com
Luke Williams
lwilliams@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300

Mark C. Mao
mmao@bsfllp.com
Sean P. Rodriguez
srodriguez@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6820

Sabria A. McElroy
smcelroy@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 377-4216

21

Izaak Earnhardt
iearnhardt@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave NW, 11th Floor
Washington, DC 2005
Telephone: (202) 237-2727

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
Andrew Ellis
aellis@koreintillery.com
Ian Moody
imoody@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Fax: (314) 241-3525

Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Jeremy Gradwohl
jgradwohl@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Robert E. Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

*Interim Co-Lead Counsel*
*for the Publisher Class*

23