# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **No. 1:21-md-3010 (PKC)** |

*This Document Relates To:*

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL PUBLISHER ANTITRUST LITIGATION** | **No. 1:21-cv-07034 (PKC)** |
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | **No. 1:21-cv-07001 (PKC)** |
| **ASSOCIATED NEWSPAPERS LTD. v. GOOGLE LLC** | **No. 1:21-cv-03446 (PKC)** |
| **GANNETT CO., INC. v. GOOGLE LLC** | **No. 1:23-cv-05177 (PKC)** |
| **INFORM INC. v. GOOGLE LLC** | **No. 1:23-cv-01530 (PKC)** |

**DEFENDANTS GOOGLE LLC, ALPHABET INC., AND
YOUTUBE, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTIONS FOR COLLATERAL ESTOPPEL AND PARTIAL SUMMARY JUDGMENT**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 3

I.      PLAINTIFFS FAIL TO MEET THE LEGAL
STANDARDS FOR COLLATERAL ESTOPPEL AND SUMMARY JUDGMENT ...... 3

     A.     Plaintiffs Fail To Establish The Elements Required For Collateral Estoppel ........ 3

          1.     The Issues In These Cases Are Not
Identical To The Issues In The Virginia Case ........................................... 4

               a)     The Virginia Court Construed
*Trinko* Differently Than The Second Circuit ................................. 6

               b)     The Virginia Court's Analysis
Of Two-Sided Transaction Platforms
Does Not Align With Second Circuit Precedent ............................. 9

               c)     The Virginia Court Applied
Standards For Identifying Anticompetitive
Conduct That Differ From Second Circuit Law .......................... 10

               d)     The Virginia Court Analyzed A Tying Claim
Using Principles That Differ From Second Circuit Law .............. 11

               e)     The Virginia Court Analyzed Google's
Alleged Course Of Conduct Using Principles That
Differ From Those Applicable In The Second Circuit ................. 13

          2.     Collateral Estoppel Can Apply Only
To Issues Actually Litigated And Decided In The Virginia Case ........... 14

          3.     Collateral Estoppel Does Not Apply Unless There
Has Been a Full and Fair Opportunity to Litigate in the Prior Case ......... 14

          4.     Only Issues Necessary To A Final Judgment
In The Virginia Case May Receive Collateral Estoppel ........................... 14

          5.     It Would Be Inefficient And Unfair To Apply Collateral Estoppel .......... 16

     B.     Rule 56 Does Not Allow For Summary Judgment On Most Issues ..................... 20

II.     ADVERTISERS CANNOT RECEIVE
        COLLATERAL ESTOPPEL ON ANY ISSUE ................................................ 21

        A.    Advertisers Are Not Entitled To Partial
              Summary Judgment On Market Definition (Issue B) ........................... 21

        B.    Advertisers Are Not Entitled To Partial
              Summary Judgment On Monopoly Power (Issue A) ........................... 24

        C.    Advertisers Are Not Entitled To Partial
              Summary Judgment On Anticompetitive Conduct (Issue C) .............. 26

        D.    Advertisers Are Not Entitled To Partial
              Summary Judgment On Procompetitive Justifications (Issue D) ........ 29

        E.    Advertisers Are Not Entitled To Partial
              Summary Judgment On The Refusal To Deal Doctrine (Issue E)....... 31

III.    PUBLISHERS CANNOT RECEIVE COLLATERAL ESTOPPEL ON ANY ISSUE ... 33

        A.    Publishers Are Not Entitled To Partial Summary
              Judgment On Market Definition (Issues 1, 2, and 4) .......................... 34

        B.    Publishers Are Not Entitled To Partial
              Summary Judgment On Monopoly/Market Power (Issues 5, 6, and 24) .............. 39

        C.    Publishers Are Not Entitled To Partial
              Summary Judgment On  Anticompetitive Conduct
              Or Procompetitive Justifications (Issues 7-12 and 14-19) .................. 39

        D.    Publishers Are Not Entitled To Partial
              Summary Judgment On Tying (Issues 21-25) ..................................... 42

        E.    Publishers Are Not Entitled To Partial Summary
              Judgment On Google's Defenses (Issues 3, 13, and 20)...................... 45

        F.    Publishers Are Not Entitled To Partial Summary
              Judgment On Supposed "Predicate Factual Findings" ........................ 47

IV.     INFORM CANNOT RECEIVE COLLATERAL ESTOPPEL ON ANY ISSUE .......... 51

        A.    Inform Is Not Entitled To Partial Summary
              Judgment On Market Definition (Issues 1-27) .................................... 52

        B.    Inform Is Not Entitled To Partial
              Summary Judgment On Market Power (Issues 28-46)......................... 57

        C.    Inform Is Not Entitled To Partial
              Summary Judgment On Tying (Issues 49-58) ..................................... 60

D.   Inform Is Not Entitled To Partial
Summary Judgment On Anticompetitive Conduct (Issues 49-50, 59-65) ........... 61

E.   Inform Is Not Entitled To Partial Summary Judgment
On The Summary Findings It Identifies (Issues 47 and 48) ............................... 62

F.   Inform Is Not Entitled To Partial Summary Judgment
On Google's Procompetitive Justifications and Defenses (Issues 66-81) ........... 63

V.   GANNETT AND DAILY MAIL CANNOT
RECEIVE COLLATERAL ESTOPPEL ON ANY ISSUE ............................................... 66

A.   Gannett And Daily Mail's Cases Differ From The Virginia Case ...................... 67

B.   Gannett And Daily Mail Are Not Entitled To
Partial Summary Judgment On Market Definition (Counts I-IV) ...................... 70

1.   Gannett And Daily Mail's Proposed "Open Display" Markets
Are Materially Different From The Markets In The Virginia Case .......... 70

2.   The Virginia Court's Ruling Did Not
Account For Daily Mail And Gannett Admissions
Showing The Breadth Of Competitive Alternatives ................................. 74

3.   The Geographic Scope Of Gannett And Daily Mail's
Open Display Markets Was Not Decided In The Virginia Case ............. 76

C.   Gannett And Daily Mail Are Not Entitled
To Partial Summary Judgment On Monopoly Power (Counts I-IV) ................... 76

D.   Gannett And Daily Mail Are Not Entitled To
Partial Summary Judgment On Anticompetitive Conduct
In Support Of Their Monopolization Claims (Counts II-III) ............................... 78

1.   The Virginia Case's Rulings On DRS, UPR,
And Last Look Were Based On Different Markets ................................. 78

2.   Gannett and Daily Mail Challenge Different
Versions Of DRS Than The One In The Virginia Case ........................... 79

3.   The Virginia Court's Findings On UPR Address Different
Issues Than In This Case And Were Based On Different Evidence ......... 79

4.   The Virginia Court Based Its Last Look Ruling On
Different Conduct And Different Applicable Legal Standards ............... 81

E.   Gannett And Daily Mail Are Not Entitled To
Partial Summary Judgment On Their Tying Claims (Counts I-IV) ..................... 82

      1.    The Virginia Court Based Its Tying Ruling On A Different
Legal Standard Than The One Applicable In The Second Circuit ........... 82

      2.    Gannett And Daily Mail Challenge
A Different Tie Than The Tie Found In The Virginia Case .................... 83

F.    Gannett And Daily Mail Are Not Entitled
To Partial Summary Judgment On Google's Defenses ........................................ 84

G.    Granting Gannett And Daily Mail's Motion
Would Not Narrow The Scope Of The Evidence In Their Cases ......................... 85

CONCLUSION ............................................................................................................. 86

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Actava TV, Inc. v. Joint Stock Co.* "*Channel One Russ. World,*"
    412 F. Supp. 3d 338 (S.D.N.Y. 2019)......................................................................77

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999)..................................................................25, 75, 78

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014)....................................................................8, 9, 11

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
    626 F.3d 699 (2d Cir. 2010)................................................................................36

*Akhenaten v. Najee, LLC*,
    544 F. Supp. 2d 320 (S.D.N.Y. 2008)................................................................15

*Alpert's Newspaper Delivery Inc. v. The New York Times Co.*,
    876 F.2d 266 (2d Cir. 1989)..................................................................24, 71, 74

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016)................................................................................26

*In re: Am. Express Anti–Steering Rules Antitrust Litig.*,
    2016 WL 748089 (E.D.N.Y. Jan. 7, 2016) .................................................14, 18

*In re Am. Express Anti-Steering Rules Litig. (II)*,
    2015 WL 9915999 (E.D.N.Y. Dec. 14, 2015) ...................................................37

*Aramony v. United Way of Am.*,
    254 F.3d 403 (2d Cir. 2001)................................................................................11

*Argus Inc. v. Eastman Kodak Co.*,
    552 F. Supp. 589 (S.D.N.Y. 1982)....................................................................73

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985).....................................................................................8, 9, 49

*Bd. of Trs. of the Auto. Indus. Welfare Fund v. Groth Oldsmobile/Chevrolet, Inc.*,
    2011 WL 1362178 (N.D. Cal. Apr. 11, 2011) ...................................................20

*Beechwood Restorative Care Ctr. v. Leeds*,
    436 F.3d 147 (2d Cir. 2006)..........................................................................14, 48

*Bifolck v. Philip Morris USA Inc.*,
  936 F.3d 74 (2d Cir. 2019) ....................................................................14, 16, 56

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013) ................................................... 7, 8

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .........................................................................56, 75

*Caruso Mgmt. Co.v. Int'l Council of Shopping Ctrs.*,
  403 F.Supp.3d 191 (S.D.N.Y. 2019) ...........................................................72

*Cayuga Nation v. Tanner*,
  6 F.4th 361 (2d Cir. 2021) ......................................................................14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................20

*Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
  56 F.3d 359 (2d Cir. 1995) ..................................................................51, 62

*Cent. Air Freight, Inc. v. Am. Airlines, Inc.*,
  597 F. Supp. 564 (S.D.N.Y.) ....................................................................25

*Charter Oak Fire Ins. Co. v. Electrolux Home Products, Inc.*,
  882 F. Supp. 2d 396 (E.D.N.Y. 2012) ....................................................60, 81

*Charter Oak Fire Ins. Co. v. Tecumseh Prods. Co.*,
  2007 WL 3102177 (D. Conn. Oct. 23, 2007) ...............................................15

*City of Groton v. Conn. Light & Power*,
  662 F.2d 921 (2d Cir. 1981) ....................................................................13

*City of New York v. Grp. Health Inc.*,
  2010 WL 2132246 (S.D.N.Y. May 11, 2010) ...............................................70

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011) ....................................................................37

*Coan v. Dunne*,
  2019 WL 2137459 (D. Conn. May 15, 2019) ...............................................19

*Comm'r v. Sunnen*,
  333 U.S. 591 (1948) ...............................................................................5

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.*,
  663 F.2d 405 (2d Cir. 1981) ....................................................................45

*Cullen v. Margiotta*,
    811 F.2d 698 (2d Cir. 1987)...................................................................6

*Daniel v. Am. Bd. of Emergency Medicine*,
    428 F.3d 408 (2d Cir. 2005).................................................................26

*Discon Inc. v. NYNEX Corp.*,
    86 F. Supp. 2d 154 (W.D.N.Y. 2000)...................................................27

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
    598 F. Supp. 2d 394 (S.D.N.Y. 2008).............................................19, 52

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024)........................................................13, 31

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    No. 24-917 (U.S. June 2, 2025) ...........................................................13

*E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*,
    2003 WL 22068573 (S.D.N.Y. Sept. 5, 2003)...............................70, 76

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    122 F.4th 120 (4th Cir. 2024) .............................................................13

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*,
    486 F. App'x 186 (2d Cir. 2012) .........................................................13

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)....................................................................7

*Faulkner v. Nat'l Geographic Enters. Inc.*,
    409 F.3d 26 (2d Cir. 2005)........................................................ *passim*

*Ferring B.V. v. Serenity Pharms., LLC*,
    2019 WL 7283272 (S.D.N.Y. Dec. 27, 2019) .......................................4

*Flood v. Just Energy Mktg. Corp.*,
    2017 WL 280820 (S.D.N.Y. Jan. 20, 2017) ....................................6, 22

*Flood v. Just Energy Mktg. Corp.*,
    904 F.3d 219 (2d Cir. 2018)..............................................................4, 19

*Folsom v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*,
    633 F. Supp. 178 (N.D. Ill. 1986)........................................................31

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ..............................................................12

*FTC v. Peabody Energy Corp.*,
    492 F. Supp. 3d 865 (E.D. Mo. 2020)........................................................24

*FTC v. Tapestry, Inc.*,
    755 F. Supp. 3d 386 (S.D.N.Y. 2024)........................................................24

*GAF Corp. v. Eastman Kodak Co.*,
    519 F. Supp. 1203 (S.D.N.Y. 1981)....................................................19, 73

*Gelb v. Royal Globe Ins. Co.*,
    798 F.2d 38 (2d Cir. 1986).......................................................15, 17, 18

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004)................................................................56

*Golden Hill Paugussett Tribe of Indians v. Rell*,
    463 F.Supp.2d 192 (D. Conn. 2006)........................................................69

*In re Google Digital Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)..............................................9, 10, 13

*In re Google Digital Advert. Antitrust Litig.*,
    721 F. Supp. 3d 230 (S.D.N.Y. 2024)........................................................27

*Halpern v. Schwartz*,
    426 F.2d 102 (2d Cir. 1970)................................................................15

*In re Harmon*,
    250 F.3d 1240 (9th Cir. 2001) ............................................................31

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
    516 F. Supp. 2d 324 (D. Del. 2007)........................................................26

*Illinois v. Sperry Rand Corp.*,
    237 F. Supp. 520 (N.D. Ill. 1965) ........................................................19

*Jennette v. Koshler*,
    1995 WL 60017 (S.D.N.Y. Feb. 10, 1995)....................................................37

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.*,
    937 F.2d 729 (2d Cir. 1991).............................................................6, 28

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016)........................................................12, 43, 84

*Kennedy v. New York Presbyterian Hosp.*,
    2011 WL 2847839 (S.D.N.Y. July 6, 2011) ..................................................72

*Laboy v. Semple*,
  2019 WL 13543736 (D. Conn. Dec. 5, 2019) ........................................................37

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) ................................................................................37

*McTyere v. Apple*,
  663 F. Supp. 3d 247 (W.D.N.Y. 2023) .............................................................6, 56

*In re Microsoft Corp. Antitrust Litig.*,
  232 F. Supp. 2d 534 (D. Md. 2002) .....................................................................26

*In re Microsoft Corp. Antitrust Litig.*,
  355 F.3d 322 (4th Cir. 2004) .............................................................................5, 15

*MiniFrame Ltd. v. Microsoft Corp.*,
  2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) .....................................................7, 8

*Montana v. United States*,
  440 U.S. 147 (1979) ................................................................................................5

*In re Namenda Direct Purchaser Antitrust Litig.*,
  2017 WL 4358244 (S.D.N.Y. May 23, 2017) ..................................18, 19, 26, 61

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
  670 F. Supp. 1313 (D. Md. 1986) ........................................................................44

*Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*,
  553 F. Supp. 962 (N.D. Ill. 1982) .......................................................................35

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*,
  920 F. Supp. 455 (S.D.N.Y. 1996) ..................................................................44, 45

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979) ....................................................................................... *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) .....................................................9

*Peabody Coal Co. v. Spese*,
  117 F.3d 1001 (7th Cir. 1997) (en banc) ............................................................15

*PenneCom B.V. v. Merrill Lynch & Co.*,
  372 F.3d 488 (2d Cir. 2004) ................................................................................16

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) .............................................................................22

*Postlewaite v. McGraw-Hill,*
  333 F.3d 42 (2d Cir. 2003) ............................................................................15, 30, 76

*Proctor v. LeClaire,*
  715 F.3d 402 (2d Cir. 2013) ...............................................................................4, 38, 47

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,*
  68 F.3d 1478 (2d Cir. 1995) ......................................................................................16

*Schwab v. Philip Morris USA, Inc.,*
  449 F. Supp. 2d 992 (E.D.N.Y. 2006) ............................................................16, 18

*SEC v. Mattera,*
  2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ...............................................47, 48

*SEC v. Monarch Funding Corp.,*
  192 F.3d 295 (2d Cir. 1999) ..................................................................................5, 16

*Selectron, Inc. v. Am. Tel. & Tel. Co.,*
  587 F. Supp. 856 (D. Or. 1984) ................................................................................35

*Shop & Save Food Markets, Inc. v. Pneumo Corp.,*
  683 F.2d 27 (2d Cir. 1982) ..................................................................................44, 45

*Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co.,*
  414 F. App'x 372 (2d Cir. 2011) ..............................................................................25

*TechReserves Inc. v. Delta Controls Inc.,*
  2014 WL 1325914 (S.D.N.Y. Mar. 31, 2014) ........................................................27

*Texas v. Google LLC,*
  No. 4:20-cv-00957 (E.D. Tex.) ...........................................................................19, 20

*Topps Chewing Gum v. Fleer Corp.,*
  799 F.2d 851 (2d Cir. 1986) ......................................................................................79

*Torry v. Northrop Grumman Corp.,*
  399 F.3d 876 (7th Cir. 2005) .....................................................................................37

*TQ Delta, LLC v. CommScope Holding Co., Inc.,*
  657 F. Supp. 3d 892 (E.D. Tex. 2023) ....................................................................36

*Trikona Advisers Ltd. v. Chugh,*
  846 F.3d 22 (2d Cir. 2017) ........................................................................................84

*United States v. Am. Express Co.,*
  838 F.3d 179 (2d Cir. 2016) .................................................................9, 10, 58, 76

*United States v. Google LLC,*
  1:23-cv-108 ..........................................................................................................68

*United States v. Google LLC,*
  2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ................................................. *passim*

*United States v. Google LLC,*
  No. 1:23-cv-00108 (E.D. Va. Jan. 24, 2023) ................................................. *passim*

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) ...............................................................................12, 70

*United States v. U.S. Currency in Amount of $119,984.00, More or Less,*
  304 F.3d 165 (2d Cir. 2002)........................................................................................17

*United States v. Visa U.S.A., Inc.,*
  163 F. Supp. 2d 322 (S.D.N.Y. 2001)..................................................................73, 78

*Univac Dental Co. v. Dentsply Int'l, Inc.,*
  702 F. Supp. 2d 465 (M.D. Pa. 2010) ................................................................19, 77

*US Airways, Inc. v. Sabre Holdings Corp.,*
  938 F.3d 43 (2d Cir. 2019).........................................................................................10

*Valley Disposal, Inc. v. Central Vermont Solid Waste Mgmt. Dist.,*
  31 F.3d 89 (2d Cir. 1994) .............................................................................................4

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004)............................................................................................ *passim*

*Virtual Maint., Inc. v. Prime Computer, Inc.,*
  957 F.2d 1318 (6th Cir. 1992) .............................................................................. 44-45

*Visa U.S.A. Inc. v. First Data Corp.,*
  369 F. Supp. 2d 1121 (N.D. Cal. 2005) ........................................................... *passim*

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
  382 U.S. 172 (1965)....................................................................................................25

*Wash. Alder LLC v. Weyerhaeuser Co.,*
  2004 WL 1119822 (D. Or. May 19, 2004) ..............................................................77

*Williams v. Ward,*
  556 F.2d 1143 (2d Cir. 1977)....................................................................................15

*Wills v. RadioShack Corp.,*
  981 F. Supp. 2d 245 (S.D.N.Y. 2013)......................................................................64

*Winters v. Lavine*,
    574 F.2d 46 (2d Cir. 1978)..................................................................................15

*Wrede v. Am. Tel. & Tel. Co.*,
    1984 WL 1631 (M.D. Ga. May 28, 1984) ....................................................... 25, 40

**Statutes and Other Authorities**

15 U.S.C. § 16(a) ....................................................................................................19

18 Wright, Miller & Cooper, Federal Practice and Procedure § 4417 ...........................................6

18A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 4433 (3d ed.).....................18

Restatement (Second) of Judgments § 27, cmt. i (1982) ...............................................15

## INTRODUCTION

In their quest to secure broad equitable remedies and billions of dollars in damages, Plaintiffs ask this Court to summarily decide over two hundred separate issues on which they bear the burden of proof based on high-level similarities between their cases and the Virginia case. *No* issue can receive collateral estoppel without the Court first determining that it is legally and factually identical to an issue considered in the Virginia case, that it was actually litigated and decided in that case, and that it was necessary to the Virginia Court's decision. That detailed analysis must be repeated separately for each and every one of the hundreds of issues for which Plaintiffs seek collateral estoppel. Instead of conducting that analysis, Plaintiffs rely on high-level comparisons of their cases and the Virginia case, while glossing over the material factual differences between them, as well as significant legal differences between the Virginia Court's approach and the law of the Second Circuit. Indeed, Plaintiffs' insistence that there are important, material differences even among their individual cases[1] makes it implausible that each is individually identical to the Virginia case. And Plaintiffs also fail to grapple with the fact that virtually none of their hundreds of issues were necessary for the Virginia Court's decision.

In addition, this Court has the discretion not to apply collateral estoppel on efficiency grounds alone. Plaintiffs' motions come several weeks before the remedies trial begins in the Virginia Court and at minimum several months before the Fourth Circuit will decide Google's forthcoming appeal. Far from promoting efficiency, applying collateral estoppel now would only consume judicial resources with a preliminary skirmish, rather than resolve issues with finality. Even more time would be wasted if this case proceeds any further based on an application of collateral estoppel that is later upended by an appellate court. In that event, this Court would have

---

[1] *See* Gannett and Daily Mail Letter, ECF No. 992 (arguing that "[j]oint briefing [on collateral estoppel] would not be appropriate . . . as the parties . . . must argue their different (and even conflicting) cases to the Court").

to revisit not only collateral estoppel, but also summary judgment and perhaps even retry the claims. That is no recipe for an efficient resolution of this case.

For all of these reasons, and for those detailed further below, Google respectfully requests that the Court deny Plaintiffs' motions for partial summary judgment in their entirety.

## **BACKGROUND**

In January 2023, while discovery was underway in this Court, the United States and a collection of states filed their own antitrust case in the Eastern District of Virginia. *See* Compl., *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. Jan. 24, 2023) ("EDVA"), ECF No. 1. Fact discovery was coordinated across the cases until fact discovery closed in the Virginia case on September 8, 2023. ECF No. 564; EDVA ECF No. 69. Although fact discovery continued here for another nine months, Google was not permitted to offer into evidence at the bench trial in Virginia any of the discovery taken during those nine months. *See* ECF No. 564 ¶¶ 2(e), 6(d).

On April 17, 2025, the Virginia Court issued its liability opinion. *See United States v. Google LLC*, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ("Virginia Op."). The court ruled in Google's favor on some issues, rejecting plaintiffs' contention that Google had monopolized an advertiser ad network market and finding that its acquisitions of DoubleClick and Admeld, as well as Project Poirot, were not anticompetitive. *Id.* at *25, 37, 42 n.29. On other issues, the Virginia Court found in favor of plaintiffs. The Virginia Court will not enter a final judgment until after the remedies trial scheduled to begin on September 22, 2025. *See* EDVA ECF No. 1428. Google intends to appeal the liability decision once a final judgment is entered.

