# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re Google Digital Advertising Antitrust Litigation** | Case No. 1:21-md-3010 (PKC) |
| *This document relates to:*<br><br>**In re Google Digital Publisher Antitrust Litigation** | Case No. 1:21-cv-7034 (PKC) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON PUBLISHERS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

## Table of Contents

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD....................................................................................................... 5

ARGUMENT .................................................................................................................... 5

I.     Act 2 Constitutes an Illegal Tie. ....................................................................... 5

         A.     Dynamic Allocation Imposed an Illegal Tie from DFP to AdX.................. 7

         B.     Google Cannot Refute that the Act 2 Tie Was Coercive. .......................... 10

II.    Google Is Not Entitled to Summary Judgment on the Act 1 Tying Claim. .......... 14

         A.     Publishers' Damages Model Satisfies *Comcast* Even If Act 2 Is
Not a Tie. ................................................................................................. 14

         B.     Publishers' Damages Model is Consistent with Their Liability
Theory. .................................................................................................... 17

III.   Publishers' Claims Are Timely............................................................................ 19

         A.     Publishers' Adx Claims Are Timely Because They Are Based on
an Evolving Course of Conduct That Continued to Inflict New and
Accumulating Injuries............................................................................. 19

         B.     Google's Argument That *Sabre II* Makes Publishers' Claims
Untimely Fails.......................................................................................... 22

         C.     Google's Arguments Regarding the Timeliness of the Act 1 Tie
Lack Merit. .............................................................................................. 26

         D.     The Challenged Conduct Giving Rise to Act 2 Is Not Time Barred. ....... 28

         E.     Publishers' AdSense Claims are Timely.................................................. 29

IV.   The Act 3 and 4 AdSense Claims Survive Summary Judgment.......................... 29

         A.     Evidence Supports the Elements of the AdSense Tying Claims
(Act 3 and 4). .......................................................................................... 29

          B.     Publishers Did Not Abandon Claims Involving DFP and AdSense......... 36

         C.     The Progressive Has Standing. ................................................................ 36

V.    The Remaining Monopolization Claims Survive Summary Judgment. ............... 37

A. Enhanced Dynamic Allocation. ............................................................ 37

B. Dynamic Allocation, Enhanced Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules Survive Summary Judgment. ............................................................................................ 41

C. Plaintiffs' Claims for Equitable Remedies Survive Summary Judgment. ............................................................................................ 42

VI. Publishers' Damages Model Does Not Compute Any Damages on Behalf of Entities Residing or Injured Outside the United States. .................................. 43

VII. Google's Spoliation Precludes Summary Judgment ............................................. 45

CONCLUSION ............................................................................................................ 46

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Coughlin*,
    64 F.3d 77 (2d Cir. 1995) ...................................................................... 5

*AngioDynamics v. C.R. Bard*,
    2018 WL 3730165 (N.D.N.Y. Aug. 6, 2018) ........................................... 7, 30, 31

*Anti-Monopoly v. Hasbro*,
    958 F. Supp. 895 (S.D.N.Y. 1997) ......................................................... 35

*Apple v. Pepper*,
    139 S. Ct. 1514 (2019) .......................................................................... 45

*Applera Corp. v. MJ Rsch*,
    349 F. Supp. 2d 338 (D. Conn. 2004) ..................................................... 26

*Berkey Photo v. Eastman Kodak*,
    603 F.2d 263 (2d Cir. 1979) ............................................................ passim

*Biocad JSC v. F. Hoffmann-La Roche*,
    942 F.3d 88 (2d Cir. 2019), ................................................................... 44

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) .............................................................................. 33

*Brown Shoe. v. United States*,
    370 U.S. 294 (1962) .............................................................................. 35

*Byrnie v. Town of Cromwell*,
    243 F.3d 93 (2d Cir. 2001) .................................................................... 45

*Caiola v. Citibank*,
    295 F.3d 312 (2d Cir. 2002). ................................................................. 28

*CDC Techs. v. IDEXX Lab'ys*,
    186 F.3d 74 (2d Cir. 1999) .................................................................... 40

*Cedar Petrochemicals v. Dongbu Hannong Chem.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011) .................................................... 43

*Chalmers v. Nat'l Collegiate Athletics Ass'n*,
    2025 WL 1225168 (S.D.N.Y. Apr. 28, 2025) ......................................... 24

*Comcast v. Behrend*,
    569 U.S. 27 (2013) ............................................................................. 3, 15

*Connecticut v. Sandoz, Inc.*,
2025 WL 3043397 (D. Conn. Oct. 31, 2025) ...................................................... 20

*CSX Transp. v. Norfolk S. Ry.*,
648 F. Supp. 3d 679 (E.D. Va. 2023) ................................................................. 26

*Cumulus Media New Holdings v. Nielsen Co. (US)*,
2026 WL 63294 (S.D.N.Y. Jan. 8, 2026) ........................................................... 16

*Eastman Kodak v. Image Tech. Servs.*,
504 U.S. 451 (1992) ................................................................................. 34, 36

*Ford Motor v. United States*,
405 U.S. 562 (1972) ......................................................................................... 42

*Fortner Enters. v. U.S. Steel*,
394 U.S. 495 (1969) ......................................................................................... 14

*Fotobom Media v. Google*,
719 F. Supp 3d 33 (D.D.C. 2024) ................................................................ 11, 14

*Great Am. Ins. of NY v. Summit Exterior Works*,
2012 WL 459885 (D. Conn. Feb. 13, 2012) ...................................................... 35

*Hanover Shoe v. United Shoe Mach.*,
392 U.S. 481 (1968) .............................................................................. 21, 22, 44

*Heartland Payment Sys. v. MICROS Sys.*,
2008 WL 4510260 (D.N.J. Sept. 29, 2008) ....................................................... 37

*Hill v. A-T-O*,
535 F.2d 1349 (2d Cir. 1976) ........................................................................... 29

*Hoffmann-La Roche v. Empagran S.A.*,
542 U.S. 155 (2004) ......................................................................................... 43

*Humana v. Celgene*,
2022 WL 1237883 (D.N.J. Apr. 27, 2022) ........................................................ 25

*Illinois Tool Works. v. Indep. Ink.*,
547 U.S. 28 (2006) ......................................................................................... 6, 8

*In re Actavis, Inc. Antitrust Litig.*,
787 F.3d 638 (2d Cir. 2015) ............................................................................. 38

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) ....................................................................... 33, 37

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581 (S.D.N.Y. 2015) .................................................................. 44

*In re Google Digital Advert. Antitrust Litig.* (*Google III*),
    2025 WL 3012840 (S.D.N.Y. Oct. 27, 2025) ............................................... passim

*In re Google Digital Advertising Antitrust Litig.* (*Google I*),
    627 F. Supp. 3d 346 (S.D.N.Y. 2022) ............................................... 17, 26, 29, 38

*In re Google Digital Advertising Antitrust Litig.* (*Google II*),
    721 F. Supp 3d 230 (S.D.N.Y. 2024) ................................................. 7, 12, 16, 25

*In re Google Digital Advertising Antitrust Litig.* (*Google IV*),
    2025 WL 3562687 (S.D.N.Y. Dec. 12, 2025), ............................................ passim

*In re Google Digital Advertising Antitrust Litig.*,
    2025 WL 2733347 (S.D.N.Y. Sept. 25, 2025) .................................................. 36

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ...................................................... 17

*In re Seroquel XR Antitrust Litig.*,
    2022 WL 2438934 (D. Del. 2022) ............................................................... 20, 22

*In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*,
    2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) ...................................................... 12

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ........................................................................ 7, 15

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ...................................................................... 45

*Innovation Data Processing v. IBM*,
    585 F. Supp 1470 (D.N.J. 1984) ..................................................................... 12

*International Salt v. United States*,
    332 U.S. 392 (1947) ........................................................................................ 7

*It's My Party v. Live Nation Ent't*,
    811 F.3d 676 (4th Cir. 2016) ..................................................................... 12, 37

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ..................................................................................... 6, 9, 34

*Jenkins v. Nat'l Collegiate Athletic Conf.*,
    2025 WL 3625934 (S.D.N.Y. Dec. 15, 2025) .................................................. 24

*K.M.B. Warehouse Distribs. v. Walker Mfg.*,
    61 F.3d 123 (2d Cir. 1995) ........................................................ 40

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) ............................................. 10, 30

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ....................................................... 3, 20, 22

*Klein v. Meta Platforms*,
    766 F. Supp. 3d 956 (N.D. Cal. 2025) ...................................... 31

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) ...................................................... 45

*Lotes Co. v. Hon Hai Precision Indus.*,
    753 F.3d 395 (2d Cir. 2014) ...................................................... 44

*MacDermid Printing Sols. v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016) ...................................................... 39

*N. Am. Soccer League v. U.S. Soccer Fed'n*,
    2024 WL 2959967 (E.D.N.Y. June 12, 2024) ........................... 35

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ................................................................. 31

*Northern Pacific Railway v. U.S.*,
    1957 WL 87595 (2006) ......................................................... 2, 13

*Northern Pacific Railway v. United States*,
    356 U.S. 1 (1958) ....................................................................... 7

*Ortho Diagnostic Sys. v. Abbott Lab'ys*,
    920 F. Supp. 455 (S.D.N.Y. 1996) ........................................... 32

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) .............................. 17

*PepsiCo v. Coca-Cola*,
    315 F.3d 101 (2d Cir. 2002) ...................................................... 40

*Photo Inc. v. Meta Platforms*,
    123 F.4th 592 (2d Cir. 2024) .................................................... 29

*Precision Assocs. v. Panalpina World Transp.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .............................. 20

*Precision Assocs. v. Panalpina World Transp.*,
  2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ...................................................... 44

*R & G Affiliates. v. Knoll Int'l*,
  587 F. Supp. 1395 (S.D.N.Y. 1984) ............................................................... 9, 13

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997) ............................................................................. 35

*Rogoz v. City of Hartford*,
  796 F.3d at 236 (2d Cir. 2015) ......................................................................... 5

*Sonterra Cap. Master Fund v. Credit Suisse Group*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017) ............................................................. 44

*Stouter v. Smithtown Central School District*,
  687 F. Supp. 2d 224 (E.D.N.Y. 2010 ............................................................... 24

*Sykes v. Mel S. Harris & Assocs.*,
  780 F.3d 70 (2d Cir. 2015) .................................................................... 3, 15, 16

*Todd v. Exxon*,
  275 F.3d 191 (2d Cir. 2001) ........................................................................... 32

*Toys R Us v. FTC*,
  221 F.3d 928 (7th Cir. 2000) .......................................................................... 32

*U.S. Steel v. Fortner Enters.*,
  429 U.S. 610 (1977); ..................................................................................... 32

*United Mags. v. Murdoch Mags. Distrib.*,
  353 F. Supp. 433 (S.D.N.Y. 2004) ................................................................... 5

*United States v. E. I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) ....................................................................................... 42

*United States v. Google*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) ................................................................ 1

United States v. Live Nation Ent.,
  2026 WL 563024 (S.D.N.Y. Feb. 27, 2026) ..................................................... 35

*United States v. Live Nation Ent.*,
  2025 WL 835961 (S.D.N.Y. Mar. 14, 2025) ..................................................... 37

*United States v. Live Nation Ent.*,
  2026 WL 456804 (S.D.N.Y. Feb. 18, 2026) ..................................................... 35

*United States v. Microsoft*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................ 15, 18, 41

*United States v. Milstein*,
  401 F.3d 53 (2d Cir. 2005) ........................................................................... 28

*US Airways v. Sabre Holdings* (*Sabre I*),
  105 F. Supp. 3d 265 (S.D.N.Y. 2015) ...................................................... 22, 23

*US Airways v. Sabre Holdings* (*Sabre II*),
  938 F.3d 43 (2d Cir. 2019) ........................................................... 3, 22, 23, 24

*US Airways v. Sabre Holdings* (*Sabre III*),
  2022 WL 1125956 (S.D.N.Y. April 15, 2022) ......................................... passim

*US Airways v. Sabre Holdings* (*Sabre IV*),
  2022 WL 1140291 (S.D.N.Y. Apr. 18, 2022) ............................................ 17, 20

*Viamedia v. Comcast*,
  951 F.3d 429 (7th Cir. 2020) ..................................................................... 7, 15

*Wells Real Estate v. Greater Lowell Bd. of Realtors*,
  850 F.2d 803 (1st Cir. 1988) ......................................................................... 37

*Wood v. Pittsford Cent. Sch. Dist.*,
  2008 WL 5120494 (2d Cir. Dec. 8, 2008) ..................................................... 45

*Yentsch v. Texaco*,
  630 F.2d 46 (2d Cir. 1980) ........................................................................... 32

*Zenith Radio v. Hazeltine Research*,
  401 U.S. 321 (1971) ...................................................................................... 20

**Statutes**

15 U.S.C. § 6a ..................................................................................................... 4

Fed. R. Civ. P. 30(b)(6) ............................................................................. 8, 11, 35

Fed. R. Civ. P. 56(a) ............................................................................................ 5

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1752 ................................................................ 10

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1756 ............................................................ 12, 13

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 320 ......................................................................................... 20, 22, 24

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 777 ........................................................................................... 15

**Other Authorities**

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harvard Law Rev. 397 (2009) ............................................................................................. 19

The AdX Class, The Progressive, Inc., and Mikula Web Solutions, Inc. (collectively "Plaintiffs" or "Publishers") respectfully submit this memorandum in opposition to Google's Motion for Summary Judgment.[1]

## INTRODUCTION

Google has monopolized the ad tech stack for open web display advertising, achieving monopoly power in the global markets for ad servers that website publishers use to make their ad inventory available for sale and for ad auction platforms that bring publishers and advertisers together. This Court applied collateral estoppel to the findings and conclusions of *United States v. Google*, 778 F. Supp. 3d 797 (E.D. Va. 2025) ("*Google EDVA*"), precluding Google from challenging that it "has willfully acquired and maintained its monopoly power in the ad server and ad exchange markets through . . . Unlawful Tying, First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules"[2] and "has unlawfully tied DoubleClick for Publishers and AdX in violation of section 1 of the Sherman Act." *In re Google Digital Advert. Antitrust Litig.*, 2025 WL 3012840, at *9, 17 (S.D.N.Y. Oct. 27, 2025) ("*Google III*").

