**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re Google Digital Advertising Antitrust Litigation** | Case No. 1:21-md-3010 (PKC) |
| *This document relates to:*<br><br>**In re Google Digital Publisher Antitrust Litigation** | Case No. 1:21-cv-7034 (PKC) |

**PUBLIC REDACTED VERSION**

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ............................................................................................. 1

II.  THE RELEVANT PRODUCT MARKETS AND GOOGLE'S SCHEME ...................... 3

    A.  The Relevant Tools and Product Markets ................................................. 3

    B.  Google's Anticompetitive Scheme ......................................................... 6

III.  PLAINTIFFS AND THE PROPOSED CLASSES ARE DIRECT PURCHASERS ....... 12

IV.  ARGUMENT ................................................................................................. 15

    A.  The requirements of Rule 23(a) are satisfied. ....................................... 15

        1.  The Proposed Classes are sufficiently numerous ...................................... 15

        2.  There are common questions of fact and law. .......................................... 15

        3.  The claims of the proposed Class representatives are typical of the claims of each Class. ................................................................. 16

        4.  Plaintiffs and counsel will fairly and adequately represent the Classes ................................................................................. 16

    B.  The requirements of Rule 23(b)(3) are satisfied. ................................... 18

        1.  Common issues predominate. ........................................................... 18

        2.  Standard methods are capable of computing damages to each class. ....... 33

        3.  The superiority requirement is satisfied. ............................................ 35

V.  CONCLUSION .............................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
  2012 WL 5844871 (D. Vt. Nov. 19, 2012) ................................................................ 19

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ....................................................................................................... 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................. 19, 20

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019) ....................................................................................................... 13

*B & R Supermarket, Inc. v. Mastercard Int'l Inc.*,
  2021 WL 234550 (E.D.N.Y. Feb. 19, 2021) ................................................................ 24

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ....................................................................................................... 25

*Burnett v. Nat'l Assoc'n of Realtors*,
  2022 WL 1203100 (W.D. Mo. Apr. 22, 2022)............................................................. 33

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 829 (D.N.J. 2015) ....................................................................... passim

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ......................................................................................................... 34

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ................................................................................ 18, 19, 24

*Dial Corp. v. News Corp.*,
  314 F.R.D. 108 (S.D.N.Y. 2015)......................................................................... 1, 19, 22, 24

*Elisa W. v. City of New York*,
  82 F.4th 115 (2d Cir. 2023)........................................................................................... 15

*Engel v. Scully & Scully, Inc.*,
  279 F.R.D. 117 (S.D.N.Y. 2011)................................................................................... 15

*Feliciano v. CoreLogic Rental Prop. Sols., LLC*,
  332 F.R.D. 98 (S.D.N.Y. 2019)..................................................................................... 18

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004) .......................................................................................... 20

*Hanks v. Lincoln Life & Annuity Co. of New York*,
  330 F.R.D. 374 (S.D.N.Y. 2019)............................................................................. 15, 16

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ....................................................................................................... 31

*In re Actos Antitrust Litig.*,
  2024 WL 4251891 (S.D.N.Y. Aug. 9, 2024) ................................................ 24

*In re Auction Houses Antitrust Litig.*,
  193 F.R.D. 162 (S.D.N.Y. 2000) ................................................................. 13

*In re Buspirone Pat. Litig.*,
  210 F.R.D. 43 (S.D.N.Y. 2002) ................................................................... 32

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) .............................................................. 29

*In re Da Vinci Surgical Robot Antitrust Litig.*,
  2025 WL 964879 (N.D. Cal. Mar. 31, 2025) ............................................... 19

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) .................................................................. 25, 31

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  317 F.R.D. 675 (N.D. Ga. 2016) ................................................................. 33

*In re Disposable Contact Lens Antitrust Litig.*,
  329 F.R.D. 336 (M.D. Fla. 2018) ................................................................ 29

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ................................... 26, 32, 35

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009) ................................................................... 29

*In re Glumetza Antitrust Litig.*,
  2020 WL 3498067 (N.D. Cal. June 29, 2020) ............................................. 17

*In re Glumetza Antitrust Litig.*,
  336 F.R.D. 468 (N.D. Cal. 2020) ................................................................ 19

*In re Google Digital Advert. Antitrust Litig.*,
  627 F. Supp. 3d 346 (S.D.N.Y. 2022) ................................................... passim

*In re Google Digital Advert. Antitrust Litig.*,
  2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) ................................................. 20

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ....................................... 26, 31, 32

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ......................................................... 25

*In re Lidoderm Antitrust Litig.*,
  2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ............................................... 17

*In re Mercedes-Benz Anti-Trust Litig.*,
  157 F. Supp. 2d 355 (D.N.J. 2001) ............................................................. 14

*In re Namenda Direct Purchaser Antitrust Litig.*,
  2017 WL 2693713 (S.D.N.Y. June 21, 2017) .............................................. 32

*In re Namenda Direct Purchaser Antitrust Litig.*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018) ............................................................ passim

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  2022 WL 4298767 (S.D.N.Y. Sept. 19, 2022) ........................................................ 34

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  338 F.R.D. 527 (S.D.N.Y. 2021) ........................................................................ 34

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ............................................................................... 31

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  638 F. Supp. 3d 227 (E.D.N.Y. 2022) ................................................................. 32

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  2024 WL 1014159 (E.D.N.Y. Mar. 8, 2024) ......................................................... 14

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ....................................................................... 19, 35

*In re Relafen Antitrust Litig.*,
  346 F. Supp. 2d 349 (D. Mass. 2004) ................................................................. 32

*In re Restasis Antitrust Litig.*,
  335 F.R.D. 1 (E.D.N.Y. 2020) ................................................................. 24, 26, 31

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) ...................................................................... 15

*In re U.S. Foodservice Inc. Pricing Litig*,
  729 F.3d 108 (2d Cir. 2013) .......................................................................... 19

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008) ....................................................................... 29

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ...................................................................... 17, 22

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) ................................................................... 16, 17

*Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
  2022 WL 2829880 (S.D.N.Y. June 30, 2022) ......................................................... 24

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) ......................................................... 26

*Menking ex rel. Menking v. Daines*,
  287 F.R.D. 174 (S.D.N.Y. 2012) ...................................................................... 12

*Moehrl v. Nat'l Assoc'n of Realtors*,
  2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ..................................................... 19, 32

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) .......................................................................... 22

iv

*Nitsch v. Dreamworks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016) ............................................................................. 24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .................................................................................... 19

*Oliver v. Am. Express Co.*,
2024 WL 100848 (E.D.N.Y. Jan. 9, 2024) ............................................................... 34

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) .................................................................................... 19

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) .................................................................................... 12

*Salveson v. JP Morgan Chase & Co.*,
2020 WL 4810704 (E.D.N.Y. July 16, 2020) .......................................................... 13

*Seijas v. Republic of Argentina*,
606 F.3d 53 (2d Cir. 2010) ................................................................................. 34, 35

*Simon & Simon, PC v. Align Tech., Inc.*,
2023 WL 8261297 (N.D. Cal. Nov. 29, 2023) ......................................................... 19

*SourceOne Dental, Inc. v. Patterson Companies, Inc.*,
2018 WL 2172667 (E.D.N.Y. May 10, 2018) .......................................................... 26

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) ................................................................................. 16, 19

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ........................................................................................... 18, 20

*United States v. Google LLC*,
No. 23-cv-108 (E.D. Va. Apr. 17, 2023) .................................................................. 13

*United States v. Google LLC*,
2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ................................................... passim

*US Airways v. Sabre Holdings Corp.*,
2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ........................................................... 32

*Valassis Commc'ns, Inc. v. News Corp.*,
2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ............................................................ 22

**Rules & Statutes**

Fed. R. Civ. P. 23 ........................................................................................... 15, 16, 18

**Other Authorities**

Bill Lueders,
*Editor's Note: Standing Up for Fairness*, The Progressive (Aug. 20, 2021),
https://progressive.org/magazine/standing-up-fairness-lueders ................................ 17

Gregory K. Leonard,
  *The Illinois Brick Damages Edifice: Demolition or Deconstruction?*, 84 Antitrust L.J. 315
  (2022) ................................................................................................................................ 32

Katrina Vanden Heuvel,
  *We're Suing Google. Here's Why.*, The Nation,
  https://www.thenation.com (May 19, 2021) ........................................................................ 17

*Mission & History*, The Progressive,
  https://progressive.org/about-us/mission-and-history ........................................................ 17

**Treatises**

Gregory Leonard & Laila Haider,
  *Proving Antitrust Damages: Legal and Economic Issues*, ABA Section of Antitrust Law,
  (3d ed. 2017) ................................................................................................................. 25, 32

Newberg and Rubenstein on Class Actions § 20:28 (6th ed.) ................................................. 1, 19

## I.     INTRODUCTION[1]

The Court should certify Plaintiffs' two proposed Classes pursuant to Rule 23(b)(3). Plaintiffs allege that Google violated Section 2 of the Sherman Act by monopolizing the markets for publisher ad servers and auction platform services for programmatic open-web display advertising.  Google did so through a comprehensive anticompetitive scheme that tied together its products in those markets and reinforced those ties with multiple synergistic exclusionary acts, allowing it to charge supracompetitive prices.

Courts routinely certify classes in Section 2 cases because they raise standard liability questions that are common to all class members, including defendant's monopoly power, whether the challenged conduct is exclusionary, anticompetitive effects, and the imposition or maintenance of artificially inflated prices.[2]  These common questions here will be resolved through common evidence, will generate the same answers for all Class members, and will be the focus of any trial in this matter.  They will therefore predominate over any individual issues that may arise.  Indeed, the recent post-trial opinion by Judge Brinkema of the Eastern District of Virginia—which found Google liable for monopolizing the same markets through the same misconduct—relied on common evidence and did not implicate individualized issues.  *See United States v. Google LLC*, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ("EDVA Op.").

Plaintiffs are publishers that paid Google for sales of their ad impressions on Google's **auction platforms**, which match publishers' available display ad space with interested

---

[1] Unless otherwise noted, all emphases are added, and all internal quotation marks and citations are omitted.  All unpublished expert reports, party-produced documents, depositions, and cases not accessible through Westlaw are identified with exhibit numbers—Ex. ___—and are attached to the Declaration of Izaak Earnhardt, filed contemporaneously with the Motion and this Memorandum of Law.

[2] *E.g.*, *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 121 (S.D.N.Y. 2015), *amended* WL 690895 (S.D.N.Y. Feb. 9, 2016); *see also* Newberg and Rubenstein on Class Actions § 20:28 (6th ed.) ("courts have routinely certified classes alleging that a monopolist's conduct caused a direct and uniform overcharge, as overcharge cases often rely on facts common across the class such as the existence of a relevant market, the defendant's monopoly power, and the existence of the illegal course of conduct").

advertisers.  Publishers make ad impressions available for auction through **ad servers**.