Although Google cannot yet appeal the Virginia decision, Advertisers, Publishers, Inform, and Daily Mail and Gannett (collectively, "Plaintiffs") have moved for partial summary judgment here, arguing that the doctrine of collateral estoppel should preclude Google from challenging the

more than two hundred issues that they claim the Virginia Court decided.[2]

## ARGUMENT

As explained below in Part I, no Plaintiff group can meet their burden of demonstrating that collateral estoppel can resolve any of the issues in their cases. Parts II, III, IV, and V focus on additional reasons why collateral estoppel should be denied on the specific issues raised by Advertisers, Publishers, Inform, and Daily Mail/Gannett, respectively.

## I.    PLAINTIFFS FAIL TO MEET THE LEGAL STANDARDS FOR COLLATERAL ESTOPPEL AND SUMMARY JUDGMENT

Plaintiffs are not entitled to collateral estoppel because they have not met their burden of demonstrating it applies. *See infra* Part I.A. In addition, Federal Rule of Civil Procedure 56 does not allow partial summary judgment on most of Plaintiffs' issues. *See infra* Part I.B.

### A.  Plaintiffs Fail To Establish The Elements Required For Collateral Estoppel

This Court has the discretion to reject or apply collateral estoppel if Plaintiffs can first establish each of the following elements: "(1) the issues in both proceedings [are] identical, (2) the issue in the prior proceeding [was] actually litigated and actually decided, (3) there [was] a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated [was] necessary to support a valid and final judgment on the merits." *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005). Plaintiffs also must demonstrate a fifth element before collateral estoppel can be applied against a defendant: "a court must also satisfy itself that

---

[2] *See* MDL Pls.' Joint Mem. of Law in Supp. of Mots. for Collateral Estoppel and Partial Summ. J., ECF No. 1043 ("Joint Br."); Mem. of Points and Authorities in Supp. of Advertisers' Mot. for Collateral Estoppel and Partial Summ. J., ECF No. 1039 ("Adv. Br."); Proposed Order Granting Advertisers' Mot. for Collateral Estoppel and Partial Summ. J., ECF No. 1038-1 ("Adv. Proposed Order"); Mem. of Law in Supp. of Publisher Class Pls.' Mot. for Collateral Estoppel and Partial Summ. J., ECF No. 1041 ("Pub. Br."); Appendix A to Notice of Publisher Class Pls.' Mot. for Collateral Estoppel and Partial Summ. J., ECF No. 1040-2 ("Pub. Appx. A"); Mem. of Law in Supp. of Pl. Inform's Mot. for Partial Summ. J., ECF No. 1048 ("Inform Br."); Attachment A to Notice of Mot. for Partial Summ. J., ECF No. 1046-2 ("Inform Br. Att. A"); Pls. Daily Mail and Gannett's Mem. of Law in Supp. of Mot. for Partial Summ. J., ECF No. 1050 ("DMG Br."); Proposed Order Granting Mot. for Partial Summ. J., ECF No. 1049-1 ("DMG Proposed Order").

application of offense collateral estoppel is fair." *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 236 (2d Cir. 2018). As the parties seeking the benefit of collateral estoppel, Plaintiffs bear the burden of establishing the first, second, fourth, and fifth elements. *See Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) ("The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion.")[3]; *Ferring B.V. v. Serenity Pharms., LLC*, 2019 WL 7283272, at *8 (S.D.N.Y. Dec. 27, 2019) ("When a plaintiff asserts offensive collateral estoppel, it bears the burden to establish that application of offensive collateral estoppel is fair."). And even if all the elements are present, this Court has "broad discretion" to refuse to apply collateral estoppel. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).

### 1. The Issues In These Cases Are Not Identical To The Issues In The Virginia Case

Application of offensive collateral estoppel "must be confined to situations where the matter raised in the second suit is *identical in all respects* with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." *Faulkner*, 409 F.3d at 37 (emphasis added). Plaintiffs cannot demonstrate that either the controlling facts or applicable legal standards here are identical to those in the Virginia case.

*First*, collateral estoppel cannot apply where cases involve different factual issues. *See Valley Disposal, Inc. v. Central Vermont Solid Waste Mgmt. Dist.*, 31 F.3d 89, 102 (2d Cir. 1994) (rejecting application of collateral estoppel when a party "relie[d] on facts that differ . . . materially from the ones before the" court in a prior matter).[4] Moreover, allowing Plaintiffs to resolve on

---

[3] Unless indicated otherwise, quotes omit internal citations and quotations.

[4] Plaintiffs quote Google filings to suggest that it has "acknowledged that the markets and conduct at issue in the [Virginia case] are identical to the markets and conduct at issue in this MDL." Joint Br. at 1; *see also id.* at 5-6; Adv. Br. at 18; Pub. Br. at 6-7; DMG Br. at 1. But Google's statements simply recognized the high-level similarities between the Virginia case and the cases before this Court for purposes of transfer. Those general parallels are not enough for

summary judgment factual issues that are not identical to those resolved after a bench trial in Virginia would violate not only collateral-estoppel principles, but also Google's Seventh Amendment right to a trial by jury. *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 304 (2d Cir. 1999) ("[C]ollateral estoppel may have a devastating impact on a civil litigant's constitutional right to a jury trial" if applied when not all prerequisites are met).

Unable to show that factual issues across cases are identical, Plaintiffs argue that identicality is not required, noting that the Supreme Court once inquired whether the issues in two cases were "in substance the same." *See Montana v. United States*, 440 U.S. 147, 155 (1979) (quoted in Joint Br. at 4-5). But the *Montana* decision only confirms that issues must be identical for collateral estoppel to apply: there, the prior court had already "decided the precise constitutional claim," and there was "[n]o different constitutional challenge . . . at issue in th[e] litigation." *Id.* at 156-57. Moreover, *Montana*—like the other cases Plaintiffs cite[5]—involved the defensive use of collateral estoppel. When considering requests for offensive collateral estoppel, on the other hand, courts exercise even greater caution and apply "the criteria for foreclosing a defendant from relitigating an issue or fact . . . strictly." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004). Plaintiffs cannot meet the strict requirement to show that their case is "identical in all respects" to the Virginia case. *See Faulkner*, 409 F.3d at 37; *see also Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948) (collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged").

---

collateral estoppel to apply. Instead, Plaintiffs must show that the elements of the collateral-estoppel standard are satisfied for each and every specific issue for which they seek preclusion.

[5] *See* Joint Br. at 3 (citing *Zherka v. City of New York*, 459 F. App'x 10, 13 (2d Cir. 2012) and *ITT Corp. v. United States*, 963 F.2d 561, 564 (2d Cir. 1992)).

*Second*, even if there were no factual differences across the prior and present cases (which is not the case here), "[i]ssues that may bear the same label are nonetheless not identical if the standards governing them are significantly different." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991); 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4417 ("Courts have readily perceived that for purposes of preclusion, issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same."). Contrary to Plaintiffs' contention that "different legal standards have no bearing on issue preclusion based on factual findings," their own authority makes clear that principle applies only "'[i]f the issues are merely factual.'" *See* Joint Br. at 6 (quoting *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 48 (2d Cir. 2014)). When, as here, different legal frameworks apply, courts hold that issues are not identical.[6] Collateral estoppel is particularly inappropriate where there are differences in federal law across circuits. *See Flood v. Just Energy Mktg. Corp.*, 2017 WL 280820, at *6 (S.D.N.Y. Jan. 20, 2017) (declining to apply collateral estoppel where the Northern District of Ohio's interpretation of a federal statute in a prior action "deviated from Second Circuit law").

Collateral estoppel cannot apply here because—as explained below—there are at least five ways in which the Virginia Court's legal analysis is inconsistent with Second Circuit law.

### a) The Virginia Court Construed *Trinko* Differently Than The Second Circuit

The Virginia Court rejected Google's defense that its actions "cannot result in antitrust

---

[6] *See Cullen v. Margiotta*, 811 F.2d 698, 733 (2d Cir. 1987) ("Since the standards governing the propriety of the suit as a class action in the state court and the federal court differed significantly, the state court ruling did not decide the issue presented in this case, and there is no collateral estoppel."), *overruled on other grounds, Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143 (1987); *Faulkner*, 409 F.3d at 37 (affirming lower court's decision declining to apply collateral estoppel because of differences in the "legal landscape"); *McTyere v. Apple*, 663 F. Supp. 3d 247, 253 (W.D.N.Y. 2023) ("[I]ssues are not identical if the second action involve[s] application of [a] different legal standard, even though the factual setting of the suits may be the same.").

liability under the 'refusal to deal' doctrine articulated by the Supreme Court" in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). In doing so, it offered three reasons for concluding that "*Trinko* does not apply to Google's conduct at issue." Virginia Op. at *42-43. Because all of those grounds would be analyzed differently in the Second Circuit, collateral estoppel cannot apply to any findings flowing from the Virginia Court's refusal to apply *Trinko*, including its findings that tying, First Look, Last Look, Dynamic Revenue Sharing ("DRS"), and Unified Pricing Rules ("UPR") were anticompetitive.

*First*, the Virginia Court declined to apply *Trinko* because *Trinko* involved a "highly regulated industry" and "Google's ad tech products operate in markets where there is no industry-specific 'regulatory structure designed to deter and remedy anticompetitive harm.'" *Id.* at *43. The Second Circuit has previously considered—and expressly rejected—such an interpretation. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007) (holding that the "pervasive regulatory scheme" at issue in *Trinko* was "not essential to *Trinko*'s holding").

*Second*, the Virginia Court perceived a distinction between lawful refusals to deal with competitors and "restraints that a monopolist places on its customers." Virginia Op. at *43. But courts in the Second Circuit do not make that distinction—perhaps because any refusal to deal with a competitor could easily be recast as a restraint upon customers (who always prefer for a defendant to open up its products so that rivals can serve them more readily). For example, in a case challenging Amazon's policy of "restrict[ing] the ability of paying customers to obtain [non-Amazon] e-books . . . on Kindle devices or apps," Judge Rakoff looked to the "essence" of the claim, determined that rival booksellers were "complain[ing] that Amazon has not allowed them to sell e-books on Amazon's devices and apps," and—citing *Trinko*—held that "no business has a 'duty to aid competitors.'" *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp.

2d 612, 617, 619, 623 (S.D.N.Y. 2013). Likewise, in *MiniFrame Ltd. v. Microsoft Corp.*, a rival software manufacturer challenged a "single-user restriction" in Microsoft's software licenses as a "refus[al] to deal with [plaintiff] and its customers" because it gave "customers 'practically . . . no choice but to purchase'" Microsoft's software. 2013 WL 1385704, at *1, *3 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F. App'x 1 (2d Cir. 2013). Although the restriction applied to customers, Judge Sullivan rejected the claim because "a corporation has 'no duty to aid competitors.'" *Id.* at *4 (quoting *Trinko*, 540 U.S. at 411).[7]

*Third*, the Virginia Court's application of the *Aspen Skiing* exception to *Trinko* is inconsistent with Second Circuit cases. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). Although firms generally have no duty to deal with rivals, *Aspen Skiing* recognized an "exception[]" that applies only if a defendant (1) "unilateral[ly] terminat[ed] . . . a voluntary (*and thus presumably profitable*) course of dealing"; and (2) sacrificed "short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 408-09. But instead of applying those elements separately to each of the programs at issue (including First Look, Last Look, DRS, and UPR), the Virginia Court suggested that the *Aspen Skiing* exception applied to Google based on its analysis of two different events: Google's decision to "shut down" an AdMeld feature (which was not found unlawful or unprofitable), and its decision not to "implement real-time bidding outside of its ad tech infrastructure" (which was a consistent and profitable policy since Google launched its ad exchange, not a departure from any prior course of dealing or sacrifice of profits). *See* Virginia Op. at *43. In the Second Circuit, by contrast, the *Aspen Skiing* analysis must be applied to the allegedly anticompetitive conduct, not to other conduct altogether. *See, e.g.*, *In re*

---

[7] Indeed, *Trinko* itself was a case brought by customers that wanted Verizon to allow rival phone companies to connect to Verizon's network. *See* 540 U.S. at 404-05. The Supreme Court correctly understood that claim as seeking to require Verizon to deal with its rivals, even though it could have been framed instead as Verizon restraining customers from working with it or its rivals on terms the customers would have preferred.

*Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (finding that *Aspen Skiing* exception did not apply because defendant "did not terminate any prior course of dealing—let alone a 'presumably profitable' one"). Indeed, this Court has declined to apply the *Aspen Skiing* exception to specific claims in this litigation for the same reason. *See In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 383 (S.D.N.Y. 2022) ("*Google I*") (dismissing claim based on refusal to share unencrypted users IDs for failure to allege that that specific practice involved profit sacrifice).

Because each of the Virginia Court's grounds for distinguishing *Trinko* would be analyzed differently in the Second Circuit and result in different rulings, collateral estoppel cannot apply to any finding that First Look, Last Look, DRS, or UPR were anticompetitive.

### b) The Virginia Court's Analysis Of Two-Sided Transaction Platforms Does Not Align With Second Circuit Precedent

The Virginia Court found that "ad exchanges . . . resemble two-sided transaction platforms," Virginia Op. at *26, but it did not apply two sets of principles that the Second Circuit has developed for analyzing two-sided transaction platforms.

*First*, when *defining markets* involving two-sided transaction platforms, the Second Circuit has instructed that courts "must consider the feedback effects inherent on the platform by accounting for the reduction in . . . demand [from customers on one side of the platform] that would accompany any degree of . . . attrition [from customers on the other side of the platform]." *United States v. Am. Express Co.*, 838 F.3d 179, 200 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ("*Amex*"); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250, at *24 (E.D.N.Y. Oct. 26, 2022) (excluding market-definition opinion of expert who considered substitution from users on only one side of a two-sided transaction platform). But when the Virginia Court defined a market for "ad exchanges

for open-web display advertising," it considered only the perspective of publishers, without taking account of feedback effects from advertiser behavior, *see* Virginia Op. at *21-23, despite finding that advertisers had more options than publishers to shift their business away from "open web" advertising, *id.* at *24. In sum, the Virginia Court applied different legal principles to define the two-sided ad exchange market than would be applied by this Court, so its findings related to the definition of an ad exchange market cannot receive collateral estoppel effect.

*Second*, when analyzing *competitive effects* in cases involving two-sided transaction platforms, the Second Circuit requires "consider[ation] [of] both sides of the platform." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 61 (2d Cir. 2019); *Amex*, 585 U.S. at 547 (holding that a two-sided transaction platform's conduct could not be found anticompetitive without proof that it caused net harm, considering impacts on both sides of the platform). The Virginia Court, however, employed a *one-sided* approach, finding that First Look, DRS, and UPR were anticompetitive by focusing exclusively on publishers and without considering advertisers at all. *See* Virginia Op. at *41-42. And while the Virginia Court stated that Last Look "harmed . . . advertisers using *non-Google* ad buying technologies," *id.* at *42 (emphasis added), its analysis left out advertisers using *Google* ad buying technologies. These departures from the Second Circuit's standards for evaluating competitive effects on two-sided transaction platforms preclude application of collateral estoppel to the Virginia Court's findings that these programs were anticompetitive.

### c) The Virginia Court Applied Standards For Identifying Anticompetitive Conduct That Differ From Second Circuit Law

As this Court has held, anticompetitive conduct is "'conduct without a legitimate business purpose that makes sense only because it eliminates competition.'" *Google I*, 627 F. Supp. 3d at

379 (quoting *In re Adderall XR Antitrust Litig.*, 754 F.3d at 133).[8] Under that standard, conduct with a legitimate business purpose does not violate Section 2, even if that conduct also has some anticompetitive effects. But the Virginia Court instead applied a balancing test that deems conduct anticompetitive "if the plaintiff can 'demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.'" Virginia Op. at *35 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)). Although the *Adderall* standard adopted by this Court does not permit such weighing of procompetitive and anticompetitive effects, the Virginia Court did precisely that in determining Google's conduct was anticompetitive. *See* Virginia Op. at *47. Because the Virginia Court applied a legal standard not identical to the one that governs here, its findings that First Look, Last Look, DRS, and UPR were anticompetitive and not adequately justified cannot receive collateral estoppel effect.

### d) The Virginia Court Analyzed A Tying Claim Using Principles That Differ From Second Circuit Law

In its ruling on the tying claims, the Virginia Court found that the plaintiffs there had shown the four elements required by the Fourth Circuit: "'(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce.'" Virginia Op. at *38 (quoting *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992)). But in the Second Circuit, a tying claim has an additional element: "the tie-in has anticompetitive

---

[8] "The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001).

effects in the tied market." *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016).[9] Because the Virginia Court did not require this additional element, the legal standards are not identical, and collateral estoppel cannot apply to the Virginia Court's tying-related findings.

Plaintiffs mistakenly contend that the tests are actually "the same" because the third element of the Virginia Court's test and the anticompetitive effects element of the Second Circuit's test both refer to the tied product market. *See* Joint Br. at 8-9 n.8. The third element of the Virginia Court's test focuses on whether the defendant has "sufficient economic power in the tying product market," but unlike the Second Circuit's test, it does not require the plaintiff to prove actual "anticompetitive effects in the tied market." *See* Virginia Op. at *40 (finding the third element satisfied after examining only AdX's power in the tying product market, without discussing any effects on the tied product market). Plaintiffs also argue that the Virginia Court "*did* find anticompetitive effects in the tied product market (publisher ad servers)," but they rely on portions of the opinion addressing monopoly power, not the competitive effects caused by the alleged tie. Joint Br. at 9 (citing Virginia Op. at *31). The Virginia Court did not address whether tying *caused* the anticompetitive effects on the publisher ad server market because, contrary to the law of the Second Circuit, it applied a standard that did not require such proof.[10]

---

[9] "To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market." *Kaufman*, 836 F.3d at 141.

[10] Plaintiffs insist that a *per se* tying claim does not depend on proof of competitive effects on the tied product market. *See* Joint Br. at 8-9. But the *per se* rule does not apply where, as here, "the tying product is software whose major purpose is to serve as a platform for third-party applications and the tied product is complementary software functionality." *United States v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001); *see also Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542-43 (9th Cir. 1983) ("We do not believe that, standing alone, such technological interrelationship among complementary products is sufficient to establish the coercion essential to a *per se* unlawful tying arrangement."), *overruled on other grounds as recognized in Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657 (9th Cir. 1997). Moreover, Plaintiffs assert Section 2 tying claims (in addition to *per se* tying claims under Section 1), Pub. Br. at 1, 10, 12-13, 15; Inform Br. at 13-14: DMG Br. at 1, 6, 19, and they do not and cannot contend that a Section 2 tying claim could succeed in the Second Circuit without proof of anticompetitive effects on

### e) The Virginia Court Analyzed Google's Alleged Course Of Conduct Using Principles That Differ From Those Applicable In The Second Circuit

Relying on *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024), the Virginia Court held that the "touchstone for determining whether a monopolist [is] alleged to have engaged in . . . exclusionary [conduct]" is a "holistic assessment" of the defendant's conduct, and its "ultimate conclusion of whether Google violated Section 2 turn[ed] on whether the company's conduct, *when considered as a whole*, harmed competition." Virginia Op. at *35-36 (emphasis added). By contrast, the Second Circuit requires that each allegedly anticompetitive program be "analyze[d] . . . individually" even if it is "interrelated and interdependent." *City of Groton v. Conn. Light & Power*, 662 F.2d 921, 928 (2d Cir. 1981); *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012) ("Because these alleged instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive either."). As this Court recognized, "it is unlikely that multiple independently lawful acts can come together to create an unlawful monopoly 'broth' from which antitrust injury can arise." *Google I*, 627 F. Supp. 3d at 381. *Duke Energy*'s approach to analyzing allegedly anticompetitive conduct is not identical to that of the Second Circuit, so collateral estoppel cannot apply to any of the Virginia Court's findings that were based on *Duke Energy*.[11]

---

the tied product market, *see* Pub. Br. at 12-13 (citing authorities explaining that a Section 2 tying claim requires proof of an adverse effect on competition).

[11] In dissenting from the denial of rehearing en banc in *Duke Energy*, Judge Quattlebaum correctly stated that the panel decision left the Fourth Circuit "noncompliant with Supreme Court directives [and] isolated from [its] sister circuits," specifically contrasting the decision with *Eatoni Ergonomics*. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 122 F.4th 120, 125, 131 (4th Cir. 2024) (Quattlebaum, J., dissenting). The Supreme Court is now considering whether to grant certiorari. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, No. 24-917 (U.S. June 2, 2025), available at https://www.supremecourt.gov/orders/courtorders/060225zor_4f15.pdf.

### 2. Collateral Estoppel Can Apply Only To Issues Actually Litigated And Decided In The Virginia Case

Collateral estoppel can apply only to issues actually litigated and decided in a prior proceeding. *Faulkner*, 409 F.3d at 37; *see also Cayuga Nation v. Tanner*, 6 F.4th 361, 374 (2d Cir. 2021) (holding that issue was not "both litigated and decided in the prior action" despite a "passing reference" to it). Here, Plaintiffs seek collateral estoppel on hundreds of issues, and each issue must be carefully scrutinized to determine whether this element is satisfied.

### 3. Collateral Estoppel Does Not Apply Unless There Has Been a Full and Fair Opportunity to Litigate in the Prior Case

For collateral estoppel to apply in a subsequent proceeding, "there must have been a full and fair opportunity for litigation in the prior proceeding." *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 80 (2d Cir. 2019). It would be unfair to preclude consideration of the evidence from this case that was unavailable to Google at the Virginia trial. *See infra* Parts IV.B and V.D.3.

### 4. Only Issues Necessary To A Final Judgment In The Virginia Case May Receive Collateral Estoppel

For collateral estoppel to apply, the issues to which the plaintiff seeks preclusive effect must "have been necessary to support a valid and final judgment on the merits" in the earlier proceeding. *Bifolck*, 936 F.3d at 82. "An issue is 'necessary or essential only when the *final outcome* hinges on it,'" *id.*, and "if its disposition was the basis for the holding with respect to the issue and not mere dictum." *In re: Am. Express Anti–Steering Rules Antitrust Litig.*, 2016 WL 748089, at *4 (E.D.N.Y. Jan. 7, 2016). To "shoulder[] the burden on this point," Plaintiffs must establish that each of the hundreds of issues for which they seek collateral estoppel "would have made a difference—necessarily—in the [Virginia Court's] ultimate decision." *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 153 (2d Cir. 2006).