Those findings, consistent with the evidence, establish that Google violated Sections 1 and 2 of the Sherman Act through those illegal restraints which also constitute a tie of AdX (the tied product) to DFP (the tying product)—the "Act 2 tie"—effecting, together with the adjudged Act 1 tie, a two-way tie of its ad server and ad auction platforms. Whether Act 2 is considered a

---

[1] Google's Memorandum of Law (ECF 1353) is cited as "Mot. __". Google's Rule 56.1 Statement of Material Facts (ECF 1356) is cited as "DSOF ¶ __"; Plaintiffs' Response to Google's Statement of Material Facts and Plaintiffs' Statement of Additional Material Facts, filed herewith, are cited as "RSOF ¶ __" and "PSOF ¶ __", respectively. The exhibits to the Declaration of Andrew Henderson (ECF 1355) and to the Declaration of Izaak Earnhardt, filed herewith, are cited as "Def. Ex. __" and "Plf. Ex. __, respectively. Except as noted, internal citations are omitted.

[2] *Google EDVA* uses the terms "First Look" and "Last Look" to refer to key functions of Dynamic Allocation. *Google III*, 2025 WL 3012840, at *9 & n.10; *see also Google EDVA*, 778 F. Supp. 3d at 826-27, 829; PSOF ¶ 61.

tie or just illegal monopolistic conduct, these acts caused antitrust injury to the AdX Class and the AdSense Plaintiffs, entitling them to damages for the inflated take rate Google extracted.

Google's motion seeking to avoid any repercussions for its violations with respect to DFP and AdX or its conduct regarding its AdSense products is without merit and should be denied.

The AdX Class's claims challenge the DFP ad server's implementation of Dynamic Allocation, Dynamic Revenue Share, and Uniform Pricing Rules to drive market share to the AdX ad exchange, which conduct constitutes an illegal tie of AdX to DFP—the "Act 2 tie". These illegal restraints required Publishers using DFP to secure real-time bids from AdX to provide AdX with a competitive advantage over other ad exchanges meaning Publishers had to sell impressions through AdX that they could have sold at higher prices or on other terms through rival exchanges. Google's sole challenge to whether these restraints constitute a tie— arguing the absence of coercion—fails because the EDVA Court found, and the evidence establishes, that Google's restraints were coercive. Google incorrectly asserts that Publishers seek to tie the restraints, but Publishers have consistently alleged that the tie of AdX to DFP was *implemented* through those restraints. Moreover, settled precedent in *Northern Pacific Railway v. United States* condemns Dynamic Allocation's "meeting the competition" restraint even when competitors win some portion of the tied product market, and Google's reliance on instances where DFP was used for backfill or direct deals does not negate the tie when DFP is used for its core purpose of accessing competitive real-time bidding. *See* § I.

Google argues that if the conduct underlying Act 2 does not amount to a tie, then Publishers' damages model violates *Comcast* because it combines the damages allegedly arising from both Acts 1 and 2. But, regardless of whether Act 2 is deemed a technical tie under Section 1, the Class's methodology shows that their damages properly "stemmed from *the*

*defendant's actions* that created the legal liability". *See Sykes v. Mel S. Harris & Assocs.,* 780 F.3d 70, 88 (2d Cir. 2015) (emphasis added) (interpreting *Comcast v. Behrend*, 569 U.S. 27 (2013)). "Act 2" is merely a label that Publishers apply to actions designed to coerce DFP publishers to use AdX on grounds other than the merits—*i.e.*, the same anticompetitive restraints Google is precluded from relitigating. Thus, contrary to Google's argument that only damages from charges for DFP (the Act 1 tied product) are recoverable for Act 1 if Act 2 is not a tie, Publishers' monopolization claim, and their harm and damages, arise from the combined effects of the Act 1 tie *together with* the illegal restraints of Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules, making Publishers' damages model appropriate regardless of whether those illegal restraints constitute a tie. *See* § II.

Google's statute of limitations arguments fare no better. Google's evolving course of conduct inflicted new and accumulating injuries through its supracompetitive take rates inflated by its scheme throughout the limitations period. The harm to Publishers increased with each inflated take rate charged and that harm was neither established nor reasonably estimable at some point prior to the limitations period, including because Google's evolving scheme involved driving volume to AdX (with its inflated take rate) for reasons other than competition on the merits. Under the continuing violation rule of *Berkey Photo* and *Klehr*, Plaintiffs' may thus recover damages starting four years before filing. Google's attempt to invoke the Second Circuit's decision in *US Airways v. Sabre* ("*Sabre II*") ignores that *Sabre II* involved a substantially different situation than Google's evolving course of conduct and continued harm. In *Sabre II*, the untimely claim was based on a single "overt act"—the entry into an anticompetitive contract—that defined the illegal acts and the future harm for the plaintiff airline. Google does not point to *any* anticompetitive restraints in its publisher contracts, and the mere

fact that its supracompetitive price was memorialized in a pre-limitations contract cannot satisfy *Sabre II*. Google's misread of *Sabre II* also negates its other timeliness arguments. *See* § III.

Contrary to Google's assertions, the AdSense Ties (Acts 3 and 4) are supported by evidence, including Google's admissions, showing: (1) distinct consumer demand for the separate sub-markets of basic ad servers and basic ad auction platforms; (2) Google's dominant market power in those markets; and (3) Google's coercion of publishers to purchase the AdSense basic ad server and ad auction platform together. Further, The Progressive, which accessed AdSense through DFP, suffered an overcharge injury for AdSense auction platform services by paying supracompetitive prices caused by the combined effects of the AdSense Ties. *See* § IV.

Google's motion for summary judgment on Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules as restraints in the Act 2 tie and monopolization scheme also fails. In addition to the points concerning those restraints addressed by §§ I-III, below, those acts were held anticompetitive by the Court's preclusion order, *Google III*. There is also no basis for summary judgment on Enhanced Dynamic Allocation because Publishers have withdrawn the allegation that it is independently anticompetitive but, by expanding the reach of Dynamic Allocation, it was part of Google's maintenance of monopoly power. And, because Google still has its unlawfully acquired and maintained monopoly power, there is no basis for dismissing Publishers' claims for equitable relief. *See* § V.

Google cannot support its's new, untimely argument that the Foreign Trade Antitrust Improvements Act ("FTAIA") bars a portion of the Class's Damages—the AdX Class does not assert any claims on behalf of non-U.S. residents. *See* § VI. And, Google's spoliation of evidence should weigh against granting Google's motion. *See* § VII.

## **LEGAL STANDARD**

Summary judgment is only proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *United Mags. v. Murdoch Mags. Distrib.*, 353 F. Supp. 433, 438 (S.D.N.Y. 2004). "It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief." *Id.* The Court "*must disregard all evidence favorable to the moving party that the jury is not required to believe*". *Rogoz v. City of Hartford*, 796 F.3d at 236, 245-46 (2d Cir. 2015) (emphasis in original). A court "may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and quotation marks omitted).

## **ARGUMENT**

### I.   **Act 2 Constitutes an Illegal Tie.**

Google violated Sections 1 and 2 of the Sherman Act by using, among other restraints, Dynamic Allocation, Dynamic Revenue Share, and Uniform Pricing Rules to coerce users of DFP to advantage AdX over its rivals, which Publishers have named "Act 2". RSOF ¶ 40.[3]  As adjudicated, these restraints are anticompetitive and drive impressions to AdX for reasons other than the competitive merits. *Google III*, 2025 WL 3012840, at *9; *Google EDVA*, 778 F. Supp.

---

[3] Those restraints were reinforced in 2018 by Google's bundling of AdX and DFP as Google Ad Manager ("GAM"). RSOF ¶¶ 40; PSOF ¶¶ 128-129.  While Enhanced Dynamic Allocation also drove additional impressions to AdX, it is addressed separately herein because Publishers do not contend that it, standing alone, is anticompetitive. *See* § V.A, below; PSOF ¶ 186.

3d at 826, 850-852.  Moreover, Google does not here contest the ruling of the EDVA court, adopted by this Court, that, together with the Act 1 tie, the restraints supporting Act 2 led to the monopolization of the ad exchange market.  *See id.* at 872; *Google III*, 2025 WL 3012840, at *9.

Those anticompetitive restraints constitute an illegal tie, from DFP to AdX, under Sections 1 and 2.[4]  In order to use the DFP ad server for one of its primary purposes—putting ad exchanges in real-time bidding competition[5]—Google forced publishers using DFP to sell impressions through AdX that they could have sold at higher prices or on preferred terms through rival exchanges.[6]  RSOF ¶¶ 74-78.  Google used its control over the DFP ad server (the tying product) to implement these restraints and force the sale of impressions through AdX (the Act 2 tied product), thereby tying AdX to DFP.  "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, (1984), *abrogated on other grounds by Illinois Tool Works. v. Indep. Ink.,* 547 U.S. 28 (2006).

Google challenges (Mot. 9-12) only whether Publishers were "coerced" to use the tied AdX ad exchange, arguing that Plaintiffs' purported "reframing" of Dynamic Allocation, Dynamic Revenue Share, and Uniform Price Rules as a tie fails asserting that "restraints" are not "products", that third-party exchanges won many of the impressions offered through DFP, and that some DFP publishers do not have access to AdX and so never use AdX and DFP together.

---

[4] Judge Brinkema's decision did not address whether these restraints constituted a tie because DOJ did not allege a tie from DFP to AdX.  PSOF ¶ 35; Amended Complaint ¶ 338, *United States v. Google*, No. 23-cv-108 (E.D. Va. Apr. 17, 2023), ECF120 (Plf. Ex. 210); *id.* ¶¶310-323 (alleging the same conduct constituted Section 2 monopolization).

[5] *See Google EDVA*, 778 F. Supp 3d at 834 ("placing ad exchange bids in competition with bids from header bidding, programmatic direct sales, and other ad exchanges").

[6] *Google EDVA*, 778 F. Supp. 3d at 826 ("The First Look functionality benefited AdX advertisers, as they could win the auction even when advertisers using rival ad exchanges were willing to pay a higher price for the impression (*i.e.*, when bids from other exchanges offered publishers more revenue for the impression).").

As detailed below, each argument fails.  *First*, Publishers have consistently alleged that Google *implemented* the Act 2 tie through these restraints, which collectively use Google's control of DFP to give AdX an advantage over third-party exchanges on an impression-by-impression basis.  RSOF ¶¶ 40, 74-78, 81, 90, 133, 135, 140, 145-47, 169, 182, 184; PSOF ¶¶ 59-63, 74-129.  *See In re Google Digital Advertising Antitrust Litig.* ("*Google II*"), 721 F. Supp 3d 230, 263 (S.D.N.Y. 2024).  *Second*, the type of competitive advantage bestowed by Dynamic Allocation demonstrates coercion even if AdX bidders sometimes declined lower value impressions, leaving them to third-party exchanges.  *Northern Pacific Railway v. United States*, 356 U.S. 1, 1-12 (1958).  *Third*, the Act 2 tie is based on forcing Publishers to advantage AdX when they use the DFP ad server to put multiple ad exchanges into competition—a primary purpose of an ad server, *Google EDVA*, 778 F. Supp 3d at 834—so instances where DFP is used for other purposes outside the relevant market (*e.g.*, AdSense backfill or direct deal ads) is immaterial.

### A. Dynamic Allocation Imposed an Illegal Tie from DFP to AdX.

The mechanics and impact of Dynamic Allocation establish a tie under Sections 1 and 2.[7] Dynamic Allocation mimics the preferential restraints the Supreme Court condemned as a *per se* illegal ties in *Northern Pacific*, 356 U.S. at 3, and in *International Salt v. United States*, 332 U.S. 392, 397 (1947), *abrogated on other grounds by Illinois Tool Works v. Indep. Ink,* 547 U.S. 28

---

[7] The technical requirements of a tying claim "attach only to *per se* ties" under Section 1.  *Viamedia v. Comcast*, 951 F.3d 429, 468-69 (7th Cir. 2020).  Even if the plaintiff cannot establish the elements of the tie, the same acts can constitute unlawful anticompetitive conduct under Section 2.  *Id*.  The requirements for a tying claim under Section 2 are more relaxed where, as here, anticompetitive impact and monopoly power have been established in both the tying ad server market and the tied ad exchange market.  *See id.*; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133-134 n.5 (2d Cir. 2001) ("Plaintiffs could also prove their tying claims under a rule of reason theory, requiring plaintiffs to prove that the challenged action had an adverse effect on competition as a whole in the relevant market"); *AngioDynamics v. C.R. Bard*, 2018 WL 3730165, at *4 n.6 (N.D.N.Y. Aug. 6, 2018).

(2006).  In both cases, the restraints found to be coercive were not absolute but only applied when the monopolist's offers were the same as or better than the competitors' offers, finding a tie even where consumers could choose to use a competitor's product if the terms were superior.

The EDVA Court determined that Dynamic Allocation works in the same fashion.  Under Dynamic Allocation, AdX only needed to meet or exceed the highest average historical price in DFP to win the impression.  *Google EDVA*, 778 F. Supp 3d at 826-27; *Google III*, 2025 WL 3012840, at *9; RSOF ¶¶ 135-37.  As Google testified through its 30(b)(6) witness: AdX ███████ ████████████████████████████████████ RSOF ¶ 135; PSOF ¶¶ 95, 101-03.  Thus, Dynamic Allocation operated just like the preferential routing clause in *Northern Pacific*, 356 U.S. at 3, 8 n.6, allowing AdX to win each impression merely by matching the competition's price, and not allowing the competitor to outbid AdX.  Indeed, Dynamic Allocation was even more anticompetitive than the *Northern Pacific* restraint because AdX's real-time bid only had to match the highest *average historical bid* from competing exchanges, and thus AdX could win the impression "even when advertisers using rival ad exchanges were willing to pay a higher price for the impression."  *Google EDVA*, 778 F. Supp 3d at 826; RSOF ¶ 135.

Google augmented the coercive effect of Dynamic Allocation with Enhanced Dynamic Allocation and with Dynamic Revenue Share, which used the highest DFP bid to alter the AdX revenue share to maximize impressions won by AdX, further enhancing and maintaining its market power.  *Google EDVA*, 778 F. Supp 3d at 864-65; *Google III*, 2025 WL 3012840, at *9; RSOF ¶ 169.  Google later used Unified Pricing Rules in its dominant DFP ad server to ensure that publishers could not offer lower price floors to Google's competitors without offering them to AdX, preventing publishers from directing impressions to competitors: "Unified Pricing Rules . . . involved Google using its coercive monopoly power to deprive its publisher customers

8

of a choice that they had previously exercised to promote competition." *Google EDVA*, 778 F. Supp 3d at 865; *Google III*, 2025 WL 3012840, at *9; RSOF ¶¶ 182, 184.

Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules each deprived publishers of choice and allowed Google to dictate anticompetitive restraints within DFP that favored AdX bids and drove impressions to AdX at the expense of rivals on terms other than the merits. RSOF ¶¶ 74-78, 133, 169, 172, 182, 184. These three coercive restraints, independently and collectively, imposed the type of conditional tie condemned in *Northern Pacific*.

*Second*, these restraints prevented publishers from exercising independent judgment on the merits of AdX and insulated AdX from the competitive pressures of the open market. *Hyde*, 466 U.S. at 13; *Google EDVA*, 778 F. Supp. 3d at 862; PSOF ¶¶ 47, 57-58, 75-82. Whenever AdX buyers were willing to match the highest average DFP ad server price, DFP publishers were forced to use AdX even if they preferred to use another ad exchange. RSOF ¶¶ 63, 74-78, 133, 135, 169, 182, 184; PSOF ¶¶ 95-97, 101-103; *see Hyde*, 466 U.S. at 12; *Google EDVA*, 778 F. Supp. 3d at 862. "The free market mandated by the Sherman and Clayton Acts 'is distorted whenever a buyer is induced to buy any amount of the tied goods because of a tie-in' rather than for reasons that motivate a reasonable buyer in a competitive market, such as price or quality." *R & G Affiliates. v. Knoll Int'l,* 587 F. Supp. 1395, 1400 (S.D.N.Y. 1984).

The EDVA Court's findings with respect to the Act 1 tie (tying DFP to AdX) and monopolization of the ad exchange market establish the remaining requisite elements of an illegal Act 2 tie. Google possessed monopoly power in the market for the Act 2 tying product, publisher ad servers. *Google EDVA*, 778 F. Supp. 3d at 850-852*; Google III*, 2025 WL 3012840, at *9. Google used its dominant DFP product to implement the Act 2 tie through Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules, allowing AdX to monopolize

9

and capture over 60% of the ad exchange market, thereby affecting a "not insubstantial" amount of interstate commerce. *Google EDVA*, 778 F. Supp. 3d at 863; *Google III*, 2025 WL 3012840, at \*14. The EDVA Court found coercion in both the Act 1 tie and in the monopolization of the ad exchange market. *Google EDVA*, 778 F. Supp. 3d at 855, 857, 862, 864-65. Binding findings by the EDVA Court and ample other evidence establish the Act 2 tie.

### B. Google Cannot Refute that the Act 2 Tie Was Coercive.

Google's sole challenge to the tie based on its restraints is to argue (Mot. 9) that Publishers cannot prove they were coerced to use AdX. This argument fails. Restraints that Google implemented through DFP forced publishers to provide AdX with critical advantages over rivals. For this reason, the EDVA Court found that the restraints underpinning the Act 2 tie—Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules—were coercive.[8] Publishers were unable to avoid these restraints when they wanted to access real time AdX bidding. RSOF ¶¶ 74-78, 135-37, 140, 146, 172-173, 182; PSOF ¶¶ 58, 60, 75-79, 81-85, 115.

The coercion requirement determines "whether the defendant has so acted as to constrain buyer choices illegitimately." Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ("Areeda") ¶1752a. "The element of actual coercion is designed to weed out the many cases where the bundling of separate products is due to consumer demand." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016).

---

[8] *See, e.g.*, *Google EDVA*, 778 F. Supp. 3d at 835 (First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules, placed "restrictions on how publishers could work with rival ad exchanges"); *id.* at 864-65 (Google imposed the restraints to coerce publishers to use AdX when publishers would have otherwise used rival ad exchanges); *id.* at 864 (Dynamic Allocation's First Look was "artificially advantaging AdX"); *id.* at 864 (Google used monopoly power to make it "harder for customers to do business with" rival ad exchanges); *id.* at 865 (Last Look "entrenched Google's monopoly power" in the ad exchange market); *id.* at 865 (Dynamic Revenue Share compounded anticompetitive effects of Last Look); *id.* at 865 (Unified Pricing Rules were coercive); *id.* at 855 (combining DFP and AdX further "intertwined" the two).

The EDVA Court held that Google coerced Publishers into using AdX by requiring its use to access unique Google Ads demand. *Google EDVA* at 861-63; RSOF ¶¶ 74, 78.

- "Google's tying DFP to AdX communicated to publishers that if they used a rival publisher ad server, they would be shut out of AdX's core functionality." *Id.* at 861.

- "Google effectively has 'coerce[d] the abdication of [publishers'] independent judgment.'" *Id.* at 862.

- Publisher "felt locked-in by dynamic allocation in DFP, which only gave AdX" and not other exchanges the "ability to compete with real-time bids." *Id.* at 862.

- "By effectively restricting the unique advertising demand offered by AdWords advertisers to AdX, Google has ensured that publishers would lose significant revenue if they did not use AdX." *Id.* at 863.[9]

As the EDVA Court found, "The 'unfair advantage' that First Look offered Google was built into the software that controlled the auction logic within DFP, and publishers could not toggle it off." *Google EDVA,* 778 F. Supp 3d at 827. In other words, when Publishers using DFP sought real-time demand from AdX, Google forced them to give AdX a first-look advantage, which allowed AdX to win even when rivals were willing to pay more. RSOF ¶¶ 77, 133, 135; PSOF ¶¶ 94-100. Similarly, Google strictly enforced Unified Pricing Rules and publishers were constrained by those rules if AdX was active. RSOF ¶¶ 182, 184; PSOF ¶¶ 82.h.

The coercion worked—as Google's sell-side 30(b)(6) witness testified, by 2020-2021, between 80 and 90 percent of all impressions that came to Google Ad Manager allowed AdX to compete. RSOF ¶¶ 74-77.

1. Google's restraints implemented the tie from DFP to AdX.

Contrary to Google's assertion (Mot. 12), there has been no "reframing" of the Act 2 tie as "a claim for tying DFP to restraints that discouraged the use of rival ad exchanges."

---

[9] *See also Fotobom Media v. Google*, 719 F. Supp 3d 33, 51 (D.D.C. 2024) (access to Google's "'must have' proprietary applications" "substantially motivates, if not coerces, Android OEMs and wireless carriers to preload" the tied product).

Publishers have asserted from the outset that Act 2 is a series of restraints that coerce DFP publishers to allow AdX to bid preferentially. RSOF ¶¶ 40, 81, 90. As this Court recognized, "In asserting an unlawful tie of the DFP ad server as the tying product to AdX as the tied product, the Publishers list several different categories of challenged practices, including Dynamic Allocation, EDA and Dynamic Revenue Sharing. (Pub. Compl't ¶¶ 205-06.)." *Google II*, 721 F. Supp 3d at 263.[10] Accordingly, Google's string-cited cases rejecting a tying claim in the absence of two products or services (Mot. 11-12 & n.12) are inapposite.

    2.  <u>No minimum percentage of the tied product market must be foreclosed.</u>

    Google's reliance (Mot. 10-11) on arbitrary numerical cut-offs to show the absence of coercion ignores that publishers could use DFP to sell their impressions on other exchanges *only* when AdX did not match the price and had passed on the impression after exercising its First Look option. RSOF ¶¶ 82, 135. No bright-line percentage threshold of foreclosure is required.[11]

    Whether AdX bidders passed on impressions does not alter the fact that Dynamic Allocation gave AdX a competitive advantage every time AdX competed for an impression (RSOF ¶¶ 74-78, 133, 135). Google's reliance on *In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig*., 2010 WL 882989 (S.D.N.Y. Mar. 5, 2010), is misplaced. There, customers had a choice: the "Premium Cable Services" (the tying product) "are available through

---

[10] Google (Mot. 11) mischaracterizes Prof. Elhauge's Report as alleging a "claim for tying 'DFP to *restraints* that discouraged the use of rival ad exchanges.'" As Prof. Elhauge's report headings and deposition clearly reveal, the restraints are the mechanism through which DFP and AdX were tied: Elhauge Rep. §VII.A.4 ("The Restraints Tying Google's DFP Ad Server to Use of Its AdX Ad Auction Platform"); Elhauge Reb. §III.A.4 (same); RSOF ¶ 90.

[11] "What percentage is 'high' depends on the rationale invoked to support liability. . . While any line is arbitrary, we would require 90 percent bundling to make persuasive *otherwise insufficient evidence of a tying condition*". Areeda ¶1756d2 (emphasis added). Google's cases using percentage tests (Mot. 10) questioned whether a tie existed or merely represented customer choice. *It's My Party v. Live Nation Ent't*, 811 F.3d 676, 685 (4th Cir. 2016) (noting "little basis for concluding that artists were coerced into taking the tied product" and describing tying evidence as "pure speculation by a competitor"); *Innovation Data Processing v. IBM*, 585 F. Supp 1470, 1474-75 (D.N.J. 1984) (where tying product was available both with and without tied product, evidence that 15% of customers did not purchase tied product highlighted non-illusory nature of options).

the use of a 'CableCARD,' which permits a subscriber to access services without utilizing a Time Warner supplied cable box" (the tied product). *Id.* at \*1. In contrast, here, Publishers lacked a choice: the competitive advantage Dynamic Allocation provided to AdX applied auto-matically. RSOF ¶¶ 74-78, 135; PSOF ¶¶ 82.d. And, complete foreclosure of the tied product is not required to establish a tie where the restraints imposed systematically favor defendant over equally efficient rivals. *Northern Pacific*, 356 U.S. at 11-12 (rejecting the same argument made here asserting no unlawful tie where customers were "free" to use competitors' services).[12]

As Publishers' technical expert Anand Das explained, third-party exchanges won impressions because Google declined lower value impressions, thereby reinforcing and further entrenching AdX's advantage over rivals. RSOF ¶ 82.[13] That Google allowed rival exchanges to win impressions that AdX bidders under-valued "does not preclude a finding of coercion" as to those impressions that AdX bidders captured through First Look. *See Knoll Int'l*, 587 F. Supp at 1400 ("Plaintiff's willingness to purchase some number of systems does not preclude a finding of coercion as to additional and unwanted quantities.").

3. Publishers' use of DFP for purposes distinct from putting AdX into real-time competition with rival exchanges does not negate coercion.

Google also argues (Mot. 10) that Publishers fail to establish coercion because some publishers who used DFP did not qualify for AdX. Google cites Plaintiffs' expert Prof. Elhauge

---

[12] *Compare* Appellant Br., *Northern Pacific Railway v. U.S.*, 1957 WL 87595, at \*15-18 (2006) (arguing no unlawful tying since "purchasers and lessees [were] free to use the services of other transportation agencies, where rates are less or service better") *with* Mot. 2 (arguing no Act 2 tie since "Publishers that use DFP have been free to transact with more than a dozen non-Google ad exchanges"); *see also* Areeda ¶1756d2.

[13] As Mr. Das notes, ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████

as saying Google ████████████████████████████████████████

misleadingly omitting the key phrase ████████████ RSOF ¶ 81.  Act 2 has always focused

on Publishers' use of the DFP ad server as the only means of accessing AdX's core, real-time

bidding function to put multiple exchanges into competition to maximize publisher revenue.

PSOF ¶¶ 57-60, 75.  Although DFP can be used for other purposes, such as AdSense backfill or

direct deals (which are consummated outside the relevant ad exchange market), that does not

undermine the existence of an Act 2 tie when DFP is used to secure competitive bids on AdX

and competing ad exchanges.  *See, e.g., Fortner Enters. v. U.S. Steel*, 394 U.S. 495, 503-504

(1969) ("the proper focus of concern" is seller's power "to raise prices, or impose other

burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the

market"); *Fotobom Media*, 719 F. Supp 3d at 52 (permitting tying claim to proceed despite

Google's exclusion of significant segment of market—Samsung Android devices—from the tie).

When, in 2018, Google allowed third-party exchanges to submit real time bids to DFP through

Exchange Bidding, Google insisted that AdX be permitted to bid on every impression, again

through Dynamic Allocation (for remnant inventory) or Enhanced Dynamic Allocation (adding

guaranteed inventory).  RSOF ¶ 78 ("Exchange Bidding requires publisher to have the DFP

account be mapped to an AdX account which is also set as the default for dynamic allocation").

For the above reasons, Google's challenge to Publisher's Act 2 is unavailing.

## II.    Google Is Not Entitled to Summary Judgment on the Act 1 Tying Claim.

### A.  Publishers' Damages Model Satisfies *Comcast* Even If Act 2 Is Not a Tie.

Google argues that if Act 2 is not a tie, then Publishers' damages model fails because it

"combines the damages allegedly arising from both" Acts 1 and 2.  Mot. 12-14.  But even if the

restraints constituting Act 2 are not deemed a tie, Prof. Elhauge's damages methodology

nonetheless shows that Publishers' "damages stemmed from *the defendant's actions* that created

the legal liability." *Sykes,* 780 F.3d at 88 (emphasis added) (interpreting *Comcast*, 569 U.S. 27).[14]

Prof. Elhauge assessed whether various restraints contributed to Google's maintenance of monopoly power in the ad exchange market. Prof. Elhauge uses the term "Act 2 tie" to refer to the restraints that Google used to coerce users of DFP to advantage AdX over its rivals. PSOF ¶ 60; RSOF ¶ 40, 90. Although the restraints underlying Act 2 were not characterized as a tie in the EDVA trial where DOJ did not so allege, the EDVA Court nevertheless held that those same restraints were coercive and exclusionary under Section 2, *see Google III,* 2025 WL 3012840, at *9 (citing *Google EDVA* , 778 F. Supp. 3d at 864-65), and that those restraints together with Act 1 foreclosed competition in the ad server and auction platform markets, *Google EDVA*, 778 F. Supp. 3d at 872.

Plaintiffs' allegation that a series of restraints constitutes both a *per se* illegal tie and, separately, a part of a Section 2 scheme is not unique. *See, e.g.*, *Visa Check/MasterMoney*, 280 F.3d at 129-30 (plaintiffs alleged that the same defendants' policies represented both unlawful tying under Section 1 and anticompetitive conduct under Section 2); *Viamedia*, 951 F.3d at 467-68 (plaintiff's labeled the same conduct as both a *per se* illegal tie and a monopolization claim).[15] Thus, even if, despite the points made in § I above, the restraints were held not to

---

[14] *Comcast* stands for the proposition that where an antitrust claim has multiple distinct components, but only one remains viable, the damages model must take care to measure damages flowing only from "the wrong". *Comcast*, 569 U.S. at 36-38. But Publishers here measure damages from a single monopolization scheme, which Judge Brinkema already found to be illicit. Whether the restraints that fall under the label "Act 2" are deemed a tie or are treated as illegal for the reasons the EDVA Court already found, Publishers would still measure damages only from the "wrong", and thus there is no *Comcast* issue.