Advertisers bid into those auctions through **ad buying tools**.  These three distinct product

markets comprise the "ad tech stack" for programmatic sales of open-web display ads; Google

dominates all three markets.  When publishers' ad impressions are sold through Google's auction

platforms, Google keeps a portion of the winning bids paid to publishers as its fee (the "take

rate" or "revenue share").  Plaintiffs' two proposed Classes consist of publishers who paid

Google for ad impression sales on its AdX and AdSense platforms.

Common evidence will show that, through an exclusionary scheme of tying arrangements

and anticompetitive auction conduct, Google willfully acquired and maintained monopoly power

that foreclosed competition on the merits.  Despite offering comparable (or higher quality)

products at lower prices, other ad server providers and auction platforms were unable to gain the

market share and scale necessary to compete effectively.  Destroying competition in those

markets enabled Google to charge a uniform and supracompetitive 20% take rate on its auction

platforms for more than a decade.

Common evidence will also show that Google's anticompetitive conduct injured all

members of the proposed Classes.  Plaintiffs' expert economist, Professor Einer Elhauge,[3]

employs a well-accepted "yardstick" method that estimates but-for, competitive prices by

reference to transactions using Google's auction platforms for display ads in mobile apps without

the anticompetitive tie to the ad server equivalent.[4]  After observing that all members of both

Classes paid the same take rate with minimal (if any) discounting—and using a ██████████ as

---

[3] Professor Elhauge is a professor at Harvard Law School and a highly regarded antitrust economist.  *See Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 829, 830 (D.N.J. 2015) (describing Professor Elhauge as "eminently qualified" as an economist and an "antitrust titan").  All citations to Professor Elhauge's expert reports incorporate by reference the data, documents, and testimony he references and relies upon.

[4] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████  *See infra* at 27.

a conservative yardstick—Professor Elhauge concludes that all members of both Classes were injured by paying Google overcharges on AdX or AdSense.  Prof. Elhauge uses the same yardstick to estimate aggregate overcharges for members of both Classes.  Prof. Elhauge's yardstick confirms what Google's executives privately recognized: if Google's auction platforms were not protected by its scheme of ties and other exclusionary conduct, competition would have forced Google to cut its auction take rate by at least half.

The proposed Classes satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3).

## II.    THE RELEVANT PRODUCT MARKETS AND GOOGLE'S SCHEME

### A.    The Relevant Tools and Product Markets

Digital advertising on the internet involves the nearly instantaneous sale of ad impressions and the display of those ads to millions of publisher webpage visitors.[5]  Each product in the "ad tech stack"—the combination of tools that facilitates that process—possesses distinct demand, buyers, sellers, and transactions, and comprises its own relevant market with "basic" and "advanced" submarkets, as illustrated by the figure below.  Elhauge Rpt. § V.F (Ex. 1); see EDVA Op. *19-25.  Elhauge Rpt. Figure 1:



---

[5] Das Rpt. ¶41 (Ex. 5).  Plaintiffs' industry expert, Anand Das, co-founded PubMatic, a large ad exchange, and has over a decade of experience in the ad tech industry.  Das Rpt. ¶¶1-11.  All citations to Mr. Das's expert reports incorporate by reference the documents and testimony he references and relies upon.

**Ad servers** are "sell-side" tools used by publishers to identify ad impressions for sale on webpages, solicit bids from advertising demand sources (*e.g.*, ad exchanges and ad networks), serve the winning ad to webpage users, and provide reporting to publishers concerning ad impressions sold. *See* Elhauge Rpt. ¶¶21-28; Das Rpt. ¶¶43-49.

The advanced ad server submarket consists of configurable tools that perform multiple functions for large publishers.[6] Advanced ad servers, such as Google's DFP,[7] allow publishers to configure rules for soliciting bids for particular ad impressions, including identifying demand sources to be solicited, setting price floors, and selecting the ad to be displayed. Elhauge Rpt. ¶¶26-27; Das Rpt. ¶¶43-48. Although publishers using advanced ad servers can also source advertising in transactions negotiated directly with specific advertisers ("direct sales"), this case centers on the sale of "remnant" impressions that are not sold through direct sales, but rather through open auctions on one or more auction platforms. Elhauge Rpt. ¶¶16, 26-27.

The basic ad server submarket consists of highly automated products used by less sophisticated publishers. Elhauge Rpt. ¶¶22-23, 190-92; Das Rpt. ¶¶88-92. Google's AdSense tag, placed on publishers' websites to facilitate programmatic ad sales, functions as a basic ad server and does not allow different auction platforms to be placed in competition with one another. Elhauge Rpt. ¶¶23, 312. Because the AdSense tag cannot be used to display ads sold through direct deals, its use is limited to remnant demand. Elhauge Rpt. ¶¶22-23; Elhauge Reb. Rpt. ¶¶181-83; GOOG-DOJ-02139596 at -603 (Ex. 16).

During the Class Period (discussed *infra* Section III), Google's DFP product had at least a ███████████ in the advanced ad server submarket, Elhauge Rpt. ¶¶203, 205; Elhauge

---

[6] Elhauge Rpt. ¶¶26-27, 188-92; Elhauge Reb. Rpt. ¶¶181-83 (Ex. 3); Das Rpt. ¶¶43-48.
[7] Google acquired DoubleClick for Publishers ("DFP") from DoubleClick in 2008 and marketed it separately from 2008 to 2018 before bundling it with its advanced ad auction platform (AdX) as Google Ad Manager ("GAM").

Reb. Rpt. ¶227,[8] while its AdSense Tag product had an ███████████ in the basic ad server submarket, Elhauge Rpt. ¶204; Elhauge Reb. Rpt. ¶¶226.[9]

**Auction platforms** match publishers' available ad impressions with bids that advertisers make using ad buying tools. Elhauge Rpt. ¶¶17, 36-42, 193-96; Elhauge Reb. Rpt. ¶¶181-83. A "core feature" of an auction platform is its ability to return "real-time" bids, which are bids tailored to specific users based on their characteristics, unlike "static" bids that are set in advance, irrespective of the specific user. EDVA Op. *8, *39; Das Rpt. ¶¶35-37. Auction platforms also come in advanced versions, often known as "ad exchanges," and basic versions. Elhauge Rpt. ¶¶42, 196; Das Rpt. ¶¶53-54. During the Class Period, Google's AdX had a ███ ███████████ in the advanced auction platform submarket, Elhauge Rpt. ¶¶206, 208-09; Elhauge Reb. Rpt. ¶228,[10] and its AdSense platform had nearly a ███████ in the basic auction platform submarket, Elhauge Rpt. ¶¶207-09.

**Ad buying tools** are software that help advertisers buy impressions and place their ads on websites to generate ad views, ad clicks, or actual product purchases. Elhauge Rpt. ¶29. Both advanced and basic ad buying tools manage ad campaigns, and store, track, bid on, purchase, and deliver ads displayed on websites. Elhauge Rpt. ¶29. Advanced ad buying tools, such as Google's DV360, are designed for sophisticated advertisers and advertising agencies. Elhauge Rpt. ¶198; Das Rpt. ¶¶59-60. Basic ad buying tools, such as Google's AdWords, are easier to use

---

[8] *See* GOOG-DOJ-06845250 at -256 (Ex. 17) ███████████████████████████████████ ███████; *see also* EDVA Op. *30 ("From 2018 through 2022, Google's share of this worldwide market [for advanced ad servers] held steady between 91.0% and 93.5%, and its U.S. market share stayed between 86.5% and 92.3%.").

[9] *See* Anand Das Dep. 3/20/2025 82:11-12 (Ex. 7) (AdSense is "the only game in town for small publishers"); ███ (Google) 11/10/2023 Dep. 349:1-19 (Ex. 18).

[10] *See* EDVA Op. *34 ("AdX's relatively high and durable market share is consistent with the Court's conclusion that Google has monopoly power in the open-web display ad exchange market. Dr. Lee found that, from 2018 to 2022, AdX was the exchange for 63% to 71% of the worldwide open-web display transactions among the ad exchanges that produced data for this litigation").

and designed for individuals and small businesses.  *See* Elhauge Rpt. ¶¶197, 199; Das Rpt. ¶55.

During the Class Period, Google's DV360 product had a ███████ of the advanced ad buying tool submarket, and its AdWords product had an ███████ of the basic ad buying tool submarket.  Elhauge Rpt. ¶234; Elhauge Reb. Rpt. ¶¶229-35.

### B.     Google's Anticompetitive Scheme

Plaintiffs will establish through common evidence that Google willfully acquired and maintained monopoly power in the multiple markets at issue.  Google did not innovate its way to its dominant market position.  Das Reb. Rpt. ¶157 (Ex. 6).  Rather, as described below, Google used a synergistic scheme of tying and non-tying restraints to enhance and maintain its monopoly power to extract supracompetitive rates from publishers on its AdX and AdSense auction platforms.

The tying restraints described below comprise three sets of interdependent product bundles that forced publishers to use Google's tools in tandem.  Common evidence will show these restraints achieved their intended anticompetitive effect—locking publishers into Google's ecosystem and excluding rival tools.  The non-tying restraints encompassed five distinct anticompetitive practices that enabled AdX to win more impressions at the expense of other auction platforms, thereby enhancing the anticompetitive effects of Google's ties.

**Google's Tying Restraints.**  Common evidence will show that Google excluded competition through a series of ties.  Elhauge Rpt. § VII.A; Elhauge Reb. Rpt. § III.A.  Google contractually tied its AdX advanced auction platform with its DFP advanced ad server starting in 2015, and beginning in June 2018 (and continuing to the present) Google bundled DFP and AdX into a single product, marketed as Google Ad Manager (or "GAM").[11]  Elhauge Rpt. ¶¶294-300;

---

[11] *See* Elhauge Rpt. ¶¶307-308; Elhauge Reb. Rpt. ¶¶345-47; ███████ (Google) 6/25/2024 Dep. 235:19-236:19 (Ex. 19); *In re Google Digital Advert. Antitrust Litig.* ("*Google I*"), 627 F. Supp. 3d 346, 369 (S.D.N.Y. 2022).

Elhauge Reb. Rpt. ¶¶355-59.[12]  Google solidified these ties through coercive policies and programs including conditioning the provision of real-time bids from the AdX auction platform on the use of the DFP ad server, and conditioning the use of DFP for the sale of remnant ads on granting AdX the "first look" at all publisher inventory.[13]  Elhauge Rpt. ¶¶287-93; Einer Elhauge 3/11/2025 Dep. 117:23-119:7 (Ex. 4); Das Reb. Rpt. ¶95.  Google also reinforced its DFP-AdX tie by tying its AdWords basic ad buying tool with both auction platforms—*i.e.*, requiring that publishers use Google's auction platforms to access Google's ███████" advertiser demand.[14]

For the full Class Period and to this day, Google has tied its AdSense ad auction platform with its AdSense basic ad server, only selling a package that included both.  This two-way tie prevented other ad servers from competing for the business of small and medium-sized publishers seeking access to basic auction platforms.  *See* Elhauge Rpt. ¶¶310-15; Elhauge Reb. Rpt. ¶¶414-54; Elhauge Dep. 152:6-156:19, 160:6-16; Das Reb. Rpt. ¶¶43-46, 95.h, 98.a.