In a case involving offensive collateral estoppel, the Second Circuit held that, when a prior

14

judgment "rests on two or more independent alternative grounds, it is not conclusive as to issues . . . which . . . were necessarily found in order to establish only one of those grounds." *Halpern v. Schwartz*, 426 F.2d 102, 106 (2d Cir. 1970).[12] The court emphasized two considerations supporting that rule. First, "the decision on an issue not essential to the prior judgment may not have been afforded the careful deliberation and analysis normally applied to essential issues, since a different disposition of the inessential issue would not affect the judgment." *Id.* at 105. Second, "since there are alternative grounds which could independently support the prior judgment, vigorous review of an asserted error as to one ground probably would not occur." *Id.*; *see also Postlewaite v. McGraw-Hill*, 333 F.3d 42, 51 (2d Cir. 2003) (holding that, "if the arbitrators made both findings, either of which would have been a colorable basis for the award, neither finding may properly be said to have been essential to the award").[13]

The Virginia Court held that five distinct types of conduct—tying, First Look, Last Look, DRS, and UPR—were anticompetitive. *See* Virginia Op. at *41-42. Any one of these could have

---

[12] Other cases have read *Halpern* as not precluding the application of *defensive* collateral estoppel against a plaintiff who brought (and lost) the prior proceeding. *See Williams v. Ward*, 556 F.2d 1143, 1154 (2d Cir. 1977) (explaining that the "concern noted" in *Halpern* did not apply where the plaintiff "was prosecuting both actions at once"); *Winters v. Lavine*, 574 F.2d 46, 68 (2d Cir. 1978) ("Here, as was true of Williams in *Williams v. Ward*, [the plaintiff] 'was prosecuting both actions at once.'"); *Akhenaten v. Najee, LLC*, 544 F. Supp. 2d 320, 332 (S.D.N.Y. 2008) (cited in Joint Br. at 12). But those cases are inapplicable because Plaintiffs here seek *offensive* collateral estoppel. *Cf. Parklane*, 439 U.S. at 329-32 (recognizing differences between defensive and offensive collateral estoppel and limiting offensive collateral estoppel to situations where its application would be fair); *Charter Oak Fire Ins. Co. v. Tecumseh Prods. Co.*, 2007 WL 3102177, at *1 (D. Conn. Oct. 23, 2007) ("Offensive uses of collateral estoppel are generally subject to greater scrutiny than defensive uses."). In another case discussing this issue in the context of a claim for offensive collateral estoppel, the Second Circuit noted *Williams* and *Winters*, but resolved the case on other grounds, holding that the doctrine "d[id] not apply to bar relitigation" because the defendant had not "receive[d] effective appellate review." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986).

[13] *Microsoft*, 355 F.3d at 328 ("[I]f a judgment in the prior case is supported by either of two findings, neither finding can be found essential to the judgment."); *Peabody Coal Co. v. Spese*, 117 F.3d 1001, 1008 (7th Cir. 1997) (en banc) ("[H]oldings in the alternative, either of which would independently be sufficient to support a result, are not conclusive in subsequent litigation with respect to either issue standing alone."); Restatement (Second) of Judgments § 27, cmt. i (1982) ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone."); *id.* § 27 reporter's note ("[T]he reasoning of the [*Halpern*] court is highly persuasive and is adopted as the basis of this Comment.").

satisfied the anticompetitive conduct element of a Section 2 claim, meaning that they were all independent grounds underlying the Virginia Court's decision and cannot receive collateral estoppel effect.[14]

### 5. It Would Be Inefficient And Unfair To Apply Collateral Estoppel

"Collateral estoppel is an equitable doctrine—not a matter of absolute right. Its invocation is influenced by considerations of fairness in the individual case." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004). Indeed, "[d]espite the economies achieved by use of collateral estoppel, it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995). In particular, the "offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does" and "may be unfair to a defendant." *Parklane*, 439 U.S. at 329, 330; *see also Bifolck*, 936 F.3d at 84 (recognizing "judicial wariness of nonmutual offensive collateral estoppel"). For that reason, trial courts have "broad discretion to determine" whether to apply collateral estoppel, and "where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow [it]." *Parklane*, 439 U.S. at 331.

Efficiency is one of the most important considerations in assessing whether it would be fair to apply collateral estoppel. *Monarch Funding*, 192 F.3d at 304 ("When the efficiency rationale for collateral estoppel fails, however, courts have understandably declined to apply the doctrine."); *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1079 (E.D.N.Y. 2006) (noting that the fairness of giving issues preclusive effect is "questionable . . . [if] little efficiency would be gained"). "[W]here fairness concerns are particularly strong, or efficiency gains are relatively

---

[14] To the extent Plaintiffs argue that each of these types of conduct were necessary to the Virginia Court's ruling on anticompetitive conduct, such a "holistic assessment" runs afoul of Second Circuit law. *See supra* Part I.A.1.e.

meager, courts tend to refrain from applying collateral estoppel." *United States v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d Cir. 2002).

Applying collateral estoppel here likely would impede the efficient resolution of these cases. Google will appeal the Virginia decision once a final judgment is entered. If the Virginia Court's findings receive collateral estoppel here and the Virginia decision is later reversed (or even if any findings given collateral estoppel effect here are not addressed in the appellate court's ruling[15]), then any proceedings in this case that occur in the interim based on collateral estoppel would need to be reopened, risking an enormous waste of judicial resources. For instance, if collateral estoppel precludes Google from litigating certain issues at trial, reversal of the Virginia decision would require a retrial where Google would have the opportunity to present all of its defenses. If collateral estoppel forecloses Google from moving for summary judgment on grounds that an appellate court later endorses (e.g., that *Trinko* applies to Google's conduct), Google should receive an opportunity to move for summary judgment on those grounds after the Virginia decision is reversed. And in that event, this Court would have wasted time and resources dedicated to considering summary judgment arguments on narrow, non-precluded issues when the entire case could have been resolved more efficiently and without delving into those subsidiary questions had the Court considered all of Google's arguments from the start.

Plaintiffs gloss over these inefficiencies and argue that "[a]pplying collateral estoppel is the only path to avoid potentially duplicative litigation." Joint Br. at 18. Not so. To begin with, in seeking only partial summary judgment, Plaintiffs admit collateral estoppel would not resolve their cases.[16] They would still have to prove additional elements not considered in the Virginia case,

---

[15] *Gelb*, 798 F.2d at 45 ("[I]f an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground.").

[16] *See* Joint Br. at 2 (recognizing that their motions seek only to "narrow[] the pre-trial and trial issues to be litigated"); Adv. Br. at 11 n.2 (recognizing that their Section 2 claims "also require a finding of antitrust injury to the class—

such as antitrust injury and damages. *See In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 4358244, at *16-17 (S.D.N.Y. May 23, 2017) ("*Namenda*"); *infra* note 23. And doing so means that "little efficiency would be gained: plaintiffs' proof of reliance and damages would almost certainly—as a matter of legal burden and persuasive strategy—require presentation of all evidence available to them of defendants' alleged scheme." *Schwab*, 449 F. Supp. 2d at 1079.

Rather than decide now whether collateral estoppel should apply, this Court should "postpone the question of preclusion in the second action until the appeal of the first judgment has been decided." 18A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 4433 (3d ed.); *cf. Gelb*, 798 F.2d at 44 ("Appellate review plays a central role in assuring the accuracy of decisions."). That is exactly how the court handled a similar situation in *In re: American Express Anti–Steering Rules Antitrust Litigation*, 2016 WL 748089 (E.D.N.Y. Jan. 7, 2016). Like this case, private plaintiffs there sought collateral estoppel based on a district court judgment in a parallel antitrust case brought by the government, while the defendant's appeal was pending. *Id.* at *3-4. The court deferred resolution of the private plaintiffs' motion, reasoning:

> The [plaintiffs] have not identified any case, nor is the court aware of any case, in which a district court gave preclusive effect to such a significant set of antitrust issues during the pendency of a merits appeal of the first-decided action. To apply collateral estoppel under such circumstances—even assuming each of the four elements were met as to each issue—would be unfair to Defendants. In addition, depending on the Second Circuit's resolution of the appeal of the Government Action, the application of collateral estoppel at this stage in the proceeding could, in fact, create inefficiencies.

*Id.* at *6. Plaintiffs note that the court reached this decision after the Second Circuit had stayed the permanent injunction in the government case, *see* Joint Br. at 18, but that only underscores the

---

something not directly addressed in the [Virginia] Opinion"); Pub Br. at 19, 20 (recognizing that, even if collateral estoppel applies, they would "still need to establish" that the challenged conduct "caused them to pay overcharges on AdX and the aggregate amount of damages they sustained"); Inform Br. at 2-3 (recognizing that their requests for estoppel on four of eight counts would only "narrow the issues for trial"); DMG Br. at 16 n.8, 19 (recognizing that claims based on acts not covered by the Virginia Court's ruling would still need to be adjudicated and the "specific intent" element of their attempted monopolization claim would still need to be proven).

18

unfairness of their present request for collateral estoppel, coming as it does *before* the Virginia Court has ordered any remedy at all and *before* Google is even able to file an appeal.

Other courts have likewise declined to apply collateral estoppel when a defendant has not had an adequate opportunity for appellate review of an adverse decision. *See Flood*, 904 F.3d at 237 (upholding decision not to apply offensive collateral estoppel when the prior decision had not proceeded to final judgment and the appellate court had denied interlocutory review); *Coan v. Dunne*, 2019 WL 2137459, at *2 (D. Conn. May 15, 2019) (declining to apply collateral estoppel during the pendency of an appeal). By contrast, Plaintiffs' exemplar cases all sought collateral estoppel only *after* appeals in prior cases had been resolved. *See* Joint Br. at 14-15; *Parklane*, 439 U.S. at 324-25 (collateral estoppel sought after the Second Circuit ruled); *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1209-10 (S.D.N.Y. 1981) (same); *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 397 (S.D.N.Y. 2008) (same); *Namenda*, 2017 WL 4358244, at *8 (same); *Univac Dental Co. v. Dentsply Int'l, Inc.*, 702 F. Supp. 2d 465, 475-76 (M.D. Pa. 2010) (collateral estoppel sought after the Third Circuit ruled).[17]

A jury trial had been scheduled to begin on August 11, 2025 in the State case that, at one time, had been part of this MDL. *Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.) ("EDTX"), ECF No. 796, at 3. Then yesterday, the Texas court decided to continue the trial and not set a new trial date until "after the entry of final judgment in the [Virginia case]," reasoning that the Virginia Court's final judgment "will undoubtedly impact, and may substantially narrow, the issues to be resolved in this case" and that "principles of judicial economy and avoiding duplicative

---

[17] Plaintiffs contend that Section 5(a) of the Clayton Act evinces "the Congressional intent to allow private plaintiffs to benefit from successful government suits through collateral estoppel." Joint Br. at 17. But they neglect to mention that Section 5(a) applies only to "final judgment[s]," 15 U.S.C. § 16(a), and that "[i]t is well established that for a judgment to be 'final', as contemplated by section 5(a) of the Clayton Act, the time to appeal must have run or the judgment affirmed by a court of last resort," *Illinois v. Sperry Rand Corp.*, 237 F. Supp. 520, 523 (N.D. Ill. 1965).

proceedings counsel in favor of granting the requested continuance." EDTX ECF No. 881, at 14. Likewise here, denying Plaintiffs' motion so that Google has an opportunity to appeal the Virginia Court's liability ruling and the Fourth Circuit has an opportunity to address that ruling will avoid duplicative proceedings and promote judicial economy.

### B. Rule 56 Does Not Allow For Summary Judgment On Most Issues

In seeking partial summary judgment, Plaintiffs invoke subdivisions (a) and (g) of Rule 56, *see* Joint Br. at 3-4, 19-20; Pub. Br. at 1-2, n.3; DMG Br. at 4, 19, but neither provision supports their sweeping requests to definitively find hundreds of issues in their favor. Rule 56(a) permits entry of summary judgment on a "claim or defense—or the part of each claim or defense," meaning that this Court should deny at the outset collateral estoppel on the many issues that would not advance—much less resolve—any of the elements of Plaintiffs' claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Moreover, Rule 56(g) authorizes partial summary judgment only as to "material fact[s]" that are not "genuinely in dispute." Plaintiffs have not cited any case applying collateral estoppel to grant partial summary judgment under Rule 56(g) or even suggesting that this part of the Rule was intended to apply outside of the run-of-the-mill situation where some facts are not genuinely in dispute at summary judgment. *See Bd. of Trs. of the Auto. Indus. Welfare Fund v. Groth Oldsmobile/Chevrolet, Inc.*, 2011 WL 1362178, at *12 (N.D. Cal. Apr. 11, 2011) (denying motion "in the alternative for a finding of undisputed facts" because neither Rule 56(a) nor (g) "authorize parties to move for 'partial summary judgment' as to a particular fact").

## II.    ADVERTISERS CANNOT RECEIVE
COLLATERAL ESTOPPEL ON ANY ISSUE

Advertisers request that this Court give preclusive effect to the Virginia Court's findings that: (1) ad exchanges are a relevant market; (2) Google possesses monopoly power in that market; (3) UPR constituted anticompetitive conduct that violated Section 2 of the Sherman Act; (4) Google's procompetitive justifications for UPR are invalid and insufficient; and (5) the refusal to deal doctrine does not apply to UPR. *See* Adv. Br. at 2-4. They also seek to apply collateral estoppel to 21 additional "subsidiary factual findings." *Id.*

Advertisers cannot meet the requirements for collateral estoppel to apply to any of their 26 issues. Their antitrust claims depend on an ad exchange market that is not identical to the one found by the Virginia Court. They seek collateral estoppel on a UPR claim that was previously dismissed from their case. And they ask for collateral estoppel to apply to "findings" that the Virginia Court never actually made and to findings that were not necessary to the Virginia Court's decision. For all of these reasons, and for others further explained below and summarized in Appendix A, Advertisers' motion should be denied.

### A.    Advertisers Are Not Entitled To
Partial Summary Judgment On Market Definition (Issue B)

Advertisers seek to preclude Google from litigating whether "[a]d exchanges for open-web display advertising constitute a distinct relevant product market," Adv. Br. at 3, 8-9, but collateral estoppel cannot apply here because their alleged ad exchange market is not identical to the ad exchange market defined by the Virginia Court. First, the Virginia Court found that the relevant geographic market for ad exchanges was worldwide, Virginia Op. at *28, while Advertisers claim that the relevant geographic market was the United States, ECF No. 399 ¶ 57 (cited in Adv. Br. at

8).[18] Second, the Virginia Court recognized that ad exchanges are two-sided transaction platforms, Virginia Op. at *26, but Advertisers ███████████████████, *see* Yung Decl. Ex. 6 (Zona Reply Rpt.) ¶ 26. These differences between the scope of the ad exchange market defined by the Virginia Court and the one alleged by Advertisers (and used by their experts to assess market shares and anticompetitive effects, among other things) preclude the application of collateral estoppel here. *See Faulkner*, 409 F.3d at 37 (collateral estoppel only appropriate where the "matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged"); *Visa U.S.A. Inc. v. First Data Corp.*, 369 F. Supp. 2d 1121, 1124-26 (N.D. Cal. 2005) (denying collateral estoppel on market definition where markets were "parallel" rather than "identical," as they "must be"); *see also Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1032 (9th Cir. 2001) (denying collateral estoppel on market definition where "the 'Markets,' as defined by plaintiffs, are different from the markets in the [prior] proceeding").

In addition, the Virginia Court's ad exchange market definition cannot receive collateral estoppel here because, although it recognized that an ad exchange is a two-sided transaction platform, the Virginia Court did not consider the advertiser side of the platform when it defined the ad exchange market, contrary to the law of the Second Circuit. *See supra* Part I.A.1.b; *see also Flood*, 2017 WL 280820, at *6 (declining to apply collateral estoppel where the prior case's jury instructions "deviated from Second Circuit law" and "did not consider" elements required in the Second Circuit).

---

[18] Google's economic expert, Dr. Mark Israel, demonstrated that the geographic scope of the ad exchange market is not immaterial: it significantly affects Google's market share. Yung Decl. Ex. 10 (Israel Rpt.) ¶ 431 & Fig. 57 (showing that AdX's share was 36% in a US-only market and 47% in the rest of the world); *see also* Yung Decl. Ex. 5 (Elhauge Rebuttal Rpt.) ¶ 173 █████████████████████████████████████

Nor can Advertisers show that collateral estoppel should apply to seven subsidiary factual findings related to an ad exchange market definition.[19] *See* Adv. Br. at 9-11. As an initial matter, the Virginia Court did not actually make most of those findings.[20] In describing these issues, Advertisers paraphrase the Virginia Court's opinion and then seek to apply collateral estoppel to their revised language, rather than to what the Virginia Court actually found. For example, their second issue seeks to apply collateral estoppel to their claim that "[t]he display ad tech ecosystem cannot be characterized as a single two-sided market," but Advertisers do not quote any such finding made by the Virginia Court. *See* Adv. Br. at 9 (citing Virginia Op. at *26). While the Virginia Court declined to analyze the ad tech ecosystem as a single two-sided market, it never stated that the ecosystem "cannot" be characterized that way. *See* Virginia Op. at *26-28. And even if the Virginia Court had made the subsidiary findings on which Advertisers seek collateral estoppel, summary judgment would not be available under Rule 56(a) (because none of them would advance the issues in this case) or Rule 56(g) (because it cannot be used to resolve disputed factual issues based on collateral estoppel). *See supra* Part I.B.

Advertisers' first three subsidiary issues relate to whether ad exchanges belong in a single, two-sided market with other ad tech tools. Without citing any case, Advertisers assert that the Virginia Court "could not have defined a relevant market limited to 'ad exchanges'" without making those first three findings. Adv. Br. at 10. They are mistaken. A fact-finder *could* define

---

[19] *See* Adv. Br. at 3 ("[1] All ad tech tools do not belong in a single market; [2] The display ad tech ecosystem cannot be characterized as a single, two-sided market; [3] Advertiser buying tools, ad exchanges, and publisher ad servers each serve distinct functions, are priced differently, and cannot be substituted for each other; [4] The relevant product market for ad exchanges that facilitate the sale of open-web display advertising does not include products that facilitate instream video, mobile app, or social media advertising; [5] Display advertising on closed networks (i.e. walled gardens) are distinct from open-web display advertising; [6] Ad exchanges for open-web display advertising are distinct products from ad networks; [and 7] Direct deals between advertisers and publishers do not present a reasonable substitute for ad exchanges.").

[20] Only the third issue directly quotes the Virginia Court's opinion. *Compare* Adv. Br. at 3, *with id.* at 9-10.

both a narrow ad-exchange-only market and a broader market encompassing all ad tech tools because, "within a broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 413 (S.D.N.Y. 2024) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (cleaned up)); *see also FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 885 (E.D. Mo. 2020) ("A broad product market . . . may contain smaller markets . . . which themselves constitute relevant product markets for antitrust purposes."). Thus, those first three issues were not necessary to the Virginia Court's definition of an ad exchange market and cannot receive preclusive effect.

Advertisers' final four issues relate to types of advertising (e.g., instream video, social media, direct deals) and ad tech tools (i.e., ad networks) that the Virginia Court carved out of the ad exchange market that it defined. As explained above, however, the market defined by the Virginia Court is not identical to the ad exchange market alleged by Plaintiffs, so collateral estoppel cannot apply to these four issues.

## B. Advertisers Are Not Entitled To Partial Summary Judgment On Monopoly Power (Issue A)

Advertisers cannot preclude litigation over whether "Google possesses monopoly power in the ad exchanges for open-web display advertising market," *see* Adv. Br. at 2, 5, because the Virginia Court's monopoly-power findings were predicated on a different definition of the ad exchange market from the one urged by Advertisers. *See supra* Part II.A. Those findings also ignore the advertiser side of the market, contrary to Second Circuit law. *See id.*; *see also supra* Part I.A1.b. Where, as here, the markets in the prior and subsequent cases are not identical, courts deny collateral estoppel on monopoly power (and competitive effects) predicated on those markets. *See, e.g.*, *Alpert's Newspaper Delivery Inc. v. The New York Times Co.*, 876 F.2d 266, 271 (2d Cir. 1989) (denying collateral estoppel on monopoly power and anticompetitive effects where plaintiffs

proposed a geographic market of the New York metropolitan area but evidence on these issues in the prior case was "limited to Fairfield County"); *Wrede v. Am. Tel. & Tel. Co.*, 1984 WL 1631, at *1, *4 (M.D. Ga. May 28, 1984) (denying collateral estoppel on monopoly power and anticompetitive conduct because the markets were not identical; in the prior action, the jury found the market was limited to the sale and lease of specific telephone systems, in contrast to the instant action where "there [was] no indication . . . that plaintiff's relevant market was in any way limited" to those specific systems).[21] This Court should do the same and deny collateral estoppel on the issue of monopoly power in the ad exchange market.

Although Advertisers also seek collateral estoppel for seven subsidiary factual findings related to monopoly power,[22] they have failed to show that collateral estoppel applies to any of them. *See* Adv. Br. at 6-7. As just explained, the monopoly-power issues in this case are not identical to the Virginia case because the markets are defined differently, and those differences alone prevent collateral estoppel from applying to all seven of the subsidiary findings concerning monopoly power. In addition, while Advertisers claim that those findings were "directly relevant

---

[21] *See also Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of that market there is no way to measure [a defendant's] ability to lessen or destroy competition."); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) ("In order to ascertain [] market share . . . we first must define the relevant product and geographic markets."); *Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 375 (2d Cir. 2011) ("When evaluating the extent to which a defendant exercises power in the alleged relevant market, that market must be properly defined."); *Cent. Air Freight, Inc. v. Am. Airlines, Inc.*, 597 F. Supp. 564, 573 (S.D.N.Y.) ("Century has failed to meet its burden in establishing that American had monopoly power in the relevant market, because it has failed to present credible evidence that the relevant market is defined as it claims."), *aff'd*, 738 F.2d 418 (2d Cir. 1984).

[22] *See* Adv. Br. at 2-3 ("[1] Google has charged durable supracompetitive prices for AdX; [2] Google has maintained a high share of the open-web display ad exchange market, with AdX having a market share roughly nine times greater than that of its next-largest competitor; [3] Google has been unwilling to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices; [4] There are high barriers to entry in the market for ad exchanges for open-web display advertising; [5] Google used its market power in supply-side and demand-side platforms to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges; [6] Google largely limited its programmatic open-web advertisers in Google Ads to bidding for inventory from publishers that used AdX and DFP, which is evidence of monopoly power; [and 7]) Google artificially handicapped its buyside to boost the attractiveness of its sellside (AdX), by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP. Google did this despite knowing that its advertiser customers would benefit from AdWords' bidding for open-web display ad inventory on non-Google exchanges.").

to, and an alternative means of establishing, market power," Adv. Br. at 8, a bare assertion of *relevance* is not enough to carry their burden of showing that all seven of them were *necessary* to the Virginia Court's decision. *See supra* Part I.A.4. Further, Advertisers' concession that each of their subsidiary factual findings was "an alternative means of establishing . . . market power," if true, would demonstrate that none was actually necessary to the Virginia Court's decision. Moreover, summary judgment for these subsidiary factual findings is not available under Rule 56(a) (because none of them would advance the issues in this case) or Rule 56(g) (because it cannot be used to resolve disputed factual issues based on collateral estoppel). *See supra* Part I.B.