[15] *See* discussion of *Viamedia* in note 7 above. *See also United States v. Microsoft*, 253 F.3d 34, 84 , 50-51 (D.C. Cir. 2001) (*en banc*) (where the "facts underlying the tying allegation substantially overlap[ped] with those . . . in connection with the § 2 monopoly maintenance claim," despite reversing the district court's finding that the challenged conduct constituted a Section 1 tying violation, the court nonetheless affirmed the finding that the same conduct was unlawful monopolization under Section 2); Areeda ¶ 777 ("Tying law's technical requirements were developed largely because the so-called *per se* rule against tying has a significant potential to overreach, particularly when applied to nondominant firms.").

constitute an Act 2 tie, Publishers may still recover damages flowing from those acts, *Sykes*, 780 F.3d at 88, particularly where those acts have been found anticompetitive both standing alone and as part of a monopolization scheme, *Google III*, 2025 WL 3012840, at *9, *17.

Further, Publishers' damages analysis is independent of whether the restraints are collectively viewed as a tie or categorized as a series of restraints designed to coerce users of DFP to allow AdX to bid preferentially.[16]  Prof. Elhauge is testifying as an economist about the economic implications and effects of certain conduct.  *See* RSOF ¶¶ 81, 90.  As this Court recognized, "Act 2" is a label that Publishers and Prof. Elhauge apply to conduct designed to coerce DFP publishers to use AdX on grounds other than the merits.  PSOF ¶ 60; *see also* RSOF ¶ 40; *Google II*, 721 F. Supp. 3d at 263.[17]  The application of legal labels to Google's conduct does not change its economic character or effect.  The coercive conduct underpinning Act 2—whether deemed a tie, a monopolization claim, or both—harms competition and inflates prices *in the same way*: by foreclosing competition, maintaining or enhancing the incumbent's market power, and leading to artificially inflated prices.[18]  As Prof. Elhauge testified, ████████████
████████████████████████████████████████████████████████████████ *See*

---

[16] Prof. Elhauge recognized in selecting his yardstick that the restraints that form the Act 2 tie ████████
████████████████████████████████████████████████████ PSOF ¶ 152.  In other words, Prof. Elhauge's yardstick reflects a competitive environment where publishers could use non-Google ad server equivalents ████████████████ to reach Google's ad auction platforms, PSOF ¶ 153; RSOF ¶ 199; *In re Google Digital Advertising Antitrust Litig.* ("*Google IV*"), 2025 WL 3562687, at *11 (S.D.N.Y. Dec. 12, 2025), and applies whether those conditions obtained due to unravelling of ties or undoing of other exclusionary conduct with the same effect as ties.  *See also* ¶¶ RSOF 90, 199-204.

[17] In *Google II*, 721 F. Supp. 3d at 263, the court recognized: "In asserting an unlawful tie of the DFP ad server as the tying product to AdX as the tied product, the Publishers list several different categories of challenged practices, including Dynamic Allocation, EDA and Dynamic Revenue Sharing. (Pub. Compl't ¶¶ 205-06)".

[18] Google's own expert Dr. Gregory Leonard recognized ████████████████████████████████████
████████ PSOF ¶ 174; *see also Cumulus Media New Holdings v. Nielsen Co. (US)*, 2026 WL 63294, at *12 (S.D.N.Y. Jan. 8, 2026) ("Competition is hindered when" tying "arrangements insulate inferior products from competitive pressures or create barriers to entry of new competitors in the market for the tied product.").

RSOF ¶ 81.  Accordingly, whether Google's anticompetitive restraints are deemed a tie or treated as part of the Section 2 monopolization claim does not bring *Comcast* into play.

**B. Publishers' Damages Model is Consistent with Their Liability Theory.**

Google argues (Mot. 12, 14-15) that the only form of damages consistent with the Act 1 tie (from AdX to DFP) would be overcharges on DFP such that Publishers' damages model that computes overcharges on AdX creates a "mismatch" between Publishers' liability theory and their damages methodology.  *Id*.  Google's argument fails for three reasons.

*First*, as discussed above, even if the Court were to decide that the conduct constituting Act 2 did not satisfy the elements of a *per se* illegal tie, Google is estopped from contesting whether those restraints, collectively with Act 1, comprise a valid claim for monopolization of the advanced ad server and advanced auction platform markets.  *See Google III,* 2025 WL 3012840, at *9 (citing *Google EDVA*, 778 F. Supp. 3d at 864-65); *Google EDVA*, 778 F. Supp. 3d at 872.  The Court has held that where, as here, various restraints act together to impair competition under a monopolization theory, their impact is to be assessed based on their combined effects.[19]  *In re Google Digital Advertising Antitrust Litig.* ("*Google I*"), 627 F. Supp. 3d 346, 381 (S.D.N.Y. 2022) ("there is nothing remarkable" in an allegation that "purportedly unlawful schemes were 'more powerful' because of their 'combined effect'").[20] This monopolization scheme enhanced Google's monopoly power in the advanced ad server and

---

[19] Abundant evidence supports that the restraints comprising Act 1 and Act 2 act synergistically to cause harm.  *E.g.*, RSOF ¶¶ 39-40, 49-50, 74-78; PSOF ¶¶ 168-180.

[20] *See also id.* ("the Court must avoid 'tightly compartmentalizing the various factual components' of a plaintiff's claims and 'wiping the slate clean after scrutiny of each.").  In antitrust course of conduct cases, courts routinely hold that damages models need not disaggregate damages associated with each unlawful act.  *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *23 (S.D.N.Y. Jan. 26, 2021); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *12 (S.D.N.Y. Jan. 30, 2025) ("It is not . . . necessary for a damages model to fully disaggregate the damages associated with each unlawful act, particularly where the various unlawful acts are interconnected."); *US Airways v. Sabre Holdings* (*"Sabre IV"*), 2022 WL 1140291, at *1-2 (S.D.N.Y. Apr. 18, 2022).

ad exchange markets, *Google EDVA*, 778 F. Supp. 3d at 864-66, served to "entrench AdX as the dominant ad exchange and DFP as the dominant publisher ad server," *id*. at 868-69, and Act 1 and the restraints underlying Act 2 combined to "reduce competition in the ad exchange market", *id*. at 869-71.

*Second*, Google's argument (Mot. 12) that because tying involves the impairment of competition in a tied market, harm is limited to the tied market would fail even if the only claim were the Act 1 tie.  In *Microsoft*, the court found that foreclosing competition in the tied market (internet browsers) had anticompetitive effects in the tying market (Microsoft operating system). *Microsoft*, 253 F.3d at 60-62.  Likewise, as discussed above (§ I), Act 1 cemented Google's dominance in the ad server market, which in turn enabled Google to maintain control of both the ad server and ad auction platform markets.[21]  Thus, the harm was experienced in both markets.

Moreover, Google's "mismatch" contention (Mot. 14-15) contradicts the position it advanced in opposition to class certification where Google argued that in computing damages from a tie, both *the tied and the tying* markets must be evaluated.  *Google IV,* 2025 WL 3562687, at *18 (summarizing Google's argument); PSOF ¶ 160.  Without deciding whether Google's suggested package model (of netting the effects across the tied and tying products) was correct, this Court credited Prof. Elhauge's analysis showing that "in a competitive market without tying, the price of DFP would be lower."  *Id*. at *19.  Google concedes that Prof. Elhauge opined that Google's conduct inflated prices for DFP as well as for AdX.  *See* Mot. 14, n.17 (citing *Google IV*, 2025 WL 3562687, at *18-19).[22]  Thus, Google has admitted both that effects in

---

[21] *See also Google EDVA*, 778 F. Supp. 3d at 869 (the Act 1 tie worked "to entrench AdX as the dominant ad exchange and DFP as the dominant ad server"); *id*. at 857 (same); *see* RSOF ¶ 50; PSOF ¶¶ 38-46.  None of Google's cited cases at Mot. 14-15 & n.17 relates to monopolization claims where, as here, the conduct is alleged to impair competition in both the tying and tied markets.  Nor do any of the cases cited by Google at Mot. 18 hold or state that damages for tying can only be sought in tied markets.

[22] Prof. Elhauge conservatively excluded overcharges on DFP from his damages model.  *See* RSOF ¶¶ 56, 188.

either a tying or a tied market are appropriate damages and that the Act 1 tie harmed competition

in both the tied and tying markets.

*Third*, Judge Brinkema found that the anticompetitive effects of the Act 1 tie were

experienced in both the tied and tying markets: monopolizing the advanced ad server market

allowed Google to use that power to impair competition in the market for ad exchanges.[23]

Indeed, the evidence makes clear that ad servers, ad platforms, and ad buying tools are distinct

products that operate together.  PSOF ¶¶ 38, 64-72; RSOF ¶¶ 30-33.  In particular, by

dominating the advanced ad server market, Google positioned itself to implement the restraints

that facilitated Google's dominance of the advanced ad exchange market.  PSOF ¶¶ 38-46,

78-80; 169, 172; RSOF ¶¶ 39-40, 50, 75.  Thus, the Act 1 tie had anticompetitive effects in both

the ad server and ad exchange markets.  These findings are consistent with well-established

economic literature showing that ties can cause anticompetitive effects in tying markets.[24]

## III.  <u>Publishers' Claims Are Timely.</u>

Google improperly seeks to avoid responsibility for its illegal conduct by making

timeliness arguments that are not supported by the law or the facts.[25]

### A.  **Publishers' Adx Claims Are Timely Because They Are Based on an Evolving Course of Conduct That Continued to Inflict New and Accumulating Injuries.**

Publishers seek damages for the new and accumulating injuries they incurred starting

four years prior to filing suit and continuing through the Class period.  Publishers suffered such

---

[23] *See, e.g.*, *Google EDVA*, 778 F. Supp. 3d at 863 ("the AdX-DFP tie . . . facilitates the billions of dollars of revenues that AdX generates annually"); *id.* at 857 (describing the claim as "tying DFP to AdX to lock in publishers into exclusively using Google's sell-side ad tech tools" including AdX "rather than those offered by competitors").

[24] *See* Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harvard Law Rev. 397, 417-419 (2009) (Plf. Ex. 192) (collecting literature).

[25] "Because a statute of limitations is an affirmative defense," the defendant "bears the burden of proof to show it bars the claims."  *NYSEG v. FirstEnergy*, 766 F.3d 212, 230 (2d Cir. 2014); *see Szymanski v. Local 3, Int'l Bhd. of Elec. Workers*, 577 Fed. App'x. 52, 53-54 (2d Cir. 2014).  Separately, Google failed to move to dismiss on timeliness despite relying on allegations in the Complaint.  *See* DSOF ¶ 49; PSOF ¶¶ 5, 8.

injuries each time they paid a take rate that was inflated as a result of Google's evolving anticompetitive scheme. PSOF ¶¶ 37, 132, 178-182; RSOF ¶ 49; *see also* § II, above. Under the Clayton Act, "'each time a plaintiff is injured by an act of the defendants'", "'a cause of action accrues to him to recover the damages caused by that act,'" and as "'to those damages, the statute of limitations runs from the commission of the act.'" *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 295 (2d Cir. 1979) (quoting *Zenith Radio v. Hazeltine Research*, 401 U.S. 321, 338 (1971)). A "purchaser . . . is not harmed until the monopolist actually exercises its illicit power to extract an excessive price." *Id.* Thus, "So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers," purchasers who suffered such an overcharge may sue for damages starting four years before suit. *Id.* at 295-96.[26] The Supreme Court recognized the continuing violation rule in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)[27]:

> "Antitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'"

Here, as in *Hanover Shoe v. United Shoe Mach.*, "we are dealing with conduct which constituted a continuing violation of the Sherman Act, and which inflicted continuing and

---

[26] *See* Areeda ¶ 320c4 ("Customers of the monopolist are not injured until after the monopolist causes them injury through higher prices" and, "When a §2 action is filed in a timely fashion, the customer will be able to collect damages for the four years prior to filing and will be able to rely on pre-limitation conduct in order to establish the exclusionary practices portion of a monopolization claim."); *US Airways v. Sabre Holdings* ("*Sabre III*"), 2022 WL 1125956, at *6 (S.D.N.Y. April 15, 2022) ("US Airways can seek § 2 claim damages arising from other monopolizing conduct" (not arising solely from the contractual restraints) including "anticompetitive conduct beginning in or about 2004 to 2012" "provided that the resulting injury occurred during the four years preceding the filing"); *Connecticut v. Sandoz, Inc.*, 2025 WL 3043397, at *9 (D. Conn. Oct. 31, 2025); *In re Seroquel XR Antitrust Litig.*, 2022 WL 2438934, at *9-10 (D. Del. July 5, 2022); *Precision Assocs. v. Panalpina World Transp.*, 2011 WL 7053807, at *47-48 (E.D.N.Y. Jan. 4, 2011); *Sabre IV*, 2022 WL 1140291, at *1-2.

[27] Although *Klehr* concerned RICO accrual issues, it described the "well established" accrual rule under the Clayton Act since "Congress consciously patterned civil RICO after the Clayton Act." *Id.*, 521 U.S. at 183, 188-90.

accumulating harm on" the Class.  392 U.S. 481, 502 n.15 (1968).  Google's restraints leading to and maintaining its monopoly power were effectuated by a continuing course of "mutually reinforcing", evolving conduct that included coercing Publishers using DFP to use AdX and *vice versa* and that collectively caused new and accumulating harm.  PSOF ¶¶56, 143, 168-72; RSOF ¶¶ 39, 49-50, 75-78.  Google's course of conduct was not static or otherwise the result of an act taking place at a single, pre-limitations point in time; instead, Google's scheme to maintain its monopoly power, sustain its supracompetitive take rate, and drive volume to AdX and away from competitors deliberately evolved through Dynamic Allocation (with its First Look and Last Look) as amplified by Dynamic Revenue Share (in multiple versions) and expanded by Enhanced Dynamic Allocation and then as replaced by Uniform Pricing Rules after Google finally shifted to first price auctions.  PSOF ¶¶ 82-127, 168-172.  This course of conduct has allowed Google to charge a consistently supracompetitive 20% take rate that class members had to pay throughout the limitations period, including on volume that Google gained throughout that period by virtue of its illegal restraints.  PSOF ¶¶ 173-181; *see also* RSOF ¶¶ 39, 49-50, 75.

The claims of the AdX Class are timely because each Class member suffered a new injury every time that it paid Google the take rate that was inflated by virtue of the combined effect of Google's evolving restraints—restraints neither set in any pre-limitations contract nor the result of some other pre-limitations single act.  *See Berkey Photo*, 603 F.2d at 295-96; *Sabre III*, 2022 WL 1125956, at *6.  Not only did Google's illegal restraints evolve over time, but for Publishers, just as the purchasers analyzed in *Berkey Photo*, "at the time" of the "anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future" including because the "amount of their purchases" was not determined.