**Google's Other Exclusionary Conduct.**  Google engaged in additional acts designed to steer more impressions through AdX auctions and away from rival auction platforms, thereby impairing rival platforms' ability to compete and reinforcing Google's market power.

*Dynamic Allocation*.  In 2008, Google implemented a feature called Dynamic Allocation ("DA") for AdX, which gave Google the "first look" at a publisher's inventory before DFP would offer any impression to third-party exchanges, and as a result, AdX could secure impressions without allowing any third-party auction platforms to compete with a higher bid.

---

[12] Although Google allowed access to a diminished form of AdX called AdX Direct that was not tied to the use of DFP, that only involved a small, declining portion of AdX transactions, ████████████████████████████
████████████  Elhauge Rpt. ¶301; Elhauge Reb. Rpt. ¶274.

[13] *See* Elhauge Reb. Rpt. ¶¶332-44; *see also Google I*, 627 F. Supp. 3d at 368-70; EDVA Op. *38-41.

[14] *See* Elhauge Rpt. ¶¶231, 269-75; Elhauge Reb. Rpt. ¶¶350-54; Elhauge Dep. 88:13-14, 89:11-22.

EDVA Op. *13-14; Cramton[15] Reb. Rpt. ¶¶22-31, 41 (Ex. 9).[16] DA also allowed AdX to peek at the price any third-party exchange was expected to bid—sometimes termed a "last look" advantage—and then cherry-pick valuable impressions by simply matching rather than exceeding that price. Cramton Reb. Rpt. ¶34.[17] Because access to real-time comparative bids was limited to publishers using DFP and AdX together, publishers had to use both products to get real-time bids. Elhauge Rpt. ¶288 n.780; Elhauge Dep. 119:1-7; Das Reb. Rpt. ¶95; EDVA Op. *15. DA thus reinforced the effects of the ties "by artificially advantaging AdX" over other ad exchanges, thereby "reduc[ing] competition in the ad exchange market." EDVA Op. *41, *45; Elhauge Reb. Rpt. ¶¶458-461.

In time, publishers and rival ad exchanges attempted to circumvent DA with Header Bidding, which provided competitive real-time bidding among multiple exchanges. EDVA Op. *14-15; Elhauge Rpt. ¶¶43-45. But rather than participate alongside other exchanges,[18] Google viewed Header Bidding as an ██████████████████[19] and continued to take advantage of AdX's exclusive "last look" to peek at competing Header Bidding bids. Elhauge Rpt. ¶¶318-20; Elhauge Reb. Rpt. ¶¶474-77; Das Rpt. ¶¶133-37. Because publishers were required to use the

---

[15] Plaintiffs' auction expert Peter Cramton is Professor of Economics Emeritus at the University of Maryland and International Research Fellow at the Max Planck Institute for Research on Collective Goods. *See* Cramton Rpt., App'x III (Ex. 8). All citations to Dr. Cramton's expert reports incorporate by reference the documents and testimony he references and relies upon.

[16] *See* GOOG-DOJ-31847985 at -985 (Ex. 20) ████████████████████████████████████
█████████████████████████████████████████████████████████████████████ GOOG-DOJ-
27792007 at -028 (Ex. 21) █████████
████████████████; GOOG-TEX-00089241 at -242 (Ex. 22); GOOG-DOJ-04830048 at -048 (Ex. 23) █████████████████████

[17] *See* GOOG-DOJ-AT-00597161 (Ex. 24) ███████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████; GOOG-DOJ-14024199 at -200 (Ex. 25) ██████████████████████████████
████████████████████; *see also* Elhauge Rpt. ¶¶316-19; EDVA Op. *15-16, *42.

[18] *See also* EDVA Op. *15 ("Google declined to have AdX participate in header bidding, thereby avoiding direct head-to-head competition between AdX and other ad exchanges, such as Index Exchange, Magnite, OpenX, and PubMatic.").

[19] Elhauge Rpt. ¶45.

DFP ad server to access real-time bids in AdX, publishers were forced to use DFP to manage their incoming Header Bidding bids from other ad exchanges.[20]  As part of DA's last look, in what was otherwise a sealed bid auction, the price associated with the winning Header Bidding bid was conveyed by DFP to AdX as a floor price, giving AdX the "unique opportunity to adjust its bid in response to the highest bid from rival ad exchanges."  EDVA Op. *15.[21] This in effect let Google "open the envelope for the winning bid," learn what its competitors were willing to pay, and take the ad impression without paying more to the publisher.  EDVA Op. *15.

   ***Enhanced Dynamic Allocation***.  In 2014, Google "enhanced" the scope of DA to include impressions that were set aside for direct transactions.[22]  Prior to this "Enhanced Dynamic Allocation" ("EDA") feature, impressions designated to be sold through direct transactions between advertisers and publishers could not be appropriated by AdX through DA.  Elhauge Rpt. ¶325.  Under EDA, however, these impressions could be secured by AdX.  Elhauge Rpt. ¶¶325-27.  Google's 30(b)(6) designee testified that by 2016, DA and EDA gave AdX ███████

██████████████████████████████████████████████████████████████

(Google 30(b)(6)) 7/12/24 Dep. 63:7-66:25 (Ex. 26).  While other exchanges were nominally allowed to participate in EDA, Google ██████████ these third-party exchanges, regularly preventing them from winning impressions even when they offered publishers the highest price.  Elhauge Rpt. ¶¶325-27; Elhauge Reb. Rpt. ¶¶464, 495, 502; Cramton Reb. Rpt. ¶¶61-65.[23]

   Together, DA and EDA reinforced the DFP-AdX ties by limiting AdX real-time bidding

---

[20] GOOG-AT-MDL-008842393 at -398 (Ex. 27) (Declaration of ███████████).
[21] *See also* GOOG-DOJ-02857276 (Ex. 28) ███████████████████████████████████████
███████; ███████████ (Google) 6/7/2024 Dep. 12:23-13:2; 179:5-182:24 (Ex. 29).
[22] *Google I*, 672 F. Supp. 3d at 386-87; Elhauge Rpt. ¶¶305, 324-33; Elhauge Reb. Rpt. ¶¶464, 491, 495, 497, 502; Das Reb. Rpt. n.236.
[23] Google's internal design documents describe how rival ad exchanges were disadvantaged.  *See, e.g.*, GOOG-DOJ-13228856 at -857 (Ex. 30) ██████████████████████████████████; GOOG-DOJ-AT-01902619 (Ex. 31) ████████████████████████████.

to users of DFP and by restricting DFP publishers from giving other exchanges the first or last look at impressions granted to AdX.

*Sell-side Dynamic Revenue Share*.  In 2015, Google implemented a practice known as Sell-side Dynamic Revenue Share ("DRS") by selectively varying its AdX take rate to win impressions that otherwise would not have cleared the AdX auction.[24]  Google's DRS was unique in that it operated in tandem with DA—allowing AdX to peek at competitive bids and lower its revenue share by the precise amount required to meet the highest bidding exchange and win the impression.[25]  DRS was not a competitive price cut because ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[26]  As a consequence of DRS, publishers sold impressions on AdX that could otherwise have gone to rival platforms.  Elhauge Rpt. ¶¶340-41; Elhauge Reb. Rpt. ¶¶493-95; Cramton Reb. Rpt. ¶¶71-72; EDVA Op. *16, *46.

*Unified Pricing Rules*.  In September 2019, Google adopted a policy known as "Unified Pricing Rules" ("UPR") to eliminate publishers' ability to set higher price floors for AdX than those set for competing exchanges.  *See* EDVA Op. *16.  Before UPR, publishers often set higher price floors for AdX auctions to counteract Google's dominance and information advantage, to filter out low-quality ads, and to reduce dependence on AdX.  Das Rpt. ¶148; Elhauge Rpt.

---

[24] Elhauge Rpt. ¶¶334-41; Elhauge Reb. Rpt. ¶¶491-507; *see also Google I*, 672 F. Supp. 3d at 389-91; EDVA Op. *16.

[25] GOOG-DOJ-14162335 at -335 (Ex. 32) ████████████████████████████████████████████████ ██████████████.  Competing ad exchanges like AppNexus could not operate DRS in the same way.  *See* EDVA Op. *16 ("Because third-party exchanges did not have Last Look to 'see all the bids' and vary their take rate accordingly, they lost scale and revenue from AdX's use of sell-side dynamic revenue share.") (quoting Brian O'Kelley (Xandr) 9/23/23 Dep. 163:9–165:11).

[26] *See* EDVA Op. *16. ██████████████████████████████████████████ ████████████████████████████████████████████████.

¶¶345-55; Cramton Rpt. ¶¶266-269; EDVA Op. *16.[27]  UPR prohibited publishers from setting higher price floors on AdX than on any other exchange, ensuring that AdX was guaranteed the lowest possible price floor.  Elhauge Rpt. ¶¶342-67; Elhauge Reb. Rpt. ¶¶508-69; Cramton Reb. Rpt. ¶¶139-140; EDVA Op. *16-17.  By removing the ability to set lower price floors on auction platforms that competed with ███████████████████████████

███ as one senior Google engineer described it[28]—Google eliminated publishers' ability to steer impressions to their preferred auction platforms, thereby further reinforcing Google's market power.  Elhauge Rpt. ¶¶342-67; Elhauge Reb. Rpt. ¶¶508-69; EDVA Op. *17.[29]

   ***Discriminatory risk aversion coefficient.***  In 2017 Google developed an algorithm called Project Poirot which reduced bids from its DV360 ad buying tool—a practice known as "bid shading"—into certain exchanges.[30] ████████████████████████████

████████████████████████████████████████████████████

███ ██████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████ ████████████████████████████████

---

[27] *See* GOOG-TEX-00453305 at -306 (Ex. 34); GOOG-DOJ-13473146 at -146 (Ex. 35).
[28] GOOG-DOJ-AT-01680260 (Ex. 36). ██████████████████████████████████
████████████████████████████████████████████████████
[29] GOOG-TEX-00096393 at 395 (Ex. 38) ███████████████████████████
██████████████████████████████████████████████
[30] *See Google I*, 627 F.Supp.3d at 397-98 (describing Project Poirot).
[31] GOOG-AT-MDL-002295032 at -034 (Ex. 39); ███████████ (Google 30(b)(6)) 7/10/2024 Dep. 31:16-32:7 (Ex. 40); ██████████ (Google) 4/25/2024 Dep. 121:17-122:13 (Ex. 41).
[32] ████████████████████████████████████████████████████
██████████████████████████████████████      *See* Cramton Rpt.

███████████████ Elhauge Rpt. ¶¶368-71; Elhauge Reb. Rpt. ¶¶570-82; Cramton Reb. Rpt.

¶¶120-121.  Google's discriminatory treatment suppressed bids on third-party exchanges,

depriving rival exchanges of winning impressions and thus the scale needed to compete

effectively.  Elhauge Rpt. ¶370; Elhauge Reb. Rpt. ¶570.