### C. Advertisers Are Not Entitled To Partial Summary Judgment On Anticompetitive Conduct (Issue C)

Advertisers seek collateral estoppel on "two closely related issues pertaining to UPR": (1) "UPR constituted anticompetitive conduct"; and (2) "UPR was an exclusionary and anticompetitive act to maintain Google's monopoly power in violation of Section 2 of the Sherman Act."[23] *See* Adv. Br. at 3, 11-13. But collateral estoppel cannot apply here because the "issues pertaining to UPR" in the Virginia case are not identical to the issues in the Advertisers' case. In fact, UPR has not been at issue in the Advertisers' case since the Court dismissed the UPR claim

---

[23] In addition to the reasons discussed above why neither of these issues should receive collateral estoppel effect, there are two other reasons to deny collateral estoppel as to whether UPR was a Section 2 violation (i.e., the second issue). *First*, the Virginia Court did not decide that UPR alone violated Section 2, as Advertisers implicitly concede. *See* Adv. Br. at 12 (stating that "[t]he first issue was clearly decided" and "[t]he second issue was *likely* unambiguously resolved") (emphasis added). *Second*, although the Virginia Court found that UPR was anticompetitive, unlike government plaintiffs, private plaintiffs like Advertisers need to prove more than anticompetitive conduct to establish a Section 2 violation. *See Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 436 (2d Cir. 2005) ("It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'"); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) ("To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations."). For that reason, courts deny private plaintiffs' requests to give collateral estoppel effect to "liability" determinations from prior government cases. *See, e.g.*, *Namenda*, 2017 WL 4358244, at *16-17; *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 333-35 (D. Del. 2007); *In re Microsoft Corp. Antitrust Litig.*, 232 F. Supp. 2d 534, 538-39 (D. Md. 2002).

of the only remaining class representative (Hanson). *See In re Google Digital Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 251 (S.D.N.Y. 2024).[24]

Even if Advertisers had a live UPR claim, they would not be entitled to collateral estoppel because the Virginia Court's finding that UPR was anticompetitive rested on its analysis of how UPR impacted competition in the ad exchange market that it had defined. *See* Virginia Op. at *42 (describing UPR as "t[aking] away . . . a primary tool that publishers had used . . . to mitigate Google's dominance of the ad exchange market"). And because the ad exchange market discussed by the Virginia Court is not identical to the ad exchange market alleged by Advertisers, *see supra* Part II.A, the analysis of UPR's effects on Advertisers' ad exchange market would also be different. *See TechReserves Inc. v. Delta Controls Inc.*, 2014 WL 1325914, at *5 (S.D.N.Y. Mar. 31, 2014) ("Plaintiff's claims fail at the outset because Plaintiff's factual allegations do not support a statement of a relevant market by which this Court can determine whether the alleged anticompetitive conduct and harm occurred."); *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 160 (W.D.N.Y. 2000) ("[O]ne cannot prove market-wide competitive harm without first establishing the market in which it is to be measured."). Moreover, the Virginia Court's analysis of UPR's competitive effects is not identical to Advertisers' theory: the Virginia Court focused exclusively on how UPR impacted publishers and Google's rivals, *see* Virginia Op. at *42, *46, while Advertisers' claims depend on something different—UPR's effects on them. These factual differences between the issues in the Virginia case and the Advertiser case preclude applying collateral estoppel on the UPR claims.

---

[24] Notwithstanding dismissal of Hanson's UPR claim, Advertisers maintain that they may pursue a claim that the combination of Bernanke and UPR was anticompetitive. *See* ECF No. 966, at 1 ("Advertisers have focused their claims and the damages they seek on two facets of Google's anticompetitive conduct: its Project Bernanke and Unified Pricing Rules ('UPR') programs."). That claim is not identical to any claim addressed by the Virginia Court: its opinion does not even mention Bernanke.

Another reason why the UPR claims in the Virginia Case are not identical to any UPR claim in the Advertiser case is that the applicable legal standards are different. *See Jim Beam*, 937 F.2d at 734 ("Issues that may bear the same label are nonetheless not identical if the standards governing them are significantly different."). *First*, the Virginia Court distinguished *Trinko* on grounds that are inconsistent with Second Circuit law, *see supra* Part I.A.1.a, and a proper application of *Trinko* would foreclose the UPR claim. *Second*, the Virginia Court did not consider the impacts of UPR on both sides of the two-sided ad exchange market, as Second Circuit law requires. *See supra* Part I.A.1.b. Third, the Virginia Court applied a different standard for identifying anticompetitive conduct from the one applicable to this case. *See supra* Part I.A.1.c. Every one of these legal differences precludes collateral estoppel from applying to the Virginia Court's finding that UPR was anticompetitive.

In addition to the issues not being identical, the UPR findings were not necessary to the Virginia Court's decision that Google monopolized the ad exchange market. The Virginia Court determined that First Look, Last Look, DRS, and UPR were each anticompetitive, Virginia Op. at *41-42, but its UPR findings were unnecessary to the result because it could have reached the same conclusion on the monopolization claim based on its findings about any one of the other three programs. *See supra* Part I.A.4.

Collateral estoppel also cannot be applied to the five "specific factual findings regarding the nature and effects of UPR" highlighted by Advertisers. *See* Adv. Br. at 14-15.[25] As explained above, those findings are not identical to any live issue in Advertisers' case because the only

---

[25] *See also* Adv. Br. at 3-4 ("[1] UPR limited Google's rivals' ability to compete in the ad exchange market; [2] UPR harmed competition by depriving publishers of a choice that they had previously exercised to promote competition; [3] UPR restricted Google's customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers; [4] UPR increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges; [and 5] UPR resulted in Google's ad tech products gaining scale while rival ad tech products lost scale.").

remaining named Advertiser's UPR claim has been dismissed. Further, those findings were not necessary to the Virginia Court's decision because its findings about other programs would have sufficed to resolve the monopolization claim and because none of the five findings was individually necessary to the decision. For instance, the court still could have concluded that UPR was anticompetitive, even if it had not found that UPR deprived publishers of a choice (the second finding) or that UPR helped Google gain scale (the fifth finding). *See supra* Part I.A.4. Moreover, summary judgment for these subsidiary factual findings is not available under Rule 56(a) (because none of them would advance the issues in this case) or Rule 56(g) (because it cannot be used to resolve disputed factual issues based on collateral estoppel). *See supra* Part I.B.

### D. Advertisers Are Not Entitled To Partial Summary Judgment On Procompetitive Justifications (Issue D)

Advertisers seek collateral estoppel on three issues related to Google's procompetitive justifications for UPR. *See* Adv. Br. at 4, 15-17. But none of the issues here are identical to issues actually litigated and decided in the Virginia case because there are no UPR claims left in Advertisers' case and thus no need to address the justifications for UPR. *See supra* Part II.C (discussing factual and legal differences). Separately, the Virginia Court's discussion of UPR (including the justifications for UPR) was not necessary to its resolution of the monopolization claims in that case. *See id.* And the Virginia Court's exclusive focus on how UPR affected publishers is inconsistent with Second Circuit law that requires consideration of effects on advertisers as well. *See id.* While any of those reasons by itself would defeat the application of collateral estoppel to all three of the issues related to Google's procompetitive justifications for UPR, there are also additional reasons why collateral estoppel cannot apply to each of those three issues.

*First*, this Court should reject Advertisers' request to preclude Google from litigating

whether "[t]he procompetitive justifications that Google proffers for UPR are both invalid and insufficient, and any procompetitive benefits of this conduct are far outweighed by its anticompetitive effects." *See* Adv. Br. at 4, 15-16. Their argument fails at the outset because the Virginia Court made no such finding. While "sum[ming]" up a longer part of its opinion, the Virginia Court stated, "[t]he procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects." Virginia Op. at *47. But that sentence does not mention UPR specifically, and the Virginia Court did not describe Google's justifications for UPR as "invalid," "insufficient," or "far outweighed by . . . anticompetitive effects."[26] As a result, Advertisers cannot meet their burden of showing that collateral estoppel applies to this issue. *Cf. Postlewaite*, 333 F.3d at 49 ("The party asserting preclusion bears the burden of showing with *clarity and certainty* what was determined by the prior judgment, and issue preclusion will apply only if it is *quite clear* that this requirement has been met.").

*Second*, the same infirmity dooms Advertisers' request to collaterally estop Google from challenging that "UPR cannot be justified because it purportedly levels the playing field for advertisers, simplified the bidding process for publishers, improved matches, or increased publisher revenue." *See* Adv. Br. at 4. The Virginia Court never even evaluated the testimony from Google's experts that UPR benefited advertisers, not only by establishing a level playing field, but also by lowering some price floors, enabling simpler bidding strategies, and protecting advertisers from "price fishing." *See* EDVA ECF No. 1375 ¶¶ 1033-34. Because the Virginia Court did not reject (or even discuss) these justifications for UPR, the issue was not actually decided, and

---

[26] Whether procompetitive justifications outweigh anticompetitive effects is not relevant in the Second Circuit, *see supra* Part I.A.1.c, so even if the Virginia Court had performed such weighing for UPR, the issue would not be identical to any issue in this case, and collateral estoppel cannot apply to any finding about such weighing.

collateral estoppel cannot apply. *In re Harmon*, 250 F.3d 1240, 1247 (9th Cir. 2001) ("[A] court's silence concerning a pleaded allegation does not constitute adjudication of the issue"); *Folsom v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 633 F. Supp. 178, 181 (N.D. Ill. 1986) ("[I]f the court did not address (or even mention) an issue in its ruling, then the court never actually determined the issue."); *see also supra* Part I.A.1.b (discussing the Virginia Court's failure to consider both advertisers and publishers in analyzing competitive effects).

*Third*, Advertisers argue Google is precluded from litigating whether "UPR is not shielded from antitrust liability because it involved product design choices," *see* Adv. Br. at 4, 16, based on findings never made in the Virginia case. The Virginia Court found that "Google's decade-long campaign of exclusionary conduct" could not be "properly characterized as a series of design choices," but it did not make a finding specific to UPR. *See* Virginia Op. at *46. To the contrary, in the very next sentence, the Virginia Court cited *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354-55 (4th Cir. 2024), and emphasized that "courts must avoid unduly divvying up a 'complex or atypical exclusionary campaign,'" *id.*, undermining Advertisers' argument that the product-design finding applies to UPR alone. Further, because the Virginia Court's product-design analysis depends on legal standards for evaluating courses of conduct that are inconsistent with Second Circuit law, *see supra* Part I.A.1.e, that analysis is not identical to how the issue of product design would be analyzed in this case, and collateral estoppel cannot apply. Nor is summary judgment available for the product design finding under Rule 56(g) because it presents a question of law, not fact. *See supra* Part I.B.

### E. Advertisers Are Not Entitled To Partial Summary Judgment On The Refusal To Deal Doctrine (Issue E)

Advertisers cannot receive collateral estoppel about whether "[t]he refusal to deal doctrine does not apply to UPR." *See* Adv. Br. at 4, 17-18. First, Second Circuit precedent forecloses the

grounds on which the Virginia Court distinguished *Trinko*, so the analysis of the refusal-to-deal issue here could not be identical. *See supra* Part I.A.1.a. Second, the scope of the refusal-to-deal arguments are not identical because a UPR claim was tried in the Virginia case, but none remains here. *See supra* Part II.C. Third, the Virginia Court did not find that "[t]he refusal to deal doctrine does not apply to UPR" specifically. As Advertisers concede, the Virginia Court referred broadly to "Google's conduct at issue," without addressing UPR in particular. *See* Adv. Br. at 17 (citing Virginia Op. at *43). Fourth, any implicit finding that UPR could not be analyzed as a refusal to deal would not have been necessary to the Virginia Court's disposition of the monopolization claim. Even if the Virginia Court had held that *Trinko* applied to UPR, Google still would have been found liable as long as *Trinko* did not also apply to the alleged tie, First Look, Last Look, and DRS. Fifth, summary judgment based on the Virginia Court's finding about the applicability of the refusal to deal doctrine is not available under Rule 56(g) because it presents a question of law, not fact. *See supra* Part I.B.

## III.    PUBLISHERS CANNOT RECEIVE COLLATERAL ESTOPPEL ON ANY ISSUE

Publishers seek collateral estoppel on 25 issues and an additional 54 "predicate factual findings" relating to issues of market definition, market/monopoly power, anticompetitive conduct and justifications, tying, and Google's defenses. *See* Pub. Br. at 3-6; Pub. Appx. A.[27] For those requests to be granted, Publishers would have to show that the standards for collateral estoppel are satisfied separately for each of those issues and factual findings. *See supra* Part I. They cannot meet that burden for many reasons, including because the factual claims in this case are not identical to those decided by the Virginia Court; the legal standards differ as well; and many of the issues were not necessary to the Virginia Court's decision. For these reasons, and for others described below and summarized in Appendix B, Publishers cannot obtain collateral estoppel on any of their issues.

Before turning to the flaws in the substance of Publishers' arguments, there is an inconsistency between Publishers' arguments and requested relief that makes it unclear as to which exact issues Publishers are seeking collateral estoppel. While their brief "seek[s] preclusion on twenty-five issues" and describes the issues in general terms, *see* Pub. Br. at 3, 4-6, their Proposed Order asks the Court to "find[] that all issues identified in [Publishers'] Appendix A . . . have preclusive effect in this case," ECF No. 1040-1, and Publishers' "Appendix A consists entirely of direct quotes from the EDVA Opinion," Pub. Br. at 18; *see also* Pub. Appx. A. These dueling

---

[27] Publishers' Appendix A also includes headings I (monopolization violation) and II (tying violation). Pub. Appx. A at 1, 13. By not discussing those headings in their brief, Publishers have waived any argument that those headings should be given collateral estoppel effect. Further, collateral estoppel cannot apply to those headings because they constitute ultimate conclusions on liability. Publishers concede that they must still prove "injury, causation, and damages"—issues that were not addressed by the Virginia Court—to succeed on any of their claims, Pub. Br. at 19, and courts decline to apply collateral estoppel to ultimate findings of liability in such circumstances. *See supra* note 23 (citing *Namenda,* 2017 WL 4358244, at *16). In addition, collateral estoppel cannot apply to heading I for the reasons discussed below in Part III.A-C, or to heading II for the reasons discussed below in Part III.D.

articulations of the issues leave significant uncertainty and make it impossible to know for sure which articulation should be tested against the legal standards described in Part I. In either case, collateral estoppel does not apply for any issue referenced by the Publishers. But for purposes of this brief, Google assumes that they seek collateral estoppel on the 25 issues as they argued for on pages 4-6 of their brief and that the articulation of the 25 issues in their Appendix A is intended to support their claims that each issue was actually decided. *See* Pub. Br. at 17-18; *see also infra* Part III.A-E.[28] Unlike the 25 issues, the 54 predicate findings on which Publishers seek collateral estoppel are specified *only* in their Appendix A, and Google explains why those articulations of the 54 predicate findings cannot be given preclusive effect in Part III.F.

### A. Publishers Are Not Entitled To Partial Summary Judgment On Market Definition (Issues 1, 2, and 4)

Publishers are not entitled to collateral estoppel on their Issue 4—"[t]he publisher ad server and ad exchange markets have worldwide geographic scope," Pub. Br. at 4, 8-9—because they have not asserted claims based on worldwide markets. The Virginia Court held that the markets at issue were worldwide, Virginia Op. at *28, but Publishers allege that their proposed markets were "the United States, or in the alternative," certain "predominantly English-speaking countries," Pub. Compl. ¶ 121, ECF No. 408. Although Publishers have never brought a claim based on worldwide markets, their expert (Prof. Elhauge) opined that ███████████████████████████████ ██████ Yung Decl. Ex. 4 (Elhauge Rpt.) ¶¶ 186.[29] █████████████████████████████

---

[28] If Publishers argue that their Appendix A includes the precise articulation of the 25 issues for which they seek collateral estoppel, and if the Court does not treat such arguments as waived for Publishers' failure to discuss that precise language in their opening brief, Google would respectfully request an opportunity to submit a sur-reply brief describing additional reasons why their Appendix A's articulation of those 25 issues should not receive collateral estoppel.

[29] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████ Yung Decl. Ex. 4 (Elhauge Rpt.) ¶ 180 (emphasis added).

████████████████ For purposes of collateral estoppel, what matters is whether the geographic market on which Publishers base their claims is identical to the geographic market defined by the Virginia Court. Because Publishers' alleged geographic market is not identical to the worldwide market found by the Virginia Court, collateral estoppel cannot apply to Issue 4.

Publishers next claim that collateral estoppel can still apply "where the geographic scope of the relevant market in the subsequent suit was entirely encompassed by the geographic scope of the relevant market in the prior suit," Pub. Br. at 9 n.7, even though they are seeking collateral estoppel for a worldwide market that is identical to—not "encompassed within"—the geographic market found by the Virginia Court. The problem with Publishers' arguments about Issue 4 is not that there are differences between the geographic markets for which they *seek collateral estoppel* and the one found by the Virginia Court; the problem is that there are differences between the geographic markets *actually at issue in their case* and the ones found by the Virginia Court. Neither of the cases cited by Publishers sought collateral estoppel for an unpled market, as Publishers seek here. *See* Pub. Br. at 9 n.7 (citing *Selectron, Inc. v. Am. Tel. & Tel. Co.*, 587 F. Supp. 856 (D. Or. 1984), and *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 553 F. Supp. 962 (N.D. Ill. 1982)).[30]

No matter, Publishers say, for they think they should be able to amend their complaint now to allege worldwide markets. *See* Pub. Br. at 9. As an initial matter, Publishers' approach would put the cart of collateral estoppel before the horse of amendment. In evaluating whether the

---

[30] Publishers also ignore that *Oberweis* did not articulate a general principle that collateral estoppel can always apply if the geographic market in the subsequent suit is narrower than in the prior suit. In *Oberweis*, the court applied collateral estoppel to claims involving a Chicago market (which was narrower than the Midwest market in the prior case) only because the prior decision actually included specific findings about the narrower Chicago market that left "*no* doubt about . . . antitrust violations in the Chicago market." *See Oberweis*, 553 F. Supp. at 966, 969-70. By contrast, Publishers do not seek collateral estoppel here for any specific findings of the Virginia Court about a narrower United States market. *Selectron* relies entirely on *Oberweis* in its discussion of this issue, so Publishers' citation to *Selectron* adds nothing. *See Selectron*, 587 F. Supp. at 862.

geographic market here is identical to the one found in the Virginia case, the Court should look to the operative complaint, not to a hypothetical amended complaint that Publishers have not even sought permission to file.

If Publishers were to file a motion to amend their complaint, that motion should be denied because of their "undue delay . . . and perhaps most important, the resulting prejudice to the opposing party." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010). Publishers' failure to move to amend *even as of today* amounts to clear and undue delay: there can be no excuse for not filing such a motion by now, three months after the Virginia Court's ruling, and more than two months after suggesting the possibility of amendment. *See* ECF No. 984, at 2 (raising the prospect of amending to conform complaint to the evidence on another issue); *see also TQ Delta, LLC v. CommScope Holding Co., Inc.*, 657 F. Supp. 3d 892, 901 (E.D. Tex. 2023) ("untimely" request to amend waived opportunity for offensive collateral estoppel).

More importantly, permitting amendment now—more than a year after the close of fact discovery—would severely prejudice Google because it was not able to use party and non-party depositions (and other discovery tools) in this case to develop evidence undermining the existence of Publishers' alleged worldwide market. Had Google known that Publishers would assert a worldwide market while discovery was still open, it would have sought documents and data related to worldwide markets, rather than the U.S. market[31]; taken different depositions; and/or asked more questions about the geographic market at the depositions it did take. It would doubly prejudice Google first to allow Publishers to assert new claims that Google could have challenged more fully if they had been asserted sooner and then to apply collateral estoppel to preclude Google

---

[31] For example, in reliance on Publishers' allegations, Google's requests for production of documents to Publishers sought "[d]ata and documents . . . limited to the United States." Yung Decl. Ex. 7 (Jan. 27, 2023 Google's Requests for Production) at 19, 20. Google's subpoenas to third-party ad exchanges included the same geographic limitation. *See, e.g.*, Yung Decl. Ex. 8 (Mar. 29, 2023 Subpoena) at 19, 20.

altogether from marshalling the existing record evidence against a worldwide market.[32] *See City of New York v. Grp. Health Inc.*, 649 F.3d 151, 158 (2d Cir. 2011) (affirming denial of leave to amend when allowing amendment would "require additional discovery" that would "delay proceedings and require substantial additional expense").[33]

With their Issues 1 and 2, Publishers seek to apply collateral estoppel to the Virginia Court's findings that publisher ad servers and ad exchanges are relevant product markets, *see* Pub. Br. at 4, 7-8, but collateral estoppel cannot apply because the product markets determined by the Virginia Court are not identical to those alleged here. Specifically, Publishers ████████ ████████████████████████████████████ Yung Decl. Ex. 5 (Elhauge Rebuttal Rpt.) ¶ 79, while the Virginia Court excluded instream video ads from those markets, *see* Virginia Op. at *23 ("[J]ust as with publisher ad servers, ad exchanges that facilitate the sale of only instream video . . . are not helpful for publishers seeking to monetize their open-web display inventory.").[34]

Publishers concede that their publisher ad server and ad exchange markets are "slightly different" from the markets found by the Virginia Court. Pub. Br. at 15.[35] That alone demonstrates

---

[32] Although Publishers suggest that the Seventh Circuit allowed amendment of a complaint to simplify application of collateral estoppel, *see* Pub. Br. at 9, their cited case discusses how amendment of the complaint *in a prior case* to conform to evidence submitted at trial *in that prior case* would clarify how collateral estoppel would apply in a subsequent case. *See Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 878-79 (7th Cir. 2005). The case does not address the situation presented here, where Publishers seek to amend the complaint *in a subsequent case* to try to excuse their inability to show that both cases raise identical issues.

[33] *See also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (affirming denial of a motion to amend because discovery had been completed and a motion for summary judgment had been filed); *Laboy v. Semple*, 2019 WL 13543736, at *3 (D. Conn. Dec. 5, 2019) (finding prejudice when amendment would result in opposing party "expend[ing] additional resources to conduct discovery and prepare for trial"); *Jennette v. Koshler*, 1995 WL 60017, at *2 (S.D.N.Y. Feb. 10, 1995) (denying leave to amend complaint where plaintiff had been deposed, discovery had closed, and defendants would be burdened by the expense of conducting further discovery).

[34] Because Issues 1.1-1.3, 1.6, and 2.1-2.3 depend on the Virginia Court's definition of the markets to exclude instream video, they (like Issues 1 and 2) are not identical to the issues in this case, and collateral estoppel cannot apply to them. *See* Pub. Appx. A at 1-3.