603 F.2d at 295-96.[28]  Because Google's anticompetitive conduct was designed to drive sales volume to AdX (*see* § I, above; PSOF ¶¶ 57-60, 74-82), the "damage that action will cause" was necessarily dependent upon the continued and evolving impact that Google's anticompetitive conduct would have throughout the limitations period.  *Berkey Photo*, 603 F.2d at 296.

The continuing violation rule articulated by the Second Circuit in *Berkey Photo* and the Supreme Court in *Klehr* and *Hanover Shoe* remains good law and Publishers' claims are not affected by *US Airways v. Sabre Holdings*, 938 F.3d 43 (2d Cir. 2019) ("*Sabre II*").

**B.  Google's Argument That *Sabre II* Makes Publishers' Claims Untimely Fails.**

Google's argument (Mot. 15-22) that Publishers' claims are untimely (i) erroneously seeks to apply *Sabre II*'s ruling, which unlike here was premised on the single overt act of entry into "a contract that violates the Sherman Act" and (ii) ignores the applicable conclusion of *Berkey Photo* and *Klehr* that "a monopolist commits an overt act each time it uses unlawfully acquired market power to charge an elevated price", *In re Seroquel XR Antitrust Litig.*, 2022 WL 2438934, at *10 (Connolly, C.J.) (brackets omitted).  *See Sabre II*, 389 F.3d. at 68-69; *Klehr*, 521 U.S. at 189; *Berkey Photo*, 603 F.2d at 295-96.

The *Sabre II* decision on which Google's timeliness arguments hinge analyzed the situation where "a plaintiff pays a defendant a supracompetitive pric*e pursuant to an anticompetitive contract to* which they are a party."  *Sabre III*, 2022 WL 1125956, at *6 (emphasis added) (citing *Sabre II*, 938 F.3d at 68-69).  *Sabre II* only applies to the exclusion of the well-established approach of *Berkey Photo* and *Klehr* if there is a single "'overt act'" before

---

[28] *See also US Airways v. Sabre Holdings* ("*Sabre I*"), 105 F. Supp. 3d 265, 277-278 (S.D.N.Y. 2015) (observing that while *Berkey Photo*'s purchaser rule "is logical in the case of monopoly," it is "less persuasive when the purchaser was a counterparty to an allegedly illegal contract, who knew when the contract was executed the allegedly inflated price it was required to pay and the allegedly anticompetitive effects of the contract" while also being able reasonably to estimate the damages as of entry into the 2006 contract); *Sabre III*, 2022 WL 1125956 at *6 (discussing rival vs. purchaser claims under *Berkey Photo*); Areeda ¶ 320c4 (discussing *Berkey Photo*).

the limitations period such as "the decision to enter the contract" containing all the anticompetitive restraints of the claim. *Sabre II*, 938 F.3d at 67-69. There is no basis to apply *Sabre II* merely because, as Google asserts (Mot. 21-22), a defendant can point to a contract price term entered prior to the limitations period. Instead, the contract itself must "violate the Sherman Act" and contain all the anticompetitive restraints of the claim such that the "'overt act,' the decision to enter the contract," occurred before the limitations period making "the performance of" the contract just a "manifestation of the 'overt act'". *Sabre II*, 938 F.3d at 67-69.[29] Further, in *Sabre II*, all the vertical restraints for the untimely claim were expressly contained within the 2006 contract between the plaintiff and defendant. *See id.* at 67; *Sabre I*, 105 F. Supp. 3d at 271-73 (describing the contractual restraints that made up the untimely claim).

The restraints complained of here, however, were not "contractual restraints" relating back to a single event of an "anticompetitive contract" containing the asserted restraints; they were part of an evolving scheme designed to maintain the market power to charge supracompetitive prices and shift volume throughout the limitations period. PSOF ¶ 33-129, 165-185; RSOF ¶¶ 49-50, 52; *see* §§ I-II, above. Google does not argue, nor could it, that Publishers' monopolization claim is based on restraints all contained in a contract entered before the limitations period. Indeed, Google has asserted the opposite in this MDL noting in opposition to class certification that the Act 1 and Act 2 ties included "non-contractual and purportedly coercive acts". PSOF ¶ 15. Accordingly, there is no pre-limitations static point at

---

[29] Indeed, Google recognizes in its instant motion that US Airways could "seek § 2 claim damages arising from other monopolizing conduct" that "is in addition to and independent of the 2006 contract" so long as "the resulting injury occurred during the four years preceding the filing of the lawsuit." Mot. 16 (citing *Sabre III*, 2022 WL 1125956 at *6). But Google there misrepresents Judge Schofield's analysis of the non-contractual conduct, claiming that "courts separately consider the timeliness of alleged 'schemes'"—Judge Schofield did not separately analyze the timeliness of the various components of Sabre's alleged course of non-contractual monopolizing conduct between 2004 and 2012, instead holding that if US Airways can prove that such "conduct resulted in damages within the four-year statutory period, then US Airways can recover those damages". *Sabre III*, 2022 WL 1125956 at *6.

which any class member knew or could have known the scope of the anticompetitive conduct through which Google would cause some known amount of harm.[30]

As such, *Berkey Photo* and *Klehr* control since "each overt act that is a part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again", permitting recovery during the entire limitations period.  *Sabre II*, 938 F.3d at 67 (quoting *Klehr*, 521 U.S. at 189)*; Berkey Photo*, 603 F.2d at 295-96 (recognizing from *Zenith* that "'Otherwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery'"); *Sabre III*, 2022 WL 1125956, at *6 (relying on *Berkey Photo*).[31]  Notably, Google buries its only reference to "the Second Circuit's important *Berkey Photo* decision", Areeda ¶ 320c4, and *Klehr* in a footnote (Mot. 22 n.33), attempting to distinguish them by asserting that neither discusses contracts with price terms.  As addressed above, such a distinction is inapposite since *Sabre II* makes clear that pricing in a contract is only relevant if the contract establishes the restraints making it a "contract that violates the Sherman Act" as a single overt act at its time of entry.  938 F.3d at 68-69.

Google's flawed reliance on supracompetitive rates memorialized in contracts that do not contain the challenged restraints (Mot. 21-22) is refuted by the reasoning of *Berkey Photo*:[32]

---

[30] Unlike Google's conduct, *Chalmers v. Nat'l Collegiate Athletics Ass'n*, 2025 WL 1225168, *9-10 (S.D.N.Y. Apr. 28, 2025) (cited Mot. 17 nn. 25, 26), and *Jenkins v. Nat'l Collegiate Athletic Conf.*, 2025 WL 3625934, *5 (S.D.N.Y. Dec. 15, 2025) (cited Mot. 17, n. 26), both involved agreements that prior to the limitations period established defendants' perpetual right to use the student-athlete's name, image, and likeness ("NIL"), the terms of which did not change.  The *Chalmers* and *Jenkins* courts found such agreements to constitute a single "overt act" prior to the limitations period making the claims untimely.  *Id*.  As *Chalmers* noted (*9), defendants' exercise of their contractual rights to use the athletes' NILs was "a textbook example" of the performance of a contract that was a manifestation of the overt act rather than an independent overt act.  Further, the language Google cites (Mot. 17) from *Chalmers* that the continuing violation doctrine is "heavily disfavored" comes from *Stouter v. Smithtown Central School District*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010), an employment discrimination case that in turn cites only other employment discrimination cases for that proposition.  In the antitrust context, the Supreme Court and Second Circuit have set out and upheld the continuing violations rule, which has been in place for decades.

[31] *See also* the authorities cited in note 26, above.

[32] Prices charged by a monopolist are often contractual.  Where those prices are supracompetitive, that is an effect of

"So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. . . . [T]here can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to extract an excessive price. . . . Moreover, it would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market control for four years after its last anticompetitive action, it may charge an exorbitant price until its power is eviscerated in an appropriate suit for equitable relief." *Berkey Photo,* 603 F.2d at 295-96.

Nor did *Sabre II* affect that analysis. *See Sabre III*, 2022 WL 1125956, at *6 (discussing same from *Berkey Photo*). Indeed, Google conceded in this MDL that *Berkey Photo* contemplates "recovery on continuing violations theory . . . where plaintiffs identify and seek to recover for overcharges paid within the previous four years".[33] PSOF ¶ 141.

Thus, the fact that components of Google's scheme occurred more than four years before filing does make any claims untimely. The new and accumulating harm by Google's collection of a supracompetitive price insulated from competition during the limitations period because of Google's evolving illegal "non-contractual" restraints is fully recoverable. Google's unjustified effort to stretch *Sabre II* well beyond its bounds would lead to the very "Untoward consequences" that underly the continuing violations rule and would vitiate enforcement of the antitrust laws. *See Berkey Photo,* 603 F.2d at 295.

---

monopoly power, not its cause. *See Humana v. Celgene*, 2022 WL 1237883, at *10 (D.N.J. Apr. 27, 2022) ("price [is] not a necessary aspect of the violation, and . . . supracompetitive prices flow as a consequence of both the violation and a voluntary decision of the monopolist. Accordingly, . . . the 'ongoing sales . . . at a supracompetitive price constitute a continuing violation.'").

[33] Notably, Google in that motion to dismiss Gannett's line-item capping claim argued that "Gannett does not allege that it suffered injuries in the form of overcharge damages that continued into the limitations period arising out of Google's" line-item caps; instead, Google noted that Gannett "claims" "that Google's alleged practice of limiting line items in 2017 pressured publishers like Gannett to switch to Exchange Bidding". PSOF ¶ 142. The Court granted Google's motion holding that Gannett's complaint described "a repeated manifestation of the same overt act". *Google II*, 721 F. Supp. 3d at 272-73.

### C. Google's Arguments Regarding the Timeliness of the Act 1 Tie Lack Merit.

While Google asserts (Mot. 21-22) that its supracompetitive rates "are specified by contract", Google does not, because it cannot, identify any contract it has with a class member that sets forth the challenged conduct such that Publisher's harm is simply a manifestation of a contract or other single event.[34]  As explained above, that places this case firmly within the confines of *Berkey Photo* and *Klehr*, rendering Google's remaining timeliness arguments regarding Act 1 meritless and irrelevant.

Google's assertion that "allegations of a 'scheme' do not make the Act 1 claim timely" (Mot. 16 (capitalization altered)) misses the point.[35]  Publishers' claims are timely because they allege evolving conduct that occurred throughout the limitations period from which they suffered new and accumulating injury under *Berkey Photo* and *Klehr* when Google charged supracompetitive prices and drove up AdX volume.  *See* § III.A, above.  Further, Google's attempt (Mot. 16-17) to atomize the components of its unlawful conduct contravenes the Court's admonition against "'tightly compartmentalizing the various factual components' of a plaintiff's claims and 'wiping the slate clean after scrutiny of each.'"  *Google I*, 627 F. Supp. 3d at 381.

---

[34] Indeed, Google's motion papers take the opposite position.  Mot. 19 (asserting that unified DFP-AdX contracts "*did not require* publishers to use both products" (emphasis in original)).  Further, Google is estopped from relitigating whether the Act 1 tie was "anticompetitive conduct" through which it "willfully acquired and maintained its monopoly power in the ad server and ad exchange markets."  *Google III*, 2025 WL 3012840, at *17; *id.* at *8.

[35] *CSX Transp. v. Norfolk S. Ry.*, 648 F. Supp. 3d 679 (E.D. Va. 2023) (cited Mot. 16 n. 23), is inapt because it analyzed the timeliness of CSX's claim that it "was harmed as a competitor to" defendant.  *Id.* at 702-03.  The *CSX* court discussed "what appears to be the leading case on" the "distinction" between the limitations period for an antitrust customer's claims versus a competitor's claims, *i.e.*, *Berkey Photo*: "in customer cases, new causes of action continue to accrue and new limitations periods begin running with each sale."  *Id.* at 701-02 (quoting *Berkey Photo*, 603 F.2d at 295: "Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price"); *see also Sabre III*, 2022 WL 1125956, at *6 (same).  *Applera Corp. v. MJ Rsch*, 349 F. Supp. 2d 338 (D. Conn. 2004) (cited Mot. 16 n.23), is also inapt as a competitor case and because the time-barred conduct was superseded by "an entirely new and different licensing program", the exclusionary effects of which were unconnected and unclear.  *Id.* at 353-54.

Google argues (Mot. 17-21) that Professor Elhauge's reference to two components of the conduct underlying the Act 1 tie that occurred during the limitations period—(1) its imposition of mandatory "unified" contracts, and (2) deprecation of AdX slots—do not make the Act 1 tie timely.  This contention rests on a misapprehension.[36]  Publishers' damages model derives from the combined effects of all of the restraints underpinning the Act 1 and 2 ties including the two components of those ties singled out by Google, which components *maintained* Google's monopoly power in the ad exchange market allowing it to continue to charge a stable, supracompetitive rate over time on increased volume to AdX.[37]  PSOF ¶¶ 178-181; *see* § II, above.  It is thus unremarkable (*see* Mot. 18) that Prof. Elhauge does not calculate some additional, incremental damages for those two aspects of the Act 1 tie given they were reinforcements and manifestations of Google's evolving scheme to maintain its monopoly power and its inflated pricing.[38]

And, Google's argument (Mot. 21-22) that payment of inflated prices does not make Act 1 timely because the "supracompetitive AdX rates are specified by contract" fails for the reasons stated above.  *See* § III.A-B; PSOF ¶¶ 178-181.[39]

---

[36] Further, Google's factual assertions on these issues are, at a minimum, contestable.  Google's assertion (Mot. 19) that not every Publisher was subject to minimum fees is irrelevant because at least *some* publishers were subject to minimum fees, which reinforced the anticompetitive effects of Act 1 felt by all Publishers.  PSOF ¶ 50; RSOF ¶¶ 53, 55-60.  And, although Google argues (Mot. 20-21) that its AdX ad slot deprecation did not require the use of DFP, Google's own evidence demonstrates ███████████████████████████████████████ ███████████████████████████████.  PSOF ¶¶ 52-53, 170, 179; RSOF ¶¶ 65, 67-72.

[37] In addition to being irrelevant to the timeliness of Plaintiffs' claims, Google's factual attacks (Mot. 16 n.24, 19) on its use of unified contracts preceding its public bundling of DFP and AdX and of Unified Pricing Rules appear to be an attempt to relitigate those acts contrary to this Court's ruling on collateral estoppel.  *See Google III*, 2025 WL 3012840, at *17; *see also Google EDVA*, 778 F. Supp. 3d at 855 ("Once DFP had obtained near-total market share, Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX."); *id.* at 831("The overall result of Unified Pricing Rules was that Google's ad tech products continued to gain scale in the display advertising space while rival ad tech products lost scale.").