## III.    PLAINTIFFS AND THE PROPOSED CLASSES ARE DIRECT PURCHASERS

Plaintiffs seek to certify two Classes: (1) the AdX Publisher Class,[33] to be represented by

Genius Media Group (n/k/a MediaLab AI, Inc.) ("Genius") and The Nation Company, LLC

("The Nation"); and (2) the AdSense Publisher Class,[34] to be represented by The Progressive,

Inc. ("The Progressive").[35]  Mot. at 1-2.  Genius, The Nation, and The Progressive are all Class

members.  *See infra* § IV.A.3-4.  The membership of each proposed Class's is determined from

Google's data reflecting publishers that have made sales through its auction platforms between

December 15, 2016 (four years preceding the filing of the complaint) and March 31, 2024, the

end of the last dataset produced by Google during fact discovery ("the Class Period").  *See*

---

¶¶250-57; Cramton Reb. Rpt. ¶¶102-125. ███████████████████████████████████
███████████████████████████████████████████████████████████ *See, e.g.,*
GOOG-AT-MDL-011538685 at -685 (Ex. 42) ██████████████████████████
███████████████████; GOOG-AT-MDL-008517180 at -180 (Ex. 43) █████████████████.

[33] The proposed AdX Publisher Class is defined as: "All persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites via Google's AdX Ad Exchange ('AdX Sales') from December 15, 2016 through March 31, 2024 ('Class Period').  The AdX Publisher Class only seeks damages associated with its members' AdX Sales." Mot. at 1-2

[34] The proposed AdSense Publisher Class is defined as: "All persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites via Google's AdSense Package ('AdSense Sales') during the Class Period.  The AdSense Publisher Class only seeks damages associated with its members' AdSense Sales." Mot. at 2.

[35] Plaintiffs slightly modified the class definitions listed in Plaintiffs' First Amended Consolidated Class Action Complaint. *See* ECF 408 at ¶368. Such amendments are routinely made at the class-certification stage.  *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 210-12 (S.D.N.Y. 2018) (citing *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) and *Menking ex rel. Menking v. Daines*, 287 F.R.D. 174 (S.D.N.Y. 2012)).

Elhauge Rpt. ¶4.[36]

Publishers are "the immediate buyers from the alleged antitrust violators," and thus have standing to pursue their claims against Google. *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019). Publishers contract directly with Google and use Google's auction platform services to sell impressions, and Google is compensated by deducting a percentage of the auction-clearing bids from those impression sales. Elhauge Rpt. ¶¶16, 418. For the AdX Publisher Class, Google has conceded that publishers, not advertisers, directly pay Google's AdX a 20% open-auction revenue share,[37] stating "publishers are the only parties that directly purchase ad exchange services."[38] Google likewise directly charges a publisher in the AdSense Class 20% (or in certain circumstances 32%) of the net amount of the bid after the advertiser's fee to the buying tool has already been deducted. Elhauge Rpt. ¶¶16, 67-69.[39]

Publishers—direct purchasers of Google's auction platform services and thus members of

---

[36] Google has produced data reflecting all entities with auction platform accounts, and Prof. Elhauge used that data to identify Class members. Elhauge Reb. Rpt. ¶¶737-39 & nn.1861-63. While Class membership is restricted by data available for the Class Period, Plaintiffs and the Class seek damages for injuries sustained from the beginning of the Class Period extrapolated through the time of trial. Elhauge Rpt. ¶4.

[37] *See* Google Mot. to Dismiss Advertisers' Am. Consol. Class Action Compl., *In re Google Advertising Antitrust Litig.*, No. 21-md-3010 (S.D.N.Y. Feb. 3, 2023), ECF 447 at 9 ("the customers who pay the ad exchange fee [are] . . . the publishers"); *id*. at 8 (advertisers "do not pay" ad exchange fees); *see also* GOOG-TEX-00691300 at -300 (Ex. 44)███████████████████████. Google's class expert, Dr. Leonard, also concedes that publishers are the direct purchasers, observing that advertisers are harmed by the alleged auction platform overcharges only to the extent ████████████████████████████████████. Leonard Rpt. ¶24 (Ex. 10); *id.* ¶216 (same); Elhauge Reb. Rpt. ¶703.

[38] Google's Reply Memorandum in Support of Motion to Dismiss at 18, *United States v. Google LLC*, No. 23-cv-108 (E.D. Va. Apr. 17, 2023), ECF No. 122 (Ex. 45).

[39] This situation is analogous to *Salveson v. JP Morgan Chase & Co.*, 2020 WL 4810704 (E.D.N.Y. July 16, 2020), which held that where a merchant is paid by credit card, and the bank that issued the card retains a portion of the cardholder's payment before transmitting the balance of the funds to the merchant, the merchant (like the publishers here) is the direct purchaser in the credit card transaction. *Id*. at *10-12; *see also In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 163 (S.D.N.Y. 2000) (certifying class where both buyers and sellers brought claims against art auction houses for conspiring to fix fees for services, and where the buyers (like the advertisers here) sought to recover overcharges relating to the buyers' premiums (like the charges advertisers pay for use of ad buying tools), and the sellers (like the publishers here) sought to recover overcharges of the seller commissions (like the auction platform rates here)).

the Classes—maintain AdX and AdSense accounts.[40]  Some publishers engage Multiple

Customer Management ("MCM") firms to manage the sale of a portion of their ad inventory.

Elhauge Reb. Rpt. ¶734 & Tbl. 6.  Where such relationships exist, Google refers to the website

publisher as the "child publisher" and the MCM entity as the "parent publisher."  Elhauge Reb.

Rpt. ¶734 & Tbl. 6; Elhauge Dep. 190:4-16.  For certain types of MCM relationships (called

"Manage Inventory"), the parent publisher maintains an AdX account and is paid directly by

Google for ad impression sales, less Google's revenue share.  Elhauge Reb. Rpt. n.1855.[41]  In

that circumstance, the parent publisher falls within the Class definition with respect to the

transactions it manages on AdX for the child publisher.  Elhauge Reb. Rpt. ¶739.

　　　Under a second kind of MCM relationship (called "Manage Account"), the child

publisher maintains the AdX account, directly receives a portion of the revenue, and instructs

Google to pay the remainder to the MCM/parent publisher as a commission.  Elhauge Reb. Rpt.

n.1856.  Because Google pays the child publisher directly for sales of ad impressions, Google

has a direct payment relationship with the child publisher.[42]  In that circumstance, even if Google

remits some of the proceeds to the parent publisher as directed by the child publisher, the child

publisher is the Class member.[43]

　　　About ███ of the AdX Class are MCM parent publishers (including both Manage

---

[40] Prof. Elhauge identifies class members with data that Google produced that "identifies each unique 'publisher.'" Elhauge Reb. Rpt. ¶737 & n.1861.  Dr. Leonard analyzes the same data set, implying that it identifies publishers that "transact 'directly'" with Google.  *See* Leonard Rpt. ¶44; *see also id.* ¶47 & n.61.

[41] Until 2022, Google maintained a program known as "Scaled Partner Management," which operated the same way as a Manage Inventory relationship.  Elhauge Reb. Rpt. n.1854; Elhauge Dep. 196:23-197:2; Leonard Rpt. ¶48.

[42] Elhauge Reb. Rpt. ¶741 & n.1867; Elhauge Dep. 194:24-195:11; *id.* 192:2-4 (referring to MCM arrangements as "buying on commission").

[43] *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.,* 2024 WL 1014159, *12 (E.D.N.Y. Mar. 8, 2024) ("the cardholder is the direct purchaser from Amazon, notwithstanding the fact that Chase paid for the product on the cardholder's behalf"); *see also In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 366 (D.N.J. 2001) ("The source from which one obtains funds for a purchase does not attenuate the seller-to-buyer relationship, either as a matter of logic or commercial reality").

14

Inventory and Manage Account relationships), ██████████████████████████

██████████████████. Leonard Rpt. ¶47.[44]  The MCM arrangements create

no ascertainability issues because the identity of the Class members under all circumstances "can

be ascertained by reference to objective criteria."  *Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117,

127 (S.D.N.Y. 2011); *see In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at

203.

## IV.    ARGUMENT

"A party seeking class certification must satisfy the requirements of Rule 23(a) and at

least one of the three requirements listed in Rule 23(b)."  *Hanks v. Lincoln Life & Annuity Co. of

New York*, 330 F.R.D. 374, 379 (S.D.N.Y. 2019).  Here, as is typical in direct-purchaser antitrust

cases involving overcharges, the requirements are satisfied.

### A.    The requirements of Rule 23(a) are satisfied.

#### 1.    The Proposed Classes are sufficiently numerous.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is

impracticable."  A class containing more than 40 members satisfies the numerosity requirement.

*In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 138 (S.D.N.Y. 2019).  Each proposed class

meets that test: the AdX Class has approximately 5,000 members, and the AdSense Class has

over 700,000 members.  Elhauge Reb. Rpt. Tbls. 8, 11.

#### 2.    There are common questions of fact and law.

The requirement of commonality is satisfied by establishing "a single common question"

of fact or law as to all class members.  *Elisa W. v. City of New York*, 82 F.4th 115, 127 (2d Cir.

---

[44] In the AdSense Class, approximately ██████████████████████████████████. *See*
Elhauge Reb. Rpt. Tbl. 7; Elhauge Dep. 197:6-12. ████████████████████████████
████████████████████████████. *See* Elhauge Reb. Rpt. ¶¶734, Tbl. 6, 739, Tbl. 8.

2023). The vast majority of factual and legal issues implicated by Plaintiffs' antitrust claims are common, including what restraints comprised Google's scheme; whether that scheme had anticompetitive effects; whether that scheme violated the antitrust laws; whether members of each proposed Class paid overcharges; and whether aggregate damages can be measured for each Class as a whole.

### 3. The claims of the proposed Class representatives are typical of the claims of each Class.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Both Google and Plaintiffs have produced documents and data establishing that each of Genius, the Nation, and The Progressive (together, "proposed Class representatives") sold impressions and paid Google's supracompetitive revenue shares during the Class Period. *See* Elhauge Rpt. ¶443, & Tbl. 7; Elhauge Rpt. ¶446 & Tbl. 8 Errata (Ex. 2); Leonard Rpt. ¶53 & n.74. The typicality requirement is satisfied because the claims of each representative and their corresponding Classes (1) are based on the same conduct by Google, (2) assert violations of the same antitrust laws, and (3) seek relief for injury from overcharges on Google's auction platforms. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 214.