[35] Counsel for the putative Publisher Class has previously argued on behalf of American Express that "the law is clear that collateral estoppel can only apply in antitrust cases where the market at issue in both cases is identical." Mem. of Law in Further Supp. of Mot. for Summ. J., *In re Am. Express Anti-Steering Rules Litig. (II)*, 2015 WL 9915999 at § II.A.1 (E.D.N.Y. Dec. 14, 2015) (citing *First Data* and *Pool Water Products*, *see* Part II.A *supra*).

that collateral estoppel should be denied on Issues 1 and 2 (and the accompanying factual findings). *See supra* Part I.A.1; Part II.A (citing cases denying collateral estoppel due to different markets). In an attempt to avoid that outcome, Publishers claim that the Virginia Court "did not explicitly or implicitly reject [their] product market definitions," Pub. Br. at 16, but collateral estoppel cannot apply to issues that were not actually decided. *See supra* Part I.A.2. They also argue that "Google cannot show that the marginal addition of instream video ads has any material effect on the assessment of Google's market power," Pub. Br. at 16, ignoring that it is *their* burden to show that the markets are identical for collateral estoppel to apply, *see Proctor*, 715 F.3d at 414. And they offer no evidence to support their claim that the Virginia Court's monopoly power findings "are not altered materially by including the additional transaction type of instream video." Pub. Br. at 17.[36]

Collateral estoppel cannot apply to the definition of the ad exchange market (Issue 2) for two additional reasons. *First*, the Virginia Court found ad exchanges to be two-sided transaction platforms, Virginia Op. at *26, while Publishers ████████████████, *see* Yung Decl. Ex. 3 (Elhauge Tr.) at 67:5-67:8. Because the two-sided ad exchange market found by the Virginia Court is not identical to the one-sided ad exchange market that Publishers allege, collateral estoppel cannot apply to Issue 2. *Second*, even though the Virginia Court correctly found that ad exchanges are two-sided transaction platforms, it defined an ad exchange market based solely on the options available to publishers, without considering the wider array of options available to advertisers, as courts in the Second Circuit must do. *See supra* Part I.A.1.b. Because the Virginia

---

[36] On the other hand, there is evidence suggesting that including instream video in the ad exchange market would reduce Google's market share. *Compare* Yung Decl. Ex. 10 (Israel Rpt.) at Fig. 53 (AdX's share of video ad spend was ~5%), *with id.* Fig. 45 (AdX's share of indirect non-video display ad spend is ~35-42%).

Court's ad exchange market-definition analysis is not identical to the facts or the legal standards that would govern in this case, Issue 2 cannot be given collateral estoppel effect.[37]

### B. Publishers Are Not Entitled To Partial Summary Judgment On Monopoly/Market Power (Issues 5, 6, and 24)

Publishers are not entitled to collateral estoppel on issues related to whether Google possesses monopoly power in the market for publisher ad servers (Issue 5), monopoly power in the market for ad exchanges (Issue 6), or market power in the market for ad exchanges (Issue 24). *See* Pub. Br. 9-10, 13-14. The Virginia Court's monopoly-power and market-power findings were predicated on different market definitions from those urged by Publishers and which ignore the advertiser side of the ad exchange market, contrary to Second Circuit law. *See supra* Part III.A. Where, as here, the markets in the prior and subsequent cases are not identical, courts deny collateral estoppel on monopoly power (and competitive effects). *See supra* Part II.B (citing cases denying collateral estoppel on issues predicated on different markets across cases). This Court should do the same and deny collateral estoppel on Issues 5, 6, and 24.[38]

### C. Publishers Are Not Entitled To Partial Summary Judgment On Anticompetitive Conduct Or Procompetitive Justifications (Issues 7-12 and 14-19)

There are a host of reasons why collateral estoppel does not apply to whether Google's conduct—including alleged tying, First Look, Last Look, DRS, and UPR—was anticompetitive (Issues 7-12) or whether that conduct was adequately justified at the Virginia trial (Issues 14-19). *Cf.* Pub. Br. at 4-5, 10-12.

---

[37] Because Issues 2.1-2.5 depend on the Virginia Court's definition of the ad exchange market, and the court did not consider advertiser-side substitution despite acknowledging that market is a two-sided transaction platform, its analysis is not identical to what would be required here, and collateral estoppel cannot apply. *See supra* Part I.A.1.b; *see also* Pub. Br. App. A at 2-3.

[38] Because Issues 5.1-5.3, 5.5, 5.7-5.8, 6.1-6.7, and 6.9-6.10 depend on the Virginia Court's definition of the publisher ad server market or ad exchange market, they (like Issues 5 and 6) are not identical to the issues in this case. Issues 5.8 and 6.9-6.10 also depend on market shares found in a worldwide market, which is not identical to the geographic market pled here. *See supra* Part III.A; *see also* Pub. Appx. A at 5-8.

*First*, the Virginia Court's conclusions about whether Google's conduct was anticompetitive depended on its definition of the relevant markets. Indeed, the Virginia Court explained that "[d]efining the relevant market first is crucial" because "without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." Virginia Op. at *18; *see also supra* Part II.C (citing cases requiring defined markets before analyzing anticompetitive conduct). As explained above, the Virginia Court did not define identical markets to those alleged by Publishers, *see supra* Part III.A, so its competitive-effects analysis—and the findings flowing from that analysis—could not have been identical either. In short, the differences in the markets at issue preclude collateral estoppel from being applied on issues concerning not only market definition, but also whether conduct was anticompetitive (Issues 7-12 and 14-19). *See supra* Part II.B (citing *Alpert's*, 876 F.2d at 271, and *Wrede*, 1984 WL 1631, at *1, *4).[39]

*Second*, in evaluating the overall competitive effects of Google's conduct and its justifications, the Virginia Court applied different legal standards than would apply in this Court. *See supra* Part I.A.1.c. This difference in legal standards precludes collateral estoppel from applying to Issues 7-12 and 14-19.[40]

*Third*, when the Virginia Court analyzed the effects of conduct on the ad exchange market, it did not consider how the conduct impacted all advertisers, even though it found that ad exchanges should be treated as two-sided transaction platforms. *See* Virginia Op. at *26. For example, the Virginia Court acknowledged Google's arguments that:

- First Look "benefited AdX advertisers," Virginia Op. at *13, and "gave advertisers more

---

[39] For the same reasons, collateral estoppel does not apply to Issues 7.1-7.2, 9.1-9.3, 10.1, 15.1-15.2, 16.1, 17.1, 18.1, and 19.1. *See* Pub. Appx. A at 8-12.

[40] For the same reasons, collateral estoppel does not apply to Issues 7.1-7.2, 9.1-9.3, 10.1, 15.1-15.2, 16.1, 17.1, 18.1, and 19.1. *See* Pub. Appx. A at 8-12.

opportunities to bid on inventory," *id.* at *45;

- Last Look "gave advertisers more opportunities to bid on inventory," *id.* at *45;

- DRS "helped . . . advertisers win more auctions," *id.* at *16; and

- UPR "established a level playing field for advertisers," *id.* at *46.

But without engaging with this advertiser-side evidence, the Virginia Court focused on publishers in finding the programs anticompetitive.[41] *See* Virginia Op. at *41-42, *45-46. Such one-sided analysis differs from what Second Circuit law requires (and what ██████████████████ ██████[2]), so collateral estoppel cannot apply to the Virginia Court's conclusions as to First Look (Issues 9 and 16), Last Look (Issues 10 and 17), DRS (Issues 11 and 18), or UPR (Issues 12 and 19). *See supra* Part I.A.1.b.[43]

     *Fourth*, the Virginia Court concluded that these programs were anticompetitive only after it rejected *Trinko*'s applicability. Because its reading of *Trinko* is inconsistent with Second Circuit law, the Virginia Court's findings on Issues 7-12 cannot be given collateral estoppel effect.[44] *See supra* Part I.A.1.a.

     *Fifth*, none of the Virginia Court's findings concerning whether specific Google programs were anticompetitive (Issues 7 and 9-12) or adequately justified (Issues 15-19) were necessary to its overall determination of Section 2 liability. The court could have reached the same result on

---

[41] The Virginia Court's only discussion of how these programs affected advertisers came when it stated that "First Look . . . resulted in . . . fewer impressions going to [non-Google] advertisers who were willing to pay the most for them" and "harmed . . . advertisers using non-Google ad buying technologies." Virginia Op. at *42, *45. But the Virginia Court failed to consider impacts of First Look on the advertiser side of the market as a whole because it did not consider impacts on advertisers that use Google tools, and it did not consider the impacts of Last Look, DRS, or UPR on any advertisers.

[42] Yung Decl. Ex. 3 (Elhauge Tr.) at 72:5-72:8 ██████████████████████████████████████████ ).

[43] For the same reasons, collateral estoppel does not apply to Issues 9.1-9.3, 10.1, 16.1, 17.1, 18.1, and 19.1. *See* Pub. Appx. A at 8-9, 11-12.

[44] For the same reasons, collateral estoppel does not apply to Issues 7.1-7.2, 9.1-9.3, and 10.1. *See* Pub. Appx. A at 8-9.

the Section 2 claim if it had found that only one of the alleged tying, First Look, Last Look, DRS, and UPR was anticompetitive. As a result, none of the findings related to those programs were necessary to the liability determination, *see supra* Part I.A.4, and collateral estoppel cannot apply to Issues 7, 9-12, and 15-19.[45]

*Sixth*, Google cannot be precluded from litigating whether the alleged tie of DFP and AdX amounted to monopolization (Issue 7) for all of the reasons that collateral estoppel does not apply to other tying-related issues. *See supra* Part I.A.1.d; *infra* Part III.D.

*Seventh*, collateral estoppel cannot apply to Issue 8 and Issue 14 because they refer only to unspecified "anticompetitive practices" and "procompetitive justifications" (respectively) and the practices and justifications in this case differ from those addressed by the Virginia Court. For example, Publishers still appear to challenge some conduct that the Virginia Court did not analyze (Enhanced Dynamic Allocation) and other conduct that it found not anticompetitive (Project Poirot). *See* Virginia Op. at *42 n.29.[46] And Google may offer justifications in this case that the Virginia Court's opinion did not address. *See supra* Part II.D (discussing additional justifications for UPR). In light of these differences between the conduct and justifications at issue in the Virginia case and here, applying collateral estoppel on Publishers' general and all-encompassing articulations of Issues 8 and 14 would preclude Google from litigating issues in this Court that the Virginia Court never decided. *See supra* Part I.A.2.

### D. Publishers Are Not Entitled To Partial Summary Judgment On Tying (Issues 21-25)

Issues 21 through 25 each relate to elements of the Virginia plaintiffs' claim that Google

---

[45] For the same reasons, collateral estoppel does not apply to Issues 7.1-7.2, 9.1-9.3, 10.1, 15.1-15.2, 16.1, 17.1, 18.1, and 19.1. *See* Pub. Appx. A at 8-12.

[46] While Publishers have stated that they "will not pursue Acts 7, 9, 10, 12, and 15," *see* ECF No. 984, at 4 n.3, they have not similarly withdrawn their claims about Enhanced Dynamic Allocation (Act 6) and Project Poirot (Act 11), *see* Pub. Compl., ECF No. 408 ¶¶ 22, 27. They also intend to pursue a claim based on "Google's use of a discriminatory risk aversion coefficient," Pub. Br. at 11 n.8, which was not included in their Complaint.

tied its publisher ad server (DFP) to its ad exchange (AdX). *See* Pub. Br. at 5-6, 12-15.[47]

Publishers cannot receive collateral estoppel on Issue 21 (which relates to whether publisher ad servers and ad exchanges are distinct products) because the Virginia Court's findings on that issue depend on its market definition analysis, which is not identical to the market definition analysis that would apply here. *See* Virginia Op. at *38 (referring to market definition discussion contained in "Section VI(A)(1–2)" of the opinion); *supra* Part III.A. Collateral estoppel does not apply to Issue 24 (which relates to Google's alleged market power in the tying product market for ad exchanges) for the reasons discussed above in Part III.B. Nor does collateral estoppel apply to Issue 25 (which relates to the alleged tie's impact on interstate commerce): that issue presumes the existence of a tie, but Second Circuit law forecloses finding that a tie exists, for the reasons discussed below.

Publishers recognize that Issues 22 and 23 both relate to the Fourth Circuit's "conditioning" element of a tying claim, Pub. Br. at 14, which the Second Circuit refers to as "coercion." *See Kaufman*, 836 F.3d at 141 (describing proof that "the seller uses actual coercion to force buyers to purchase the tied product" as the second element of a tying claim); *see also* Virginia Op. at *38-39 (describing "coercive pressure" while analyzing the "conditioning" element). But regardless of the label, collateral estoppel cannot apply to Issues 22 and 23 because the Virginia Court's analysis of this element is not identical to how the Second Circuit would analyze it. *See supra* Part I.A.1.

The Virginia Court held that Google "condition[ed] purchase of the tying product upon purchase of the tied product" by imposing a "coercive policy [that] made purchasing DFP, the tied product, together with AdX, the tying product, 'the only viable economic option' for publishers."

---

[47] Publishers' Act 1 tie parallels the tying claim in the Virginia case, but their Act 2, 3, and 4 tying claims do not. *See* Pub. Compl., ECF No. 408 ¶¶ 16-19. Because Publishers' Act 2, 3, and 4 tying claims are not identical to the tying claim in the Virginia case, collateral estoppel cannot apply to them.

Virginia Op. at *39 (quoting *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1324 (D. Md. 1986)). But the "only viable economic option" test is inconsistent with Second Circuit law. In *Shop & Save Food Markets, Inc. v. Pneumo Corp.*, 683 F.2d 27 (2d Cir. 1982), the plaintiff supermarket claimed that the defendant illegally tied wholesale groceries (the tied product) to a lease on the store's location (the tying product) by demanding higher rent if the plaintiff bought groceries from the defendant's competitors. *Id.* at 29. The Second Circuit rejected that tying claim because the plaintiff was "free to purchase" and did in fact purchase groceries elsewhere, despite the economic "penalty" that the defendant extracted for doing so. *See id.* at 31 ("[A]n attempt to force a tie which results only in an agreement to pay a higher price for the tying product is not a tying violation."). Because economic coercion cannot support a tying claim in the Second Circuit, the legal standards under which this Court would analyze the coercion element are not identical to those applied by the Virginia Court, and collateral estoppel cannot apply to the Virginia Court's findings related to coercion/conditioning (Issues 22 and 23).[48]

Even if some version of "only viable economic option" test could be reconciled with Second Circuit law, the Virginia Court's application of that test could not. Courts have applied the "only viable economic option" only when the defendant's pricing policies effectively coerce buyers to buy the tying and tied products together, rather than individually. For instance, *Nobel* (the case cited by the Virginia Court) explained that plaintiffs needed to prove that the "*price structure* on the [tied products] makes any other option not feasible" and analyzed the pricing practices of the defendant before rejecting plaintiffs' tying claim. 670 F. Supp. at 1324-26 (emphasis added); *see also Virtual Maint., Inc. v. Prime Computer, Inc.*, 957 F.2d 1318, 1322-

---

[48] One decision from this circuit has mentioned the "only viable economic option" test, but it did not consider whether that test conflicts with *Shop & Save* because the evidence there demonstrated that "the unbundled prices . . . are *not* so high as to make their purchase as part of the package the only viable alternative." *See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 471-72 (S.D.N.Y. 1996) (emphasis added).

1324 (6th Cir. 1992) (concluding that "[a] tying arrangement clearly exists here because the large price differential . . . induces all rational buyers" to take both products together, when the price of the bundle was $16,000, but the price of the tying product purchased alone was $80,000 to $160,000); *Ortho Diagnostic*, 920 F. Supp. at 471 (collecting cases and requiring proof that the "*pricing* structure make[] purchase of the tying and tied products together the only viable economic option" (emphasis added)).

The Virginia plaintiffs argued that Google's withholding of a feature (real-time bids) of the tying product (AdX) was coercive, but they did not claim that Google employed coercive pricing. With no claim of coercive pricing before it, the Virginia Court's application of the "only viable economic option" test extended that test beyond situations where it previously had been applied. Setting aside the impropriety of applying this test at all, such an extension runs afoul of Second Circuit law because the Virginia Court was evaluating a *per se* tying claim, *see* Virginia Op. at *38, and "[e]xpansion of the *per se* rule should be approached with great caution." *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 411 (2d Cir. 1981); *Shop & Save*, 683 F.2d at 31 ("'[I]t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act.'"). In short, even if the "only viable economic option" could apply to claims of coercive pricing in the Second Circuit, collateral estoppel cannot apply to Issues 22 and 23 because the Virginia Court's application of that test was inconsistent with the caution demanded by the Second Circuit before the *per se* rule can apply.[49]

### E. Publishers Are Not Entitled To Partial Summary Judgment On Google's Defenses (Issues 3, 13, and 20)

Publishers cannot apply collateral estoppel to three of Google's defenses. *First*, collateral

---

[49] For the reasons described in Part III.D, collateral estoppel does not apply to Issues 23.1-23.4. *See* Pub. Appx. A at 13-14.

estoppel does not apply to Issue 3 (concerning whether the ad tech stack is a single two-sided market, *see* Pub. Br. at 4, 8) because the Virginia Court's market-definition analysis does not reflect the Second Circuit's teachings on how to define two-sided markets. *See supra* Part I.A.1.b.[50] In addition, Issue 3 was not necessary to the Virginia decision because the court could have accepted a single two-sided market encompassing all ad tech tools and still found for plaintiffs based on submarkets for publisher ad servers and ad exchanges. *See supra* Part II.A (discussing cases recognizing that broad markets may contain narrower submarkets).[51]

*Second*, Publishers cannot preclude Google from litigating Issue 13 (concerning whether *Trinko* applies to Google's conduct, *see* Pub. Br. at 4, 12) because the Virginia Court distinguished *Trinko* on grounds that do not comport with Second Circuit law. *See supra* Part I.A.1.a.[52]

*Third*, Issue 20 (concerning whether Google's "anticompetitive acts" should be analyzed as product design choices, *see* Pub. Br. at 5, 12) cannot receive collateral estoppel effect because Publishers challenge different "acts" from those addressed in the Virginia Court's opinion. *See supra* Part III.C (discussing Enhanced Dynamic Allocation and Poirot in "Seventh" argument). In addition, the Virginia Court's product-design analysis is inconsistent with Second Circuit law. In finding that "Google's decade-long campaign of exclusionary conduct" could not be "properly characterized as a series of design choices," the Virginia Court emphasized that "courts must avoid unduly divvying up a 'complex or atypical exclusionary campaign.'" Virginia Op. at *46 (quoting *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354-55 (4th Cir. 2024)). Because the Virginia Court did not analyze whether each of Google's programs individually was a lawful product design choice, its approach departed from how Issue 20 would be analyzed in the

---

[50] For the same reasons, collateral estoppel does not apply to Issues 3.1-3.4. *See* Pub. Appx. A at 3-4.

[51] For the same reasons, collateral estoppel does not apply to Issues 3.1-3.4. *See* Pub. Appx. A at 3-4.

[52] For the same reasons, collateral estoppel does not apply to Issues 13.1-13.2. *See* Pub. Appx. A at 9-10.

Second Circuit, *see supra* Part I.A.1.e, and collateral estoppel cannot apply.[53]

Further, summary judgment under Rule 56(g) is not available on Issue 3 because Rule 56(g) cannot be used to resolve disputed factual issues based on collateral estoppel,[54] and summary judgment is not available on Issues 13 or 20 because they present questions of law, not fact.[55] *See supra* Part I.B.

### F.  Publishers Are Not Entitled To Partial Summary Judgment On Supposed "Predicate Factual Findings"

In addition to the 25 issues discussed above, Publishers also seek collateral estoppel on 54 "predicate factual findings" related to those issues. *See* Pub. Br. at 3; Pub. Appx. A. Summary judgment under Rule 56(a) is not available for any of those factual findings because none of them would advance the issues in this case, and Rule 56(g) cannot be used to resolve disputed factual issues on the basis of collateral estoppel. *See supra* Part I.B.

Although Publishers bear the burden of showing that each of their 54 predicate factual findings meets the elements required for collateral estoppel to apply, *see Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013), they simply assert that "[t]he Court should also treat the factual bases . . . as conclusively established here" without explaining how each finding meets the standards for applying collateral estoppel, *see* Pub. Br. at 2, 8, 10, 12, 14, 15. Merely quoting 54 passages from the Virginia decision (in an appendix to their brief) without any further analysis cannot carry Publishers' burden to show that collateral estoppel applies.[56]

---

[53] For the same reasons, collateral estoppel does not apply to Issues 20.1-20.2. *See* Pub. Appx. A at 12.

[54] For the same reason, collateral estoppel does not apply to Issues 3.1-3.4. *See* Pub. Appx. A at 3-4.

[55] For the same reason, collateral estoppel does not apply to Issue 20.1. *See* Pub. Appx. A at 12.

[56] Publishers rely on this Court's decision in *SEC v. Mattera*, 2013 WL 6485949, at *9 (S.D.N.Y. Dec. 9, 2013) (Castel, J.), for the proposition that, "[i]f this Court gives preclusive effect to any of the [Virginia] court's findings establishing the elements of Google's liability . . . Google should also be precluded from re-litigating the underlying factual findings," Pub. Br. at 2 n.3. But their quotation from *Mattera*—noting that the defendant there was estopped from "litigating the same facts" that he had pled guilty to in his prior criminal action—was simply another way for this Court to express its ultimate conclusion that the plaintiff was entitled to "summary judgment in its favor on its

In any event, Publishers cannot show that many of these 54 quotations from the Virginia decision relate to issues that are *identical* to ones in this case for the reasons discussed above in Part III.A-E. *See supra* notes 34, 37-40, 43-45, 49-55. Nor can Publishers show that all of the 54 predicate factual findings were *necessary* to the Virginia Court's decision. For example, Issue 3.4 focuses on how "ad exchanges differ somewhat from . . . credit-card networks." Pub. App. A at 4 (quoting Virginia Op. at *26 n.24). Issue 5.4 discusses how "[i]ndustry participants perceive DFP." Pub. App. A at 5 (quoting Virginia Op. at *30). And Issue 23.2 describes how "Google's publisher customers . . . felt." Pub. App. A at 13 (quoting Virginia Op. at *39). Publishers do not and cannot point to any indication in the Virginia Court's decision that the Virginia Court thought any of these issues (or many others like them among Publishers' 54 predicate factual findings) "made a difference—necessarily—in [the court's] ultimate determination," *see Beechwood*, 436 F.3d at 153.

Publishers have made it impossible to perform a proper collateral-estoppel analysis of each of their 54 predicate factual findings because they have jumbled together multiple factual and legal points that must each be analyzed separately. For example, Issue 7.2 references (a) Google's "forcing" of publishers, which relates to whether the conditioning/coercion element of a tying claim is met, an issue where the Virginia Court's analysis is not identical to Second Circuit law, *see supra* Part III.D; (b) "rivals' market share," which depends on market definitions that are not identical here and in the Virginia case, *see supra* Part III.A; and (c) an "anticompetitive effect," which can only be evaluated in the context of a relevant market (which is not the same in both

---

section 10b and Rule 10b-5 claims" as a whole. 2013 WL 6485949, at *9. Contrary to Publishers' assertion, *Mattera* does not discuss, much less resolve, whether "underlying factual findings" may receive collateral estoppel effect when, as here, Publishers concede that collateral estoppel does not apply to all "elements of Google's liability." *See* Pub Br. at 19, 20 (recognizing that, even if collateral estoppel applies, Publishers would "still need to establish" that the challenged conduct "caused them to pay overcharges on AdX and the aggregate amount of damages they sustained").

cases), *see supra* Part III.C. *Cf. Discover*, 598 F. Supp. 2d at 401 ("declin[ing] to give collateral estoppel effect to the determinations encapsulated in [plaintiff's] Attachment A, concluding that the presentation to the jury of 81 individual statements in a vacuum and without context would be unfair to Defendants").