[38] Because Google's arguments on the timeliness of these components of Act 1 are irrelevant, so too is its invitation (Mot. 19-20 & n.29) to reopen class certification issues.

[39] Google's laches argument (Mot. 15 n. 19) fails as "laches is not a defense to an action filed within the applicable

**D. The Challenged Conduct Giving Rise to Act 2 Is Not Time Barred.**

Google asserts (Mot. 40-41) that monopolization claims based on Dynamic Allocation and Dynamic Revenue Share are time-barred because "those programs began more than four years before the claims were first asserted."[40]  As explained above, because Google's restraints are not part of a single overt act such as the entry into an anticompetitive contract, it is irrelevant whether such restraints existed in one form or another prior to the limitations period given that they were part of Google's evolving scheme to maintain monopoly power so it could charge a supracompetitive take rate on volume increased by that very scheme.  *See* § III.A-B, above.

Google's conduct was not simply the implementation of one act, *e.g.,* Dynamic Allocation; instead, Google continued to enhance, expand on, and apply Dynamic Allocation as part of its course of conduct to maintain its monopoly power throughout the limitations period, sustaining its ability to charge supracompetitive pricing.  PSOF ¶¶ 90-93, 171-172, 175-177; RSOF ¶¶ 133-135, 140; *see* § V.A.  Likewise, Google made fundamental and new adjustments to its Dynamic Revenue Share's variation of the take rates on publishers' transactions including in December 2016 (*e.g.*, DRS v2.0—which allowed Google to increase its take rate to recoup losses from having lowered it to win other transactions) that reinforced and maintained its monopoly power.  PSOF ¶¶ 111-118, 180; RSOF ¶¶ 169-173, 191.  And, Google engaged in its conduct regarding key aspects of Dynamic Revenue Share in secret concealing its operation from publishers such that this conduct was not known or understood until within the limitations period, providing a basis for fraudulent concealment tolling.  PSOF ¶¶ 111-119; RSOF ¶¶ 172-174.[41]

---

statute of limitations", *United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) (brackets omitted), and as "raised only in a footnote" it is not adequately before the Court.  *See, e.g.*, *Caiola v. Citibank*, 295 F.3d 312, 328 (2d Cir. 2002).

[40] Google does not challenge the timeliness of Unified Pricing Rules, which commenced in 2019.  *See* Mot. 40-41.

[41] Fraudulent concealment occurs where an antitrust plaintiff can establish: "(1) that the defendant concealed from

### E.  Publishers' AdSense Claims are Timely.

Google's related arguments (Mot. 34) with respect to AdSense, asserting that the Act 3 and 4 ties began more than four years before filing, fail for the reasons discussed above.  *See* § III.A-B.  The conduct that constituted the AdSense ties included more than contractual provisions, *see* § IV, below, and even where based on contract, Google's terms of service make clear that its AdSense contracts with Publishers are evolving with services that are "constantly changing" and that Google may "modify the AdSense Terms at any time."  PSOF ¶¶ 210.[42]

## IV.  **The Act 3 and 4 AdSense Claims Survive Summary Judgment.**

### A.  **Evidence Supports the Elements of the AdSense Tying Claims (Act 3 and 4).**

Google deprived AdSense Publishers of the ability to choose to use the two AdSense products separately.[43]  There is a dispute of material fact as to whether (a) the AdSense Ties are *per se* illegal under Section 1, and/or (b) together constitute a valid monopolization claim under Section 2.  Act 3 results from Google's requirement that AdSense auction platform users must use a Google ad server (either DFP or the "AdSense Tag").  PSOF ¶ 214; RSOF ¶ 41.  Act 4 results from Google's requirement that AdSense Tag users must use the AdSense auction platform.  PSOF ¶ 215; RSOF ¶ 42.  These restraints together coerce publishers to sell

---

him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part."  *Photo Inc. v. Meta Platforms*, 123 F.4th 592, 603 (2d Cir. 2024)); *see also Google I*, 627 F. Supp. 3d at 406 ("conduct on the part of Google that lacked transparency, occurred out of the public eye, and had effects that were not immediately obvious or well understood").

[42] Further, because Google's conduct in the advanced ad server and ad exchange markets caused anticompetitive harm in the basic ad server and basic auction platform markets, Google's overt acts with respect to the advanced ad auction submarket likewise restarted the AdSense claim limitations period with each new act and each new overcharge.  *See* PSOF ¶ 215.

[43] *Hill v. A-T-O*, 535 F.2d 1349, 1353 (2d Cir. 1976) (emphasis in original) ("buyers" subject to ties "are forced to forego their free choice between competing products"); *Google EDVA*, 778 F. Supp. 3d at 865 (Google's restraints "constituted anticompetitive conduct because it involved Google using its coercive monopoly power to deprive its publisher customers of a choice that they had previously exercised to promote competition"); *Google EDVA*, 778 F. Supp. 3d at 867 ("This tying has had the anticompetitive effect of limiting Google's publisher customers' choice of publisher ad server for reasons other than competition on the merits.").

impressions using the AdSense auction platform and prevent the use of competitive alternatives, PSOF ¶ 216, thereby enabling Google to monopolize the basic ad server and basic auction platform sub-markets.

The AdSense Ties are *per se* ties because they involve: (i) the sale of a product conditioned on the purchase of a separate product; (ii) coercion of tying product buyers to purchase the tied product; (iii) sufficient economic power in the tying product market to enable such coercion; (iv) anticompetitive effects; and (v) a not insubstantial amount of interstate commerce. *See Kaufman*, 836 F.3d at 141. Exclusionary conduct may violate Section 2 even if it is not a *per se* illegal tie. *See* nn.7, 15, above.

Google executives recognized that AdSense publishers ███████████████████████ ███████ and must pay Google's monopoly price for the AdSense package. PSOF ¶ 217; RSOF ¶ 94. Google admits that the ties are coercive: publishers must use a Google ad server product to reach Google's AdSense auction platform, PSOF ¶ 215; RSOF ¶ 100, and publishers using Google's basic ad server (the AdSense Tag) must sell their impressions exclusively via the AdSense auction platform, PSOF ¶ 216; RSOF ¶ 96. Google's three arguments disputing the *per se* illegal tie fail.

    1.   <u>AdSense consists of two distinct products.</u>

Google argues (Mot. 30-32) that AdSense is a unitary product because Google never sold a basic ad server and a basic auction platform separately. But if monopolists could defend tying by selling two products together, tying as an antitrust violation would be vitiated. *See AngioDynamics*, 537 F. Supp. 3d at 308 (denying summary judgment despite products never

having been sold separately by defendant); *see also* PSOF ¶ 218.[44]  In determining product distinctiveness, courts evaluate the "consumer demand" for the separate products.  *Id.* at 306-07.

Because the demand for particular ad server functionalities is distinct from the demand for the auction platform, it follows that a material number of publishers would purchase the AdSense Tag and Auction Platform separately.

- Google recognized distinct demand for the two components and identified AdSense Tag-using publishers' desires to use multiple auction platforms simultaneously. PSOF ¶¶ 219-220; RSOF ¶ 126, *see AngioDynamics*, 537 F. Supp. 3d at 307.

- Google  *See, e.g.*, PSOF ¶ 221; RSOF ¶ 126.

- Google concluded ███████████████████████████████████████ PSOF ¶¶ 219, 222; RSOF ¶ 126.

-  Google sells the AdSense auction platform for use with its different ad servers (AdSense Tag or DFP).[45]  PSOF ¶ 214; RSOF ¶ 100.

Basic ad servers and auction platforms are offered "separately in similar markets."[46]

Indeed, in the "similar" ad tech stack for in-app impressions, *Google IV*, 2025 WL 3562687, at *12, Google offers the functionality of AdMob's auction platform (comparable to AdSense) separately from Google's SDK (its ad server product for in-app impressions).  PSOF ¶ 223 (Google allowed non-Google SDKs to connect to Google's AdMob's auction platform).

---

[44] Further, Google should be estopped from making this argument because it previously argued that The Progressive did not buy the AdSense package and instead purchased only the auction platform while utilizing a different ad server (DFP).  *See* PSOF ¶ 211.  *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (judicial estoppel "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment").

[45] *Klein v. Meta Platforms*, 766 F. Supp. 3d 956, 963-64 (N.D. Cal. 2025) (cited Mot. 31), is inapt because it did not address the presence or absence of demand sufficient to identify a separate product market; rather, it addressed whether the "preliminary discussions" at issue were sufficiently concrete to support a damages theory (and thus antitrust injury).  The point here is not that Google considered offering a feature but that when investigating such an offering, Google determined that the *demand* for it existed.  PSOF ¶¶ 219, 222.

[46] *AngioDynamics*, 537 F. Supp. 3d at 307 (quoting *Kaufman*, 836 F.3d at 142).

Google treated the AdSense components separately from each other—different employees handled the tag operations and the auction platform and contemporaneous internal documents treat the AdSense products as distinct.  PSOF ¶¶ 224-225.

### 2.  Google has market power in the Basic Ad Servers market.

Google's AdSense Tag provides Google with market power in the basic auction platform market.  PSOF ¶¶ 230-239.  Although a Section 2 claim requires a showing of "monopoly power," *Ortho Diagnostic Sys. v. Abbott Lab'ys*, 920 F. Supp. 455, 465 (S.D.N.Y. 1996), *as corrected* (Mar. 22, 1996), a Section 1 tying claim only requires a showing of "economic power," *i.e.*, an "advantage not shared by . . . competitors in the market."  *U.S. Steel v. Fortner Enters.*, 429 U.S. 610, 620 (1977); *see Yentsch v. Texaco*, 630 F.2d 46, 58 (2d Cir. 1980).

Market power can be shown by direct evidence (reduced output, increased prices, or decreased quality) or indirect evidence (high market share plus barriers to entry).[47]   Google's monopoly power in Basic Ad Servers is demonstrated under either test.

Google charged durable supracompetitive take rates for the AdSense package ██████████████████████████—for 15 years, constituting direct evidence of Google's monopoly power.  PSOF ¶¶ 232-236; RSOF ¶ 108.  Moreover, Google's executives have admitted that AdSense has no competition.  PSOF ¶ 237; RSOF ¶¶ 94, 108.  Indirect evidence includes the dominant share of the AdSense package in the basic auction platform market and high barriers to entry.[48]  PSOF ¶¶ 228-231; RSOF ¶¶ 108, 110.

---

[47] *See, e.g., Todd v. Exxon*, 275 F.3d 191, 206 (2d Cir. 2001) (evidence of "actual adverse effect on competition" "arguably is more direct evidence of market power than calculations of elusive market share figures"); *Toys R Us v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (market power may be proved through direct evidence or by proving relevant markets and showing defendant's share exceeds whatever threshold is important in the practice of the case).

[48] At a minimum, the factual dispute over the AdSense Tag's market power (*see* Mot. 29) makes summary judgment inappropriate.  Similarly, Google's criticism of Prof. Elhauge's citation to the "6sense" source (Mot. 29) mischaracterizes the results of that sources' analyses, which consistently showed that Google's market share ranged from 71% to 89% during the June 2024 to February 2026 period.  PSOF ¶ 227.

Google does not contest that there are triable issues of fact as to whether the AdSense auction platform is the only basic ad auction platform (with functionally 100 percent of that market), PSOF ¶ 231; RSOF ¶¶ 94, 96, and whether any rival basic ad servers to the AdSense Tag have any significant market presence, PSOF ¶¶ 226-27; RSOF ¶ 108.  Nor has Google sought to exclude Prof. Elhauge's relevant market analyses showing a relevant antitrust submarket for basic auction platforms, PSOF ¶ 229, and that Google has monopoly power in the markets of the two tied products, PSOF ¶¶ 226-37; RSOF ¶¶ 94, 96, 108.  Thus, there are genuine issues of fact whether, as the monopolist in both markets, Google has sufficient economic power to coerce publishers to use the AdSense Tag to reach the AdSense auction platform and *vice versa*.  This two-way tie locks in Google's monopoly power in the basic auction platform submarket.[49]

The vitality of the Act 3 tie of the AdSense auction platform to the AdSense Tag is independent of the Act 4 tie, since overcharges from foreclosing the tied product market can occur in the tying product market.  *See* § II, above.  Here, Act 3 cemented Google's dominance of the Basic Ad Server submarket (the only basic ad server that could reach the AdSense auction platform directly), which in turn enabled Google to maintain control of the basic auction platform submarket, and to overcharge publishers.  PSOF ¶¶ 236-39.

Google does not challenge the evidence that it has sufficient power in the basic auction platform submarket to coerce publishers seeking a basic ad server to use the AdSense Tag or the

---

[49] All AdSense publishers were injured when they paid the AdSense auction platform supracompetitive take rate caused by Google's exclusionary AdSense tying restraints, regardless of whether the publisher purchased the AdSense bundle or used DFP to access AdSense, as The Progressive did.  *See, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) ("Although the defendants' conduct at issue targeted their competitors, . . . the plaintiffs' claimed injury of higher prices was inextricably intertwined with the conduct's anti-competitive effects and thus 'flow[ed] from that which makes defendants' acts unlawful.") (alteration in original) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982)); PSOF ¶ 240; *see also* § IV.C, below.

evidence that Google's tying resulted in substantial foreclosure of competition in the two markets.[50]  RSOF ¶¶ 96, 108; PSOF ¶¶ 230-238, 241.  By dominating the basic ad auction platform market, Google was able to make the AdSense Tag the only basic ad server that could access its dominant AdSense auction platform (the Act 3 tie) and to design and maintain a technological limitation that enabled its basic ad server to sell exclusively through the AdSense auction platform, RSOF ¶¶ 41-42, 96; PSOF ¶¶ 214-215, 221-222.  allowing it to reinforce that dominance and extract a supracompetitive package price.  Thus, the Act 3 tie had anticompetitive effects in both the basic product submarkets.  These findings are consistent with economic literature showing that ties can cause anticompetitive effects in tying markets.  *See* n.24, above.