### 4. Plaintiffs and counsel will fairly and adequately represent the Classes.

Rule 23(a)(4) requires that class representatives and class counsel "fairly and adequately protect the interests of the class." A class representative meets that requirement unless there is a non-speculative conflict with other class members that is fundamental and central to the action. *See Hanks*, 330 F.R.D. at 381 (adequacy satisfied unless "plaintiff's interests are antagonistic to the interest of other members of the class") (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 (2d Cir. 2015)); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 102 (E.D.N.Y. 2012)

("a conflict of interest will not destroy adequacy under Rule 23 unless the conflict is fundamental and concrete; conflicts which are merely speculative … should be disregarded at the class certification stage") (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)). Here, there are no conflicts, let alone fundamental ones. Each proposed representative has the same interests as the members of the Classes: to prove that Google violated the antitrust laws and to maximize the recovery of damages. All members of both Classes were harmed, not benefitted, by Google's conduct.[45] Moreover, the law is clear that because all Class members have the same interest in pursuing recovery of overcharges (and maximizing that recovery), there are no cognizable conflicts even if offsetting benefits exist.[46]

The proposed Class representatives are adequate. Genius publishes song lyrics and other music-related content and sells open-web display advertising through DFP and AdX.[47] The Nation supports its journalism and commentary with open-web display advertising sold through DFP and AdX.[48] The Progressive likewise publishes journalism and commentary and sells open-web display advertising through AdSense.[49] The proposed Class representatives have worked

---

[45] Elhauge Dep. Tr. 186:14-187:25 (stating that he "concluded that those [offsetting] benefits did not exist"); Elhauge Reb. Rpt. ¶701 ("the Challenged Restraints created no cognizable benefits for any class member."); *id.* ¶694 ("the Challenged Restraints did not reduce costs or improve product quality"); *see infra* § IV.B.1.b.ii (rebutting Google's expert's speculation that some Class members might have benefitted from some aspects of the challenged conduct).

[46] *See Visa Check/MasterMoney*, 280 F.3d at 143-44 (holding that offsetting benefits conferred on some class members on sales of some products in a package does not defeat adequacy); *Vitamin C*, 279 F.R.D. at 103-04 (applying *Hanover Shoe* and holding that "evidence that [a direct purchaser] benefitted economically" from anticompetitive conduct does not create a conflict); *In re Glumetza Antitrust Litig.*, 2020 WL 3498067, at *14 (N.D. Cal. June 29, 2020) (collecting cases and refusing to find a conflict of interest where some plaintiffs purportedly benefitted); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *15 (N.D. Cal. Feb. 21, 2017) (certifying class and rejecting defense expert opinion of Dr. Leonard of intra-class conflict because some direct purchasers benefitted).

[47] *See* Todd Schneider (Genius) 6/27/2024 Dep. 27:12-19, 82:17-22, 116:17-19 (Ex. 46); *About Genius*, Genius, https://genius.com/Genius-about-genius-annotated; ECF 408 at ¶46.

[48] *See* Suzette Cabildo (The Nation) 5/21/2024 Dep. 200:7-202:2 (Ex. 47); The Nation, https://www.thenation.com; Katrina Vanden Heuvel, *We're Suing Google. Here's Why.*, The Nation (May 19, 2021), https://www.thenation.com/article/society/google-lawsuit-monopoly-antitrust; ECF 408 at ¶48.

[49] *See* Norm Stockwell (The Progressive) 5/24/2024 Dep. 14:10-23; 32:14-33:20, 47:7-23 (Ex. 48); Mission & History, The Progressive, https://progressive.org/about-us/mission-and-history; Bill Lueders, *Editor's Note: Standing Up for Fairness*, The Progressive (Aug. 20, 2021), https://progressive.org/magazine/standing-up-fairness-lueders; ECF 408 at ¶49.

diligently to represent the interests of the Classes through discovery and should be appointed as Class representatives.

As set forth in the attached firm resumes, proposed class counsel (Boies Schiller, Korein Tillery, and Berger Montague) are experienced and capable plaintiff antitrust class-action attorneys.[50]  The transferor court appointed these three firms as Interim Co-Lead Class Counsel.[51]  Over the past four years, these firms have dedicated tens of thousands of hours and millions of dollars to litigating on behalf of the proposed Classes.[52]  These firms have worked closely and diligently to prosecute this case and should be appointed as Co-Lead Class Counsel under Rule 23(g).

## B.    The requirements of Rule 23(b)(3) are satisfied.

Under Rule 23(b)(3), a case is maintainable as a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Plaintiffs' proposed Classes satisfy both the predominance and superiority requirements.

### 1. Common issues predominate.

The predominance inquiry asks "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Feliciano v. CoreLogic Rental Prop. Sols.*, *LLC*, 332 F.R.D. 98, 107

---

[50] *See* Declaration of Philip C. Korologos ¶2 & Exhibit A (Ex. 13); Declaration of Carol O'Keefe ¶ 2 & Exhibit A (Ex. 14); Declaration of Eric L. Cramer ¶2 & Exhibit A (Ex. 15).
[51] *See* Modified Order Appointing Interim Co-Lead Class Counsel for Publisher Class, *In re Google Digital Publisher Antitrust Litig.*, No. 20-cv-8984-BLF (N.D. Cal. Apr. 26, 2021), ECF 76 (re-docketed after transfer as No. 21-cv-07034-PKC (S.D.N.Y. Apr. 26, 2021), ECF 76).
[52] *See* Decl. of Philip C. Korologos ¶¶3, 6-9; Decl. of Carol O'Keefe ¶¶3, 6-14; Decl. of Eric L. Cramer ¶¶6-8.

(S.D.N.Y. 2019) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).[53]

"Predominance is satisfied if resolution of *some* of the legal or factual questions . . . can be

achieved through generalized proof, and if these particular issues are more substantial than the

issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d

Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig*, 729 F.3d 108, 118 (2d Cir. 2013)).

     If common issues and evidence have greater overall significance, the presence of

individual issues will not defeat predominance. *Sykes*, 780 F.3d at 87 ("The mere existence of

individual issues will not be sufficient to defeat certification.  Rather, the balance must tip such

that these individual issues predominate.").  Only when individualized issues "permeate the

litigation" can class certification become "inefficient or unfair." *In re Petrobras Sec.*, 862 F.3d

250, 270 (2d Cir. 2017).  The Rule 23(b)(3) predominance requirement is often satisfied in

Section 2 direct purchaser antitrust cases, including where plaintiffs seek to recover overcharges,

because they focus on the market-wide effects of the defendant's conduct. *See Cordes,* 502 F.3d

at 108 (predominance "is a test readily met in certain cases alleging . . . violations of the antitrust

laws") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).[54]

     At this stage, "Rule 23(b)(3) requires a showing that *questions* common to the class

predominate, not that those questions will be answered, on the merits, in favor of the class."

---

[53] *See also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) ("Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted.").

[54] *See, e.g., Dial Corp.*, 314 F.R.D. at 114-21 (finding predominance satisfied in Section 2 scheme case); *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) ("Section 2 monopolization claims readily lend themselves to common evidence" because "the state of the market and defendants' use and maintenance of monopoly power, as opposed to individual plaintiff's conduct, drives the claim"); *see also In re Da Vinci Surgical Robot Antitrust Litig.*, 2025 WL 964879, *7-8 (N.D. Cal. Mar. 31, 2025); *Simon & Simon, PC v. Align Tech., Inc.*, 2023 WL 8261297 (N.D. Cal. Nov. 29, 2023); *Castro*, 134 F. Supp. 3d at 847-49; *Allen v. Dairy Farmers of Am., Inc.*, 2012 WL 5844871, at *16-17 (D. Vt. Nov. 19, 2012); *Moehrl v. Nat'l Assoc'n of Realtors*, 2023 WL 2683199, at *12-13 (N.D. Ill. Mar. 29, 2023); Newberg and Rubenstein on Class Actions § 20:28 (6th ed.).

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  The "evidence need merely be capable of resolving a common question on a class-wide basis."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022).  As the Supreme Court explained in *Amgen*, "Rule 23(b)(3) . . . does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."  568 U.S. at 469 (cleaned up); *see also Tyson Foods*, 577 U.S. at 453.  Here, common evidence can prove each element of Plaintiffs' claims.

### a. Plaintiffs' Sherman Act claims will be proven through common evidence.

Plaintiffs will offer common evidence to prove that Google violated Section 2 of the Sherman Act.  A Section 2 claim requires proof of: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Google I*, 627 F. Supp. 3d at 378.

**Monopoly Power in Relevant Markets**: Plaintiffs will prove with common evidence the appropriate definitions of the relevant markets.[55]  Plaintiffs' proposed markets for advanced ad servers and advanced auction platforms almost exactly match those defined by Judge Brinkema in the EDVA Case.  That court found that there were no reasonably interchangeable substitutes for (i) "publisher ad servers for open-web display advertising," EDVA Op. *19-21, and (ii) "ad exchanges for open-web display advertising," EDVA Op. *21-23.  Common evidence also supports Plaintiffs' proposed submarkets for basic ad servers and basic ad auction platforms.

---

[55] *In re Google Digital Advert. Antitrust Litig.*, 2024 WL 988966, at *3 (S.D.N.Y. Mar. 7, 2024) ("Monopoly power . . . can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market.") (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004)).

*See, e.g.*, GOOG-DOJ-AT-00198548 at -552 (Ex. 49) ███████████████

████████████████████████████████████████████████████

██████████████████████████████. Judge Brinkema further rejected

the assertion that the market should include direct sales between publishers and advertisers or

impressions on other advertising channels such as mobile apps, search, or "walled garden"

websites. EDVA Op. *20-21.

Google's monopoly power in these markets is equally a question of common proof.[56]

Here, too, the EDVA court found that Google had a 91% market share in the advanced ad server

market, which was protected by significant entry barriers and Google's restrictions on working

with rival ad exchanges, and that Google degraded desirable features for its advanced ad server

without losing customers. EDVA Op. *20, *30-31. As discussed above in section II.A, Google

had a controlling market share in each of the submarkets at issue, ███████████ in most of

them. The EDVA court also found "strong support" for Google's market power in the advanced

ad auction platform market from direct and indirect evidence, noting AdX's ability to charge a

"durable 20% take rate for well over a decade"[57] and a "relatively high and durable market

share," which was "roughly nine times larger than the share held by Google's next largest

competitor." EDVA Op. *32-34; *see also* Elhauge Rpt. ¶¶237-43. All of these determinations

---

[56] Notably, Judge Brinkema also rejected Google's theory, advanced by the same expert proffered in this case (Dr. Mark Israel), that there is a single two-sided market for online advertising that obviates the need to define product markets for ad servers or ad auction platforms. The court explained that Dr. Israel's theory "disregards *Amex*'s explicit limitation of its holding to two-side transaction platforms," finding that "most of the core ad tech products … do not fit within this definition," but instead are more analogous to "merchant-facing products such as point of sale terminals and digital payment gateways" for which there is distinct, single-side competition. EDVA Op. *26-28. The Court also noted multiple instances in which Google has argued that distinct markets exist for individual ad tech products. EDVA Op. *27 & n.25.

[57] *See* GOOG-DOJ-AT-02118627 at -628 (Ex. 50) ████████████████████

████ ; GOOG-DOJ-09470144 at -145 (Ex. 51) ████████████████████

██████████████████████ GOOG-DOJ-02852767 at -767-68 (Ex. 52) ████████

████ .

were based on Google- and market-specific evidence, not on any individualized inquiries.