On top of these problems common to all 54 of Publishers' predicate factual findings, there are additional reasons why collateral estoppel cannot apply to certain findings:

- Issue 5.4 discusses how evidence that Google "degraded some DFP features" by launching UPR suggested that Google had monopoly power in the publisher ad server market. Pub. App. A at 5 (quoting Virginia Op. at *31). But the Virginia Court recognized that such evidence was "insufficient" to establish monopoly power on its own, downplayed the evidence as not "airtight," and ultimately grounded its monopoly-power determination in evidence about DFP's market share and barriers to entry. *See* Virginia Op. at *31. In short, the Virginia Court's opinion shows that the finding that Google degraded DFP was not necessary to the decision.

- Issue 6.8 discusses how Google "combined DFP and AdX under a single publisher-facing product," Pub. App. A at 7 (quoting Virginia Op. at *33), but that finding was not necessary to the Virginia Court's rulings on market power or tying. As to market power, the court could have reached the same conclusions by relying on other evidence, such as market shares. *See* Virginia Op. at *31-35. As to tying, the court held that the Virginia plaintiffs proved their tying claim without discussing the technological combination of DFP and AdX. *See* Virginia Op. at *38-40.

- Issue 7.1 discusses how Google "boost[ed]" AdX by "effectively limiting" AdWords advertisers to bidding on AdX, Pub. App. A at 8 (quoting Virginia Op. at *41), but this finding was not necessary to the Virginia Court's decision because there was other evidence of AdX's alleged market power and the Virginia Court did not suggest that its market power determination would have been different if there had been no limitation on bidding by AdWords advertisers. *See* Virginia Op. at *31-35.

- Issue 13.1 discusses how publishers had to use AdX to "receive real-time bids from AdWords advertisers," Pub. App. A at 9 (quoting Virginia Op. at *43), and it cannot receive collateral estoppel for the same reasons as Issue 7.1. Issue 13.1 also presumes that "Google has engaged in tying," Pub. App. A at 9 (quoting Virginia Op. at *43), but the tying standards applied by the Virginia Court are not identical to those that would apply here, *see supra* Parts I.A.1.d and III.D.

- Issue 13.2 discusses the termination of a course of dealing and profit sacrifice in support of finding the *Aspen Skiing* exception satisfied, Pub. App. A at 10 (quoting Virginia Op. at *43), but the Virginia Court's interpretation of *Trinko* and application of the *Aspen Skiing* exception are inconsistent with Second Circuit law, *see supra* Part I.A.1.a.

- Issue 20.1 discusses "markets in which [Google] had monopoly power," Pub. App. A at 12, but the markets defined by the Virginia Court are not identical to those here and, as such, findings of monopoly power in those markets cannot be given preclusive effect, *see supra* Part III.A-B.

- Issue 20.2 discusses an "AdX-DFP tie," Pub. App. A at 12 (quoting Virginia Op. at *46), but the tying standards applied by the Virginia Court are not identical to those that would apply here, *see supra* Parts I.A.1.d and III.D.

- Issue 24.1 discusses how Google "effectively restricted . . . AdWords advertisers to AdX," Pub. App. A at 14 (quoting Virginia Op. at *40), and it cannot receive collateral estoppel for the same reasons as Issue 7.1.

Having failed to carry their burden of showing that collateral estoppel applies to any issue, Publishers' motion for partial summary judgment should be denied in its entirety.

## IV.   INFORM CANNOT RECEIVE COLLATERAL ESTOPPEL ON ANY ISSUE

Despite having some of the most unique claims in this matter and some of the least-developed expert theories, Inform requests preclusion on the largest number of issues: 81 in total. Inform requests rulings concluding that: (1) ad servers and ad exchanges for "open-web display" advertising are relevant product markets (Issues 1-27); (2) Google possesses monopoly power in the ad exchange and ad server for "open-web display" advertising markets (Issues 28-46); (3) Google has willfully acquired or maintained its monopoly power through anticompetitive conduct (Issues 47-48); (4) Google unlawfully tied AdX and DFP (Issues 49-58); (5) Dynamic Allocation and Sell-Side DRS are anticompetitive (Issues 59-65); and (6) Google's affirmative defenses and procompetitive justifications do not apply (Issues 66-81). Inform Br. at 2, 13-17; Inform Br. Att. A.

Inform seeks collateral estoppel on nearly seven dozen separate points and submits 20 pages of briefing and a 10-page supplemental attachment, yet has not met the collateral estoppel requirements for *any* of its issues. By failing to include an issue-by-issue analysis, Inform has not met its "burden of showing that the issues are identical and were necessarily decided in the prior action," on any issue. *See supra* Part I.A; *see also Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995). Moreover, many of Inform's 81 points are not findings that could even potentially give rise to collateral estoppel. Instead, Inform seeks collateral estoppel on a potpourri of "issues" ranging from characterizations of what was said at trial (e.g., Issue 11, describing what Dr. Mark Israel said at the Virginia trial) and discussions of individual pieces of evidence (e.g., Issue 25, describing a single internal Google study, Inform Br. Att. A at 4).  Still more "issues" are irrelevant to Inform, for instance because they pertain to a time years after Inform sold its online advertising business and had stopped using Google ad tech products (e.g., Issue 31, describing Google's market share in 2022). For these reasons and the

51

others described below and in the attached Appendix C, the Court should reject Inform's request to resolve the 81 issues in their motion. Indeed, in *Discover Financial Services v. Visa U.S.A. Inc.*, a court in this District considered a similar wide-ranging request for estoppel and held that it would be "unfair to Defendants" to give collateral estoppel on 81 statements in an appendix that would require those issues to be presented to the jury "in a vacuum and without context." 598 F. Supp. 2d at 401 (declining preclusion on an appendix of 81 issues as unfair, but granting preclusion on six determinations that were actually necessary to the prior decision).

The general categories of issues that Inform actually discusses in its brief likewise do not merit collateral estoppel. Inform has not shown that each issue was identical with and necessary to the Virginia decision. Just as with the Advertisers' and Publishers' complaints, Inform's ad-server and ad-exchange markets differ from those in the Virginia case: Inform includes instream video and presses a U.S.-only market. Further, the Virginia Court applied different, non-Second Circuit legal standards when defining markets and when assessing anticompetitive effects in those markets. *See supra* Part I.A.1. These differences in law preclude collateral estoppel on the majority of Inform's issues. And despite Inform's unsupported arguments to the contrary, many of the issues (or categories of issues) on which Inform seeks estoppel were not actually decided in the Virginia case or were not necessary to the decision. Finally, discovery obtained from Inform directly contradicts several of the issues on which it seeks collateral estoppel. This discovery from Inform was not available for Google to use in the Virginia case, meaning that Google did not have a full and fair opportunity to litigate these issues. Under these circumstances, where Inform's own experience contradicts the "findings" it seeks to import, collateral estoppel cannot apply.

### A. Inform Is Not Entitled To Partial Summary Judgment On Market Definition (Issues 1-27)

Inform's Issues 1-27 pertain to ad server or ad exchange market definition. Inform cannot

obtain collateral estoppel on these issues because its proposed markets are not identical to the markets the Virginia Court found. Unlike the Virginia case plaintiffs, Inform—which primarily sold video advertising—proposes U.S.-based markets and specifically includes instream video within those markets. Moreover, the Second Circuit's legal standards related to market definition for two-sided platforms differ from those relied on by the Virginia Court.

**_The product markets are not identical._** Inform's Issues 1-7, 9, 10, 13, 15, 16, and 27 each pertain to or incorporate the Virginia Court's definition of a market for "publisher ad servers for open web display ads." But Inform's proposed ad server product market differs significantly from the product market that the Virginia Court found. In particular, Inform includes ad servers that specialize in serving video ads in its product market. Inform's expert Dr. Peña testified that

███████████████████████████████████████████████████

████ Yung Decl. Ex. 2 (Peña Tr.) at 249:5-149:8; _see also id._ at 198:2-4 ██████████

████████████████████████████████████████████████ But the Virginia Court excluded those same ad servers from its market.[57] Similarly, Inform's Issues 17, 19 - 21, 23, 24, and 26 each pertain to or incorporate the Virginia Court's definition of a market for "ad exchanges for open web display ads," which excluded ad exchanges that transacted video ads.[58] Inform, however, contends that █████████████████████████████████████

██████████████ Yung Decl. Ex. 2 at 209:12-210:5.

None of the Virginia Court's findings regarding "uniqueness," lack of substitutes, or the "commercial realities" of web-display-only markets apply to the different markets that Inform

---

[57] _See_ Virginia Op. at *20 ("[P]ublisher ad servers for . . . instream video advertising are not reasonably interchangeable with . . . publisher ad servers for open-web display advertising.").

[58] Virginia Op. at *23 ("[A]d exchanges that facilitate the sale of only instream video, mobile app, or social media ads are not helpful for publishers seeking to monetize their open-web display inventory.").

proposes. The issues across the cases therefore cannot be identical. *See supra* Part III.A. Inform argues that "[r]elevant markets need not have precise metes and bounds" and "[t]here can be many places to draw that line and properly define a relevant market." Inform Br. at 5 (citing U.S. Dep't Justice & Fed. Trade Comm'n, *2023 Merger Guidelines*, at 40 (Dec. 18, 2023)). But to make its issues eligible for collateral estoppel, Inform must demonstrate that these issues (in this case, market definitions) are identical between the two cases; it does not help Inform to observe that more than one market definition might be appropriate. In other words, the Virginia Court's findings that there were relevant markets for open-web-display ad tech should not preclude Google from litigating the question of whether there are relevant markets for open-web-display-plus-video ad tech or whether the area of effective competition is broader when both open-web-display and video functionalities are considered.

Inform's argument that the same products (DFP and AdX) are at issue in both cases also does not demonstrate that the market definition issues are identical. Inform used DFP and AdX for more purposes than serving only "open-web display" ads; Inform admits that it used DFP and AdX to transact in video advertisements. *See* Inform Br. at 1, 4. The Virginia Court's conclusions on market definition (and exclusion of instream video) were based in part on its finding that some websites could not "monetize the primary content on their websites with instream video ads." Virginia Op. at *20. The substitutes available to a company like Inform, whose primary business was monetizing video, would necessarily be different (and broader), than the substitutes the Virginia Court considered when looking only at open-web-display.

It would be improper to allow Inform to meet its burden of proving market definition based on a finding of a market that Inform does not itself advance and that would leave the majority of Inform's own transactions outside the markets.

54

***The geographic markets are not identical.*** Inform's Issues 1-7, 9, 10, 13, 15, 16, 27 and

17, 19-21, 23, 24, and 26 incorporate the Virginia Court's geographic market definition, which

was worldwide. Virginia Op. at *28. By contrast, Inform (like all the other Plaintiffs) alleges only

United States-based markets. *See* Inform Third Am. Compl. ¶¶ 117, 127, ECF No. 797; *supra* Part

III.A. This difference in geographic markets is material and goes to any analysis of Google's

market power in the market, as Google's shares of an ad exchange market differ significantly as

between the U.S. and the rest of the world. *See supra* Part III.A, note 18.

Inform argues that a geographic market definition was unnecessary to the Virginia Court's

decision, but that point is both irrelevant and does not make its proposed markets and the Virginia

markets identical as required for collateral estoppel. *See supra* Part I.A.1.

***The legal standards are not the same.*** Inform's Issues 17-24 and 26 all involve defining

an ad exchange market based only on substitution from the publisher side. For example, Inform's

Issue 21, "[t]he ad exchange is the only ad tech tool through which publishers can auction their ad

inventory at scale," focuses exclusively on publishers. Inform Br. Att. A at 3; *see also id.* (Issues

18, 19, 21, 22, 24).

This would not be a proper market definition analysis under Second Circuit law, where a

court must consider substitution from both sides of a two-sided transaction platform. *See supra*

Part I.A.1.b. Inform argues in its brief (and proposes as a collateral-estoppel issue) that "in

analyzing whether Google had monopoly power in the distinct ad exchange market, the court

specifically evaluated both sides of that market." Inform Br. at 6 (emphasis omitted). That

argument is unsupported by any citation to the Virginia Opinion (because there is none, and the

Virginia Court expressly did not evaluate the advertiser side of the market), and in any event does

not suggest that the Virginia Court applied Second Circuit law when *defining* its market for ad

exchanges for "open-web display" advertising. This difference in the legal standards means the "issues are not identical . . . even though the factual setting of the suits may be the same." *McTyere*, 663 F. Supp. 3d at 253 (denying collateral estoppel); *see also supra* Part II.A.

**Many issues were not necessary to the Virginia Court's decision and are not elements of Inform's claims.** Inform's Issues 8, 11, 12, 14, 16, 18, 19, 22, 23, and 25 were not necessary to the Virginia Court's decision. Each of these issues is a finding about one characteristic or another of ad servers or ad exchanges. None of these issues, standing alone, is necessary to the Virginia Court's market definitions. For example, Issue 22 concerns the "distinct prices" that ad exchanges charge. Inform Br. Att. A at 3. While distinct pricing is one of the *Brown Shoe* "practical indicia" that could be useful to analyze for market definition, distinct pricing *alone* would not support a market definition. *See Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 497 (2d Cir. 2004) (noting its *Brown Shoe* analysis did not "treat pricing as dispositive, but rather use[d] pricing trends as one indicator of the impact each market participant ha[d] on overall price and output"). Similarly, the Virginia Court's market definition for ad exchanges for "open-web display" advertising does not "hinge[]" on the Court's interpretation of a single Google internal document (Issue 25). *See Bifolck*, 936 F.3d at 82.

Inform also cannot obtain summary judgment on Issues 8, 11, 12, 14-16, 18, 19, or 22-27 under Rule 56(a) or 56(g). *See supra* Part I.B.

**The issues are irrelevant or inapplicable to Inform.** All of the market-definition issues are irrelevant to Inform because, as discussed above, Inform advances different markets than those found by the Virginia Court. Beyond that, however, several of Inform's issues are doubly irrelevant because they concern events that occurred after Inform stopped using the relevant ad tech. ██████

████████████████████████████[59] and ████████████████████████████[60]

Issue 12 concerns "eliminating variable price floors with Unified Pricing Rules." Inform Br. Att. A at 2. But UPR, and the requirement to apply a single floor to all ad exchanges in DFP, had no effect on Inform because Inform had already stopped using AdX through DFP years before and sold its business at almost the same time that UPR was introduced. Likewise, Issue 14—concerning whether some publishers could switch users to apps or social media sites—has no application to Inform. Inform was not a publisher and had no direct relationship with users. There is no basis to give Inform collateral estoppel on issues irrelevant to its case, especially in light of the confusion that would be caused by doing so.

### B. Inform Is Not Entitled To Partial Summary Judgment On Market Power (Issues 28-46)

Inform's Issues 28-46 pertain to ad server or ad exchange market shares and/or market power. Inform cannot obtain collateral estoppel on any market power issue because each of the Virginia Court's conclusions regarding market power (and market shares) were made in the context of the specific markets that the Virginia Court had defined, which are not identical to Inform's proposed markets. Moreover, with respect to its market for ad exchanges for "open-web display" advertising, the Virginia Court did not assess net harm on both sides of the platform, as the Second Circuit requires. And, finally, several of the issues are irrelevant to Inform and others are in direct conflict with Inform's own experience as shown by discovery obtained in this case.

***Inform's market power issues depend on the Virginia Court's non-identical market definitions.*** Inform's Issues 28-31, 33, 37, and 39-46 each incorporate the Virginia Court's market

---

[59] Yung Decl. Ex. 1 (Prince Rpt.) ¶ 26.  Google is aware of no evidence suggesting that ████████████ ██████████████████████

[60] Yung Decl. Ex. 1 ¶¶ 13, 117.

definitions. As discussed above, the Virginia Court's markets do not align with Inform's. The Virginia Court's conclusions as to monopoly power, as well as observations about Google's market shares, barriers to entry, and other market features, all pertain to markets that are meaningfully different from Inform's markets that include video advertisements and exclude ex-US transactions. *See, e.g., supra* Part II.A (discussing Dr. Israel's findings that AdX's share is substantially lower in the United States compared to the rest of world and its share of video ad spend is only 5% compared to ~35-42% of non-video display ad spend).

***The ad exchange market power issues use a different legal standard than applies here.*** Each of Inform's issues relating to ad-exchange market power (Issues 38-46) incorporates the Virginia Court's one-sided analysis of its international "open-web display" ad exchange market. In analyzing market power in its market for ad exchanges for "open-web display" advertising, the Virginia Court focused exclusively on the fees charged and services provided to publishers, without considering "the feedback effects inherent on the platform by accounting for the reduction in . . . demand [from publishers] that would accompany any degree of . . . attrition [from advertisers]." *Amex*, 838 F.3d at 200. The market-power analysis in the Second Circuit would use a different legal standard, so Inform's issues are not identical. *See supra* Part I.A.1.b.

***Several of the market power issues are irrelevant to Inform.*** Inform again seeks to obtain collateral estoppel on issues that have no bearing on its case. Here, Inform seeks to obtain collateral estoppel on market shares or conclusions about market power from a time after Inform stopped using DFP or sold its business. Specifically, Inform's Issues 31, 32, and 37 concern Google's market share in 2018 to 2022.[61] Google's market share during these years cannot be relevant to

---

[61] Issue 32 concerns market shares "over the past decade," and a significant portion of that time period post-dates Inform's claims.

Inform because Inform has no claims based on anything that occurred during this time–after it stopped using Google ad tech and sold its business. Inform's Issue 36 posits that UPR degraded DFP's features. This is also irrelevant to Inform, which sold its online advertising business around the same time UPR was introduced (and could not have been affected by UPR in any event as ███

████████████████████████████

### *Evidence obtained from Inform directly undermines some of its market power issues.*

Inform should not get collateral estoppel on factual findings that Inform's own experience contradicts. Issue 34 is "[p]ublishers almost always used a single ad server for open-web display ads because operating two or more publisher ad servers would not be practical due to challenges with forecasting, integration, and latency." Inform Br. Att. A at ██████████████████████

█████████ Yung Decl. Ex. 9 (Inform 30(b)(6) Tr.) at 160:5-160:8. ████████████████

████████████████████████████████████

████████████████████████████████████

████████ *id.* at 84:15-85:6. Issue 35 is "Open web publishers very rarely switched from DFP to another ad server, even when Google makes product changes with which they disagree." Inform Br. Att. A at 4. But again, Inform's own experience was different, it was not an open web publisher

██████████████████████████

The Supreme Court has recognized that, when "the defendant in the first action . . . was unable to engage in full scale discovery . . . application of offensive collateral estoppel may be unwarranted." *Parklane*, 439 U.S. at 331 n.15. In the Virginia case, Google was permitted to conduct fact discovery for less than six months (from late March 2023 to early September 2023) and take only 30 depositions of fact witnesses. EDVA ECF No. 69; EDVA ECF No. 94 ¶ 7 (citing EDVA ECF No. 87 ¶ 6(G)). Discovery in the MDL proceeded on a different, later, schedule, and

Inform did not complete its document production until October 7, 2024–*after* the Virginia trial ended.[62] Given those limitations and the differences between Inform's case and the Virginia case, it would not have made sense for Google to sacrifice its ability to take discovery in the MDL and take its deposition of Inform early just on the off chance that Inform would reveal something useful for the Virginia case. Here, however, the Court has the benefit of over 200,000 documents and a 30(b)(6) deposition of Inform, including evidence that directly contradicts the findings on which Inform seeks estoppel.[63] While these materials were available to the Virginia plaintiffs to impeach Google's witnesses, Google could not use them to support its defenses at the Virginia trial. *See* ECF No. 564 ¶¶ 2(e), 6(d). But it would be improper to preclude Google from using this evidence in *Inform's own case* and to preclude Google from demonstrating how this evidence supports judgment in its favor. *Cf. Charter Oak Fire Ins. Co. v. Electrolux Home Products, Inc.*, 882 F. Supp. 2d 396, 404-05 (E.D.N.Y. 2012) (denying collateral estoppel when "material evidence . . . has since come to light" after the prior case).

### C.  Inform Is Not Entitled To Partial Summary Judgment On Tying (Issues 49-58)

Inform's Issues 49-52 and 54-58 are identical to Publishers' Issues 7, heading II, 25, 21, 22, 24, 6.8, 23.2, and 7.2. Inform should not obtain collateral estoppel on these issues for the same reasons as Publishers. *See supra* Part III.D.

Additionally, Inform should not obtain collateral estoppel on Issues 49 and 50, which are conclusions that the tying conduct violated Sections 1 and 2 of the Sherman Act. These conclusions say nothing about whether Inform can prove Sherman Act violations, because a private party like Inform must prove more than what was required of the plaintiffs in the Virginia case. Unlike the

---

[62] *See* Yung Decl. Ex. 11 (Oct. 7, 2024 Production Email).

[63] The Inform deposition occurred well after the fact discovery cutoff in Virginia, as did depositions of Inform's experts.

Virginia case plaintiffs, Inform must prove injury, causation, and damages. *See supra* Part I.A.5. Collateral estoppel on ultimate liability is inappropriate because "questions of causation and injury to [Inform] were not adjudicated in the prior litigation." *See Namenda*, 2017 WL 4358244, at *16-17 (declining to grant partial summary judgment on the grounds of collateral estoppel); *see also supra* note 23.

Inform should not obtain collateral estoppel on Issues 54, 57, and 58, because evidence from Inform directly contradicts these findings. These three findings relate to publishers being compelled to use DFP, supposedly in order to get access to AdX. ████████████████████ ███████████████████████████████ *See* Yung Decl. Ex. 9 (Inform 30(b)(6) Tr.) at 71:3-72:5. Inform indisputably ***did not*** need to use DFP in order to access AdX. Inform should not obtain collateral estoppel on these issues and preclude Google from using evidence of Inform's own experience (and lack of coercion). *See supra* Part IV.A.

Finally, Inform should not obtain collateral estoppel on Issue 53 because that finding is neither necessary to the Virginia Court's opinion nor relevant to Inform. Issue 53 is "Google marketed DFP as a distinct product until it rebranded DFP as part of the Google Ad Manager product suite in 2018." Inform Br. Att. A at 6. Inform does not even attempt to argue that this finding was necessary to the Virginia Court's opinion, and it was not. The Virginia Court made other findings that independently support its conclusion that DFP and AdX were separate products. Further, this issue is irrelevant and inapplicable to Inform, which never used Google Ad Manager.

### D. Inform Is Not Entitled To Partial Summary Judgment On Anticompetitive Conduct (Issues 49-50, 59-65)

Inform's Issues 59-65 are encompassed within Publishers' Issues 9.1, 9, 10, 11, and 18.1. Inform should not obtain collateral estoppel on these issues for the same reasons as Publishers. *See supra* Part III.C.