3. <u>Google coerces AdSense publishers to buy the AdSense products together.</u>

Google's argument (Mot. 32-32) that Publishers fail to prove coercion fails.  The "essential characteristic" of an illegal tie is seller exploiting control over the tying product to force purchase of the tied product.  *Google EDVA*, 778 F. Supp. 3d at 859; *Hyde*, 466 U.S. at 12.[51]  There is a triable issue of fact as to whether AdSense's basic auction platform dominance was sufficient to coerce publishers to use a Google ad server.[52]  To begin with, Google's executives have recognized that publishers who use AdSense ██████████████████████████ ██████████████████████████████████████████████ PSOF ¶ 217; RSOF ¶ 108.  Google admits that it engages in Act 3 coercion by requiring publishers to use a Google ad server, either DFP or the

---

[50] As to Act 3, Google only challenges whether there are separate markets for basic ad servers and ad auction platforms (Mot. 30-32) and whether Publishers can prove coercion (Mot. 32-33).

[51] Google contends (Mot. 33 & n. 46) that a tying claim requires the plaintiff to show it did not want the tied product *at all*.  This misreads *Hyde*, which recognizes unlawful ties where the buyer "might have preferred to purchase elsewhere on different terms."  466 U.S. at 12; *see also Eastman Kodak v. Image Tech. Servs.*, 504 U.S. 451, 464 n.9 (1992) (coercion satisfied where buyer "might have preferred" the tied product "on different terms").

[52] The AdSense tag, the only basic ad server that can access the dominant AdSense auction platform, also coerces publishers to use the AdSense auction platform because no other auction platforms are available. *See* PSOF ¶ 215.

AdSense Tag. PSOF ¶ 214.[53]  *United States v. Live Nation Ent.*, 2026 WL 456804, at *25

(S.D.N.Y. Feb. 18, 2026) ("unremitting policy of tie-in, if accompanied by sufficient market

power in the tying product to appreciably restrain competition in the market for the tied product

constitutes the requisite coercion." (citation omitted)), *reconsideration denied*, 2026 WL 563024

(S.D.N.Y. Feb. 27, 2026).  Google further concedes that it requires publishers using the AdSense

Tag to sell impressions exclusively via the AdSense auction platform, PSOF ¶ 215, thereby

conceding that there is Act 4 coercion.

### 4. Publishers Adequately Plead a Basic Ad Server Sub-Market

Google's claim (Mot. 24-27) that Publishers do not plead a "basic ad server" submarket

elevates form over substance.[54]  Since 2021, Publishers have alleged distinct ad server

products—AdSense for small publishers and DFP for large publishers.  RSOF ¶ 17-18.  Those

allegations form the "practical indicia" of a cognizable submarket: products with distinct

characteristics serving distinct customers.  *See Brown Shoe. v. United States*, 370 U.S. 294, 325

(1962).  Market definitions are often clarified or narrowed post-discovery.  *See N. Am. Soccer

League v. U.S. Soccer Fed'n*, 2024 WL 2959967, at *14 (E.D.N.Y. June 12, 2024).

Google's claim of prejudice (Mot. 26-27) cannot withstand analysis.  The relevant

"practical indicia"—AdSense's functionality, segmentation, and pricing—come from Google's

internal records.  PSOF ¶ 229.  A defendant cannot be surprised from facts in its possession.  *See

Anti-Monopoly v. Hasbro*, 958 F. Supp. 895, 903 n.8 (S.D.N.Y. 1997), *aff'd*, 130 F.3d 1101 (2d

---

[53] Google creates a disputed issue of fact by contradicting its own Rule 30(b)(6) testimony in asserting (Mot. 28) that it is undisputed that ████████████████████████ relying on the declaration of an employee whose testimony confirms he had no foundation for testifying to the facts it contained.  RSOF ¶ 100.  That declaration is inadmissible, *see Raskin v. Wyatt Co.*, 125 F.3d 55, 66-68 (2d Cir. 1997), and Google is bound by its deposition testimony, *cf. Great Am. Ins. of NY v. Summit Exterior Works*, 2012 WL 459885, at *3-5 (D. Conn. Feb. 13, 2012).

[54] Because Publishers adequately allege a basic ad server market, Google's authorities (Mot. 27 & n.41) regarding amendment are inapposite.

Cir. 1997).  Where "Google and its experts have analyzed the facts of record" under the market

definition, as they have here (*see* PSOF ¶ 242), there is no prejudice.  *See In re Google Digital

Advertising Antitrust Litig.*, 2025 WL 2733347, at 3 (S.D.N.Y. Sept. 25, 2025).

### B. Publishers Did Not Abandon Claims Involving DFP and AdSense.

Google argues (Mot. 23) that Publishers abandoned their AdSense-DFP tying claims

because Publishers did not mention DFP in connection with Acts 3 and 4 in their December 12,

2025 letter.  But Publishers expressly referenced DFP in describing the challenged conduct.[55]

PSOF ¶ 207.  Publishers do not allege stand-alone ties between AdSense and DFP; rather, they

assert that to use the AdSense auction platform, publishers must use the AdSense Tag *or* DFP—

just like the tying condemned in *Eastman Kodak.*  504 U.S. at 461-62.  While a publisher may

access the AdSense auction platform through Google's AdSense Tag or DFP, it cannot access

that auction through "any other supplier."  *Id.*; PSOF ¶ 214; RSOF ¶ 100-102.[56]

Google's argument (Mot.  23) that Publishers failed to prove ties involving DFP and the

AdSense auction platform ignores evidence establishing those ties.  PSOF ¶ 211 (separate

products); PSOF ¶¶ 214-216 & RSOF ¶¶ 100-102 (coercion); PSOF ¶¶ 23, 212, 229-237 (market

power); *see* PSOF ¶¶ 32, 131, 213 (interstate commerce).

### C. The Progressive Has Standing.

Google contends (Mot.  34) that The Progressive lacks antitrust standing because, while it

used the AdSense auction platform, it did not purchase the AdSense Tag.  But The Progressive

---

[55] Google argues (Mot. 43-44) for summary judgment on certain other "abandoned" claims or conduct.  Publishers have withdrawn those claims or allegations, stating that they would not pursue them at trial, The Progressive and Mikula pursue claims related only to AdSense, and JLaSalle is no longer pursuing any claims in this litigation.  *See* PSOF ¶¶ 256-57.  Given such a posture, summary judgment is unnecessary.

[56] Although the Court stated in its class certification order that "Publishers' experts did not analyze the existence of such a tie" between the AdSense auction platform and DFP, *Google IV*, 2025 WL 3562687, at *26, evidence, including expert evidence, demonstrates that Publishers are required to use the AdSense Tag or DFP in order to use the AdSense ad auction platform.  PSOF ¶ 215; RSOF ¶ 100.

did purchase DFP, which constitutes part of the tie, and evidence confirms that AdSense users could not use any non-Google ad server.  PSOF ¶ 214; RSOF ¶¶ 100-102.

Google's argument also rests on the incorrect premise that a plaintiff must purchase every product in a tying arrangement to have standing.[57]  Antitrust standing turns on injury.  Google's tying conduct forced The Progressive to pay inflated take rates for the AdSense auction platform (PSOF ¶ 238).  That alone establishes standing.  *United States v. Live Nation Ent.*, 2025 WL 835961, at *4 (S.D.N.Y. Mar. 14, 2025) ("Consumers who directly purchased a product at allegedly supracompetitive prices from a defendant . . . usually have antitrust standing."); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 688 ("plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct.  Such an injury plainly is of the type the antitrust laws were intended to prevent.").  A plaintiff need not purchase both the tying and tied products.  *Heartland Payment Sys. v. MICROS Sys.*, 2008 WL 4510260, at *11–14 (D.N.J. Sept. 29, 2008); *Wells Real Estate v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 814 (1st Cir. 1988) (collecting cases).[58]

## V.    The Remaining Monopolization Claims Survive Summary Judgment.

### A.  Enhanced Dynamic Allocation.

Publishers do not contend that Enhanced Dynamic Allocation (Act 6) is anticompetitive standing alone but instead claim that "it expanded the scope of Dynamic Allocation's anticompetitive First Look and Last Look, giving AdX access to 90% of DFP impressions, and

---

[57] In its class certification order, this Court held that The Progressive was not an adequate *class representative* for the AdSense class since it "did not use one of the two products in the claimed tying arrangement."  *Google IV*, 2025 WL 3562687, at *26.  Nonetheless, The Progressive has standing to sue on its own behalf because it was forced into using AdSense or DFP and paid a supracompetitive price as a result.

[58] Google's argument (Mot. 34 & n.47) that The Progressive is not an efficient enforcer is misplaced since it directly paid inflated take rates to Google and no other party could sue for those overcharges.  *Davitashvili v. Grubhub*, 2022 WL 958051, at *12 (S.D.N.Y. Mar. 30, 2022) (plaintiffs were efficient enforcers where they paid supracompetitive prices); *Alaska Elec. Pension Fund v. Bank of Am.*, 175 F. Supp. 3d 44, 60-61 (S.D.N.Y. 2016) (same).

disadvantaged third-party exchanges in doing so." ECF 1269 at 3-4. The Court should deny Google's motion for summary judgment relating to Act 6 (Mot. 35-38) because that conduct augmented the anticompetitive effects of Dynamic Allocation, a restraint held anticompetitive. *See Google III,* 2025 WL 3012840, at *9 (citing *Google EDVA*, 778 F. Supp. 3d at 864-65).

The Court has held that a Section 2 exclusionary scheme may include acts not anticompetitive standing alone where (1) the scheme includes at least one independently unlawful act and (2) the acts work synergistically to cause harm. *Google I*, 627 F. Supp. 3d at 382. A monopolist violates Section 2 when it combines a lawful act "with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition." *In re Actavis Antitrust Litig.*, 787 F.3d 638, 654 (2d Cir. 2015) (citing *Berkey Photo*, 603 F.2d at 274-75, 287). Google is estopped from litigating whether the combination of the Act 1 tie with restraints including Dynamic Allocation (First and Last Look), Dynamic Revenue Sharing, and Unified Pricing Rules are illicit monopolization. *See Google III,* 2025 WL 3012840, at *9; *Google EDVA*, 778 F. Supp. 3d at 864-65, 872.

Google introduced Enhanced Dynamic Allocation as an extension of Dynamic Allocation, enabling Google to get a "real time" First Look advantage not only on programmatic inventory but also on direct deals.[59] PSOF ¶ 188; RSOF ¶ 141. Thus, Enhanced Dynamic Allocation was another means by which Google coerced DFP publishers to use AdX, which worked synergistically with the rest of the scheme to cause anticompetitive harm. PSOF ¶¶ 188-196. Enhanced Dynamic Allocation extended the reach of Dynamic Allocation, enabling AdX to bid preferentially on 80-90% of all DFP impressions by 2021. PSOF ¶ 190; RSOF ¶¶ 76, 140.

---

[59] EDA as applied to direct deals was more complex than Dynamic Allocation given an additional floor meant to keep direct deals on track. PSOF ¶¶ 191-92, 194. AdX was advantaged in EDA because third-party exchanges could only win probabilistically even when their average historical price beat the AdX bid, leading Google engineers to admit that ██████████████████████ RSOF ¶¶ 147, 149.

Google's assertion (Mot. 37) that Publishers fail to demonstrate the anticompetitive effects of Enhanced Dynamic Allocation is not accurate. Prof. Elhauge evaluated the effects of Enhanced Dynamic Allocation—not as a standalone restraint—but as one of the acts that together with other restraints including Dynamic Allocation coerced DFP users to use AdX. PSOF ¶¶ 197-99; RSOF ¶¶ 140, 161, 163, 199, 204. Google argues (Mot. 36) that Publishers "have not demonstrated that EDA caused marketwide prices to rise, output to fall, or quality to decline". That too is not accurate. Viewed as part of the illicit monopolization scheme, the evidence shows that Enhanced Dynamic Allocation expanded the reach of Dynamic Allocation to more impressions, forcing Google to concede that "EDA increased Google's 'ability to charge a high rate for its ad auction platform.'" *See* RSOF ¶¶ 157-63.

Prof. Elhauge opined that Enhanced Dynamic Allocation, when viewed as part of the Act 2 restraints coercing DFP users to use AdX preferentially, raised prices above but-for levels and therefore decreased output below but-for levels. PSOF ¶¶ 196, 199; RSOF ¶¶ 157-58.[60] Accordingly, a reasonable jury could find that Enhanced Dynamic Allocation amplified the effects of Google's anticompetitive scheme by foreclosing competition in the ad exchange market, supporting the ongoing AdX overcharge and suppressing output.[61]

---

[60] In *MacDermid Printing Sols. v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) (cited at Mot. 36), the court examined the plaintiff's single theory of harm—an anticompetitive conspiracy between the plaintiff's rival and supplier—under the standard for finding direct evidence of harm under Section 1. Here, by contrast, Prof. Elhauge's yardstick conservatively excludes damages flowing from EDA, RSOF ¶ 202, but Prof. Elhauge separately shows that its implementation with the other challenged restraints was anticompetitive. PSOF ¶ 196.

[61] Google implemented its 20% AdX take rate from the inception of Dynamic Allocation. PSOF ¶¶ 82.b, 133, 140. While Google did not raise its take rate after imposing Dynamic Revenue Share and Enhanced Dynamic Allocation, both restraints helped Google maintain its AdX overcharge including by driving more impressions to AdX through Dynamic Allocation, thereby foreclosing competition in the ad exchange market. *See* RSOF ¶¶ 157-63. Prof. Elhauge's findings (PSOF ¶¶ 196-201) of adverse effects on competition undermine Google's argument (Mot. 37) that Publishers focus only on effects to competitors.

Google is correct (Mot. 39) that Prof. Elhauge's damages model conservatively excludes any damages that may have been caused by Enhanced Dynamic Allocation separate and apart from its contribution to the coercive aspects of Act 2.  RSOF ¶ 202.  Given that Publishers are not alleging a standalone Enhanced Dynamic Allocation claim but instead are alleging it as part of an illicit monopolization scheme and showing damages from the combined effects of Google's conduct in a manner consistent with their theory of liability, they do not need to demonstrate separate damages flowing from Enhanced Dynamic Allocation.[62]  *See* § II.B, above.