In sum, as is typical with monopolization cases, the "definitions of the relevant geographic and product markets," as well as the defendant's "market power in the relevant market," are "questions common to the class and capable of resolution through common proof." *See Dial Corp.*, 314 F.R.D. at 113.

**Willful Maintenance.**  Common evidence will also establish that Google illegally maintained monopoly power in violation of Section 2.  Plaintiffs' common evidence will show that rather than competing on the merits, Google used its monopoly power to undermine competition.[58]  Exclusionary conduct can include schemes that synergistically cause competitive harm.[59]  The impact of this synergistic effect needs to be evaluated as a whole.  *See* EDVA Op. *35 (collecting cases).  As this Court observed in *Google I*, the trier of fact "must avoid tightly compartmentalizing the various factual components of a plaintiff's claims and wiping the slate clean after scrutiny of each."  627 F. Supp. 3d at 381 (quoting *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019)).

The core of Google's exclusionary conduct consists of its multiple tying arrangements. Proof common to the Classes will show that the purpose and effect of these ties were to foreclose rivals, drive sales to Google, and maintain inflated prices.  Although Plaintiffs focus on Google's broader exclusionary scheme under Section 2, the ties that were part of that scheme also violate Section 1.  Judge Brinkema found Google's tying of DFP and AdX not only to violate Section 2 of the Sherman Act but also to be a *per se* violation under Section 1—based on the same

---

[58] *See, e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015) (finding conduct by entity with monopoly power "to coerce consumers rather than persuade them on the merits, and [thereby] to impede competition" a violation of Section 2); *id.* at 652 (characterizing as unlawful conduct that harms rivals other than through efficiency).

[59] *See* Elhauge Rpt. ¶¶230, 259-60, 262, 265-66, 302, 309, 330, 340-41, 367, 375; Elhauge Reb. Rpt. ¶¶333, 491, 508, 623, 626, 629, 710, 713.

evidence, including Google forcing publishers to pay for its DFP ad server in order to access real-time bids from AdX.[60]  EDVA Op. *38-41.

Common proof of Google's multiple ties will also include Google's own internal documents.  For example, before the contractual tie and GAM bundle, Google employees understood that ████████████████████████████████████████████████████ ████████████████[61]  GOOG-TEX-00302454 at -454 (Ex. 53).  Google employees recognized AdX as ██████████████████████████████████████ GOOG-DOJ-02148005 at-006 (Ex. 54).  Thus, Google's "goal" was also to force publishers into █████████████████████████████████████████████████████████ GOOG-TEX-00532696 at -696 (Ex. 55); *see* EDVA Op. *39.  The GAM bundle "further intertwined DFP and AdX."  EDVA Op. *33.  As Google recognized: ████████████████████████ ███████████████████████████ GOOG-DOJ-AT-02199478 at -500 (Ex. 56).  But given "AdX's monopoly power in the ad exchange market," forgoing AdX was a "Hobson's choice" because "it was not financially viable for large publishers to forgo using AdX and the access it offered to the unique advertising demand from AdWords."  EDVA Op. *45.[62]

Google's auction-related exclusionary policies reinforced these ties and deprived rival ad server tools and exchanges of the scale needed to compete effectively against Google's products. In each relevant product market, Google's anticompetitive conduct induced exit and disincentivized entry or expansion, thereby solidifying its monopolies across the ad tech stack.

---

[60] Whether considered under Section 2 or Section 1, or under a *per se* or rule of reason standard, the proof of this conduct and its effects will be common.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 133 n.5, 136-40.

[61] GOOG-DOJ-05276794 at -794 (Ex. 57) ████████████████████████████████████████████ ██████████████████████████; EDVA Op. *39.

[62] *See also* Trial Testimony of Tom Kershaw (Magnite), Sept. 13, 2024 AM Tr. at 20:3-16, *United States v. Google LLC*, No. 23-cv-108-LMB (E.D. Va.) (Ex. 58) (not accepting the tied products presented publishers "the option to starve to death").

Elhauge Rpt. ¶233; EDVA Op. *31, *34.  Judge Brinkema found that Google was able to "entrench" its monopoly positions through this "series of anticompetitive policies" (including Dynamic Allocation, DRS, and UPR) that decreased product quality and "were not in its publisher customers' best interests."  EDVA Op. *41.  Judge Brinkema further found, as did Prof. Elhauge, that these policies were mutually reinforcing such that they worked together to enhance the anticompetitive effects of the scheme.  EDVA Op. *41-42; *see supra* n.59.

### b.  Common impact can be shown through class-wide evidence.

Plaintiffs will show through common evidence that injury to the Classes is widespread, *see Cordes*, 502 F.3d at 107-08,[63] and that all or virtually all Class members were injured by Google's conduct.[64]

### i.    Plaintiffs will prove common impact with a standard two-step analysis.

Plaintiffs will prove common impact with a "commonly accepted two-step method."  *In re Restasis Antitrust Litig.*, 335 F.R.D. at 15.[65]  Plaintiffs will show "first, that class members paid artificially inflated prices and, second, that 'this price inflation occurred to substantially all class members.'"  *Id.* (quoting *Castro*, 134 F. Supp. 3d at 847).

---

[63] *See also Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.* ("*Iowa PERS*"), 2022 WL 2829880, at *25 (S.D.N.Y. June 30, 2022) ("At this stage of the proceedings, however, the question before the Court is whether Dr. Zhu's evidence is *capable* of showing class-wide impact, not whether, on the merits, the jury *will* find that Plaintiffs have shown class-wide impact.") (emphasis in original); *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, 2021 WL 234550, at *22 (E.D.N.Y. Feb. 19, 2021) ("the question is whether the method by which plaintiffs propose to prove class-wide impact *could* prove such impact, not whether plaintiffs in fact *can* prove class-wide impact") (emphasis in original).

[64] In any event, the possibility of uninjured plaintiffs does not defeat predominance.  *See Iowa PERS*, 2022 WL 2829880, at *20 ("district courts in this Circuit have certified classes that likely or certainly contained uninjured class members"); *In re Restasis Antitrust Litig.*, 335 F.R.D. 1, 17 (E.D.N.Y. 2020) ("The Supreme Court and Second Circuit, however, have never suggested that a certain percentage or number of uninjured plaintiffs would automatically bar class certification."); *Dial Corp.*, 314 F.R.D. at 120 ("the fact that some putative class members may be uninjured does not automatically defeat predominance").

[65] *See, e.g.*, *In re Actos Antitrust Litig.*, 2024 WL 4251891, at *20 (S.D.N.Y. Aug. 9, 2024), *report & recommendation adopted,* 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024) (approving two-step method); *Castro*, 134 F. Supp. 3d at 847-48 (same) (collecting cases); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 297-98 (N.D. Cal. 2016) (same).

**Step 1: Common evidence will demonstrate that Google's scheme caused Google's take rates to be artificially inflated.**  Plaintiffs will offer Prof. Elhauge's standard economic analysis as applied to the facts of this case and his yardstick model to demonstrate the two categories of class-wide evidence capable of showing that Google's scheme artificially inflated prices paid by the members of the two Classes.

*First*, Prof. Elhauge employs standard economic analyses to evaluate how exclusionary conduct harms market buyers or sellers:[66] Prof. Elhauge determined that Google's scheme foreclosed competition, and by enhancing Google's market power, allowed Google to charge supra-competitive rates for AdX and AdSense.  Elhauge Reb. Rpt. ¶709 & n.1801.[67]  Class-wide evidence shows that Google prevented potential rivals from the opportunity to bid on ad impressions, depriving them of the revenue and scale economies needed to compete effectively. Google foreclosed potential and actual competitors from entering or expanding in the relevant markets, thereby reducing their ability to constrain Google's monopoly power.  As a result, Google, the dominant entity, was able to maintain the artificially inflated rates it charged publishers for its auction services.  Elhauge Rpt. ¶¶230-32; Elhauge Reb. Rpt. ¶¶236-37, 209, 491, 508, 623; *see also* Elhauge Rpt. ¶¶218-26, 255-68.

Google's own documents confirm that it was able to charge prices above competitive

---

[66] In his expert report, Dr. Leonard concedes that Prof. Elhauge's method is standard.  Leonard Rpt. ¶¶154, 220; *see also* Gregory Leonard & Laila Haider, *Proving Antitrust Damages: Legal and Economic Issues*, ABA Section of Antitrust Law, at 290 (3d ed. 2017) ("*Proving Antitrust Damages*") (Ex. 33) (in exclusionary conduct cases, the "theory of harm to competition is typically that the exclusionary conduct permitted the defendant to achieve or maintain monopoly power—i.e., the ability to price above competitive levels").

[67] Dr. Leonard's assertion that a direct purchaser can only claim harm from conduct to which it is directly "subject", Leonard Rpt. ¶¶15, 19, 36, is incorrect both as a matter of law and as a matter of economics.  *See, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) ("Although the defendants' conduct at issue targeted their competitors, . . . the plaintiffs' claimed injury of higher prices was inextricably intertwined with the conduct's anti-competitive effects and thus 'flow[ed] from that which makes defendants acts unlawful.") (alteration in original) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982)); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 222 (S.D.N.Y. 2019) ("even though the injuries to the DPPs were derivative of the direct harm experienced by the defendants' competitors, harming competitors was simply a means for the defendants to charge the plaintiffs higher prices").

levels for use of its auction platforms.[68] ██████████████████████████

██ ██████████████████████████████████████████████████████████████████ ██

████████████████████████████████████████████████████████████████

████████████████████████████████████        Elhauge Rpt. ¶241.

*Second*, to model the but-for world absent Google's scheme, Prof. Elhauge used a

standard yardstick method.[71]  Under such an approach, the economist "examines the actual prices

and quantities that occurred in a similar market that was not affected by defendant's behavior."

*In re Restasis Antitrust Litig.*, 335 F.R.D. at 15.  The yardstick need not be a "perfect clone" but

only be "sufficiently comparable to permit a degree of reliable comparison."  *In re Keurig Green*

*Mountain Single-Serve Coffee Antitrust Litig.* ("*Keurig II*"), 2025 WL 354671, at *34 (S.D.N.Y.

Jan. 30, 2025).  Google's principal economic expert, Dr. Israel, has endorsed the yardstick

approach, including in his testimony at the EDVA Case trial.[72]

Prof. Elhauge determined that ad auctions in mobile applications ("mobile apps") are an

appropriate yardstick for the competitive price here.  For mobile app ad sales, there is an

analogous set of technological tools that similarly includes an ad tech stack that has tools for ad

serving (called "SDKs"), auction platforms (to run the auctions), and ad buying tools.  As Prof.