Inform argues that Google used four of the same experts across cases. *See* Inform Br. at 13 n.41. This is irrelevant to the collateral estoppel analysis because it says nothing about whether issues are identical, findings were necessary, or any other collateral-estoppel factor. As each set of anticompetitive conduct on which Inform seeks preclusive effect stems from a different set of market definitions, different standard of analysis for procompetitive and anticompetitive effects, and were analyzed under a "holistic" approach in Virginia while the Second Circuit requires individualized analyses, Issues 49-50 and 59-65 are not identical and thus are not entitled to collateral estoppel. *See also supra* Parts I.A.1.b-e, III.C.

### E.  Inform Is Not Entitled To Partial Summary Judgment On The Summary Findings It Identifies (Issues 47 and 48)

Inform's Issues 47 and 48 are summary findings that Google "engaged in 'willful acquisition or maintenance of [its monopoly] power'" through "a series of anticompetitive policies, practices, and technology changes," Inform Br. Att. A at 6. But the "series of anticompetitive policies, practices, and technology changes" at issue in Inform's case are not identical to those that the Virginia Court found anticompetitive. Indeed, Inform concedes as much, arguing that its issues "*parallel* the allegations in Inform's TAC" and then referencing its own unique claims in the online video advertising market. Inform Br. at 12, n.40 (emphasis added). For collateral estoppel to apply, issues must be identical: not just similar or "parallel." *See Cent. Hudson Gas & Elec.*, 56 F.3d at 368; *cf. First Data*, 369 F. Supp. 2d at 1124-26 (denying collateral estoppel on market definition where markets were "parallel" rather than "identical," as they "must be").  Inform cannot obtain collateral estoppel on these findings because its claims do not identically match the conduct that the Virginia Court found anticompetitive.

**F.  Inform Is Not Entitled To Partial Summary Judgment**
**On Google's Procompetitive Justifications and Defenses (Issues 66-81)**

Inform targets for preclusion Google's defenses relating to its procompetitive justifications (Issues 66-70); lawful refusals to deal (Issues 71-72); legitimate design choice or product improvements (Issues 73-76); failure to allege any legally cognizable relevant product or geographic markets (Issue 77); lack of monopoly power (Issue 78); lawful, justified, procompetitive conduct carried out in Google's legitimate business interests (Issue 79); lack of any plausible harm to competition or consumers (Issue 80); and failure to allege a cognizable antitrust injury (Issue 81). Inform Br. Att. A at 8-10. Inform has not established that any of these issues are identical or that the findings were necessary to support the decision.

***Procompetitive justifications.*** Inform's request that the Court enter partial summary judgment based on collateral estoppel on Google's procompetitive justifications (Issues 66-70) is inappropriate. Those issues are not identical to those addressed in the Virginia case, involve different legal standards, and therefore were not actually decided. As Publishers make overlapping requests (Inform Issues 66-67 and Publishers' Issues 14-15; Inform Issue 69 and Publishers' Issue 17), the same reasoning applies to Inform. *See supra* Part III.C.

Further, it would also be inappropriate to apply collateral estoppel to Issue 67 finding Google's procompetitive justifications "proffer[ed] for its anticompetitive conduct [as] both invalid and insufficient. . . . Google cannot evade liability under Sections 1 and 2 of the Sherman Act" because it requires a determination on an ultimate question of liability. *See* Inform Br. Att. A at 8. As discussed above, Inform must prove additional elements not at issue in the Virginia case to establish liability.

***Lawful Refusal to Deal.*** Google should not be prohibited from arguing that its conduct constitutes a lawful refusal to deal (Issues 71-72). As explained in detail in Parts I.A.1.a and II.E,

the Virginia Court's interpretation of *Trinko* was a legal error as well as inconsistent with Second Circuit precedent, leaving open "significant room for differing opinions" between this Court and the Virginia Court. *See Wills v. RadioShack Corp.,* 981 F. Supp. 2d 245, 265-66 (S.D.N.Y. 2013) (explaining that collateral estoppel cannot apply in such circumstances).

 *Product Design.* Nor should Google be prohibited from arguing that its conduct constituted legitimate product design choices (Issues 73-76). The Virginia Court's conclusions regarding product design rely on different legal standards and thus do not warrant collateral estoppel. *See supra* Part II.D. Nor were these findings necessary to the Virginia Decision. *See id.*

 *Affirmative Defenses.* Finally, Inform seeks to bar Google from asserting certain "affirmative defenses" (Issues 77-81). But each of these is the mirror-image of an issue on which Inform affirmatively sought collateral estoppel—and on which it has failed to establish the required elements. Each of Inform's Issues 77-81 fails for the same reasons as Inform's offensive version of the issues.

- Issue 77: *"Plaintiff's claims are barred, in whole or in part, because the Complaint fails to allege any legally cognizable relevant product or geographic market."* Inform cannot obtain collateral estoppel on this defense for the same reasons its market-definition issues fail: Inform does not assert the same product or geographic markets as in the Virginia Case, and the Virginia Court applied different law, so the issues are not identical. *See supra* Parts I.A.1.b, IV.A.

- Issue 78: *"Google has never had, and is unlikely to obtain, monopoly power in any properly defined relevant market for advertising services."* Inform cannot obtain collateral estoppel on this defense for the same reasons its market-power issues fail: Inform does not assert the same product or geographic markets as in the Virginia Case, and the Virginia Court applied different law, so the issues are not identical. *See supra* Parts I.A.1.b, IV.A.

- Issue 79: *"Google's conduct alleged by Plaintiff in the Complaint was lawful, justified, procompetitive, and carried out in Google's legitimate business interests and constitutes bona fide competitive activity, the benefits of which significantly outweigh any alleged anticompetitive effects."* Inform cannot obtain collateral estoppel on this defense for the same reasons its conduct issues, procompetitive justification, and lawful refusal to deal issues fail: the issues are not identical, the Virginia Court applied different law, and the findings were not necessary to the Virginia Court's decision. Additionally, Inform's

complaint includes conduct that was not addressed by the Virginia Court, as well as conduct that the Virginia Court found lawful. *See supra* Parts I.A.1.a-c, IV.A.

- Issue 80: *"Plaintiff's claims are barred, in whole or in part, for failure to allege any plausible harm to competition or consumers."* Inform cannot obtain collateral estoppel on this defense for the same reason its conduct issues fail: the issues are not identical, the Virginia Court applied different law. Additionally, the Virginia Decision did not address whether the specific allegations in Inform's complaint constituted harm to consumers at all, nor did it address any aspect of Inform's proposed video advertising market. *See supra* Part I.A.1.a-e.

- Issue 81: *"Plaintiff's claims are barred, in whole or in part, because the Complaint fails to allege a cognizable antitrust injury."* Inform has failed to show that the Virginia Decision said anything about antitrust injury, let alone anything about antitrust injury to Inform. Antitrust injury was not at issue in the Virginia case, whereas private parties like Inform must prove it.

Nor can Inform obtain summary judgment on these issues under Rule 56(g) because it is inapplicable to Issues 66-81, which involve legal issues, and not undisputed facts.

In sum, Inform failed to meet its burden to demonstrate it is entitled to collateral estoppel. As such, there continue to be genuine issues of material fact that make partial summary judgment inappropriate. Google respectfully requests that the Court deny Inform's motion in its entirety.

65

**V.    GANNETT AND DAILY MAIL CANNOT
RECEIVE COLLATERAL ESTOPPEL ON ANY ISSUE**

Gannett and Daily Mail cannot use the Virginia case to circumvent their obligation to prove their claims. They cannot meet their burden to show that the market definition and monopoly power issues in their cases are the same as those ruled upon in the Virginia case. Nor do they meet their burden to show that the conduct they challenge is identical to conduct challenged in the Virginia case.

Gannett and Daily Mail do not and cannot dispute that it is their burden to prove the existence of their proposed markets for "open display" ad servers and ad exchanges ("Open Display Markets") and that Google holds monopoly power in those markets. They nevertheless move for partial summary judgment based on the Virginia Court's ruling addressing what they acknowledge are different markets: one for "open *web* display" ad servers and one for "open *web* display" ad exchanges. DMG Br. at 1, 6, 13 (emphases added).

Gannett and Daily Mail ask the Court to ignore the differences between their Open Display Markets and those in the Virginia case by asserting that Open Display Markets are "virtually" or "substantively" identical to "open-web display" markets. DMG Br. at 6, 8. Their claim that the word "web" is immaterial is contradicted by their own expert. As he explained in his deposition after the Virginia case concluded, "open web display is different from open display" and "*the key is the word web*." Yung Decl. Ex. 14 (Sibley Tr.) at 72:25-73:2 (emphasis added). By excluding "web" from his proposed Open Display Markets, Gannett and Daily Mail's expert included in those markets "things that aren't web, like apps." *Id.* at 73:6-73:7. This undisputed "daylight between the market definitions" in this case and the Virginia case, DMG Br. at 8, bars Gannett and Daily Mail from using the Virginia case to shortcut their burdens of proving the existence of Open Display Markets here.

Nor can Gannett and Daily Mail rely on the Virginia Court's findings of monopoly power. Because the Virginia Court never ruled on Open Display Markets, the Virginia Court did not rule—and could not have ruled—on whether Google has monopoly power or harmed competition in Open Display Markets. Indeed, accounting for all the additional "open display" substitutes that Gannett and Daily Mail's own expert included in his assessment of the purported Open Display Markets significantly lowers Google's market share in those markets.

In addition, Gannett and Daily Mail cannot benefit from the Virginia Court's findings on conduct because the Virginia Court never ruled on the precise conduct Gannett and Daily Mail challenge here—DRS, UPR, Last Look, and purported tying, even if it ruled on conduct bearing the same labels. Moreover, the Virginia Court applied different legal standards from those in the Second Circuit and assessed a different set of evidence than before this Court.

Finally, entering partial summary judgment on collateral estoppel grounds would not benefit judicial economy because the same issues that Gannett and Daily Mail seek to resolve for their antitrust claims still must be addressed for their state law claims, causation, antitrust injury, and damages.

For these reasons, and as set forth in greater detail below and summarized in Appendix D, this Court should deny Gannett and Daily Mail's motion in its entirety.

### A.  Gannett And Daily Mail's Cases Differ From The Virginia Case

Relying on the Virginia Court's liability ruling, Gannett and Daily Mail seek collateral estoppel on the following issues: (1) there are global Open Display Markets; (2) Google has monopoly power in Open Display Markets; (3) Google obtained or maintained its monopoly power in those Open Display Markets via exclusionary conduct; and (4) such conduct caused

anticompetitive effects and affected commerce for "open display" publisher ad servers. *See* DMG Proposed Order at 2-4. No court has ruled on these issues.

Unlike in the Virginia case, where the plaintiffs pursued claims based on "open-web display" markets, Gannett and Daily Mail have never alleged such markets. Instead, their operative complaints allege "online display" advertising markets that also include "mobile applications" and "video" advertising. *Compare* Compl., *United States v. Google LLC*, 1:23-cv-108 (LMB), ECF No. 1 ¶¶ 282, 290, *with* Gannett Am. Compl., ECF No. 795 ("Gannett AC") ¶¶ 30, 70, 71, 82 *and* Daily Mail Second Am. Compl., ECF No. 794 ("DM SAC") ¶¶ 22, 55, 67. Moreover, their market definition expert, Prof. David Sibley, included in his proposed markets ad tech competitors that offer publishers the ability to transact mobile app, instream video, connected TV, and native advertising. As he acknowledged, none of these kinds of transactions were included in the markets addressed in the Virginia case because Gannett and Daily Mail's Open Display Markets are "more expansive" than those "more restrictive" "open-web display" markets in the Virginia case.[64]

The conduct Gannett and Daily Mail challenge also differs from the conduct at issue in the Virginia case. Gannett and Daily Mail pursue antitrust claims related to upwards of nineteen Google product designs and acquisitions relating to Open Display Markets, *see* ECF No. 951 at 3-4, including conduct such as viewable CPMs that relates only to mobile app advertising. DM SAC § III.B.6. Most of the product designs Gannett and Daily Mail challenge were not at issue at trial in the Virginia case, including Bernanke, Global Bernanke, Bell, Alchemist, Project Elmo, Enhanced Dynamic Allocation ("EDA"), the redaction of auction data, Minimum Bid to Win,

---

[64] Yung Decl. Ex. 14 at 74:19-74:24 ("Q. So open display includes native, I think you just said, right? A. In -- my definition, yes. Q. But not in Professor Lee's? A. No, I have a slightly more expansive market definition than he does."), 72:19-73:7 (Prof. Lee's alleged markets are "more restrictive" and "included less things" than Prof. Sibley's markets); 74:25-76:1 (describing advertising included in Prof. Sibley's proposed markets that was excluded in Prof. Lee's proposed markets); *see also id*. 190:9-190:11 (Prof. Lee's "open-web display" ad exchange market is "narrower" than Prof. Sibley's proposed market).

viewable CPMs (Daily Mail), and Line Item Caps (Daily Mail). *See* ECF No. 951 at 3-4. And though other product designs at issue in the Virginia case overlap in terminology with the conduct for which Gannett and Daily Mail seek estoppel, *see* DMG Proposed Order 2-4 (Last Look, DRS, UPR, and the purported tie), mere overlaps in terminology do not control the analysis. *See Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F.Supp.2d 192, 199 (D. Conn. 2006) ("Issues of fact may bear the same label without being identical."). Substantively, none of the conduct Gannett and Daily Mail challenge in their motion is identical to conduct found unlawful in the Virginia case. *See* Part V.B-E *infra*.

Moreover, after the conclusion of trial in the Virginia case, Gannett and Daily Mail's experts reached conclusions that are inconsistent with the Virginia Court's rulings that Gannett and Daily Mail now seek to apply here.[65] None of Gannett and Daily Mail's five experts offered opinions in the Virginia case, and the nine plaintiffs' experts who testified in the Virginia case do not overlap with those put forth by Gannett and Daily Mail here. And although discovery in the cases here was coordinated with the Virginia case in some respects, much of the coordinated discovery record was not admissible as substantive evidence in the Virginia case. *See* ECF No. 564 at ¶¶ 2(e), 6(d). The evidence here that was inadmissible in the Virginia case includes Gannett and Daily Mail documents, data, and numerous depositions of their witnesses.[66]

---

[65] Gannett and Daily Mail's five experts submitted nine reports: David Sibley (market definition/alleged tying), Ali Hortacsu (damages), James Mickens (source code), Shengwu Li (alleged anticompetitive conduct), and Ned Barnes (accounting).

[66] *See, e.g.*, ECF No. 804 at 1 (noting "over 1,000 terabytes of Google and third-party data" produced in this case, including "log-level data for individual plaintiffs Daily Mail and Gannett"); ECF No. 97, Dkt. No. 1:21-cv-03446 (Daily Mail has produced over 55,175 documents and over a terabyte of data). Only one witness—Daily Mail's Matthew Wheatland—testified both here and in the Virginia case. Gannett's Tim Wolfe testified only in the Virginia case. Google has also offered expert testimony from Prof. Jonah Berger, who opines on newspaper industry trends and did not testify in the Virginia case.

### B. Gannett And Daily Mail Are Not Entitled To
### Partial Summary Judgment On Market Definition (Counts I-IV)

Gannett and Daily Mail cannot use collateral estoppel to meet their burden of proving the existence of the antitrust markets they allege. *E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*, 2003 WL 22068573, at *26 (S.D.N.Y. Sept. 5, 2003) (noting plaintiff has the burden to prove a relevant market). *First*, Open Display Markets are different from the "open-web display" markets addressed in the Virginia case. *Second*, the Virginia Court's market definition rulings were based on testimony that has since been contradicted by Gannett and Daily Mail's expert evidence. *Third*, having never ruled on any Open Display Markets, the Virginia Court likewise never ruled on the geographic scope of such markets. In addition to these flaws, collateral estoppel is unavailable because the Virginia Court analyzed two-sided markets differently than the Second Circuit requires. *See supra* Part I.A.1.b.

### 1. Gannett And Daily Mail's Proposed "Open Display" Markets
### Are Materially Different From The Markets In The Virginia Case

Gannett and Daily Mail must prove that their Open Display Markets include the set of products "reasonably interchangeable" for customers transacting open display advertising—i.e., including mobile app, instream video, connected TV, and native advertising. *City of New York v. Grp. Health Inc.*, 2010 WL 2132246, at *3 (S.D.N.Y. May 11, 2010); *see Microsoft*, 253 F.3d at 51-52 (the relevant market "must include" reasonably interchangeable products). Gannett and Daily Mail concede that the markets in the Virginia case differ from their Open Display Markets because the Virginia Court "focus[ed] on 'web'-based transactions." DMG Br. at 15; *see supra* Part I.A.1.[67] They nevertheless argue that the Virginia Court's findings satisfy their burden of

---

[67] Because the markets between cases are not identical, Gannett and Daily Mail cannot show the other elements required for collateral estoppel are met. *See supra* Part I.A.2-4.

proving Open Display Markets here because the differences between Open Display Markets and the Virginia case's "open web-display" markets are allegedly "immaterial." *Id.* at 11, 15.

They are mistaken in at least two key respects. *First*, to invoke collateral estoppel on market definition offensively, the relevant markets across the cases must be identical. *See Alpert's*, 876 F.2d at 271 (no collateral estoppel as "it [wa]s possible" that evidence from a more expansive market could change findings on anticompetitive effects from a prior case, which analyzed anticompetitive effects in a narrower market); *Visa*, 369 F. Supp. 2d at 1125 (no collateral estoppel where markets are "parallel but not identical"). Gannett and Daily Mail's concession that the markets in the Virginia case are not identical to theirs defeats their effort to piggyback on the Virginia Court's ruling. *Second*, even if collateral estoppel could apply to markets that are similar but not identical, the significant substantive differences between Open Display Markets and those ruled upon in the Virginia case bar its application here.

Unlike in the Virginia case, the consumers in Open Display Markets transact multiple types of advertising beyond just "web" advertising. *See supra* Part V.A. Prof. Sibley himself conceded that the Virginia case's focus on web markets is a "key" difference and includes in his markets alternatives like app-only and instream video-only competitors. *See* DMG Br. at 14 (Prof. Sibley includes mobile app and instream video ad exchanges); Yung Decl. Ex. 14 at. 72:25-73:7 ("I include things that aren't web, like apps").[68] And because consumers in Open Display Markets have more available substitutes than those the Virginia Court found available in "open-web display" markets, Google's market shares in Open Display Markets here are *lower* than the market

---

[68] While Prof. Sibley opines that format-specific publisher ad servers are not substitutes for "open display" publishers, *see* DMG Br. at 7, this opinion is disputed by Google's expert Dr. Mark Israel. *See* Yung Decl. Ex. 16 (Israel Supp. Rpt.) ¶¶ 31-33; Yung Decl. Ex. 10 (Israel Rpt.) ¶¶ 342-43, Fig. 51 (mobile app and instream video ad servers constrain Google's DFP ad server and should be included in the relevant market). The Virginia Court did not make any findings as to whether "open display" publishers (e.g., those who only sell mobile app advertising) can use app-only publisher ad servers instead of DFP. *See* Virginia Op. at *19-21; *see also supra* Part I.A.2-4.

shares found in the Virginia case and also *lower* than market share levels the Second Circuit has required to find monopoly power. *See infra* Part V.C.

Allowing Gannett and Daily Mail to meet their burden of proving their Open Display Markets based on a decision addressing different markets would violate the Seventh Amendment by improperly taking away from the jury the determination of the set of products that are reasonably interchangeable substitutes for consumers transacting "open display" advertising. *See Caruso Mgmt. Co.v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 209 (S.D.N.Y. 2019) (denying summary judgment on "the relevant market" as it was a "factual determination . . . that properly should be left to a jury"); *cf. Parklane*, 439 U.S. at 327, 337 (collateral estoppel does not violate the Seventh Amendment if the cases involve "identical issues"). This is particularly true when, as here, there is a genuine dispute of material fact as to the contours of Open Display Markets.[69] *See Kennedy v. New York Presbyterian Hosp.*, 2011 WL 2847839, at *4 (S.D.N.Y. July 6, 2011) (the "Seventh Amendment's jury trial right . . . exists . . . with respect to genuinely disputed issues of material fact").

Courts routinely decline to apply collateral estoppel where the markets proposed in the prior and present cases are similar but not identical. For example, the plaintiff in *Visa U.S.A. Inc. v. First Data Corp.* sought partial summary judgment on collateral estoppel based on a finding in a prior case that "general purpose card network services" is an antitrust market. 369 F. Supp. 2d at 1125. Although *First Data* involved that market, the court held that applying collateral estoppel was inappropriate because the two markets were for different services: the "general purpose card network services" market in the prior case was for "authorization, settlement, and clearance of

---

[69] *See, e.g.*, Yung Decl. Ex. 16 ¶ 7 ████████████████████████████████████████████
████████████████████████████████ are too narrow").

transactions," while the *First Data* plaintiff's alleged "general purpose card network services" market was for "intra-processing" services. *Id.* In so ruling, the *First Data* court found no "authority supporting [plaintiff's] contention that collateral estoppel is appropriate where the antitrust markets are 'parallel' but not identical." *Id.* Gannett and Daily Mail likewise allege markets that are at best "parallel but not identical" to those found in the Virginia case. *Id.*; *see also* Part II.A-B (citing cases denying collateral estoppel due to different markets).

None of the cases on which Gannett and Daily Mail rely support their contention that some overlap between their markets and the Virginia case's markets suffices to establish *their* Open Display Markets. One does not address collateral estoppel at all, DMG Br. at 6 (citing *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001)), and another is a tax case where the court recognized that application of collateral estoppel in tax law specifically "does not require direct identity of issue." *Id.* at 8-9 (citing *ITT Corp. v. United States*, 963 F. 2d 561, 563-64 (2d Cir. 1992)). Gannett and Daily Mail's reliance on *GAF Corp. v. Eastman Kodak Co.* is likewise misplaced. 519 F. Supp. 1203 (S.D.N.Y. 1981) (cited in DMG Br. at 8). Not only has it been called into question,[70] but it at most supports applying collateral estoppel where a plaintiff alleges the *same* market as one found in a prior case. *See GAF*, 519 F. Supp. at 1214 (finding that the plaintiff did not allege a different market). While Gannett and Daily Mail assert that the second case in *GAF* involved "additional products," DMG Br. 8, they ignore how these "additional products" were not new *competitor* products (the inclusion of which in the relevant market would reduce a defendant's market share and affect any assessment of monopoly power), but the

---

[70] *See Argus Inc. v. Eastman Kodak Co.*, 552 F. Supp. 589, 603 (S.D.N.Y. 1982) (disagreeing with the *GAF* court's conclusion that findings of market definition and market power for the camera market were necessarily decided in the first action).

defendant's *own products*, which the court found were "not likely" to cause a jury to find a different market than the one in the prior case. *See GAF*, 519 F. Supp. at 1214.