Finally, Google asserts (Mot. 36, 38) that Enhanced Dynamic Allocation was procompetitive claiming it increased overall publisher revenue.  This is unsupported; it also misunderstands the claim.  While Enhanced Dynamic Allocation did increase publisher revenue *from AdX*, it is disputed that it increased publisher revenue *from all demand sources*.  For example, Google recognized internally that ████████████████████████████████████ ██████████████████████████ RSOF ¶ 146.  Industry expert Anand Das opined ██████ █████████████████████████████████████████████████████████████ █████████████████████████ RSOF ¶¶ 152-53.  Indeed, the document on which Google relies confirms that █████████████████████████████████████████ █████████████████████████████████████████████████████████, Def. Ex. 46 (GOOG DOJ 13208758); RSOF ¶ 153, and Google internally confirms it has ████████████

---

[62] For the same reason, Publishers need not demonstrate "how much 'throttling' allegedly foreclosed non-Google ad exchanges from competing or raised prices to publishers," Mot. 37, and Google's cited caselaw is inapposite.  In *K.M.B. Warehouse Distribs. v. Walker Mfg.*, 61 F.3d 123, 128 (2d Cir. 1995) (cited at Mot. 37), the plaintiff failed to establish an adverse effect on competition under Section 1 where its exclusion from the market did not affect the market as a whole.  In *PepsiCo v. Coca-Cola*, 315 F.3d 101, 111 (2d Cir. 2002) (cited at Mot. 37), Pepsi could not demonstrate an adverse effect on competition where Coca-Cola's exclusive distribution agreements temporarily foreclosed a fraction of the available distribution channels.  Similarly, in *CDC Techs. v. IDEXX Lab'ys*, 186 F.3d 74, 81 (2d Cir. 1999) (cited at Mot. 38), the plaintiff presented no evidence that the challenged exclusive dealing contract foreclosed a substantial share of the market.  Here, Publishers put forward substantial evidence that EDA, as an enhancement of the Act 2 restraints and the scheme as a whole, harmed competition.  RSOF ¶¶ 157-163.

██████████████████████████████████████████████████, RSOF ¶ 153. [63]

More fundamentally, Publishers are not claiming that Enhanced Dynamic Allocation was anticompetitive standing alone.  Instead, Enhanced Dynamic Allocation as Prof. Elhauge observes, was anticompetitive because Google excluded rivals from bidding in real-time on the direct deal inventory, and allowed only Publishers using DFP and AdX together to participate.  PSOF ¶¶ 191, 201.  It was harmful because it was being used as part of the restraints underpinning Act 2 to coerce DFP publishers to use AdX.[64]  As Prof. Elhauge explains, excluding rivals from DA and EDA, harmed publishers not only by depriving publishers of the potential higher bids from rivals, but also by anticompetitively reducing competition from rival ad auction platforms".  PSOF ¶ 193.  In the but-for world, Publishers' revenues would be higher, and competition would be more robust.  PSOF ¶ 200.

## B. Dynamic Allocation, Enhanced Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules Survive Summary Judgment.

Google disregards applicable law and Plaintiff's actual claims when it asserts (Mot. 38) that Dynamic Allocation, Enhanced Dynamic Allocation, Dynamic Revenue Share, and Unified Pricing Rules "cannot survive summary judgment because" Plaintiffs "have failed to quantify damages from those Acts."  Mot. 38.  Those acts are not "claims" but rather restraints supporting violations of Sections 1 and 2.  *See* § I, above.  The combined effects of those restraints in the

---

[63] Google's reference (Mot. 35-36, 38) to the balancing test under *Microsoft* does not help it.  As Google notes, plaintiffs only need to show that anticompetitive effects outweigh procompetitive effects where the "procompetitive justification stands unrebutted."  Mot. 26 (quoting *Microsoft*, 253 F.3d at 59).  Here, as discussed, there is at least a genuine dispute about whether Google's procompetitive justification (*i.e.*, supposed increased revenue) is valid, and thus no balancing is necessary.  Finally, Prof. Elhauge did the "balancing" after concluding that there were substantial anticompetitive effects and no procompetitive justification.  PSOF ¶ 199-200.

[64] One basis for the EDVA Court's finding that Dynamic Allocation was anticompetitive was that Google ran real-time auctions that were only available to those using DFP and AdX together, and which excluded rival ad exchanges from bidding, thus giving AdX a First Look and Last Look advantage.  *See, e.g.*, *Google EDVA*, 778 F. Supp. 3d at 835, 864-65.  If Google had not locked rivals out of Dynamic Allocation and EDA, Google would not have had an exclusive First Look or Last Look and instead would have been forced to compete in real-time for programmatic and direct deal impressions.

Act 1 and 2 ties enabled Google to charge supracompetitive prices, thereby injuring Plaintiffs. PSOF ¶¶ 33, 37-62, 168-85, 196-97; *see* § I-II, above.  And an antitrust plaintiff need not fully disaggregate damages associated with each unlawful act in a scheme.  *See* n.20, above.

Google's argument relies (Mot. 39) on a selective reading of Prof. Elhauge's report. Dynamic Allocation and Dynamic Revenue Share are not "additional" harms requiring separate damages quantifications; they are restraints that implemented the Act 2 tie and resulted in monopolization of the ad exchange market.[65]  *See* PSOF ¶¶ 82-119; *see* § I, above.  Prof. Elhauge's yardstick thus appropriately quantifies the harm done by these restraints, as a whole, without the need to assign each restraint separate, incremental damages.  *See* RSOF ¶¶ 199-202.

### C.  Plaintiffs' Claims for Equitable Remedies Survive Summary Judgment.

Google advances (Mot. 39-40) the unmeritorious argument that because it has ceased certain conduct, the court should grant summary judgment on "injunctive relief."  Google's past and continuing conduct (*e.g.*, RSOF ¶¶ 49, 136, 175), has enabled it to acquire and maintain monopoly power, PSOF ¶¶ 23, 26, which it has exercised to Publishers' detriment.  Equitable relief in antitrust cases serves to "unfetter a market from anticompetitive conduct and pry open to competition a market that has been closed by defendants' illegal restraints."  *Ford Motor v. United States*, 405 U.S. 562, 577 (1972); *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961) ("The key to . . . an antitrust remedy is of course the discovery of measures effective to restore competition.").  Publishers seek equitable relief to unwind Google's unlawfully acquired dominance, which can include the prohibition of current misconduct as well

---

[65] Google's reliance (Mot. 39) on *Argus, Inc. v. Eastman Kodak*, 612 F. Supp. 904, 925 (S.D.N.Y. 1985), is misplaced.  There, the "complete absence" of evidence to support damages was based on speculative business plans and other "unfounded assumptions" "not probative of losses."  Here the Court has sustained Prof. Elhauge's damages yardstick model based on Google's own conduct in another, related market to measure the overcharge in the ad exchange market.  *See Google IV*, 2025 WL 3562687, at *9-16.

as relief designed to deprive the monopolist of advantages gained by past misconduct.

In any event, a ruling on equitable relief is premature as the parties stipulated that any proceedings on equitable relief would follow liability. PSOF ¶¶202-06. Moreover, the scope of any equitable relief in this action will be informed by any remedies ordered in the EDVA action.

## VI.    Publishers' Damages Model Does Not Compute Any Damages on Behalf of Entities Residing or Injured Outside the United States.

Based solely on a new expert analysis, Google asserts (Mot. 41-43) that recovery is barred for certain entities[66] involved in Google's Multi-Customer Management (MCM) program[67] because the Foreign Trade Antitrust Improvements Act ("FTAIA") bars recovery of "claims for damages" brought by non-U.S. class members. [68] RSOF ¶¶ 209-11.

But Publishers do not assert any claims on behalf of MCM child publishers located outside the United States. Prof. Elhauge only quantified the injury that Google's conduct caused domestically to U.S. publishers, who paid Google directly in the United States for AdX services. PSOF ¶ 164. Consequently, the FTAIA[69] (and its exemptions) do not apply: all Class members are U.S. residents, seek recovery for antitrust injuries occurring entirely in the U.S., and pursue claims based on conduct taking place in the U.S. PSOF ¶ 164; RSOF ¶ 209. Google admits that Publishers only seek recovery for, and Prof. Elhauge's AdX damages calculations are solely

---

[66] The AdX Class is limited to "persons or entities in the United States." *Google IV,* 2025 WL 3562687, at *3.

[67] MCMs manage impression sales of other publishers using Google's sell-side tools. *See Google IV,* 2025 WL 3562687, at *4. The MCM is called the "parent publisher" and the web publisher it acts for is the "child publisher." *Id.* Under a Google MCM program called Manage Inventory, "Google directly pays the parent MCM firm for inventory sold by the child publisher, and the parent publisher is then responsible for making payment to the child." *Id.* at *21. With Manage Inventory, MCM parents are Class members, and child publishers are not. *Id.* at *22-23.

[68] Google's sole support is a new analysis by Prof. Chevalier estimating that ~8.7% of Publishers' AdX damages falls into this category. That analysis did not appear in her expert report, *see* RSOF ¶¶ 209-12, and should be disregarded. *See Cedar Petrochemicals v. Dongbu Hannong Chem.,* 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011).

[69] FTAIA exempts from U.S. antitrust law claims based on foreign conduct with no relationship to U.S. commerce. *Hoffmann-La Roche v. Empagran S.A.,* 542 U.S. 155, 173 (2004) (U.S. law should not apply if "*conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim*" (emphasis in original)).

based on, overcharges paid to Google in the United States.  *See* RSOF ¶ 209 ("The AdX Class's

damages calculated by Prof. Einer Elhauge are based on sales of ad inventory on websites

corresponding to AdX accounts with a billing address located in the United States.").[70]

Google does not cite any authority that suggests the applicability of the FTAIA to claims,

like those here, brought by residents of the United States claiming to be injured in the United

States.[71]  Indeed, in *Empagran* (cited Mot. 41), the Supreme Court stated that the FTAIA's

foreign commerce exclusion would not apply to a U.S.-based plaintiff.  542 U.S. at 159.

Similarly, in *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 585-

86, 598-601 (S.D.N.Y. 2015) (cited at Mot. 42-43), Judge Schofield dismissed price-fixing

claims on FTAIA grounds only involving "Plaintiffs who are not in the United States."[72]

Finally, Google's argument assumes that the residency of the *downstream customer* is

relevant to whether the Class member was injured.  But, pursuant to decades of settled law, a

direct purchaser has standing to pursue 100% of the overcharge it incurs.  *See Hanover Shoe,* 392

U.S. at 494.  Google does not challenge that MCM parent publishers in Manage Inventory

arrangements are direct purchasers.  *See Google IV,* 2025 WL 3562687, at *21.  And this Court

has held that "any injury to MCM firms is no different than injury to open-web publishers

---

[70] The FTAIA also does not apply here because all claimed injuries occurred on transactions that took place in the United States.  *See, e.g.*, *Sonterra Cap. Master Fund v. Credit Suisse Group*, 277 F. Supp. 3d 521, 569 (S.D.N.Y. 2017) ("The FTAIA does not bar plaintiffs' antitrust claim because the Class is limited to 'U.S. based transactions.'").  Google charged artificially inflated take rates to MCM parents with Google AdX accounts in the United States.  *See* RSOF ¶¶ 209-11; PSOF ¶¶ 162-64.  Whether any such child publisher U.S.-based websites have foreign owners is irrelevant: the claimant is the MCM publisher parent (not the child publisher), and all relevant transactions for which Class members claim injury took place in the United States.

[71] *See also Precision Assocs. v. Panalpina World Transp.,* 2013 WL 6481195, at *30 (E.D.N.Y. Sept. 20, 2013) (cited at Mot. 22) ("in *Empagran I,* the Supreme Court found that where the vitamin seller defendants agreed to fix prices globally, leading to higher prices in the United States and independently in other countries, a purchaser in the United States could bring a Sherman Act claim for a domestic injury, but a foreign purchaser could not").

[72] Google's citations (Mot. 42-43) to *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 94 (2d Cir. 2019), and *Lotes Co. v. Hon Hai Precision Indus.*, 753 F.3d 395, 414 (2d Cir. 2014), are distinguishable for the same reasons: both concern damages to foreign entities.  The other cases cited by Google (Mot. 43, n.53) are similarly inapplicable because plaintiffs in those actions failed to allege or establish injury to claimants outside the United States.

operating their own websites. MCM firms would receive damages to the extent that they were injured 'through payment of fees directly to Google or reductions in advertising revenue received directly from Google". *Id*. at \*22. Google does not explain why the location of Class members' *customers* would require a set-off on the overcharge, and the law is clear that it would not.[73] Injury to MCM Class members—all of whom reside and were injured in the United States— should be measured without consideration of the residency of Class members' customers.

## VII.    Google's Spoliation Precludes Summary Judgment

After anticipating litigation, Google intentionally failed to preserve chat messages containing relevant information; indeed, Google encouraged employees to use auto-deleting chats for sensitive business discussions. PSOF ¶¶ 244-53. In addition, Google maintained a years-long policy of abusing the attorney-client privilege in its labeling and classification of ordinary business discussions and analyses to deprive potential adversaries of discovery. PSOF ¶ 254.[74] Particularly in combination, such conduct raises a question whether Google has deprived Publishers of relevant discovery in this action. As a result, the Court should consider "the possibility of an adverse spoliation inference" that, "'in combination with "some (not insubstantial) evidence" for the plaintiff's cause of action'", tips the scales in favor of the claims' survival. *Wood v. Pittsford Cent. Sch. Dist.*, 2008 WL 5120494, at \*2 (2d Cir. Dec. 8, 2008) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001)).[75]

---

[73] *See, e.g.*, *Apple v. Pepper*, 139 S. Ct. 1514, 1525 (2019) ("If the iPhone owners prevail, they will be entitled to the *full amount* of the unlawful overcharge that they paid to Apple") (emphasis in original); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 103 (E.D.N.Y. 2012) ("*Hanover Shoe* requires a court to disregard the downstream sales of these direct purchasers").

[74] *See Google EDVA*, 778 F. Supp. 3d at 872-73 ("Google's systemic disregard of the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client privilege may well be sanctionable."); PSOF ¶ 255.

[75] *See also Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) (Cabranes, J.) ("intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line. In the absence of such a result, as noted above, the purposes of the adverse inference are eviscerated.").

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Motion.


Dated: March 6, 2026

Respectfully submitted,

David Boies
dboies@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200

*/s/ Philip C. Korologos*
Philip C. Korologos
pkorologos@bsfllp.com
Robert J. Dwyer
rdwyer@bsfllp.com
James Keyte
jkeyte@bsfllp.com
Luke Williams
lwilliams@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300

Mark C. Mao
mmao@bsfllp.com
Sean P. Rodriguez
srodriguez@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6820

Sabria A. McElroy
smcelroy@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 377-4216

Izaak Earnhardt
iearnhardt@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave NW, 11th Floor
Washington, DC 2005
Telephone: (202) 237-2727

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
Andrew Ellis
aellis@koreintillery.com
Ian Moody
imoody@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Fax: (314) 241-3525

Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Jeremy Gradwohl
jgradwohl@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Robert E. Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

*Co-Lead Counsel for the AdX Class and*
*Counsel for The Progressive, Inc. and*
*Mikula Web Solutions, Inc.*