Elhauge observed, "markets for open-web display ads and mobile app ads are similar in many

---

[68] Elhauge Rpt. ¶¶237-43.
[69] GOOG-DOJ-12074410 at -410 (Ex. 59).
[70] GOOG-DOJ-02732514 at -514 (Ex. 60).
[71] *See, e.g., Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 5004632, at *14 (S.D.N.Y. Dec. 6, 2024) ("Courts in this Circuit have repeatedly stated that a 'yardstick' methodology is an accepted method to measure antitrust impact and damages."); *see also In re Restasis Antitrust Litig.*, 335 F.R.D. at 18; *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014); *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, 2018 WL 2172667, at *4 (E.D.N.Y. May 10, 2018).
[72] *See* Trial Testimony of M. Israel, Sept. 26, 2024 AM Tr. at 116:21-117:12, *United States v. Google LLC*, No. 23-cv-108-LMB (E.D. Va.) (Ex. 12) ("what you really need to do is still do the hypothetical monopolist test, which is in a conduct case, compare the alleged market in a situation where it's not alleged to be a monopoly to one where it is alleged to be a monopoly and see if the prices are higher").

ways, involving similar products sold in similar ways through a similar ad tech stack from largely similar types of sellers to largely similar types of buyers." Elhauge Rpt. ¶¶400-02.[73]

In order to monetize a mobile app, an app developer needs an in-app ad sales platform. Google offers two in-app ad sales platforms: AdMob and GAM.[74] Das Reb. Rpt. ¶177. AdMob is designed specifically for in-app advertising, while GAM supports web and mobile apps. Das Reb. Rpt. ¶177. The portion of mobile app impressions sold through AdMob and GAM to buyers not using Google's ad buying tools and not delivered through Google's SDK, *i.e.*, a market segment that is *not* subject to tying, forms the basis for Prof. Elhauge's yardstick. Elhauge Rpt. ¶¶404-11; Elhauge Reb. Rpt. ¶¶593-602. In that yardstick segment, the competitive pressure arising from the absence of exclusionary ties combined with the relative ease of substituting the ad serving tool ███████████████████████████████

███████████████████████████████████████████████████████

Elhauge Rpt. ¶¶403-11; Elhauge Reb. Rpt. ¶¶41, 45, 299, 609-10, 615; Das Reb Rpt. ¶¶193, 200.[75]

Prof. Elhauge found that the average take rates on the net bid amounts Google charged for AdX and AdSense for open web display ad impressions sold via open auction were ███████ ████████ respectively. Elhauge Rpt. ¶412; Elhauge Reb. Rpt. ¶764. These average take rates far exceeded the yardstick rates. Elhauge Rpt. ¶442; Elhauge Reb. Rpt. ¶41; Elhauge Dep. 172:6-11. The substantial difference between the actual and yardstick rates constitutes class-wide evidence that Google artificially inflated the take rates that it charged both Classes.

---

[73] *See also* Elhauge Reb. Rpt. ¶609.

[74] Along with open web display, GAM could also be used to auction mobile app ads. But unlike Plaintiffs, app developers could auction their impressions to non-Google buyers using a non-Google SDK and pay a reduced take rate. *See* Elhauge Rpt. ¶¶402-411.

[75] *See*, *e.g.*, GOOG-AT-MDL-007214166 at -166-167 (Ex. 61) █████████████████████████████ ████████████████████████████████.

Elhauge Rpt. ¶¶398-413, 442-53; Elhauge Reb. Rpt. ¶¶17, 20, 34-46, 593-622.  Because the yardstick only measures the anticompetitive effects of the ad server-ad auction platform tying restraints, and not the effects of the additional exclusionary conduct, Prof. Elhauge's overcharge estimate is conservative.  *See* Elhauge Rpt. ¶¶404-406; Elhauge Reb. Rpt. ¶¶510, 593-602; *see also* Elhauge Dep. 173:9-18, 174:13-175:11.

The yardstick effectively isolates the competitive harm flowing from the ad server-ad auction platform two-way ties.  Elhauge Dep. 180:1-14 ("the yardstick would continue to be valid as long as the ad server, ad auction platform ties were illegal.").  Those ties were the lynchpin of Google's exclusionary scheme, distorting how the open-web display ad markets developed.  Absent those ties, publishers would have been free to choose rival ad servers.  Rival ad servers and DFP thus would have been able and incentivized to pit auction platforms against one another to maximize publisher revenue, exposing AdX to competition.  Elhauge Dep. 180:1-14; Elhauge Reb. Rpt. ¶342.  The same would have been true absent the AdSense-auction platform tie.  Elhauge Rpt. ¶¶311-12.

In the but-for world, Google would not have been able to restrain "rivals from achieving the size necessary to obtain the network benefits, data mass, and economies of scale to be competitive with Google's products in the Ad Tech Stack."  Elhauge Rpt. ¶230; *see also id.* ¶¶259-68; Elhauge Reb. Rpt. ¶¶332-454.  Growth of rival auction platforms, in turn, would have put competitive pressure on Google to allow its ad buying tools to bid on multiple auction platforms (to access sufficient ad space inventory for its advertiser clients).  Elhauge Rpt. ¶¶274-75.  The ensuing competition would have produced the type of pricing pressure on Google that prevailed in the yardstick market.  Elhauge Rpt. ¶¶403-11; Elhauge Reb. Rpt. ¶¶41, 45, 299, 609-10, 615; Das Reb. Rpt. ¶¶193, 200.

**Step 2: Common evidence will demonstrate that take rate inflation was experienced across both Classes.**  Prof. Elhauge began his common impact analyses by observing that the take rates paid by the members of each Class were uniform, reflecting a rigid price structure.[76] Courts routinely rely on the existence of a standardized price structure as evidence supporting common impact.[77]

As to the AdX Class, Prof. Elhauge observed that the take rates paid by the AdX Class were highly uniform, with minimal discounting: ███████████████████████████ ███████████████████████████  Elhauge Reb. Rpt. ¶¶706, 707, 765 & Tbl. 16; Elhauge Rpt. ¶443 & Tbl. 7.[78]  The *de minimis* discounting reflects lack of negotiation leverage by the AdX Publishers.[79] ██████████████████████████████████████ ████████████████████████████████████████████████████████[80]

The take rates Google charged AdSense publishers were also uniform. The AdSense take rate was 20% when the winning advertiser's bid came from Google's basic ad buying tool (AdWords), and 32% when the winning advertiser's bid came from a third-party ad buying tool

---

[76] A defendant's "rigid price structure"—where "almost all class members" paid the same price with "little price variance between customers"—is powerful evidence of class-wide impact because it is reasonable to assume that if prices are uniform in the actual world, they would be uniformly lowered in the but-for world.  *See Castro*, 134. F. Supp. 3d at 848-49 (Prof. Elhauge's determination of a pricing structure supported his common impact proof).

[77] *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 89 (D. Conn. 2009) ("[E]vidence of a standardized pricing structure, which . . . presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact") (quoting *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 638 (D. Kan. 2008)); *see also In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 420 (M.D. Fla. 2018); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 318 (E.D. Mich. 2001).

[78] Google's expert witness on this subject, Dr. Leonard, conceded ███████████████████████
██ Leonard Rpt. ¶¶105, 107; Gregory Leonard 3/18/2025 Dep. 203:9-204:25 (Ex. 11) ██████████████
████████████████████████████████████; GOOG-AT-MDL-008842393 at -402
██████████████████████████.

[79] EDVA Op. *32 ("Google has refused to negotiate AdX's take rate with almost all of its customers, only offering minimal discounts to a handful of very large publishers."); *id.* ("only six of AdX's 3,815 largest publisher customers received discounts").  Dr. Leonard did not do any analysis to refute Professor Elhauge's analysis of the lack of AdX pricing variability.  Leonard Dep. 205:21-206:2.

[80] Elhauge Rpt. ¶¶412, 443 & n.1077, Tbl. 7; Elhauge Reb. Rpt. ¶¶707, 765 & Tbl. 16; *see* ███████████ (Google) 6/13/2024 Dep. 362:6-17 (Ex. 62) ██████████████████.

or Google's DV360.  Elhauge Reb. Rpt. ¶¶309, 706, 707, Elhauge Rpt. ¶¶445-446.  Dr. Leonard agreed with Prof. Elhauge's analysis of the lack of pricing variability on AdSense.  *See* Leonard Dep. 205:1-20 ███████████████████████████████████████████.

Based on his yardstick analysis, Prof. Elhauge concluded that Google would have cut its standard rate from 20% to ████████ in the but-for world.  Elhauge Reb. Rpt. ¶¶41, 639, 692, 705; Elhauge Rpt. ¶¶71, 442.  Because all or nearly all members of both Classes paid the standard artificially inflated take rate, and given that Prof. Elhauge's price structure analysis reveals that any class members who received discounts off the standard rate in the actual world would have received those same discounts in the but-for world (albeit off of a lower but-for standard level), all members of both Classes paid overcharges.  Elhauge Reb. Rpt. ¶¶707, 739; Elhauge Rpt. ¶¶448, 449, 451, 453.[81]  Dr. Leonard conceded that if injury is measured in the form of auction platform overcharges, Prof. Elhauge's yardstick analysis would, if valid, establish injury to all or nearly all class members.  Elhauge Reb. Rpt. ¶692; *see* Leonard Rpt. ¶217; Leonard Dep. 207:1-21, 208:19-209:15.

In the alternative, and to be conservative, Prof. Elhauge analyzed each Class under the assumption that no member of either Class would receive discounts off the standard but-for take rate.  Here too, he found that nearly all Class members paid overcharges: ██████████████ █████████████████████████████.[82]  Elhauge Reb. Rpt. ¶765 & Tbl. 16; Elhauge Rpt. ¶¶443, 448-50 & Tbl. 7.  Prof. Elhauge similarly found that ███████████████████████████ ██████████████████████████████████ Elhauge Rpt. Tbl. 8 Errata.  ████████████████

---

[81] *See Castro*, 134. F. Supp. 3d at 848 ("The economic logic of Sanofi's pricing structure would not change in the but-for world, so Sanofi would be likely to reduce price across the board.").

[82] ████████████████████████████████████████████████████████████████ ██████████████████████████  Elhauge Reb. Rpt. ¶765 & Tbl. 16; Elhauge Rpt. ¶¶443, 448-50 & Tbl. 7.

████████████████████████████████████████████████████

████████████████████████████████████    Elhauge Rpt. ¶451 Errata.[83]

### ii.    Class members were injured by the full amount of the overcharge.

As direct purchasers, members of each Class are seeking damages resulting from the take rate overcharges on Google's auction platforms.  Those overcharges are calculated as the "difference between the price they paid . . . in the actual world and those they would have paid in a world free of the alleged misconduct."  *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 213.[84]

Direct purchasers are entitled to recover the full amount of the overcharge they pay.  *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968); *Keurig II*, 2025 WL 354671, at *37 ("*Hanover Shoe* . . . dictates that the direct purchaser is entitled to recover the entire cost of the overcharge.").  Direct purchasers are injured at the moment they pay the overcharge by its full amount, regardless of any potentially offsetting benefits that flow from the challenged conduct or from subsequent transactions.  *In re Restasis Antitrust Litig.*, 335 F.R.D. at 29 ("antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset") (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)).