### 2. The Virginia Court's Ruling Did Not Account For Daily Mail And Gannett Admissions Showing The Breadth Of Competitive Alternatives

The Virginia Court relied on a different, narrower record to define the relevant markets it found. A ruling on different markets based on different evidence in a prior case cannot be the basis for collateral estoppel. *See supra* Part V.B.1; *Alpert's*, 876 F.2d at 271 (no preclusion on market definition where the evidence differed in the second case). As Gannett and Daily Mail note, the Virginia Court "repeatedly cited Wolfe's [Gannett] and Wheatland's [Daily Mail] testimony to support" its findings on market definition—markets which excluded social media ad tech tools, ad networks, and direct deals. DMG Br. at 3. For example, Gannett executive Tim Wolfe testified in the Virginia case that Gannett had not used Facebook via header bidding, Yung Decl. Ex. 17 (Wolfe EDVA Tr.) at 82:15-82:25, suggesting that ad exchanges do not compete against Facebook because they are not used in the same auctions via header bidding. Additionally, the Virginia Court cited Mr. Wheatland's testimony to conclude that "sophisticated publishers . . . do not view ad networks as substitutes for ad exchanges," Virginia Op. at *22, and that "[d]irect deals with advertisers are also not reasonable substitutes for ad exchanges." *Id*. But evidence available in this case—which was not available in the Virginia case—contradicts the trial testimony of Gannett and Daily Mail.

Well after trial in the Virginia case concluded, Gannett and Daily Mail's damages expert, Prof. Hortacsu ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[72] Beyond

expert testimony, Gannett executive Damien Long—who did not testify in the Virginia case—

testified in this case that Gannett set its prices for direct deals based on the ad prices (CPMs) for

programmatic advertising sales through ad exchanges. *See* Yung Decl. Ex. 28 (Long Tr.) at 113:1-

113:13. This testimony confirms there is price competition between direct deals and ad exchanges,

and that direct deals should be included in any Open Display Markets. *See Brown Shoe*, 370 U.S.

at 324 (noting that the relevant market is the "area of effective competition"); *AD/SAT*, 181 F.3d

at 227 ("[T]wo products or services are reasonably interchangeable where . . . consumers would

respond to a slight increase in the price of one product by switching to another product.").

---

[71] *See* Yung Decl. Ex. 31 (DMGT_DOJ_0001046) (cited in Yung Decl. Ex. 15 (Hortacsu Rpt.) Table 41) at tab ████; Yung Decl. Ex. 15 at Tables 65-69 ████████████████████████████████ *see also* Yung Decl. Ex. 23 (DM_GOOG_0666010) ████████████████████████ Yung Decl. Ex. 24 (GANNETT_GOOG_0918431) ████████████████████████████
[72] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

### 3.   The Geographic Scope Of Gannett And Daily Mail's
### Open Display Markets Was Not Decided In The Virginia Case

In their complaints, Gannett and Daily Mail alleged U.S. geographic markets, as non-U.S.

ad tech products "are not reasonable substitute[s]" for U.S. ad tech products. *See* DM SAC ¶¶ 61,

71; Gannett AC ¶¶ 76, 87. Gannett and Daily Mail nevertheless seek collateral estoppel as to the

purported *worldwide* geographic scope of Open Display Markets based on the worldwide "open-

web display" markets found in the Virginia case. DMG Br. at 9, 15. As with the relevant product

market, they carry the burden to prove the relevant geographic market. *E-Z Bowz*, 2003 WL

22068573, at *26. But as explained above, *see supra* Section Part V.B.1, the Virginia Court limited

its ruling to determining the geographic scope of "open-*web* display" markets. Virginia Op. at *28-

29 (emphasis added). As a result, collateral estoppel cannot apply to the geographic scope of Open

Display Markets. *See supra* Part I.A.1-4.

### C.  Gannett And Daily Mail Are Not Entitled
### To Partial Summary Judgment On Monopoly Power (Counts I-IV)

Gannett and Daily Mail likewise cannot preclude litigation on Google's alleged monopoly

power because the Virginia Court did not decide whether Google possessed monopoly power in

Open Display Markets. *See Postlewaite*, 333 F.3d at 48 ("If an issue was not actually decided in

the prior proceeding . . . its litigation in a subsequent proceeding is not barred by collateral

estoppel."); *supra* Part I.A.2-4. Contrary to Gannett and Daily Mail's assertions, whether Google

has monopoly power in *some other markets* has no bearing on whether Google possesses

monopoly power in their *Open Display Markets*. *See supra* Part I.A.1; *see also* Part V.B; *Amex* at

543 n.7 (market power "cannot be evaluated unless the Court first defines the relevant market");

DMG Br. at 10 (admitting a "difference" in market share calculations).[73] The cases on which

---

[73] Gannett and Daily Mail also assert that Google is "estopped from arguing that its '63% to 71%' share of the ad exchange market found by Judge Brinkema is insufficient to support a finding of monopoly power." DMG Br. at 16.

Gannett and Daily Mail rely involve identical markets, confirming that collateral estoppel is improper here. *See Univac*, 702 F. Supp. 2d at 484, 492 (cited in DMG Br. at 5) (applying collateral estoppel to monopolization claims where the relevant product and geographic markets were the same); *Wash. Alder LLC v. Weyerhaeuser Co*., 2004 WL 1119822, at *2 (D. Or. May 19, 2004) (same).

Gannett and Daily Mail's rejoinder that the Court should look past the differences between Open Display Markets and the markets in the Virginia case because Prof. Sibley estimated that Google's market shares in Open Display Markets are greater than the market shares found in the Virginia case misses the point. DMG Br. at 9-10, 15; *see id.* at 11 (claiming that Google "cannot expect to do any better than it did before"). Collateral estoppel applies only when the issues in the case were "fully and fairly litigated in a prior proceeding." *Actava TV, Inc. v. Joint Stock Co."Channel One Russ. World,"* 412 F. Supp. 3d 338, 349 (S.D.N.Y. 2019). That did not happen here because the Virginia Court addressed different markets. Nor did the Virginia Court consider—let alone adopt—any of Prof. Sibley's calculations of market shares in Open Display Markets. Accordingly, Gannett and Daily Mail's speculation that Google will fare worse on monopoly power in their proposed markets is irrelevant.

Gannett and Daily Mail's speculation is also incorrect because flaws in Prof. Sibley's market share calculations erroneously inflate his calculations. *See*, *e.g.*, Yung Decl. Ex. 16 ¶¶ 62-64. Google's expert, Mark Israel, found that, even assuming the validity of Gannett and Daily Mail's proposed "open display" ad exchange market, AdX's market share would fall below 40 percent in 2022 on a worldwide basis and below 30 percent on a U.S. basis in 2022; and that

---

This argument fails for the reasons described in Part V.C, and is also not an issue that should be resolved under Rule 56. *See supra* Part I.B.

including substitutes like mobile app-specific publisher ad servers for "open display" publisher ad servers decreases DFP's U.S. market share to below 30 percent in 2023. *Id.* ¶ 61 & n.124; Yung Decl. Ex. 10 ¶¶ 342-43, Fig. 51. These shares are consistent with Daily Mail's own reporting.[74] Such market shares—which are declining—fall below the threshold in this Circuit to even find a dangerous probability of monopoly power (let alone actual monopoly power). *See AD/SAT*, 181 F.3d at 229 ("[A] 33 percent market share does not approach the level required for a showing of dangerous probability of monopoly power.").

### D. Gannett And Daily Mail Are Not Entitled To Partial Summary Judgment On Anticompetitive Conduct In Support Of Their Monopolization Claims (Counts II-III)

Collateral estoppel likewise does not apply to preclude litigation on the specific conduct Gannett and Daily Mail challenge because the Virginia Court ruled on a narrower set of conduct. *See supra* Part I.A.1. In addition, the Virginia Court's finding of anticompetitive conduct as to DRS, UPR, and Last Look addresses different conduct than Gannett and Daily Mail challenge here and was rooted in application of different legal standards. *See supra* Part I.A.1-4.

#### 1. The Virginia Case's Rulings On DRS, UPR, And Last Look Were Based On Different Markets

As an initial matter, whether challenged conduct is anticompetitive depends on the defined relevant market. *See Visa*, 163 F. Supp. 2d at 334-35 ("In order to analyze defendants' conduct . . . the court must first determine the relevant product market."); *see supra* Part II.C (citing cases requiring a defined market to analyze conduct). As discussed above, Gannett and Daily Mail's Open Display Markets are different from those found in the Virginia case. Accordingly, no finding

---

[74] Yung Decl. Ex. 18 (DM_GOOG_1065758) at -763 ███████████████████████████████████

███████████████████ Daily Mail has since removed the article from its website. *See id.* at -766 ████████

from the Virginia case can give rise to collateral estoppel as to the conduct Gannett and Daily Mail challenge here. *See supra* Part V.B.

### 2. Gannett and Daily Mail Challenge Different Versions Of DRS Than The One In The Virginia Case

Collateral estoppel cannot apply to the DRS conduct that Gannett and Daily Mail challenge because the Virginia Court ruled on different DRS conduct than is at issue here. *See supra* Part I.A. In particular, Gannett and Daily Mail challenge all three versions of DRS (DRS v1, DRS v2, and tDRS), each of which functions differently. DMG Br. at 17-18. The Virginia Court only made findings as to DRS v2, which it described as "selectively lowering" AdX's take rate on some impressions while "charging a take rate above 20% for impressions where its advertisers faced less competition from third-party exchanges." Virginia Op. at *16. The Virginia Court therefore never ruled on DRS v1 or tDRS, neither of which raised AdX's take rate above 20 percent, and collateral estoppel cannot apply to those versions of DRS.[75] *See Topps Chewing Gum v. Fleer Corp.*, 799 F.2d 851, 858 (2d Cir. 1986) (reversing grant of collateral estoppel on summary judgment because prior case concerned different baseball card and logo packages than subsequent case). As to DRS v2, the Virginia Court did not consider or rule on Google's defenses that defeat liability here, including that Gannett and Daily Mail's claims are time-barred. *See* ECF No. 951 at 15-16.

### 3. The Virginia Court's Findings On UPR Address Different Issues Than In This Case And Were Based On Different Evidence

Gannett and Daily Mail cannot preclude litigation on their UPR claim because the Virginia Court's findings on UPR are not identical to the issues Gannett and Daily Mail raise here. *See supra* Part I.A. Gannett and Daily Mail contend that UPR was anticompetitive because it increased

---

[75] Yung Decl. Ex. 19 (Li Rpt.) ¶ 59 ███████████████████████████████

the prevalence of "bad" ads, which degraded the user experience and reduced readership, decreasing advertising sales on their properties.[76] But the Virginia Court determined that UPR was anticompetitive because it reduced the choice of Google's publisher customers. *Virginia Op.* at *42. It did not consider—let alone decide—whether UPR impacted the quality of ads or readership on *Gannett's and Daily Mail's* properties. Gannett and Daily Mail therefore cannot bar Google from litigating these issues, particularly where the evidence in this case shows that Daily Mail's own employees considered Google's exchange to be a source of the ███████████████[77]

Moreover, in claiming that UPR caused anticompetitive harm by reducing readership on their properties, Gannett and Daily Mail assert that UPR reduced ████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ *See* Yung Decl. Ex. 15 ¶¶ 514, 873-93, Table 38. Because the Virginia case was focused on image-based web ads, *see supra* Part V.B, the Virginia Court never decided whether UPR had *any* impact on—let alone reduced—the ads at issue in Gannett and Daily Mail's UPR claims.

Further, the Virginia Court found that UPR was exclusionary because it reduced the number of winning transactions processed by "open-web display" ad exchanges—i.e., the scale of "open-web display" ad exchanges—competing with Google. *See Virginia Op.* at *17 (citing Yung Decl. Ex. 30 (DTX768) at -933 (Google UPR experiment data concerning "AdX-web" sales)), *42. The Virginia Court did not assess whether UPR had any impact on the scale for competitors included in Open Display Markets here, nor do Gannett and Daily Mail offer evidence showing

---

[76] Yung Decl. Ex. 15 ¶ 419 ███████████████████████████████████████████ ████████████████████████████████ *see also* Yung Decl. Ex. 19 ¶ 1146.

[77] Yung Decl. Ex. 22 (DM_GOOG_0359771) at -771.

such harm to competition in their proposed markets.[78] The fact that UPR may have had no effect on competitors' scale in Open Display Markets only shows the risk of false positives from collateral estoppel where the markets—and thus purported harms to competition—are not identical.

Finally, the Virginia Court did not consider evidence available only in this case: that, after the advent of UPR, Daily Mail and Gannett both sold *more* advertising in Open Display Markets, Yung Decl. Ex. 20 ¶573, and that any decline in readership on Daily Mail and Gannett's sites was from the decline in the quality of Daily Mail and Gannett's *own content*, not "bad ads."[79] The differences in the issues and the supporting evidence bars the application of collateral estoppel. *See supra* Part V.B; *see also Charter Oak Fire*, 882 F. Supp. 2d at 403-05 (denying collateral estoppel due to new evidence "that would support [opponent's] theory in this case").

### 4. The Virginia Court Based Its Last Look Ruling On Different Conduct And Different Applicable Legal Standards

Collateral estoppel likewise does not apply with respect to so-called Last Look because Gannett and Daily Mail challenge different Last Look conduct than the conduct the Virginia Court evaluated as "Last Look." Moreover, the Second Circuit applies a different legal standard to refusals to deal than the standard the Virginia Court relied on. *See supra* Part 1.A.1.a.

The Virginia Court found Google's Last Look conduct to be Google's "implement[ation]" of a "DFP feature." Virginia Op. at *42, 45. By contrast, the "Last Look" conduct Gannett and Daily Mail challenge is Google's purported failure to develop technology integrations with rivals in response to changes in industry dynamics. *See* Yung Decl. Ex. 21 (Li Tr.) at 126:17-127:10

---

[78] *See* Yung Decl. Ex. 19 ¶¶ 1164-67 ███████████████
████████████ *see also* ECF No.1053-1 (Sibley Rpt. ¶ 442).

[79] *See, e.g.*, Yung Decl. Ex. 20 ¶ 572; Yung Decl. Ex. 29 (Mickens Tr.) at 336:23-340:1 ██████

(opining Last Look was anticompetitive because Google "fail[ed] to act" and "continued to treat header bids as static line items"), 130:12-131:1 (describing Last Look as an example of how a company's "failure to adjust a product" can be "exclusionary behavior").

For Gannett and Daily Mail to succeed on the refusal to deal they challenge, they must prove that Google (1) "unilateral[ly] terminat[ed] . . . a voluntary (and thus presumably profitable) course of dealing"; and (2) sacrificed "short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409. But the Virginia Court did not reach any of these questions as to the Last Look conduct it evaluated. *See supra* Part 1.A.1.a; Virginia Op. at *42-44 (no findings on whether the Last Look it analyzed met the elements of *Trinko*). Accordingly, the Virginia Court ruling on Last Look cannot be the basis for collateral estoppel.

### E.  Gannett And Daily Mail Are Not Entitled To Partial Summary Judgment On Their Tying Claims (Counts I-IV)

Gannett and Daily Mail assert that an anticompetitive tie supports both their Section 1 tying claim (Count IV) and their monopolization claims (Counts I-III). DMG Proposed Order 2-4. But the purported tie challenged by Gannett and Daily Mail is not identical to the tie found in the Virginia case. *First*, the Virginia Court based its evaluation of the tying conduct on a different legal standard than the one used in the Second Circuit. *Second*, Gannett and Daily Mail pursue a different tie concerning different markets and a different tying product than the tie found in the Virginia case. For both of these reasons, collateral estoppel does not apply.

### 1.  The Virginia Court Based Its Tying Ruling On A Different Legal Standard Than The One Applicable In The Second Circuit

As Gannett and Daily Mail acknowledge, the standard in the Second Circuit for the tying claim they bring differs from the standard used by the Virginia Court. The Second Circuit requires proof of anticompetitive effects in the tied market, and the Virginia Court did not. *See* DMG Br.

at 11 (citing *E&L Consulting, Ltd. v. Doman Indus., Ltd.*, 472 F.3d 23, 31-32 (2d Cir. 2006)). *See supra* Part I.A.1.d. Given this and other differences in legal standards, *supra* Part I.A.1, collateral estoppel cannot apply—especially given that neither Gannett nor Daily Mail has offered evidence of anticompetitive effects in the tied market.[80]

### 2. Gannett And Daily Mail Challenge A Different Tie Than The Tie Found In The Virginia Case

In addition, the actual tie challenged by Gannett and Daily Mail is also different from the tie found in the Virginia case. *See supra* Part I.A.1-4. *First*, Gannett and Daily Mail rely solely on Prof. Sibley to establish their purported tie, *see*, *e.g.*, DMG Br. at 11-12, and he testified that the tie claimed by Gannett and Daily Mail is contractual.[81] But the Virginia Court did not identify any contractual provision that coerced publishers into using DFP. *See*, *e.g.*, DMG Br. at 12 (describing "economic coerc[ion]" found in the Virginia case); Virginia Op. at *12, *39-40 (omitting any factual findings regarding contractual provisions). Gannett and Daily Mail's contracts produced in this case reveal that there has never been a contractual requirement for Gannett or Daily Mail to use DFP,[82] further confirming collateral estoppel does not apply.

---

[80] *See* Yung Decl. Ex. 14 at 262:5-262:10 ("[Q.] Did you do any analysis of anticompetitive effects, Professor Sibley? A. I think in a few cases I referred to things maybe that Professor Li did . . . But I don't have an independent opinion at all"), 264:23-265:16 (no opinion on whether the purported tie reduced output or caused supra-competitive prices); Yung Decl. Ex. 21 at 140:14-140:21 ("[Q.] My question is did you do any economic analysis of the competitive effects of the conduct you evaluated on the publisher ad server market in your reports? A. Well, I studied the effects on AdX [ad exchange], which primarily bids on DFP [ad server].").

[81] Yung Decl. Ex. 14 at 79:4-79:9 ("[Q.] Is it a technical question whether AdX real-time bids are tied to DFP? A. I believe it's as much as anything else a contractual question. You know, if you want to use AdX in real time, you've got to use DFP. I'm not sure what you call that."), 260:18-261:18 ("[Q.] Did you do any quantitative analysis about whether [publishers] make more money through AdX and DFP than they do through AdX and a third party server? A. I've certainly seen things like that, and I know that Dr. Israel thinks it's important. You know, I don't, but he does.").

[82] *See*, *e.g.*, Yung Decl. Ex. 25 (DM_GOOG_0014799) ██████████████████; Yung Decl. Ex. 26 (GANNETT_GOOG_0211799) (same); *see also* Yung Decl. Ex. 27 (DM_GOOG_0062795) at -795 ██████████████████████████████████████████████████████████████████ ██████ ung Decl. Ex. 14 at 259:22-260:4 ("Q. Do you agree with Daily Mail that Google does not contractually restrict it from using alternative ad tech or display advertising products? A. Well, it does not legally restrict you from doing it.").

*Second*, Gannett and Daily Mail identify a different tying product than was at issue in the Virginia case. While Gannett and Daily Mail identify ███████████████████████ ████████████████████████████[3] the Virginia Court found the tying product to be AdX (limited to "open-web" transactions). *See* Virginia Op. at *38. Because no court has resolved whether there is an illegal tie involving the tying product challenged by Daily Mail and Gannett, no collateral estoppel applies.

*Finally*, the relevant product markets in the Virginia case are "more restrictive" than those pursued by Gannett and Daily Mail, *see supra* Part V.B. Gannett and Daily Mail therefore cannot use the Virginia case decision to establish the tying and tied product markets, or that Google has "sufficient economic power in the tying product market to coerce purchasers into buying the tied product," for the tie they challenge. *Kaufman*, 836 F.3d at 141; *see also* Part V.B; Virginia Op. *39 (assessing coercion as to "open-web" publishers).

### F. Gannett And Daily Mail Are Not Entitled To Partial Summary Judgment On Google's Defenses

Gannett and Daily Mail cannot preclude litigation on any of Google's defenses related to market definition, monopoly power, or anticompetitive effects because those defenses were not "necessarily decided" by the Virginia Court.[84] *See supra* Part V.B-E. Moreover, because Gannett and Daily Mail challenge conduct that was not at issue in the Virginia case, litigation cannot be precluded on Google's defense that Gannett and Daily Mail have failed to demonstrate anticompetitive effects. *See supra* Part V.D-E. Google can also maintain its defense that the

---

[83] Gannett and Daily Mail's Letter, ECF No. 986 at 5 (citing Sibley Rpt. [pg.] 263).

[84] The sole case Gannett and Daily Mail cite in support of their assertion that collateral estoppel should apply to Google's affirmative defenses has no application here. DMG Br. at 19 (citing *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 32 (2d Cir. 2017)). *Trikona* applied *Connecticut's* collateral estoppel doctrine, 846 F.3d at *31-32, and it was undisputed that the affirmative defenses were "necessarily resolved" in the prior proceeding. *Id.* at 32.

conduct Gannett and Daily Mail challenge is procompetitive and based on Google's lawful product design choices because the Virginia Court's application of the refusal to deal doctrine under *Trinko* is inconsistent with the Second Circuit's application. *See supra* Part I.A.1.a, c.

### G. Granting Gannett And Daily Mail's Motion Would Not Narrow The Scope Of The Evidence In Their Cases

There are no efficiencies to be gained from granting Gannett and Daily Mail's motion for collateral estoppel. *First*, discovery in this case is closed, and Gannett and Daily Mail have already received a significant amount of discovery. *See supra* Part V.A. *Second*, granting their motion will not limit the evidence at trial because Gannett and Daily Mail base their state law and federal antitrust claims and damages on the same alleged conduct. For example, Gannett conceded that it ███████████████████████████████████████████████████████████ ███████████████████████████████████ Gannett and Daily Mail's damages estimates ████████████████████████████████████ ████████ *See, e.g.*, Yung Decl. Ex. 15 at Table 33 ███████████████████ ████████████████████ The same evidence about DRS and Last Look relevant to antitrust claims would come in regardless of whether collateral estoppel applies. Accordingly, collateral estoppel would not limit the scope of what Gannett and Daily Mail would still need to prove if their claims survive summary judgment. *See supra* Part I.A.5.

---

[85] *See* Yung Decl. Ex. 12 (Gannett 30(b)(6) Tr.) at 42:11-43:1 ██████████████ ████████████ Yung Decl. Ex. 13 (Gannett 30(b)(6) Dep. Ex. 2) at 3 ████████████████████████████████████████████████████████ ████████████ *id*. at 5 ████████████

## **<u>CONCLUSION</u>**

For the foregoing reasons, Google respectfully requests that Plaintiffs' motions for collateral estoppel and partial summary judgment be denied in their entirety.

Dated: July 18, 2025

Respectfully Submitted,

*/s/ Craig M. Reiser*
Craig M. Reiser
Daniel S. Bitton
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
Telephone: (212) 728-2218
Email: creiser@axinn.com
         dbitton@axinn.com

Bradley D. Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 469-3532
Email: bjustus@axinn.com

Justina K. Sessions**
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Email: justina.sessions@freshfields.com

Eric Mahr**
Andrew J. Ewalt**
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Email: eric.mahr@freshfields.com
         andrew.ewalt@freshfields.com

Counsel for Defendants Google LLC, Alphabet
Inc., and YouTube, LLC

*****Except as to Associated Newspapers Ltd.,
et al. v. Google LLC, No. 1:21-cv-03446 (PKC)*

86