Google's expert, Dr. Leonard, concedes that where direct purchasers are seeking overcharges, any potential offsetting benefits of the challenged conduct are irrelevant.  *See* Leonard Dep. 137:13-21 ████████████████████████████████

---

[83] *See supra* n.64.
[84] *See also DDAVP*, 585 F.3d at 689 ("overcharges are the difference between the defendants' supra-competitive price and the competitive price"); *In re Restasis Antitrust Litig*, 335 F.R.D. at 30-31; Leonard Dep. 187:13-188:3.

████████████████████████████████████████████.[85]  Dr. Leonard's attempt to inject what he perceives to be individualized issues fails because the factors he cites are irrelevant as a matter of law.  First, he uses the wrong measure of injury—lost profits or net economic harm—rather than the correct measure of overcharges.[86]  Second, he opines that assessing injury requires evaluating the degree to which Publishers "pass through" the overcharge to advertisers, Leonard Rpt. ¶¶24, 216, but offsets for passthroughs are "legally impermissible."[87]  Third, he asserts that individualized inquiries are necessary to evaluate whether the challenged conduct benefitted some Class members by purportedly reducing the price that Google charged for ad servers, increasing their ad impression sales volume, raising their ad sales prices, improving ad quality, and reducing the prices/fees some of them pay when using Google's tools to buy ad impressions.  Leonard Rpt. ¶¶15, 23, 197, 222.  But all of those purported offsetting benefits are legally irrelevant—including increased sales volume,[88] increased profitability,[89] and supposed

---

[85] *See* Gregory K. Leonard, *The Illinois Brick Damages Edifice: Demolition or Deconstruction?*, 84 Antitrust L.J. 315, 337 (2022) ("*Illinois Brick Damages Edifice*") ("the incidence of an overcharge is sufficient to establish standing and, relatedly, antitrust injury for a direct purchaser"); Leonard & Haider, *Proving Antitrust Damages*, at 276 (in exclusionary conduct cases, direct purchasers may recover "the amount of any overcharge attributable to the unlawful conduct"); Leonard Dep. 146:18-147:7.

[86] Leonard Dep. 160:5-161:10.  Dr. Leonard's error may be intended to obfuscate the relative simplicity of proof for overcharge injury.  Leonard Dep. 146:18-147:7 ████████████████████████████████████████ ████.

[87] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 314-15 (E.D.N.Y. 2022); *see also Keurig II*, 2025 WL 354671, at *36; Leonard, *Illinois Brick Damages Edifice* at 327 n.37 (direct purchaser overcharge damages not adjusted for "pass-on").

[88] *See Keurig II*, 2025 WL 354671, at *37-38 (rejecting defendants' assertion "increased sales [due to the challenged conduct] must be offset against damages"); *US Airways v. Sabre Holdings Corp.*, 2022 WL 874945, at *3 (S.D.N.Y. Mar. 24, 2022) (plaintiffs may claim damages from "overcharges for [purchases] that would not have occurred in the but-for world"); *In re Buspirone Pat. Litig.*, 210 F.R.D. 43, 60 (S.D.N.Y. 2002) (same); *see also* Leonard, *Illinois Brick Damages Edifice* at 327 n.37 (direct purchaser overcharge damages not adjusted for "quantity effects").

[89] Increased profits from the challenged conduct need not be offset.  *See In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 2693713, at *6 (S.D.N.Y. June 21, 2017) ("in an action brought by a direct purchaser of goods sold at an increased price as a result of anticompetitive conduct, the proper measure of damages is the full amount of the overcharge, and the purchaser's actual lost profit is generally irrelevant"); *In re Payment Card*, 638 F. Supp. 3d at 315 (argument that "lost sales and profits should be 'offset' against" overcharge damages is "legally impermissible"; *see also In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369 (D. Mass. 2004); Leonard, *Illinois Brick Damages Edifice* at 333 ("overcharges do not, as a general matter, align with a direct purchaser's economic losses (i.e., its lost profits)").

benefits when Class members are using Google's advertiser tools on different transactions.[90] The legal standards applicable to Dr. Leonard's purported benefits, including their relevance, raise common questions of law that will be resolved on a class-wide basis.

In any event, Prof. Elhauge examined each of the purported benefits suggested by Dr. Leonard and demonstrated that the challenged conduct did not economically benefit any Class member. *See* Elhauge Reb. Rpt. ¶¶307, 384, 392, 399-402, 411, 453-54, 458, 480-87, 502, 575, 694-96, 699; 701; Elhauge Dep. 186:14-187:25. And Judge Brinkema likewise considered and rejected the existence of many of these purported benefits. *See* EDVA Op. *44-47. Moreover, most if not all of Dr. Leonard's assertions were based on the unsupported premise that these benefits would not exist in the but-for world. Leonard Rpt. ¶¶69, 89, 110, 149. As Prof. Elhauge explained, the challenged conduct is not the existence of certain product features but rather the exclusion of rivals. Elhauge Reb. Rpt. ¶¶458, 470, 482, 502, 575, 694, 699.[91] There is no basis to assume that in a but-for word where Google did not exclude rivals, certain beneficial product features would not exist, that Google would increase prices for ad servers, or that Class members would receive less (as opposed to more) for their ad impressions. *See, e.g.*, Elhauge Reb. Rpt. ¶¶388, 392, 399-402; 695-699; Elhauge Rpt. ¶411. Notwithstanding the eventual outcome of these merits disputes, they are questions of fact that are common to all Class members and will be resolved on a class-wide basis.

**2. Standard methods are capable of computing damages to each class.**

The "use of an aggregate model to estimate damages is well established in this Circuit; it

---

[90] *See In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *19 (rejecting offsets that "do not directly relate to the transactions at issue"); *see also Moehrl*, 2023 WL 2683199, at *18-19 (same); *Burnett v. Nat'l Assoc'n of Realtors*, 2022 WL 1203100, at *14 (W.D. Mo. Apr. 22, 2022) (same); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 685 (N.D. Ga. 2016) (same).

[91] *See, e.g.*, EDVA Op. *45 (finding that publishers did not benefit from Dynamic Allocation's "addition of AdX as a new source advertiser demand" because "the anticompetitive aspect of Dynamic Allocation was First Look, *i.e.*, Google's preferencing AdX over non-Google ad exchanges within DFP").

is implied by the very existence of the class action mechanism." *In re Namenda Indirect Purchaser Antitrust Litig.*, 2022 WL 4298767, at *9 (S.D.N.Y. Sept. 19, 2022); *see Oliver v. Am. Express Co.*, 2024 WL 100848, at *10 (E.D.N.Y. Jan. 9, 2024) ("[I]it is well-established that plaintiffs can rely on an aggregated class-wide calculation of damages."). Given that Google created the uncertainty with its misconduct, damages calculations "need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "All that matters is that the questions of law and fact relevant to determining damages are common to the class, and that a damages estimate roughly reflect[s] the aggregate amount owed to class members." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 551-52 (S.D.N.Y. 2021) (alteration in original) (quoting *Seijas v. Republic of Argentina*, 606 F.3d 53, 58-59 (2d Cir. 2010)).

Plaintiffs provide a reliable common method for establishing aggregate damages to both Classes. For the AdX Class, Prof. Elhauge uses his yardstick of ▌ as a basis for estimating the but-for take rates for each Class member on each transaction.



Elhauge Rpt. ¶455; Elhauge Reb. Rpt. ¶765 & n.1918.

Elhauge Rpt. ¶455; Elhauge Reb. Rpt. ¶765.

Elhauge Reb. Rpt. ¶764.

████████████████████████ Elhauge Rpt. ¶457, ████████████████████

████████ , Elhauge Reb. Rpt. ¶761.[92]

### 3. The superiority requirement is satisfied.

For this overcharge case, a class action is superior to individual actions. Only a few members of each Class would have sufficiently large damages to justify their bringing individual actions, and if some chose to litigate, the multiplicity of individual suits presenting the same evidence would be an inefficient use of judicial resources.[93] The practical alternatives for most Class members would be to abandon the case. "In such circumstances, the class action device is frequently superior to individual actions." *Seijas*, 606 F.3d at 58. To the extent Google identifies any hypothetical problems with case management, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobras Sec.*, 862 F.3d at 268.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant the Motion to certify the AdX Publisher Class and the AdSense Publisher Class, appoint the Class representatives, and appoint Class Counsel.

---

[92] ████████████████████████████████████████████ Elhauge Reb. Rpt ¶750 & Tbl. 13.

[93] *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 220 ("Class treatment is appropriate in such 'negative value cases,' in which each class members' interest in the litigation is less than the cost to maintain an individual action."); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *23 ("Where individual class members' possible recoveries are so small that no other practical method of adjudication exists, superiority is often satisfied.").

Dated: May 2, 2025                              Respectfully submitted,

                                               David Boies
                                               dboies@bsfllp.com
                                               **BOIES SCHILLER FLEXNER LLP**
                                               333 Main Street
                                               Armonk, NY 10504
                                               Telephone: (914) 749-8200

                                               *Lead Counsel for the Publisher Class*

                                               */s/ Philip C. Korologos*
                                               Philip C. Korologos
                                               pkorologos@bsfllp.com
                                               Robert J. Dwyer
                                               rdwyer@bsfllp.com
                                               James Keyte
                                               jkeyte@bsfllp.com
                                               Luke Williams
                                               lwilliams@bsfllp.com
                                               **BOIES SCHILLER FLEXNER LLP**
                                               55 Hudson Yards, 20th Floor
                                               New York, NY 10001
                                               Telephone: (212) 446-2300

                                               Mark C. Mao
                                               mmao@bsfllp.com
                                               Sean P. Rodriguez
                                               srodriguez@bsfllp.com
                                               **BOIES SCHILLER FLEXNER LLP**
                                               44 Montgomery Street, 41st Floor
                                               San Francisco, CA 94104
                                               Telephone: (415) 293-6820

                                               Sabria A. McElroy
                                               smcelroy@bsfllp.com
                                               **BOIES SCHILLER FLEXNER LLP**
                                               401 E. Las Olas Blvd., Suite 1200
                                               Fort Lauderdale, FL 33301
                                               Telephone: (954) 377-4216

36

Izaak Earnhardt
iearnhardt@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave NW, 11th Floor
Washington, DC 2005
Telephone: (202) 237-2727

George A. Zelcs
gzelcs@koreintillery.com
Randall P. Ewing
rewing@koreintillery.com
Marc A. Wallenstein
mwallenstein@koreintillery.com
Ryan A. Cortazar
rcortazar@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
stillery@koreintillery.com
Michael E. Klenov
mklenov@koreintillery.com
Carol L. O'Keefe
cokeefe@koreintillery.com
Andrew Ellis
aellis@koreintillery.com
Ian Moody
imoody@koreintillery.com
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Fax: (314) 241-3525

Eric L. Cramer
ecramer@bm.net
Michael C. Dell'Angelo
mdellangelo@bm.net
Caitlin G. Coslett
ccoslett@bm.net
Patrick F. Madden
pmadden@bm.net
Jeremy Gradwohl
jgradwohl@bm.net
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Robert E. Litan
rlitan@bm.net
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

*Interim Co-Lead Counsel for the Publisher
Classes*